**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
PROJECT VERITAS and PROJECT      :
VERITAS ACTION FUND,      :    Civil Action No. _____
     :
     :
              Plaintiffs,      :    **COMPLAINT AND DEMAND FOR**
     :    **JURY TRIAL**
        -against-      :
     :
JAMES O'KEEFE, TRANSPARENCY 1,      :
LLC d/b/a O'KEEFE MEDIA GROUP, RC      :
MAXWELL, and ANTHONY      :
IATROPOULOS,      :
     :
              Defendants.      :
--------------------------------------------------------x

       Being known as the founder of an organization does not entitle that person to run amok

and put his own interests ahead of that organization. Defendant James O'Keefe ("O'Keefe") failed

in his duties to Plaintiff, Project Veritas, causing it serious and significant damage. O'Keefe must

be held accountable, as must the organization O'Keefe created, Defendant Transparency 1, LLC

d/b/a O'Keefe Media Group ("OMG") for suborning his violations. Similarly, two individuals

formerly affiliated with Plaintiffs, Defendants RC Maxwell ("Maxwell") and Anthony Iatropoulos

("Iatropoulos") breached their own contracts with Plaintiffs for the benefit of OMG. Plaintiffs

Project Veritas and Project Veritas Action Fund (together "Project Veritas" or "Plaintiffs") by their

attorneys, allege as follows:

**I.       PARTIES**

       1.       Plaintiff Project Veritas is a non-stock corporation organized under the laws of the

Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York. It is

registered in New York as a foreign not-for-profit corporation.

2. Plaintiff Project Veritas Action Fund is a non-stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York. It is registered in New York as a foreign not-for-profit corporation.

3. Defendant James O'Keefe is a natural person and a citizen of the State of New York. O'Keefe is a resident of Westchester County, New York.

4. Defendant Transparency 1, LLC d/b/a O'Keefe Media Group is a Delaware Limited Liability Company with a principal place of business in Mamaroneck, New York. Its sole known member is O'Keefe.

5. Defendant RC Maxwell is a natural person and a citizen of the State of Arizona.

6. Defendant Anthony Iatropoulos is a natural person and a citizen of the State of Michigan.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) as this is an action for, *inter alia*, misappropriation of a trade secret and is, therefore, a federal question under 18 U.S.C. § 1836, *et seq.* The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.SC. § 1367.

8. This Court has personal jurisdiction over O'Keefe and OMG because they reside in, do business in, and are citizens of the State of New York, and the courts thereof have jurisdiction over him per CPLR § 301. O'Keefe otherwise consented to the jurisdiction of this Court pursuant to Paragraph 28(B) of his At-Will Employment Agreement of June 22, 2010, as amended on or about September 20, 2022 ("Employment Agreement" or "EA"), a true and correct copy of which appears at Exhibit A, as redacted, attached hereto and incorporated herein by reference. Iatropoulos consented to the jurisdiction of this Court pursuant to Paragraph 25 of his At-Will Employment Agreement of June 6, 2022, as amended on or about September 4, 2022

("Iatropoulos Agreement") a true and correct copy of which appears at Exhibit B, as redacted, attached hereto and incorporated herein by reference. Maxwell consented to the jurisdiction of this Court pursuant to Paragraph 27 of his At-Will Employment Agreement of November 1, 2021, ("Maxwell Agreement") a true and correct copy of which appears at Exhibit C, as redacted, attached hereto and incorporated herein by reference.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) as O'Keefe and OMG reside in this District and a substantial part of the events and omissions giving rise to the claims raised herein occurred in this District. O'Keefe otherwise consented to venue in this Court pursuant to Paragraph 28(B) of the Employment Agreement. Similarly, Iatropoulos and Maxwell consented to venue in this Court pursuant to paragraphs 25 and 27 of their respective agreements.

10.     Pursuant to Paragraph 23(B) of the Employment Agreement, Project Veritas may proceed in this Court, and is exempt from arbitration, as this is an action to seek preliminary and final injunctive relief to enforce the restrictions and obligations of the Employment Agreement and to restrain actual breach of those restricts and obligations, and it may, therefore, pursue in this Court "any and all additional remedies available at law," notwithstanding the arbitration provisions of the Employment Agreement.  The materially identical provision appears at Paragraphs 25 and 29 of the Iatropoulos Agreement and Maxwell Agreement, respectively.

## III.    FACTS GIVING RISE TO COMPLAINT

11.     Project Veritas and Project Veritas Action Fund are 501(c)(3) and 501(c)(4), respectively, not for profit corporations formed under Virginia law with headquarters in Westchester County, New York.

12.     Both organizations engage in investigations and reporting aimed at exposing corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions.

13.     As not for profit organizations, Plaintiffs rely on donations from private donors to support their activities.  Plaintiffs maintain a database of information about their donors, including the donors' identities and contact information.  Plaintiffs keep that donor information confidential and protect it from disclosure to the public by, among other things: (1) restricting access to the information; (2) storing it on a password protected computer system; and (3) requiring employees with access to the information to acknowledge its confidentiality and agree not to disclose it .

14.     James O'Keefe founded Project Veritas in 2010.  He was, through his separation, the Chief Executive Officer of Project Veritas, President of Project Veritas Action Fund, and a member of the Board of Directors of both organizations, though he was suspended (yet not removed) on February 6, 2023.

**A.  The Employment Agreement**

15.     On June 22, 2010, O'Keefe entered into the Employment Agreement with Plaintiffs, with the operative version being the Employment Agreement as amended on September 20, 2022, which O'Keefe and Project Veritas signed on September 30, 2022.

16.     As part of the Employment Agreement, O'Keefe agreed to certain terms and conditions, both during and after the term of his employment.

17.     In Paragraph 1(B) of the Employment Agreement, O'Keefe agreed that he, identified as "Employee" thereunder, "shall devote Employee's full working time and attention and best efforts to the performance of Employee's job."

18.     In Paragraph 10(A) of the Employment Agreement, O'Keefe agreed that:

Project Veritas shall be the sole owner of any and all rights in and to the results and proceeds of Employee's services to Project Veritas, and it shall have the sole right to use, exploit, advertise and exhibit the foregoing in any and all media, whether now known or hereafter devised throughout the world, in all languages, as Project Veritas in its sole and unfettered discretion shall determine. Employee agrees that anything created by Employee in connection with the services Employee provides to Project Veritas shall belong exclusively to Project Veritas, and not to Employee, including, but not limited to, any and all video, film, photographs, negatives, video footage, images, renderings, audio video works, audio, recordings, multimedia works, music, reproductions, performances, digital media works, still images and/or other images or footage, documents, papers, writings (both published and unpublished), written work product (including drafts), designs, inventions, patents, trademarks, copyrightable materials, ideas, intellectual property, trade secrets, creative concepts, including all compilations, collections, or other work product created within the scope of or in the course of Employee's employment with Project Veritas and Employee's performance pursuant to this Agreement, and derivatives thereof, and the like ("Work(s)").

19. In the Employment Agreement, O'Keefe acknowledged that certain information is confidential.  (EA ¶ 11, identifying "Confidential Information").  O'Keefe agreed to keep all Confidential Information in the "highest confidence" and not to disclose that Confidential Information without Project Veritas's prior written consent.  (EA ¶ 11.B).  "Confidential Information" includes, in relevant part, information regarding Project Veritas's projects, potential projects, organizational practices, and donors and potential donors.  (EA ¶ 11.A).

20. O'Keefe's obligation to maintain Plaintiffs' Confidential Information in the highest confidence continues beyond his employment (EA ¶ 11.D), to wit:

Employee expressly agrees that the terms of this paragraph shall survive after the conclusion of Employee's employment with Project Veritas and/or the expiration or termination of this Agreement, and that after leaving employment with Project Veritas, in addition to all other obligations hereunder, Employee will not disclose to any person or entity, or seek from any current or former Project Veritas employee, contractor or vendor, any Confidential Information.

21. The Employment Agreement also contains a non-disparagement clause, pursuant to which O'Keefe warranted and agreed that:

> during and after Employee's employment, Employee shall not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about Project Veritas, or any of its directors, officers, employees, contractors, donors, agents, attorneys or representatives, Employee's employment by Project Veritas, the subject matter of this Agreement, any Work(s) or News Stories, or the services rendered by Employee or others in connection with any Work(s) or News Stories."

(EA ¶ 12).

22.     The Employment Agreement contains a liquidated damages provision in which O'Keefe acknowledged that if he breached his non-disclosure and/or non-disparagement obligations, Project Veritas would recover liquidated damages of $100,000 or actual damages, whichever is greater, per each such breach.  (EA ¶ 13).

23.     The Employment Agreement also prohibits O'Keefe from engaging in outside activities that would interfere with or hinder his work for Project Veritas.   Specifically, in paragraph 15 (entitled "Prohibited Outside Activities") O'Keefe agreed that he would not:

> engage in any activity, whether as an employee, contractor, volunteer or in any other capacity for any person or entity other than Project Veritas that will or is likely to (i) hinder, interfere with, or prevent Employee from devoting Employee's full time and attention and best efforts to Employee's work for Project Veritas; (ii) hinder, interfere with, or prevent Employee from fully and properly performing Employee's job responsibilities as assigned to Employee from time to time by Project Veritas; or (iii) give rise to an actual conflict of interest or the appearance of a conflict of interest with Project Veritas and/or its mission or work (any such activity, "Prohibited Outside Activity") without the express written approval by the CEO of Project Veritas.

(EA ¶ 15).

24.     The Employment Agreement also prohibits O'Keefe from soliciting two categories of people: donors and employees/contractors of Project Veritas.  (EA ¶¶ 16 & 17).

25.     First, O'Keefe agreed that during (and for one year after) his employment he:

> will not, directly or indirectly, individually or in any other capacity solicit, offer employment, employ, or interfere with any Project Veritas employee or contractor, or other person or entity that was a Project Veritas employee or contractor within the twelve (12) months immediately prior to the

termination of Employee's employment with Project Veritas, to cease working for or providing services to Project Veritas.

(EA ¶ 16).

26.     The Employment Agreement also prohibits O'Keefe, during and after his employment, from contacting, soliciting or otherwise communicating with "any person or entity that is a donor or prospective donor to Project Veritas whom Employee learns of or with whom Employee otherwise comes into contact as a result of Employee's employment by, or work for Project Veritas." (EA ¶ 17).

27.     The Employment Agreement also requires that, upon separation of employment, that he:

> shall return any and all Project Veritas property of any kind, including, but not limited to, any computers and other electronic devices, recording and communication devices, documents and information (whether in hard copy or electronic and not keep any copies), software or applications, and any work product (whether completed or incomplete) in the same condition in which it was received by Employee, reasonable wear and tear excepted.

(EA ¶ 22).

28.     The Agreement incorporates by reference Project Veritas's Employee Handbook (the "Handbook"), and company policies.   (EA ¶ 27).   The Handbook identifies Plaintiffs' Standards of Conduct, Work Rules and Conduct and Prohibited Conduct.   These sections prohibit, among other things, being threatening, intimidating or disrespectful to coworkers.

**B. Plaintiffs Suspend O'Keefe Pending the Completion of Investigations into His Alleged Misconduct**

29.     During O'Keefe's employment, the Board became aware of serious allegations by Project Veritas employees about incredibly troubling workplace and financial misconduct by O'Keefe.

30.     For instance, Project Veritas's Board of Directors ("Board") heard allegations that O'Keefe routinely behaved unprofessionally during team meetings, including by screaming at coworkers and belittling them and their contributions to Project Veritas.

31.     O'Keefe was alleged to have particularly targeted female employees with mean-spirited comments about their lack of contributions to the companies and inappropriate comments about personal situations like pregnancies.

32.     Employees alleged that O'Keefe had strained relationships with several donors because he was routinely late for meetings and rude at VIP events designed to give donors extra access to O'Keefe.

33.     O'Keefe also routinely was late for work meetings or canceled them at the last minute.  According to the allegations, O'Keefe exhibited a general lack of respect for employees and his team.

34.     Other employees alleged that they personally had observed obscene messages between O'Keefe and various women on social media applications when accessing O'Keefe's phone for work-related matters.

35.     The Board also learned of O'Keefe's alleged financial misconduct.

36.     Multiple employees alleged that O'Keefe used Project Veritas employees to run personal errands for him.  These errands included picking up O'Keefe's laundry, cleaning his boat, repairing his boat, and doing other similar errands for O'Keefe.

37.     O'Keefe also allegedly used his Project Veritas credit card for some personal expenses, and directed Project Veritas funds to be used for lavish expenses and, in some instances, his personal benefit. Examples of these allegations included:

     a.    Directing the organization to pay more than $10,000 for a helicopter flight from New York to Maine without a clear benefit to Project Veritas;

b.   Directing the organization to pay for first-class air travel for O'Keefe even where the flight did not satisfy the organization's policy for approving first-class flights;

c.   Using his Project Veritas credit card for expensive hotel rooms and suites at luxury hotels without clear business purpose, when other employees on the same trips were required to stay in budget accommodations;

d.   Directing the organization to pay for expenses associated with large organizational awareness events like the Project Veritas Experience, without engaging in any analysis to help the organization understand the potential return on investment or capitalize on the connections made through these events; and

e.   Causing the organization to pay for his regular use of private car services ("black cars"), even to go relatively short distances in and around Manhattan and then wait outside of restaurants for hours, at a total expense of more than $150,000 over the past 18 months.

38.   O'Keefe took it upon himself, without authority, on February 2, 2023, to terminate the employment of Project Veritas's Chief Financial Officer, and O'Keefe admitted that he was the one who did the terminating.  *See* https://www.youtube.com/watch?v=1JPxqKjYG9Q.

39.   The Board took immediate action in response to these troubling allegations.

40.   The Board created a special audit committee to investigate the allegations and retained outside counsel to help conduct that investigation.

41.   On February 6, 2023, by majority vote, the Board placed O'Keefe on paid leave, suspending his authority to hire and fire staff for 180 days, requiring him to surrender his company credit card, and restricting his access to proprietary information, including donor lists, but explicitly indicated that he "remains as CEO and a member of the Board".

42.   After authorization to use the card was revoked on February 6, 2023, O'Keefe continued to use the Project Veritas credit card for personal expenses, in the amount of approximately $19,000.

43.     O'Keefe participated in the February 6, 2023, meeting, where employee testimony was heard.

44.     O'Keefe refused to participate in a February 10, 2023, meeting at which financial findings were presented to the Board, and O'Keefe was suspended as CEO and from the Board (but not removed as a member thereof) indefinitely pending the resolution of the Board's investigation into the allegations of O'Keefe's misconduct.

45.     On February 15, 2023, the Project Veritas Executive Director and Board put out a statement explicitly stating that "James [O'Keefe] has not been removed from Project Veritas." The statement noted that the Board members "all love James [O'Keefe].  They are volunteers hand-picked by James [O'Keefe]."  And, in that statement, it was explicitly denied that the actions regarding O'Keefe related to Pfizer, stating we are still, in no way, and will never be, 'Brought to you by Pfizer.'"

46.     O'Keefe sent an email on February 16, 2023, outlining terms for his return, including resignation of all of the Board and most of the Project Veritas officers, and vesting him with unilateral control over Plaintiffs.  Otherwise, he would not "return to the employment of" Plaintiffs. See https://www.youtube.com/watch?v=1JPxqKjYG9Q.

47.     The Board did not terminate O'Keefe's employment, but rather intended to reinstate him with appropriate safeguards.

48.     O'Keefe was not formally removed from the Board until April 24, 2023.

49.     O'Keefe was not formally terminated from his employment by Plaintiffs until May 15, 2023.

**C.  O'Keefe Breaches his Employment Agreement**

50.     In response to his suspension, O'Keefe immediately began breaching his obligations under and the restrictive covenants of the Employment Agreement.

51.     On February 17, 2023, O'Keefe formed OMG.  OMG notes on its website that it is located in Mamaroneck, New York, which is where O'Keefe lives and where Project Veritas is headquartered.

52.      According to its website, OMG is a media organization managed by O'Keefe with substantially the same mission and structure as Project Veritas.  OMG is a company whose website describes itself as having "an army of journalists" and is building "an army of investigators and exposers along with the most elite journalists in the world."   *See* https://okeefemediagr oup.com/mission/.

53.     The OMG website even refers to "never be[ing] shut down again" because O'Keefe owns it. *Id.*

54.     Forming and operating OMG was in violation of the Employment Agreement's "Prohibited Outside Activities" provision.

55.     O'Keefe made multiple public media appearances in which he falsely stated that he was terminated from Project Veritas including, but not limited to, the programs set forth below.

56.     On March 15, 2023, O'Keefe appeared on *The Charlie Kirk Show* and falsely implied that his separation from Plaintiffs was part of the "aftermath" of the Pfizer story and falsely stated that he was "thrown out" of Project Veritas.  *See* https://rumble.com/v2db8bo-breaking-james-okeefe-launches-okeefe-media-group-after-removal-from-projec.html.

57.     The appearance on the foregoing program was by O'Keefe for the benefit of OMG and as an agent thereof.

58.     On March 15, 2023, O'Keefe appeared on *Steve Bannon's War Room* and falsely stated that he had been "removed" from Project Veritas. *See* https://rumble.com/v2db9rw-james-okeefe-the-vision-of-omg-is-to-put-cameras-in-the-hands-of-thousands-.html

59.     The appearance on the foregoing program was by O'Keefe for the benefit of OMG and as an agent thereof.

60.     On March 15, 2023, O'Keefe appeared on *Under the Skin with Russell Brand*, where he falsely stated that he had been "thrown out of [Project Veritas]". *See* https://rumble.com/v2d9cz8-oh-sht-russians-down-us-droneww3-091-stay-free-with-russell-brand.html?fbclid=IwAR1d8Ot5H_QV5ofmM6Y06UmhTQK1JC1Llrj10NFv34mtwFZmWAydBU8W5PE.

61.     The appearance on the foregoing program was by O'Keefe for the benefit of OMG and as an agent thereof.

62.     On March 15, 2023, O'Keefe appeared on *The Mark Levin Show*, where he falsely said he was "ousted from [Project Veritas] by the Board of Directors". *See* https://www.youtube.com/watch?v=U9nFjB3TLno

63.     The appearance on the foregoing program was by O'Keefe for the benefit of OMG and as an agent thereof.

64.     On March 19, 2023, O'Keefe appeared on *Human Events* and *The Ben Shapiro Show*, where he falsely stated that Project Veritas had been "stolen" from him and that he had been "thrown out" from Project Veritas, respectively. *See* https://rumble.com/v2dmsso-sunday-special-the-truth-about-james-okeefe.html and https://www.youtube.com/watch?v=2vy4ZnLHgMw.

65.     The appearances on the foregoing programs were by O'Keefe for the benefit of OMG and as an agent thereof.

66.     On May 3, 2023, O'Keefe appeared on *The Megyn Kelly Show* and falsely stated that he was "terminated" from employment with Project Veritas and again falsely implied his

separation was related to the Pfizer story. *See* https://www.youtube.com/watch?v=rXG14AvXq50.

67.    The appearance on the foregoing program was by O'Keefe for the benefit of OMG and as an agent thereof.

68.    These statements—which Mr. O'Keefe knows to be false—are disparaging of Plaintiffs, were intended to discredit Project Veritas' Board of Directors, and are all breaches of the Employment Agreement.

69.    O'Keefe also disparaged the Board by falsely insinuating that the pharmaceutical company Pfizer, Inc., orchestrated O'Keefe's suspension or that it was somehow done to mollify Pfizer, a company about which a video had been released regarding potentially disturbing actions taken by Pfizer vis a vis the coronavirus. *See* https://www.nationalreview.com/news/founder-james-okeefe-claims-project-veritas-ouster-linked-to-pfizer-sting-in-farewell-to-staff/ and https://www.youtube.com/watch?v=1JPxqKjYG9Q. The Pfizer video release was on January 25, 2023, nearly two weeks prior to the complaints prompting the investigation into O'Keefe, and was unrelated.

70.    Such statement was by O'Keefe for the benefit of OMG and as an agent thereof.

71.    O'Keefe misappropriated Project Veritas confidential information by taking donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas, rebranded as OMG material.

72.    After his suspension, O'Keefe engaged in a campaign to disparage Project Veritas to its donors and solicit them to donate to OMG.

73.    Such campaign was by O'Keefe for the benefit of OMG and as an agent thereof.

74.     Similarly, O'Keefe solicited numerous Project Veritas employees and contractors to attempt to poach them to come work for him at OMG.

75.     Such solicitation was by O'Keefe for the benefit of OMG and as an agent thereof.

76.     On February 20, 2023, O'Keefe recorded and published a video on the Vimeo platform (which has since been removed) announcing he was "packing up [his] personal belongings and [he was] intending to start anew", without resigning from his employment or board membership, and generally soliciting current employees of Plaintiffs to work with him, stating "So, our mission continues on. I'm not done", and "The mission will perhaps take on a new name, and it may no longer be called Veritas, Project Veritas. I will need a bunch of people around me, and I'll make sure, I'll make sure you know how to find me." *See* https://www.nationalreview.com/news/founder-james-okeefe-claims-project-veritas-ouster-linked-to-pfizer-sting-in-farewell-to-staff/ and https://www.youtube.com/watch?v=1JPxqKjYG9Q.

77.     Such publication was by O'Keefe for the benefit of OMG and as an agent thereof.

78.     O'Keefe has and continues to solicit Project Veritas's donors, employees and contractors, in direct violation of his Employment Agreement, for and on behalf of OMG.

79.     As an example of donor solicitation in violation of his Employment Agreement, on or about May 25, 2023, O'Keefe, from his OMG e-mail address, sent a form solicitation e-mail to at least two Project Veritas donors who are not OMG donors, stating "Hey there, I know you've been a supporter of my work in the last year" and linking to the OMG webpage that solicits monetary "subscriptions".

80.     The only way O'Keefe and OMG had those donors' contact information was because it was part of a confidential list kept by Project Veritas.

81.     O'Keefe also has misappropriated Project Veritas property by taking Project Veritas's equipment, donor lists and intellectual property for his own use with OMG.

82.     Indeed, several Project Veritas staff already have joined OMG including RC Maxwell and Anthony Iatropoulos, who appear to be using Project Veritas property in the course of their employment with OMG.

83.     The Iatropoulos Agreement contains the same material terms as O'Keefe's Employment Agreement as identified herein, though differently numbered, to wit:  the terms identified in Paragraphs 1(b), 10(A), 11, 2, 13, 15, 16, 17, 21, 22 & 23 of the Employment Agreement appear at Paragraphs 2, 11, 12, 13, 14, 16, 17, 18, 23, 24 & 25 of the Iatropoulos Agreement respectively.

84.     The Maxwell Agreement contains the same material terms as O'Keefe's Employment Agreement as identified herein, though differently numbered, to wit:  the terms identified in Paragraphs 1(b), 10(A), 11, 2, 13, 15, 16, 17, 21, 22 & 23 of the Employment Agreement appear at Paragraphs 2, 11, 12, 28, 14 (A & D), 15, 16, 23, & (26 & 29) of the Maxwell Agreement respectively, with the exception that liquidated damages for Maxwell's breaches are calculated at $10,000 per breach.

85.     The Employment Agreement states that if O'Keefe breaches or threatens to breach the Employment Agreement, Project Veritas can seek preliminary and permanent injunctive relief in court.  (EA ¶ 23.B).

86.     O'Keefe acknowledged that such a breach or threatened breach "will result in irreparable harm to Project Veritas."  (*Id.*)  Plaintiffs will continue to be irreparably harmed unless the Court orders O'Keefe to comply with the terms of his Employment Agreement.

87.     The Employment Agreement also provides that if Project Veritas obtains an injunction, O'Keefe "shall then immediately become liable to pay the attorneys' fees and costs incurred by Project Veritas to obtain the injunction." (*Id.*)

88.     If this Court does not preliminarily enjoin O'Keefe and OMG from soliciting Project Veritas's donors and employees, they may have solicited them all by the time Project Veritas wins a judgment prohibiting them from such solicitation.

## IV.     CAUSES OF ACTION

COUNT I
BREACH OF CONTRACT

*(Plaintiffs vs. O'Keefe)*

89.     Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

90.     To state a claim for a breach of contract, a plaintiff must show "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010).

91.     The Employment Agreement is a valid and binding contract between Project Veritas and O'Keefe.

92.     Project Veritas Action Fund is an intended beneficiary of the Employment Agreement per Employment Agreement ¶ 21.

93.     As set forth above, O'Keefe was required under the Employment Agreement ¶ 1.B to devote his full working time and attention and best efforts to the performance of his job.

94.     Although O'Keefe was suspended, the formation of OMG, to compete with Project Veritas, violated requirements of ¶ 1.B.

95.     As set forth above, O'Keefe agreed in the Employment Agreement ¶ 10.A that all of the work and work product derived from O'Keefe's services belonged to Project Veritas.

96.     O'Keefe's use of donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 10.A as he is using property of Project Veritas without authorization.

97.     As set forth above, O'Keefe agreed in the Employment Agreement ¶ 11 that any and all information O'Keefe learned in the course of his employment was confidential.

98.     O'Keefe's use of donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 11 and breaches the confidentiality to which he is obligated.

99.     As set forth above, O'Keefe agreed in the Employment Agreement ¶ 12 that he would not make negative remarks about or disparage Project Veritas and its affiliated persons.

100.    O'Keefe's statements, identified above,  violate ¶ 12 they are negative and disparaging of Project Veritas and its affiliated persons.

101.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 15 that he would not engage in ventures giving rise conflicts of interest with Project Veritas.

102.    O'Keefe's formation and operation of OMG while employed at Project Veritas without express written consent violates ¶ 15 as OMG competes with Plaintiffs and is a direct conflict of interest.

103.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 16 that he would not solicit Project Veritas past and present employees and contractors during and for 12 months after his employment.

104.    O'Keefe violated ¶ 16 by soliciting past and present Project Veritas employees and contractors, beginning February 20, 2023.

105.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 17 that he would not solicit Project Veritas present or prospective donors during and for 12 months after his employment.

106.    O'Keefe violated ¶ 17 by soliciting present and/or prospective donors.

107.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 22 to return Project Veritas property at separation from employment.

108.    Demand was made on May 17, 2023, for O'Keefe to return all of Plaintiffs' property in his possession.

109.    O'Keefe violated ¶ 22 by failing to return donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas.

110.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 27 to abide the Project Veritas handbook and policies.

111.    O'Keefe violated ¶ 27 by maintaining a toxic workplace culture and engaging in the behavior identified in a February 6, 2023, letter from sixteen Project Veritas employees.

112.    As a direct and proximate result of O'Keefe's foregoing breaches of contract, Plaintiffs have suffered actual damages, which they are entitled to recover from O'Keefe.

113.    As a direct and proximate result of O'Keefe's breaches of ¶¶ 11 & 12 of the Employment Agreement, Plaintiffs are entitled to $100,000 in liquidated damages per breach, which they are entitled to recover from O'Keefe.

114.    As a direct and proximate result of O'Keefe's foregoing breaches of contract, Plaintiffs have been irreparably harmed, and they are entitled to preliminary and permanent

injunctive relief enjoining O'Keefe from: (1) disparaging Plaintiffs in violation of the non-disparagement provision of the Employment Agreement; (2) contacting or soliciting Plaintiffs' donors in violation of the non-solicitation of donors provision of the Employment Agreement; (3) contacting or soliciting Plaintiffs' employees or contractors in violation of the Agreement's non-solicitation of employees provision; (4) obtaining, using or disclosing any of Plaintiffs' Confidential Information (as defined in the Employment Agreement) in violation of the Employment Agreement's provisions regarding Confidential Information; and (5) keeping and failing to return any and all property belonging to Plaintiffs, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

115.    Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins O'Keefe's misconduct.   First, O'Keefe acknowledged in the Employment Agreement that his breaches of his obligations and these restrictive covenants caused irreparable harm to Plaintiffs.   Second, if O'Keefe is not enjoined Plaintiffs will continue to lose donors, employees and suffer reputational harm and injury to its goodwill.

116.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if O'Keefe is not enjoined.  On the other hand, O'Keefe would suffer no prejudice under the proposed injunction.

117.    Finally, an immediate injunction is necessary because without it any final injunction Plaintiffs win in the future will be rendered ineffectual or meaningless.  If O'Keefe is not enjoined from soliciting Plaintiffs' donors and employees and misappropriating its Confidential Information, he will have solicited all or enough donors and employees and misappropriated enough Confidential Information such that a final award enjoining him from continuing that conduct will be meaningless.

COUNT II
VIOLATION OF DEFEND TRADE SECRETS ACT

*(Plaintiffs vs. O'Keefe)*

118.    Plaintiffs repeat and reallege paragraphs 1 through [78] hereof, as if fully set forth herein.

119.    Plaintiffs' Confidential Information, including its donor lists and employee lists, and unaired programming, are "trade secrets" within the meaning of 18 U.S.C. § 1839(3), as Plaintiffs take reasonable measure to keep such information secret, including requiring employees to sign non-disclosure agreements, and has independent economic value, it is not generally known to and not readily ascertainable to others, like O'Keefe and OMG, who can obtain economic value from the disclosure thereof.

120.    Plaintiffs' trade secrets relate to Plaintiffs' services, including investigative journalism and broadcasting, used in and/or intended for use in interstate commerce.

121.    O'Keefe took and failed to return Plaintiffs' donor lists and contact information, equipment, as well as already unreleased investigation publications by Project Veritas all of which are trade secrets.

122.    O'Keefe misappropriated Plaintiffs' said trade secrets as set forth above by converting them to the use of OMG in competition with Plaintiffs.

123.    O'Keefe's misappropriation was willful and malicious for, as having been CEO, he knew what belonged to Plaintiffs and is sufficiently sophisticated that he knew he could not convert it to his own use or for the use of OMG.

124.    As a direct and proximate result of O'Keefe's misappropriation, Plaintiffs suffered actual losses.

125.     As a direct and proximate result of O'Keefe's misappropriation, O'Keefe was unjustly enriched.

## COUNT III
## BREACH OF FIDUCIARY DUTY

*(Plaintiffs vs. O'Keefe)*

126.     Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

127.     As set forth above, prior to his separation, O'Keefe was a member of the Board of Directors of both Plaintiffs, though he was suspended (yet not removed) on February 6, 2023.

128.     "Under New York law, a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995)(citation omitted).

129.     As a director of Plaintiffs, O'Keefe had a duty to serve Plaintiffs "good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. Law § 717(a).

130.     Under the common law, a corporate director has the fiduciary to manage corporate assets in a reasonable way and is liable for any waste or misappropriation of corporate property, and is reflected in N.Y. Bus. Corp. Law § 720. *Superintendent of Ins. v Freedman*, 443 F. Supp. 628, (S.D.N.Y. 1977), aff'd, 594 F.2d 852 (2d Cir. N.Y. 1978).

131.     O'Keefe acknowledged that board members and officers, like himself, have a "duty of care and duty of loyalty to the organization", *i.e.,* to Project Veritas. *See* https://www.youtube.com/watch?v=1JPxqKjYG9Q.

132.    O'Keefe breached his fiduciary duties to Plaintiffs by a) forming OMG while still a member of the boards of directors, b) soliciting employees and/or contractors of Plaintiffs to join OMG; c) soliciting donors of Plaintiffs to donate to OMG, which donations otherwise may have inured to the benefit of Plaintiffs; and d) causing Plaintiffs to make the aforementioned lavish expenses.

133.    As a direct and proximate result of O'Keefe's breaches of fiduciary duty, Plaintiffs suffered monetary damages as well as irreparable harm, which must be enjoined by this Court.

COUNT IV
BREACH OF DUTY OF LOYALTY

*(Plaintiffs vs. O'Keefe)*

134.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

135.    O'Keefe was employed by Plaintiffs through May 15, 2023.

136.    New York Law "requires an employee to exercise the utmost good faith, including a duty of loyalty, toward his employer." *Consolidated Edison Co. v Zebler,* 40 Misc 3d 1230[A], 975 N.Y.S.2d 708 (Sup Ct, NY County 2013).

137.    Under this doctrine, "an employee who acts in any manner inconsistent with his agency or trust and fails to exercise the utmost good faith and loyalty in the performance of his duties is deemed a faithless servant and must account to his principal for secret profits and forfeit his right to compensation." *Mosionzhnik v Chowaiki*, 41 Misc 3d 822, 831, 972 N.Y.S.2d 841 (Sup Ct, NY County 2013)(cleaned up); *accord Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003).

138.    O'Keefe breached his fiduciary duties to Plaintiffs by a) forming OMG while still employed by Plaintiffs, b) soliciting employees and/or contractors of Plaintiffs to join OMG; c)

soliciting donors of Plaintiffs to donate to OMG, which donations otherwise may have inured to the benefit of Plaintiffs; and d) causing Plaintiffs to make the aforementioned lavish expenses.

139.    As a direct and proximate result of O'Keefe's breaches of his duty of loyalty, Plaintiffs suffered monetary damages as well as irreparable harm, which must be enjoined by this Court.

COUNT V
CONVERSION

*(Plaintiffs vs. O'Keefe)*

140.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

141.    Under New York law, "'[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.'" *William Doyle Galleries, Inc. v Stettner*, 167 AD3d 501, 505, 91 NYS3d 13 (1st Dept 2018), quoting *Colavito v New York Organ Donor Network, Inc*., 8 NY3d 43, 49-50 (2006).  "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property[;] and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights" *Colavito*, 8 NY3d at 50 (citations omitted).

142.    O'Keefe took and failed to return donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas all of which are trade secrets, in derogation of Plaintiffs' rights.

143.    O'Keefe converted Plaintiffs' said property to the use of OMG in competition with Plaintiffs.

144.    As a direct and proximate result of O'Keefe's conversion, Plaintiffs suffered actual losses and irreparable harm.

145.    As a direct and proximate result of O'Keefe's conversion, O'Keefe was unjustly enriched.

COUNT VI
REPLEVIN

*(Plaintiffs vs. O'Keefe)*

146.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

147.    Under New York law, "[t]o state a cause of action for replevin, a plaintiff must establish a superior possessory right to property in a defendant's possession." *Reif v Nagy*, 175 A.D.3d 107, 120 (1st Dept. 2019).

148.    O'Keefe took and failed to return Plaintiffs' donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas , all of which are trade secrets, to which Plaintiffs have superior possessory rights.

149.    O'Keefe took and possessed Plaintiffs' said property for the use of OMG in competition with Plaintiffs.

150.    As a direct and proximate result of O'Keefe's taking and possession of Plaintiffs' property, Plaintiffs were deprived of the use and enjoyment of such property and suffered actual losses and irreparable harm.

COUNT VII
INDEMNIFICATION

*(Plaintiffs vs. O'Keefe)*

151.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

152.    Under New York law, "[i]mplied indemnity is restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the

expense of the other. Generally, it is available in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer[.]" *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 690 (1990).

153.    Further, "the key element of a common-law cause of action for indemnification is not a duty running from the indemnitor to the injured party, but rather is 'a separate duty owed the indemnitee by the indemnitor.'" *Raquet v. Braun*, 90 N.Y.2d 177, 183 (1997) (quoting *Mas, supra* at 690).

154.    At all relevant times herein, O'Keefe owed numerous duties to Plaintiffs as a director, officer, and employee thereof.

155.    To the extent Plaintiffs may be subject to investigation and/or action against them on account of actions taken by or the errors or omissions of O'Keefe, Plaintiffs are entitled to indemnity from O'Keefe for costs of defense and/or liability.

COUNT VIII
TORTIOUS INTERFERENCE WITH CONTRACT

*(Plaintiffs vs. OMG)*

156.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

157.    Under New York law, "[t]o recover damages for tortious interference with contract, the plaintiff must prove the existence of a valid contract with a third party, the defendant's knowledge of that contract, the defendant's intentional and improper procurement of a breach of that contract, and damages." *Stuart'S v. Edelman*, 196 A.D.3d 711, 712 (2nd Dep't 2021).

158.    The Employment Agreement is a valid and binding contract between Project Veritas and O'Keefe.

159.    Project Veritas Action Fund is an intended beneficiary of the Employment Agreement.

160.    At all times relevant herein, OMG had knowledge of the Employment Agreement as its managing member and primary officer and agent was O'Keefe, a party to the contract.

161.    As set forth above, O'Keefe was required under the Employment Agreement ¶ 1.B to devote his full working time and attention and best efforts to the performance of his job.

162.    Although O'Keefe was on Paid Time Off, the formation of OMG, to compete with Project Veritas, violated requirements of ¶ 1.B.

163.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 10.A that all of the work and work product derived from O'Keefe's services belonged to Project Veritas.

164.    O'Keefe's use of donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 10.A as he is using property of Project Veritas without authorization.

165.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

166.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 11 that any and all information O'Keefe learned in the course of his employment was confidential.

167.    O'Keefe's use of donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 11 and breaches the confidentiality to which he is obligated.

168.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation and breach.

169.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 12 that he would not make negative remarks about or disparage Project Veritas and its affiliated persons.

170.    O'Keefe's statements, identified above, violate ¶ 12 they are negative and disparaging of Project Veritas and its affiliated persons.

171.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

172.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 15 that he would not engage in ventures giving rise conflicts of interest with Project Veritas.

173.    O'Keefe's formation and operation of OMG while employed at Project Veritas without express written consent violates ¶ 15 as OMG competes with Plaintiffs and is a direct conflict of interest.

174.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

175.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 16 that he would not solicit Project Veritas past and present employees and contractors during and for 12 months after his employment.

176.    O'Keefe violated ¶ 16 by soliciting past and present Project Veritas employees and contractors, beginning February 20, 2023.

177.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

178.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 17 that he would not solicit Project Veritas present or prospective donors during and for 12 months after his employment.

179.    O'Keefe violated ¶ 17 by soliciting present and/or prospective donors.

180.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

181.    As set forth above, O'Keefe agreed in the Employment Agreement ¶ 22 to return Project Veritas property at separation from employment.

182.    Demand was made on May 17, 2023, for O'Keefe to return all of Plaintiffs' property in his possession.

183.    O'Keefe violated ¶ 22 by failing to return donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas.

184.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

185.    As a direct and proximate result of O'Keefe's breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have suffered actual damages, which they are entitled to recover from OMG.

186.    As a direct and proximate result of O'Keefe's breaches of ¶¶ 11 & 12 of the Employment Agreement, intentionally and improperly procured by OMG, Plaintiffs are entitled to $100,000 in liquidated damages per breach, which they are entitled to recover from OMG.

187.    As a direct and proximate result of O'Keefe's foregoing breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have been irreparably harmed, and they are entitled to preliminary and permanent injunctive relief enjoining OMG from: (1) disparaging Plaintiffs, through O'Keefe and/or based on information provided by him, in violation of the non-disparagement provision of the Employment Agreement; (2) contacting or soliciting Plaintiffs' donors in violation of the non-solicitation of donors provision of the Employment Agreement,

through O'Keefe and/or based on information provided by him; (3) contacting or soliciting Plaintiffs' employees or contractors in violation of the Agreement's non-solicitation of employees provision, through O'Keefe and/or based on information provided by him; (4) obtaining, using or disclosing any of Plaintiffs' Confidential Information (as defined in the Employment Agreement) in violation of the Employment Agreement's provisions regarding Confidential Information, through O'Keefe and/or based on information provided by him; and (5) keeping and failing to return any and all property belonging to Plaintiffs, through O'Keefe, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

188.    Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins OMG misconduct.  First, O'Keefe acknowledged in the Employment Agreement that his breaches of his obligations and these restrictive covenants caused irreparable harm to Plaintiffs, and OMG is bound by such acknowledgment.  Second, if OMG is not enjoined Plaintiffs will continue to lose donors, employees and suffer reputational harm and injury to its goodwill.

189.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if OMG is not enjoined.  On the other hand, OMG would suffer no prejudice under the proposed injunction.

190.    Finally, an immediate injunction is necessary because without it any final injunction Plaintiffs win in the future will be rendered ineffectual or meaningless.  If OMG is not enjoined from soliciting Plaintiffs' donors and employees and misappropriating its Confidential Information, OMG will have solicited all or enough donors and employees and misappropriated enough Confidential Information such that a final award enjoining OMG from continuing that conduct will be meaningless.

COUNT IX
BREACH OF CONTRACT

*(Plaintiffs vs. Iatropoulos)*

191.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

192.    To state a claim for a breach of contract, a plaintiff must show "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010).

193.    The Iatropoulos Agreement is a valid and binding contract between Project Veritas and Iatropoulos.

194.    Project Veritas Action Fund is an intended beneficiary of the Iatropoulos Agreement.

195.    As set forth above, Iatropoulos agreed in the Iatropoulos Agreement ¶ 24 to return Project Veritas property at separation from employment.

196.    Demand was made on April 18, 2023, for Iatropoulos to return all of Plaintiffs' property in his possession including, but not limited to a MacBook Air (M1, 2020).

197.    Iatropoulos violated ¶ 24 by failing to return the said equipment.

198.    Iatropoulos claims to have lost the MacBook Air and told Project Veritas he would pay for it, but he has not done so and ceased all communications.  Thus, his representations lack credibility and Iatropoulos may actually be using this device for the benefit of OMG.

199.    As a direct and proximate result of Iatropoulos's foregoing breaches of contract, Plaintiffs have suffered actual damages, which they are entitled to recover from Iatropoulos.

200.    As a direct and proximate result of Iatropoulos's foregoing breaches of contract, Plaintiffs have been irreparably harmed, and they are entitled to preliminary and permanent

injunctive relief enjoining Iatropoulos from keeping and failing to return any and all property belonging to Plaintiffs, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

201.    Plaintiffs have suffered and will continue to suffer irreparable harm, including, but not limited to, the use of Plaintiffs' own equipment in direct competition with Plaintiffs, unless the Court enjoins Iatropoulos's misconduct.

202.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if Iatropoulos is not enjoined.  On the other hand, Iatropoulos would suffer no prejudice under the proposed injunction.

COUNT X
BREACH OF CONTRACT

*(Plaintiffs vs. Maxwell)*

203.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

204.    To state a claim for a breach of contract, a plaintiff must show "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010).

205.    The Maxwell Agreement is a valid and binding contract between Project Veritas and Maxwell.

206.    Project Veritas Action Fund is an intended beneficiary of the Maxwell Agreement.

207.    As set forth above, Maxwell agreed in the Maxwell Agreement ¶ 26 to return Project Veritas property at separation from employment.

208.    Demand was made on April 18, 2023, for Maxwell to return all of Plaintiffs' property in his possession including, but not limited to a MacBook Pro (13-inch, M1, 2020) SN: FVFG41PCQ05F.

209.    Maxwel1 violated ¶ 26 by failing to return the said equipment.

210.    Maxwell identifies himself as doing "Comms for O'Keefe Media Group". *See* https://twitter.com/BlackHannity.

211.    Upon information and belief, Maxwell has used one or more of these devices for the benefit of OMG.

212.    Pursuant to ¶ 14(D), Maxwell was prohibited from using Plaintiffs assets "in the performance, consideration or coordination of any outside activity", and, thus, his use of said equipment is a violation of the Maxwell Agreement.

213.    As a direct and proximate result of Maxwell's foregoing breaches of contract, Plaintiffs have suffered actual damages, which they are entitled to recover from Maxwell.

214.    As a direct and proximate result of Maxwell's foregoing breaches of contract, Plaintiffs have been irreparably harmed, and they are entitled to preliminary and permanent injunctive relief enjoining Maxwell from keeping and failing to return any and all property belonging to Plaintiffs, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

215.    Plaintiffs have suffered and will continue to suffer irreparable harm, including, but not limited to, the use of Plaintiffs' own equipment in direct competition with Plaintiffs, unless the Court enjoins Maxwell's misconduct.

216.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if Maxwell is not enjoined.  On the other hand, Maxwell would suffer no prejudice under the proposed injunction.

COUNT XI
TORTIOUS INTERFERENCE WITH CONTRACT

*(Plaintiffs vs. OMG)*

217.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

218.    Under New York law, "[t]o recover damages for tortious interference with contract, the plaintiff must prove the existence of a valid contract with a third party, the defendant's knowledge of that contract, the defendant's intentional and improper procurement of a breach of that contract, and damages." *Stuart'S v. Edelman*, 196 A.D.3d 711, 712 (2nd Dep't 2021).

219.    The Iatropoulos Agreement is a valid and binding contract between Project Veritas and Iatropoulos.

220.    Project Veritas Action Fund is an intended beneficiary of the Iatropoulos Agreement.

221.    At all times relevant herein, OMG had knowledge of the Iatropoulos Agreement as its managing member and primary officer and agent was O'Keefe, the principal executive for Plaintiffs at the time the agreement was entered into.

222.    As set forth above, Iatropoulos agreed in the Iatropoulos Agreement ¶ 24 to return Project Veritas property at separation from employment.

223.    Iatropoulos violated ¶ 24 by failing to return Plaintiffs' equipment.

224.    Upon information and belief, Iatropoulos may have used one or more of these devices for the benefit of OMG.

225.    OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violation.

226.    As a direct and proximate result of Iatropoulos's breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have suffered actual damages, which they are entitled to recover from OMG.

227.    As a direct and proximate result of Iatropoulos's foregoing breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have been irreparably harmed, and they are entitled to preliminary and permanent injunctive relief enjoining OMG from keeping and failing to return any and all property belonging to Plaintiffs, through Iatropoulos, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

228.    Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins OMG misconduct, as set forth above with respect to Iatropoulos.

229.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if OMG is not enjoined.  On the other hand, OMG would suffer no prejudice under the proposed injunction.

## COUNT XII
## TORTIOUS INTERFERENCE WITH CONTRACT

### *(Plaintiffs vs. OMG)*

230.    Plaintiffs repeat and reallege paragraphs 1 through 88 hereof, as if fully set forth herein.

231.    Under New York law, "[t]o recover damages for tortious interference with contract, the plaintiff must prove the existence of a valid contract with a third party, the defendant's knowledge of that contract, the defendant's intentional and improper procurement of a breach of that contract, and damages." *Stuart'S v. Edelman*, 196 A.D.3d 711, 712 (2nd Dep't 2021).

232.   The Maxwell Agreement is a valid and binding contract between Project Veritas and Maxwell.

233.   Project Veritas Action Fund is an intended beneficiary of the Maxwell Agreement.

234.   At all times relevant herein, OMG had knowledge of the Maxwell Agreement as its managing member and primary officer and agent was O'Keefe, the principal executive for Plaintiffs at the time the agreement was entered into.

235.   As set forth above, Maxwell agreed in the Maxwell Agreement ¶ 26 to return Project Veritas property at separation from employment.

236.   Maxwell violated ¶ 26 by failing to return Plaintiffs' equipment.

237.   Maxwell identifies himself as doing "Comms for O'Keefe Media Group".  *See* https://twitter.com/BlackHannity.

238.   Upon information and belief, Maxwell has used one or more of these devices for the benefit of OMG.

239.   Pursuant to ¶ 14(D), Maxwell was prohibited from using Plaintiffs assets "in the performance, consideration or coordination of any outside activity", and, thus, his use of said equipment is a violation of the Maxwell Agreement.

240.   OMG, through its managing member and principal officer, O'Keefe, intentionally and improperly procured such violations.

241.   As a direct and proximate result of Maxwell's breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have suffered actual damages, which they are entitled to recover from OMG.

242.   As a direct and proximate result of Maxwell's foregoing breaches of contract, intentionally and improperly procured by OMG, Plaintiffs have been irreparably harmed, and they

are entitled to preliminary and permanent injunctive relief enjoining OMG from keeping and failing to return any and all property belonging to Plaintiffs, through Maxwell, and Plaintiffs are entitled to attorneys' fees and costs to obtain such injunctive relief.

243.    Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins OMG misconduct, as set forth above with respect to Maxwell.

244.    The balance of the equities falls entirely in favor of Plaintiffs.  Plaintiffs' allegations set forth the various injuries they would suffer if OMG is not enjoined.  On the other hand, OMG would suffer no prejudice under the proposed injunction.

## V.    PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that this Court

a)    Declare O'Keefe in breach of his Employment Agreement, in violation of his fiduciary duties, and in violation of his duty of loyalty;

b)    Declare Iatropoulos in breach of the Iatropoulos Agreement;

c)    Declare Maxwell in breach of the Maxwell Agreement;

d)    Declare OMG to have tortiously interfered with the Employment Agreement, the Iatropoulos Agreement, and the Maxwell Agreement;

e)    Declare O'Keefe to have misappropriated Plaintiffs' trade secrets;

f)    Declare O'Keefe liable to indemnify Plaintiffs for the costs of defense and/or liabilities arising from actions taken by him or his errors or omissions;

g)    Issue a preliminary and permanent injunction enjoining O'Keefe and OMG (through O'Keefe and/or based on information from O'Keefe) from:

i.    Soliciting or contacting Plaintiffs' donors, employees or contractors;

ii.    Disparaging Plaintiffs;

iii.    Obtaining, using or disclosing Plaintiffs' Confidential Information; and

    iv. Keeping and failing to return Plaintiffs' property;

  h)  Issue a preliminary and permanent injunction enjoining Iatropoulos and Maxwell from keeping and failing to return Plaintiffs' property;

  i)  Compel O'Keefe to account for his official conduct under N.Y. Bus. Corp. Law § 720(a);

  j)  Award Plaintiffs compensatory (actual and/or liquidated), punitive, and nominal damages;

  k)  Disgorge a) all funds by which O'Keefe and OMG were unjustly enriched on account of his misappropriation of Plaintiffs' trade secrets; and b) disgorging his salary during his period of disloyalty;

  l)  Award Plaintiffs exemplary damages under 18 U.S.C. § 1836(b)(3)(C); and

  m)  Award Plaintiffs their reasonable attorneys' fees and costs pursuant to Paragraph 23(B) of the Employment Agreement, Paragraph 25 of the Iatropoulos Agreement, Paragraphs 21 & 22 of the Maxwell Agreement, 18 U.S.C. § 1836(b)(3)(D) and as otherwise allowable by law.

## VI. DEMAND FOR JURY TRIAL

  Plaintiffs demand trial by jury on all claims, defenses, and all other issues triable by jury in this matter.

Dated: May 31, 2023.      Respectfully Submitted,

            */s/ Jay M. Wolman*
            Jay M. Wolman (JW0600)
            RANDAZZA LEGAL GROUP, PLLC
            100 Pearl Street, 14th Floor, Hartford, CT 06103
            Tel: (888) 887-1776
            Email: jmw@randazza.com

            Marc J. Randazza (*Pro Hac Vice forthcoming*)
            RANDAZZA LEGAL GROUP, PLLC
            30 Western Avenue, Gloucester, MA 01930
            Tel:  (888) 887-1776
            Email: ecf@randazza.com