# <u>Exhibit 1</u>

Declaration of Ben Wetmore

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

PROJECT VERITAS and PROJECT      :
VERITAS ACTION FUND,              :     Civil Action No. 7:23-cv-04533
                                          :
                 Plaintiffs,     :
                                          :     **DECLARATION OF**
      -against-               :     **BEN WETMORE**
                                          :
JAMES O'KEEFE, TRANSPARENCY 1,    :
LLC d/b/a O'KEEFE MEDIA GROUP, RC   :
MAXWELL, and ANTHONY              :
IATROPOULOS,                         :
                                          :
                 Defendants.    :

---------------------------------------------------------x

I, BENJAMIN WETMORE, hereby depose and declare:

1.     I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

2.     I am President of Project Veritas, Plaintiff in the above-captioned proceeding. I have first-hand knowledge of the facts set forth herein and/or have otherwise informed myself of these facts through my inspection of the records of Project Veritas, kept in its usual course of business, and if called as a witness, could and would testify competently thereto.

3.     I have reviewed the First Amended Complaint in this action, and the facts set forth therein are true and correct to the best of my knowledge and understanding.

4.     Project Veritas is a 501(c)(3) not for profit corporation formed under Virginia law with headquarters in Westchester County, New York.

5.     Project Veritas engages in investigations and reporting aimed at exposing corruption, dishonesty, self-dealing, waste, fraud, and other misconduct in both public and private institutions.

1

RANDAZZA | LEGAL GROUP

6.     Project Veritas relies on donations from private donors to support their activities.

7.     Project Veritas maintains a database of information about their donors, including the donors' identities and contact information.

8.     Project Veritas keeps that donor information confidential and protect it from disclosure to the public by, among other things: (1) restricting access to the information; (2) storing it on a password protected computer system; and (3) requiring employees with access to the information to acknowledge its confidentiality and agree not to disclose it.

9.     Project Veritas Action Fund ("PVAF") is a 501(c)(4) organization affiliated with Project Veritas also formed under Virginia law with headquarters in Westchester County.  To the extent my statements herein relate to PVAF, my knowledge and information is on account of such affiliation.

10.    James O'Keefe founded Project Veritas in 2010.

11.    James O'Keefe was, through his separation, the Chief Executive Officer of Project Veritas, President of Project Veritas Action Fund, and a member of the Board of Directors of both organizations, though he was suspended (yet not removed) on February 6, 2023.

12.    O'Keefe entered into an Employment Agreement ("EA") with Project Veritas and Project Veritas Action Fund on June 22, 2010, with the operative version being the Employment Agreement as amended on September 20, 2022, which O'Keefe and Project Veritas signed on September 30, 2022.

13.    A true and correct copy of the EA appears at ECF No. 16-1, a copy of which is attached hereto as **Exhibit 3**.

14.    PVAF was an intended beneficiary of the EA.

RANDAZZA | LEGAL GROUP

15.     As part of the EA, O'Keefe agreed to certain terms and conditions, both during and after the term of his employment.

16.     In the EA, O'Keefe agreed that he, identified as "Employee" thereunder, "shall devote Employee's full working time and attention and best efforts to the performance of Employee's job."

17.     In ¶ 10(A) of the EA, O'Keefe agreed that:

Project Veritas shall be the sole owner of any and all rights in and to the results and proceeds of Employee's services to Project Veritas, and it shall have the sole right to use, exploit, advertise and exhibit the foregoing in any and all media, whether now known or hereafter devised throughout the world, in all languages, as Project Veritas in its sole and unfettered discretion shall determine. Employee agrees that anything created by Employee in connection with the services Employee provides to Project Veritas shall belong exclusively to Project Veritas, and not to Employee, including, but not limited to, any and all video, film, photographs, negatives, video footage, images, renderings, audio video works, audio, recordings, multimedia works, music, reproductions, performances, digital media works, still images and/or other images or footage, documents, papers, writings (both published and unpublished), written work product (including drafts), designs, inventions, patents, trademarks, copyrightable materials, ideas, intellectual property, trade secrets, creative concepts, including all compilations, collections, or other work product created within the scope of or in the course of Employee's employment with Project Veritas and Employee's performance pursuant to this Agreement, and derivatives thereof, and the like ("Work(s)").

18.     In EA ¶ 11, O'Keefe acknowledged that certain information is confidential ("Confidential Information").

19.     O'Keefe agreed in EA ¶ 11.B to keep all Confidential Information in the "highest confidence" and not to disclose that Confidential Information without Project Veritas's prior written consent.  "Confidential Information" includes, in relevant part, per EA ¶ 11.A, information regarding Project Veritas's projects, potential projects, organizational practices, and donors and potential donors.

RANDAZZA | LEGAL GROUP

20.     O'Keefe's obligation to maintain Plaintiffs' Confidential Information in the highest

confidence continues beyond his employment (EA ¶ 11.D), to wit:

> Employee expressly agrees that the terms of this paragraph shall survive after the
> conclusion of Employee's employment with Project Veritas and/or the expiration
> or termination of this Agreement, and that after leaving employment with Project
> Veritas, in addition to all other obligations hereunder, Employee will not disclose
> to any person or entity, or seek from any current or former Project Veritas
> employee, contractor or vendor, any Confidential Information

21.     The Employment Agreement also prohibits O'Keefe from engaging in outside

activities that would interfere with or hinder his work for Project Veritas.

22.     Specifically, in paragraph 15 (entitled "Prohibited Outside Activities") O'Keefe

agreed that he would not:

> engage in any activity, whether as an employee, contractor, volunteer or in any
> other capacity for any person or entity other than Project Veritas that will or is likely
> to (i) hinder, interfere with, or prevent Employee from devoting Employee's full
> time and attention and best efforts to Employee's work for Project Veritas; (ii)
> hinder, interfere with, or prevent Employee from fully and properly performing
> Employee's job responsibilities as assigned to Employee from time to time by
> Project Veritas; or (iii) give rise to an actual conflict of interest or the appearance
> of a conflict of interest with Project Veritas and/or its mission or work (any such
> activity, "Prohibited Outside Activity") without the express written approval by the
> CEO of Project Veritas.

23.     EA ¶¶ 16 & 17 also prohibits O'Keefe from soliciting two categories of people:

donors and employees/contractors of Project Veritas.

24.     First, O'Keefe agreed in EA ¶ 16 that during (and for one year after) his

employment he:

> will not, directly or indirectly, individually or in any other capacity solicit, offer
> employment, employ, or interfere with any Project Veritas employee or contractor,
> or other person or entity that was a Project Veritas employee or contractor within
> the twelve (12) months immediately prior to the termination of Employee's
> employment with Project Veritas, to cease working for or providing services to
> Project Veritas.

4

RANDAZZA | LEGAL GROUP

25.     EA ¶ 17 prohibits O'Keefe, during and after his employment, from contacting, soliciting or otherwise communicating with "any person or entity that is a donor or prospective donor to Project Veritas whom Employee learns of or with whom Employee otherwise comes into contact as a result of Employee's employment by, or work for Project Veritas."

26.     The Employment Agreement (¶ 22) also requires that, upon separation of employment, that he:

> shall return any and all Project Veritas property of any kind, including, but not limited to, any computers and other electronic devices, recording and communication devices, documents and information (whether in hard copy or electronic and not keep any copies), software or applications, and any work product (whether completed or incomplete) in the same condition in which it was received by Employee, reasonable wear and tear excepted.

27.     During O'Keefe's employment, the Project Veritas Board became aware of serious allegations by Project Veritas employees about incredibly troubling workplace and financial misconduct by O'Keefe.

28.     On February 6, 2023, by majority vote, the Board placed O'Keefe on paid leave, suspending his authority to hire and fire staff for 180 days, requiring him to surrender his company credit card, and restricting his access to proprietary information, including donor lists, but explicitly indicated that he "remains as CEO and a member of the Board."

29.     O'Keefe refused to participate in a February 10, 2023, meeting at which financial findings were presented to the Board, and O'Keefe was suspended as CEO and from the Board (but not removed as a member thereof) indefinitely pending the resolution of the Board's investigation into the allegations of O'Keefe's misconduct.

30.     O'Keefe was not formally removed from the Board until April 24, 2023.

31.     O'Keefe was not formally terminated from his employment by Project Veritas and Project Veritas Action Fund until May 15, 2023.

RANDAZZA | LEGAL GROUP

32.     In response to his suspension, O'Keefe immediately began breaching his obligations under and the restrictive covenants of the Employment Agreement.

33.     A series of Telegram messages between O'Keefe and Project Veritas employee Asha Bolton shows O'Keefe soliciting and receiving a list of Plaintiffs' donors.

34.     At all relevant times, Ms. Bolton had been O'Keefe's assistant.

35.     A true and correct copy of the Telegram messages appears at **Exhibit 4**.

36.     Such Telegram messages were stored on Project Veritas systems by O'Keefe and are the property of Project Veritas as they contain the records of O'Keefe's communications on behalf of Project Veritas.

37.     On February 22, 2023, Ms. Bolton messaged Mr. O'Keefe:  "I am working on the sheet. I am only send things in relation to donations not all messages were donation related. I don't have access to the donation emails in which Jonathan, Joanne & Gillian do."  He responded: "Work on documenting all the donors who want the money back . money back - word document." Ms. Bolton then responded with a screenshot of the donor list she was creating for Mr. O'Keefe, stating "Yes, I am."

38.     Mr. O'Keefe responded "keep going, I'm assembling text messages".  Her response was to give him a link[1] to the donor list and saying "That's a one drive document, it will continue to grow."

39.     O'Keefe knew he was not entitled to the donor list.

40.     Upon information and belief, in or around February 2023, O'Keefe had a girlfriend, Alexandra Rose.

---

[1]     https://projectveritas-my.sharepoint.com/:w:/p/asha/EY_6bQiRw_VBqtyD5gzCvXQBrVeprC92mj4RsSOLH3ov4g?e=FPZtpE  (no longer functional).

RANDAZZA | LEGAL GROUP

41.    His girlfriend, Alexandra Rose, hours after the February 6, 2023, meeting, first encouraged O'Keefe, via Telegram, to take it, saying "You need to have a backup of ALL your donors emails" and "You have the right to your donors especially when you quit. I would call any donor you've met recently that has donated and tell them what happened so they can demand their money back."  But, then, after raising the issue of a potential "non compete or non circumvention employment agreement," she observed "Who the hell wrote up the contract for PV.  They screwed you over." [2]

42.    A true and correct copy of the Telegram messages appears at **Exhibit 5**.

43.    Just five days before O'Keefe and Ms. Bolton compiled the donor list, on February 17, 2023, O'Keefe formed Transparency 1, LLC d/b/a O'Keefe Media Group ("OMG").

44.    OMG noted on its website that it is located in Mamaroneck, New York, which is where O'Keefe lives and where Project Veritas is headquartered.

45.    According to its website, OMG is a media organization managed by O'Keefe with substantially the same mission and structure as Project Veritas.

46.    OMG is a company whose website describes itself as having "an army of journalists" and is building "an army of investigators and exposers along with the most elite journalists in the world."    *See*    https://web.archive.org/web/20230531173523/https://okeefemediagroup.com/mission/

47.    The OMG website even referred to "never be[ing] shut down again" because O'Keefe owns it.

---

[2] Once more, this is a screenshot from Mr. O'Keefe's Telegram messages that he placed into Plaintiffs' custody.

RANDAZZA | LEGAL GROUP

48.      Forming and operating OMG was in violation of the Employment Agreement's "Prohibited Outside Activities" provision.

49.      O'Keefe misappropriated Project Veritas confidential information by taking donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas, rebranded as OMG material.

50.      O'Keefe solicited numerous Project Veritas employees and contractors to attempt to poach them to come work for him at OMG.

51.      Such solicitation was by O'Keefe for the benefit of OMG and as an agent thereof.

52.      On February 20, 2023, O'Keefe recorded and published a video on the Vimeo platform (which has since been removed) announcing he was "packing up [his] personal belongings and [he was] intending to start anew," without resigning from his employment or board membership, and generally soliciting current employees of Plaintiffs to work with him, stating "So, our mission continues on. I'm not done," and "The mission will perhaps take on a new name, and it may no longer be called Veritas, Project Veritas. I will need a bunch of people around me, and I'll make sure, I'll make sure you know how to find me."[3]

53.      Such publication was by O'Keefe for the benefit of OMG and as an agent thereof.

54.      O'Keefe has and continues to solicit Project Veritas's donors, employees and contractors, in direct violation of his Employment Agreement, for and on behalf of OMG.

55.      On or about May 25, 2023, O'Keefe, from his OMG e-mail address, sent a form solicitation e-mail to at least two Project Veritas donors who are not OMG donors, stating "Hey

---

[3] *See* https://www.nationalreview.com/news/founder-james-okeefe-claims-project-veritas-ouster-linked-to-pfizer-sting-in-farewell-to-staff/ and https://www.youtube.com/watch?v=1JPxqKjYG9Q.

RANDAZZA | LEGAL GROUP

there, I know you've been a supporter of my work in the last year" and linking to the OMG webpage that solicits monetary "subscriptions."

56.     A true and correct copy of this form solicitation appears at **Exhibit 6**.

57.     The only way O'Keefe and OMG had those donors' contact information was because it was part of a confidential list kept by Project Veritas.

58.     O'Keefe also has misappropriated Project Veritas property by taking Project Veritas's equipment, donor lists and intellectual property for his own use with OMG.

59.     Several Project Veritas staff already joined OMG including RC Maxwell and Anthony Iatropoulos, who may have used Project Veritas property in the course of their employment with OMG.

60.     Both Iatropoulos and Maxwell had agreements with Project Veritas containing the same material terms as O'Keefe's.

61.     True and correct copies of the Iatropoulos and Maxwell agreements appear at ECF Nos. 16-2 and 16-3.

62.     EA ¶ 23.B states that if O'Keefe breaches or threatens to breach the Employment Agreement, Project Veritas can seek preliminary and permanent injunctive relief in court.

63.     In EA ¶ 23.B, O'Keefe acknowledged that such a breach or threatened breach "will result in irreparable harm to Project Veritas."

64.     Project Veritas will continue to be irreparably harmed unless the Court orders O'Keefe to comply with the terms of his Employment Agreement.

65.     If this Court does not preliminarily enjoin O'Keefe and OMG from soliciting Project Veritas's donors and employees, they may have solicited them all by the time Project Veritas wins a judgment prohibiting them from such solicitation.

RANDAZZA | LEGAL GROUP

66.     There should be no dispute that the EA exists. Mr. O'Keefe himself has sought to invoke the arbitration provision, though this matter is exempt by its express terms.  Project Veritas Action Fund is an intended beneficiary of the Employment Agreement per Employment Agreement ¶ 21.  Plaintiffs performed—Mr. O'Keefe was duly paid for his services.

67.     O'Keefe was required under the Employment Agreement ¶ 1.B to devote his full working time and attention and best efforts to the performance of his job.  Although O'Keefe was suspended, the formation of OMG, to compete with Project Veritas, violated requirements of ¶ 1.B.

68.     O'Keefe agreed in the Employment Agreement ¶ 10.A that all of the work and work product derived from O'Keefe's services belonged to Project Veritas.  O'Keefe's use of donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 10.A as he is using property of Project Veritas without authorization.

69.     O'Keefe agreed in the Employment Agreement ¶ 11 that any and all information O'Keefe learned in the course of his employment was confidential.  O'Keefe's use of donor lists and contact information, equipment, as well as unreleased investigation publications by Project Veritas, rebranded as OMG material. violates ¶ 11 and breaches the confidentiality to which he is obligated.

70.     O'Keefe agreed in the Employment Agreement ¶ 15 that he would not engage in ventures giving rise conflicts of interest with Project Veritas.  O'Keefe's formation and operation of OMG while employed at Project Veritas without express written consent violates ¶ 15 as OMG competes with Plaintiffs and is a direct conflict of interest.

RANDAZZA | LEGAL GROUP

71.     O'Keefe agreed in the Employment Agreement ¶ 16 that he would not solicit Project Veritas past and present employees and contractors during and for 12 months after his employment.  O'Keefe violated ¶ 16 by soliciting past and present Project Veritas employees and contractors, beginning February 20, 2023.

72.     O'Keefe agreed in the Employment Agreement ¶ 17 that he would not solicit Project Veritas present or prospective donors during and for 12 months after his employment. O'Keefe violated ¶ 17 by soliciting present and/or prospective donors.

73.     O'Keefe agreed in the Employment Agreement ¶ 22 to return Project Veritas property at separation from employment.  Demand was made on May 17, 2023, for O'Keefe to return all of Plaintiffs' property in his possession.  O'Keefe violated ¶ 22 by failing to return donor lists and contact information, equipment, as well as already filmed and/or released investigation publications by Project Veritas.

74.     Project Veritas and Project Veritas Action Fund have suffered actual damages, which they are entitled to recover from O'Keefe.

75.     Defendants were on notice of the suit as early as May 31, 2023, when they set up a legal defense fund for this matter.  *See* https://web.archive.org/web/20230531220338/https://secure.anedot.com/liberty-guard/omg; and https://okeefemediagroup.com/subscribe/.  Service, following attempts at negotiations, could not be perfected until October 17, 2023.  (*See* ECF Nos. 14 & 18).  The docket otherwise reflects attempts to serve the other defendants and resolve the matter without incurring unnecessary litigation expenses on all sides.  Given the passage of time, Plaintiffs had been awaiting O'Keefe's and OMG's defenses before filing this motion; instead, they have sought to compel arbitration.  Thus, this is the first realistic opportunity for Plaintiffs to seek a preliminary injunction.

RANDAZZA | LEGAL GROUP

76.     Even prior to his separation, a significant following strongly identified O'Keefe with Project Veritas, going so far as to make "James O'Keefe IS Project Veritas" trend on Twitter.[4]

77.     No one person is Project Veritas; a successor CEO, Hannah Giles, for example, was as much responsible for the ACORN story that led to the formation of Project Veritas as O'Keefe was.

78.     Even if none of this had happened, and O'Keefe was simply permanently incapacitated, Project Veritas is strong enough to function without O'Keefe.  But, with O'Keefe actively diverting donors from Project Veritas to the for-profit OMG (and himself, as its sole owner), and where he is so identified in the public realm with Project Veritas, a permanent non-solicitation of vendors provision is necessary.

79.     With O'Keefe so tied to the image of Project Veritas, and that he personally was responsible for hiring much of Plaintiffs' staff and soliciting its donors, the restrictions on him serve the legitimate interests of Plaintiffs in avoiding having these key individuals diverted from them.

80.     Here, O'Keefe was "special or unique," having been the Chairman, CEO, and President, the figurehead of the organization, and enforcement is necessary to prevent solicitation and use of the donor list he developed while being paid by Project Veritas to do so.

81.     Plaintiffs' Confidential Information, including its donor lists and employee lists, and unaired programming, are "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

---

[4] *See* Libby Emmons, "BREAKING: Project Veritas employees' letter targeting James O'Keefe leaked, 'James O'Keefe IS Project Veritas' trends on Twitter," THE POST MILLENNIAL (Feb. 9, 2023) available at https://thepostmillennial.com/breaking-project-veritas-employees-letter-targeting-james-okeefe-leaked-james-okeefe-is-project-veritas-trends-on-twitter.

RANDAZZA | LEGAL GROUP

82.     Project Veritas and Project Veritas Action Fund take reasonable measure to keep such information secret, including requiring employees to sign non-disclosure agreements.

83.     The information has independent economic value, it is not generally known to and not readily ascertainable to others, like O'Keefe and OMG, who can obtain economic value from the disclosure thereof.

84.     Plaintiffs' trade secrets relate to Plaintiffs' services, including investigative journalism and broadcasting, used in and/or intended for use in interstate commerce.  O'Keefe took and failed to return Plaintiffs' donor lists and contact information, equipment, as well as already unreleased investigation publications by Project Veritas all of which are trade secrets. O'Keefe misappropriated Plaintiffs' said trade secrets as set forth above by converting them to the use of OMG in competition with Plaintiffs.

85.     Upon information and belief, O'Keefe's misappropriation was willful and malicious for, as having been CEO, he knew what belonged to Plaintiffs and is sufficiently sophisticated that he knew he could not convert it to his own use or for the use of OMG.

86.     As a direct and proximate result of O'Keefe's breaches of contract, intentionally and improperly procured by OMG, Project Veritas and Project Veritas Action Fund have suffered actual damages.

87.     Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins Defendants' misconduct.

88.     If O'Keefe and OMG are not enjoined, Project Veritas and Project Veritas Action Fund will continue to lose donors, employees and suffer reputational harm and injury to its goodwill.

13

RANDAZZA | LEGAL GROUP

89.     The total monetary value of Plaintiffs' loss of donors would be very difficult, if not impossible, to calculate with precision, especially in light of disparaging remarks he may have made. Nor could the lost goodwill that Plaintiffs built with these donors be easily quantified and compensated.

90.     O'Keefe would suffer no prejudice under the proposed injunction.  There is no hardship on O'Keefe or the public – the EA contains a non-solicitation agreement, not a post-separation non-compete agreement.  He can build OMG up with new people and new donors, just as he did with Project Veritas.  This does not prevent O'Keefe from soliciting donors or employees based on "pre-existing" relationships or through his "own independent efforts, unassisted by the firm." *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 294 (E.D.N.Y. Jan. 10, 2013).  In fact, it appears O'Keefe, through OMG, has taken a different approach, with member subscriptions.[5] Enforcement of the restrictions will not limit Defendants' enterprise in any meaningful way.

91.     If immediate equitable relief is not granted, Defendants will be able to continue to compete unfairly with Project Veritas and Project Veritas Action Fund using our confidential information and undermining our substantial investment of time, resources and goodwill in its relationships. Although such investment was significantly done through O'Keefe, he did so as an agent of Project Veritas and Project Veritas Action Fund, for their benefit, and he was paid for such.  O'Keefe already received the agreed-upon return on his investment of time—his paycheck.

92.     Should the injunction issue, the public would not be deprived of any essential good or service; every other journalist is able to perform in the absence of Plaintiffs' confidential information.

---

[5] *See* https://okeefemediagroup.com/subscribe/

RANDAZZA | LEGAL GROUP

93.     Upon information and belief, Defendants are not likely to suffer any harm absent the posting of a bond and as such the bond requirement is unnecessary.

94.     Wherefore, the Court should allow the requested preliminary injunction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___5/8/24___

_____
Benjamin Wetmore

15