**UNITED STATES DISCRIT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PROJECT VERITAS and PROJECT VERITAS ACTION FUND, | |
| Plaintiffs, | Civil Action No. 7:23-cv-04533 |
| v. | |
| JAMES O'KEEFE, TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP, RC MAXWELL, and ANTHONY IATROPOULOS, | |
| Defendants. | |

**DEFENDANTS, JAMES O'KEEFE AND O'KEEFE MEDIA GROUP'S, OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RENEWED CROSS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDING AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iv

PROCEDURAL BACKGROUND TO BOTH SUBMISSIONS ................................. 1

BACKGROUND COMMON TO BOTH SUBMISSIONS .......................................... 2

DEFENDANTS, JAMES O'KEEFE AND O'KEEFE MEDIA GROUP'S, OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ............................................ 5

I.     PRELIMINARY STATEMENT ..................................................................... 5

II.    MEMORANDUM OF LAW ............................................................................ 6

    A. The Standard on a Motion for Preliminary Injunction ............................ 6

    B. Likelihood of Success on the Merits ...................................................... 6

        1.     Count 1 Breach of Contract ........................................................ 7

        2.     Violation of the Defend Trade Secrets Act ............................ 13

        3.     Tortious interference with OMG ............................................ 14

    C. Likelihood of Irreparable Injury in the Absence of an Injunction ........................ 15

    D. The Balance of the Hardships ............................................................. 20

    E. The Public Interest ............................................................................ 21

CONCLUSION ........................................................................................................ 21

DEFENDANTS, JAMES O'KEEFE AND O'KEEFE MEDIA GROUP'S, RENEWED CROSSMOTION TO COMPEL ARBIRATION AND STAY PROCEEDINGS ................. 22

III.   PRELIMINARY STATEMENT .................................................................. 22

IV.    MEMORANDUM OF LAW .......................................................................... 23

    F. The Factors for a Motion to Compel Arbitration and Stay Court Proceedings .... 23

    G. The Parties Agreed to Arbitrate ......................................................... 24

    H. Congress did not Intend the Federal Statutory Claims to be Non-arbitrable ....... 24

    I. The Scope of the Arbitration Agreement Applies to Plaintiffs' Claims ................. 25

        i.     Counts 2-7 and 13 fall within the Scope of the Arbitration Agreement ............................................................................... 27

        ii.    Counts 8, 11, and 12 fall within the Scope of the Arbitration Agreement ........................................................................... 29

iii.    Count 1 is Arbitrable ................................................................................. 32

J.  Any Non-arbitrable Claims Should be Stayed ......................................................... 34

CONCLUSION ........................................................................................................................ 36

## TABLE OF AUTHORITIES

**Cases**

*Baker's Aid, Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.,*
    830 F.2d 13 (2d Cir. 1987) ................................................. 20

*BDO Seidman v. Hirshberg,*
    93 N.Y.2d 382 (1999) ................................................... 7, 9

*Benihana, Inc. v. Benihana of Tokyo,* LLC,
    784 F.3d 887 (2d Cir. 2015) .............................................. 6

*Chase Mortg. Co.-West v. Bankers Trust Co.,*
    No. 00 Civ. 8150 (MBM), 2001 WL 547224 (S.D.N.Y. May 23, 2001) ...... 30, 31

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d. DCA 1985) ........................................... 17

*Citizens Bank v. Alafabco, Inc.,*
    539 U.S. 52 (2003) .................................................... 24

*DIRECTTV, Inc. v Imburgia,*
    577 U.S. 47 (2015) .................................................... 25

*Faively Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ........................................... 16

*Gen. Media, Inc. v. Shooker,*
    No. 97 CIV.510 (DAB), 1998 WL 401530 (S.D.N.Y. July 16, 1998) ......... 25

*Genesco, Inc. v. T. Kakiuchi & Co.,*
    815 F.2d 840 (2d Cir.1987) ..................................... 24, 34, 35, 36

*Givati v. Air Techniques, Inc.,*
    960 N.Y.S 2d 196 (2013) ............................................... 25

*Hanson Tr. PLC v. SCM Corp.,*
    774 F.2d 47 (2d Cir. 1985) ............................................. 6

*Int'l Creative Mgmt. v. Abate,*
    2007 WL 950092 (S.D.N.Y, March 28, 2007) ............................. 20

*Juicy Couture, Inc. v. Bella Int'l Ltd.,*
    930 F. Supp. 2d 489 (S.D.N.Y. 2013) ............................... 16, 17

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir.2002) ............................................ 16

*Katsoris v. WME IMG, LLC,*
    237 F. Supp. 3d 92 (S.D.N.Y. 2017) .................................... 35

iv

*LDS, Inc. v. Metro Canada Logistics, Inc.*,
 28 F. Supp. 2d 1297 (D. Kan. 1998) .................................................................. 25

*M Three Corp. Consulting Ltd. v. Wascak*,
 No. 22 Civ 7158, 2022 WL 15524842 (S.D.N.Y. Oct. 27, 2022) ........................ 7

*Majorica, S.A. v. R.H. Macy & Co.*,
 762 F.2d 7, (2d Cir. 1985) ................................................................................ 17

*Marks Organization, Inc. v. Joles*,
 784 F. Supp. 2d 322 (S.D.N.Y. Mar. 18, 2011) ................................................ 17

*Mavel a.s. v. Rye Dev., LLC*,
 626 F. Supp. 3d 33 (D. Mass. 2022) ................................................................. 24

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) ............................................................................................ 6

*McKay v. Communispond, Inc.*,
 581 F. Supp. 801 (S.D.N.Y. 1983) .................................................................... 16

*Mercer Health & Benefits LLC v. DiGregoria*,
 307 F. Supp. 3d 326 (S.D.N.Y. 2018) ................................................................. 9

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
 409 F.3d 506 (2d Cir. 2005) ......................................................................... 6, 21

*Moore v. Interacciones Glob., Inc.*,
 No. 94-CV-4789 (RWS), 1995 WL 33650 (S.D.N.Y. Jan. 27, 1995) ................ 35

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
 460 U.S. 1 (1983) .............................................................................................. 34

*New Look Party Ltd. v. Louise Paris Ltd.*,
 Case No.: 11 Civ. 6433, 2021 WL 251976 *10 (S.D.N.Y, Jan. 11, 2012) .......... 17

*New Paradigm Software Corp. v. New Era of Networks, Inc.*,
 107 F.Supp.2d 325 (S.D.N.Y. 2000) ................................................................. 15

*NPS Commc'ns, Inc v. Continental Group, Inc.*,
 760 F. 2d 463 (2d Cir. 1985) ............................................................................ 35

*Oldroyd v. Elmira Sav. Bank*,
 134 F.3d 72 (2d Cir.1998) ............................................................................ 24, 34

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
 813 F. Supp. 2d 489 (S.D.N.Y. Sept 12, 2011). .................................................. 9

*Reed, Roberts Assocs. v. Strauman*,
 40 N.Y.2d 303 (1976) .......................................................................................... 8

*Reuters Ltd. v. United Press Int'l, Inc.*,
 903 F.2d 904 (2d Cir. 1990) .............................................................................. 16

*Rich v. Fox News Network, LLC,*
  939 F.3d 112 (2d Cir. 2019) ...................................................................... 14, 15

*Ross v. Bank of America, N.A. (USA),*
  524 F.3d 217 (2d Cir. 2008) ............................................................................ 29

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,*
  198 F.3d 88 (2d Cir. 1999) .............................................................................. 30

*Thomson-CSF, S.A. v. Amer. Arbitration Ass'n,*
  64 F.3d 773 (2d Cir. 1995) .............................................................................. 30

*Ticor Title Ins. Co. v. Cohen,*
  173 F.3d 63 (2d Cir. 1999) .............................................................................. 20

*Tough Traveler, Ltd. v. Outbound Prods.,*
  60 F.3d 964 (2d Cir. 1995) .............................................................................. 17

*Ward v. TheLadders.com, Inc.,*
  3 F. Supp. 3d 151 (S.D.N.Y 2014) ............................................................ 25, 27

**Statutes**

17 U.S.C. § 101 .................................................................................................. 24

9 U.S.C. § 2 ........................................................................................................ 24

9 U.S.C. § 3 .......................................................................................................... 1

9 U.S.C. § 4 .......................................................................................................... 1

Defend Trade Secrets Act, 18 U.S.C. § 1839(3) ............................................... 24

COME NOW Defendants, JAMES O'KEEFE and TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP ("O'Keefe" and "OMG", respectively, and "O'Keefe/OMG" or "Defendants" collectively), and, per this Court's Minute Entry order of June 3, 2024 (DE 52), and submits their combined:

(i)     Opposition to Plaintiffs' Motion for Preliminary Injunction opposing Motion for Preliminary Injunction of May 29, 2024, filed by Plaintiffs, PROJECT VERITAS and PROJECT VERITAS ACTION FUND ("Veritas" and PVAF", respectively, and the "Project Veritas Entities" or "Plaintiffs" collectively) (DE 50, 51); and

(ii)    Renewed Cross-Motion to Compel Arbitration and Stay Proceeding pursuant to 9 U.S.C. §§ 3 and 4, respectfully moving this Court for an order (i) compelling arbitration of all counts of the First Amended Complaint filed by the Project Veritas Entities, on October 12, 2023; and (ii) staying this litigation until arbitration is complete ("Motion to Compel and Stay").  In support, Defendants state as follows:

**PROCEDURAL BACKGROUND TO BOTH SUBMISSIONS**

The Project Veritas Entities filed their initial Complaint in this action over a year ago on June 8, 2023, (DE 1), and their currently operative First Amended Complaint ("Amended Complaint") over nine months ago on October 13, 2023 (DE 16).  Per the broad arbitration clause in the contract at dispute in this case, O'Keefe/OMG filed a motion to compel arbitration on April 16, 2024, asking the Court to compel arbitration on all counts (DE 40).

1

This Court denied Defendants' motion to compel arbitration without prejudice because it had not been preceded by a pre-motion letter (per this Court's Individual Practices), converted the motion into a pre-motion letter, and scheduled a pre-motion conference thereon (DE 42). Just before the pre-motion conference, the Project Veritas Entities filed their Motion for Preliminary Injunction on May 29, 2024 ("Motion for PI") (DE 50, 51).

The pre-motion conference occurred on May 31, 2024. The Court ordered O'Keefe/OMG to file a consolidated opposition to the Motion for PI and cross-motion to compel arbitration (DE 52).

## BACKGROUND COMMON TO BOTH SUBMISSIONS

Defendant O'Keefe founded both Plaintiff entities, Project Veritas and PVAF, in 2010. (*See* **Exhibit 1** to this submission, Declaration of James O'Keefe ("Dec. O'Keefe") ¶ 3). He was Project Veritas' Chief Executive Officer from the time of its founding until his suspension/termination in 2023 (*Id.* ¶ 3). O'Keefe also served on the Board of Directors ("Board") during that entire period (*Id.*) Under O'Keefe, Veritas was a media content producer engaged in niche investigative journalism, most specifically video exposés revealing corporate, non-profit, and governmental corruption and malfeasance (*Id.* ¶ 5). Project Veritas thrived under O'Keefe's leadership, increasing its revenue (mostly donations) roughly 30-fold between 2012 and 2020 to over $22 million annually. In early 2023, the organization put out the most impactful video exposé in its history, garnering over 50 million views from around the world (*Id.* ¶¶ 7-9). As acknowledged by Project Veritas in its Motion for PI, O'Keefe is strongly "identified with Project Veritas in the

2

public realm" and "he personally was responsible for hiring much of Plaintiffs' staff and soliciting its donors" (DE, pgs. 13-14).  Not only was O'Keefe Project Veritas' founder, he was also its team leader, having personally hired most of the employees who worked at Project Veritas at the time of his termination, as well as its primary and nearly only full-time fundraiser (Ex. 1, Dec. O'Keefe ¶¶ 8, 10, 11).  O'Keefe also served as the "face" of the organization from the public's point of view, typically appearing on screen as the lead journalist in Project Veritas' breaking news stories and on other public-facing communications such as the website (*Id.* ¶¶ 10)

At some point, unknown to O'Keefe, certain Board members developed differences with O'Keefe, and conceived a scheme to remove him from Project Veritas. O'Keefe's termination occurred when certain Board members, breaching corporate statutes and their individual directorial duties, pushed O'Keefe out of Project Veritas. Several Board members immediately resigned in protest of the Board's wrongdoing.

Predictably—as the instigators of this attack were repeatedly warned—Veritas went into a tailspin without O'Keefe, the leader that had built and sustained Veritas since its inception (*Id.* ¶ 12).  Instead of working to salvage Veritas' credibility and save its employees' jobs, Veritas' replacement leadership compounded business failure with pettiness, launching a meritless legal action against the former leader it already removed.

Project Veritas is not a viable organization without O'Keefe.  It was founded and built by O'Keefe, its employees came to Project Veritas to work with O'Keefe, its contributors sought to advance the work of O'Keefe, and the viewers of its content tuned in to watch O'Keefe and his team's breaking stories.  (*Id.* ¶¶ 8-11, 13).  Since O'Keefe left

Project Veritas, it has burned through its formerly large cash reserves and laid off much of its workforce (*Id.* ¶ 12).

The Project Veritas Entities have presented no evidence they have a meaningful prospect of surviving into the future other than as a vehicle for suing O'Keefe and seeking to undermine his credibility through ongoing legal action. This lawsuit is not about Project Veritas' desire to continue as a media content producer as it was under O'Keefe's leadership. That ship sailed at the time O'Keefe was pushed out. This lawsuit—and the current Motion for PI—is about harming O'Keefe's reputation and thus undermining his ability to build a new organization in the same media space where Project Veritas once operated. In other words, this lawsuit is vindictive, anti-competitive, and serves no public policy.

Plaintiff O'Keefe generally denies the allegations in the Amended Complaint and will assert counterclaims as appropriate.

With one possible exception, all of the Amended Complaint's claims are arbitrable because they fall within the scope of the Arbitration Agreement and are not subject to the Court Exception (defined and discussed below). If any claim is arbitrable, that claim should be stayed pending arbitration because the arbitrable claims predominate.

The timing alone proves Project Veritas' Motion for PI was not sincere; it was strategic. Plaintiffs only filed the Motion for PI to invoke the Court Exception, argue the non-arbitrable claims predominate by stoking a false sense of urgency regarding the Project Veritas Entities' requests for permanent injunctions. But the Project Veritas Entities waited nearly a year after filing their initial complaint to bring their Motion for

4

PI, and, not surprisingly, the Motion for PI is unable to support any reasonable basis for a likelihood of success on the merits or show the Project Veritas Entities are suffering any irreparable harm.

## DEFENDANTS, JAMES O'KEEFE AND O'KEEFE MEDIA GROUP'S, OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### I. PRELIMINARY STATEMENT

Plaintiffs filed their Motion for PI on May 28, 2024. That date is nearly a full year after the original Complaint date (DE 1, 50, 51).  Considering this timeline, the assertion that the Project Veritas Entities *now* suddenly face irreparable harm is absurd.  What is more—after a year into this case—the Motion for PI presents almost no evidence of the voluminous violations of which the Project Veritas Entities stridently accuse O'Keefe/OMG.

Indeed, the Plaintiffs' two declarations provided in support of their Motion for P.I.: (i) are nearly copy-paste duplicates of each other (with only the names and titles of the declarants changed); (ii) consist almost entirely of text copy-pasted from the Motion for PI and the Amended Complaint, and (iii), with rare exceptions, contain only generalized conclusory assertions lacking sufficient specificity to constitute probative evidence (DE 16; DE 51 Ex. 1 and Ex. 2).

The Project Veritas Entities submitted their late-filed Motion for PI as a strategic litigation tactic, hoping to avoid a stay of these proceedings, by arguing that non-arbitrable claims predominate over arbitrable claims (*see* defendants Cross-Motion to Compel Arbitration, *infra*).  The Motion for PI should be denied and arbitration should

follow.

## II. MEMORANDUM OF LAW

### A. The Standard on a Motion for Preliminary Injunction

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies").

The movant must establish "(1) a likelihood of success on the merits. . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo*, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted).

### B. Likelihood of Success on the Merits

The Project Veritas Entities' Motion for PI is directed only to its Counts 1, 2, and 8 (DE 51, p. 10). Count 1 alleges breach of the Employment Agreement against O'Keefe (DE 16, ¶¶ 108-137). *See* Employment Agreement at **Exhibit 2** hereto. Count 2 alleges a violation of the Defend Trade Secrets Act against O'Keefe (DE 16, ¶¶ 138-145). Count 8 alleges tortious interference against OMG. (DE 16, ¶¶ 177-211).

1.  <u>Count 1 Breach of Contract</u>

To plausibly allege breach of a contract under New York law, a plaintiff must allege that there was an enforceable contract, adequate performance by one party, breach by the other party, and resulting damages. *See, e.g., M Three Corp. Consulting Ltd. v. Wascak*, No. 22 Civ. 7158, 2022 WL 15524842, at *3 (S.D.N.Y. Oct. 27, 2022).

While the Motion for PI (as well as both declarations in support thereof) allege breaches of a number of provisions of the Employment Agreement, the only injunctive relief sought in the Motion for PI concerns the alleged breaches of the Employment Agreement's Paragraph 16 (non-solicitation of employees or contractors), Paragraph 17 (non-solicitation of donors), Paragraph 11 (misuse of Confidential Information), and Paragraph 22 (failure to return property) (*See* DE 51, pg. 22, relief sought).[1]

**Paragraph 17**: Paragraph 17 of the Employment Agreement provides as follows:

> Employee warrants and agrees that during and after Employee's employment, Employee shall not contact, solicit or otherwise communicate with any person or entity that is a donor or prospective donor to Project Veritas whom Employee learns of or with whom Employee otherwise comes into contact as a result of Employee's employment by, or work for Project Veritas.

Courts in New York will only enforce a restrictive covenant where reasonable. *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999). A restrictive covenant in an employment agreement is reasonable only if it: (1) is no greater than is required for the

---

[1] Defendants do not address the likelihood of Plaintiffs success on the merits as to Paragraph 16 of the Employment Agreement. This is because Paragraph 16 is a logical non-starter for the purposes of a preliminary injunction since, *as recognized by the Project Veritas Entities, the duties allegedly imposed by that Paragraph have already expired and no longer bind O'Keefe. See* Section II.C, below, addressing the irreparable harm portion of the preliminary injunction analysis.

protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *Id.* at 388-89. In other words, the covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee. *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976).

Here, the non-solicitation provision, which lacks any limitations on time and place, fails the reasonableness test in multiple regards.  First, it does much more than simply limit solicitation of former donors or prospective donors.  It also prohibits all "communication" with them, apparently forever, effectively turning Paragraph 17 into a non-compete agreement.

The Project Veritas Entities had thousands of donors over the years during the time they were led by O'Keefe (Ex. 1, Dec. O'Keefe ¶ 16).  O'Keefe does not have the centralized Project Veritas Entities' "donor list" that was maintained while he worked there. Thus, there is no reliable practical way for him to know whether he or OMG is "communicating" with a donor (*Id.* ¶ 17).

Next, while OMG's mission and market niche are *similar* to those of Project Veritas, unlike Project Veritas, OMG is a *for-profit* entity (Ex. 1, Dec. O'Keefe ¶ 14).  Unlike Project Veritas, OMG *earns* revenue, not mainly through donations, but rather through member subscriptions, advertising, merchandising, and some educational services (*Id.* ¶ 14). Individual customers purchase a subscription/membership through OMG's website (*Id.* ¶ 14).  They exercise no direct control over who they "communicate" with in this way.

No doubt, some former donors of the Project Veritas Entities do "communicate" with them in this way.  To the extent it applies, the non-solicitation provision is thus, in effect, an overbroad non-compete agreement that scuttles OMG's entire business model.  A non-compete agreement unlimited by time or place, such as Paragraph 17, is not reasonable under New York law.  *See, e.g., Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. Sept 12, 2011).

Second, Paragraph 17 is unreasonable and should not be enforced because it applies not just to current donors, but also to prospective donors.  It also impermissibly applies to donors with whom O'Keefe formed a relationship prior to his involvement with the Project Veritas Entities, and donors who came to the Project Veritas Entities solely to avail themselves of O'Keefe's services.  *See Mercer Health & Benefits LLC v. DiGregoria*, 307 F. Supp. 3d 326, 350 (S.D.N.Y. 2018) (non-solicitation provision unreasonable with regard to prospective clients—since employer has no legitimate interest in prospective clients—and unreasonable as to "clients to whom the employee never acquired a relationship through the resources provided by the employer, nor to client relationships that the employee developed independently."); *see also BDO Seidman*, 93 N.Y.2d at 393 ("it would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services. . .").

In addition to these legal deficiencies, it is now clear that, despite the Project Veritas Entities' voluminous allegations of wrongdoing, this lawsuit is based on almost no actual evidence, apart from the Project Veritas Entities' *suspicions*.  As support for its allegations that O'Keefe breached Paragraph 17, the Project Veritas Entities offer nothing

9

more than the following: (1) O'Keefe's assistant at Project Veritas sent him information on certain donors in February of 2023, nearly three months before O'Keefe's termination;[2] (2) also in February of 2023, O'Keefe's alleged girlfriend sent him Telegram messages stating "You need to have a backup of All your donors emails" and "You have the right to your donors especially when you quit.  I would call any donor you've met recently, that has donated and tell them what happened so they can demand their money back;"[3] and (3) shortly after his termination from Veritas, O'Keefe sent an email from his OMG e-mail address to two previous Project Veritas donors that (i) said "Hey there, I know you've been a supporter of my work in the last year"; (ii) introduced the recipients to upcoming content from OMG; (iii) encouraged the recipient to "stay tuned"; and (iv) included a link to the OMG webpage.[4]  Aside from this (and conclusory allegations and accusations), the Project Veritas Entities offer no evidence of solicitation on O'Keefe's part *such as naming a single donor diverted from Plaintiffs to OMG.*

None of this evidence suggests a likelihood of success on the merits, even if Paragraph 17 were enforceable.  O'Keefe's accessing of donor information through his

---

[2] *See* DE 51, Motion for PI, pgs. 5-6, Exhibit 1 thereto, the Declaration of Ben Wetmor ("Wetmor Dec"), ¶¶ 32-39; Exhibit 2 to the Motion for PI, the Declaration of Joseph Barton ("Barton Dec."), ¶¶ 32-39; Exhibit 4 to the Motion for PI, telegram messages between O'Keefe and his alleged assistant, Asha Bolton.

[3] *See* DE 51, Motion for PI, pgs. 6-7; Wetmor Dec. ¶¶ 40--42; Barton Dec. ¶¶ 40-42; Exhibit 5 to the Motion for PI, Telegram messages between O'Keefe and his alleged girlfriend, Alexandra Rose.

[4] *See* DE 51, Motion for PI, pgs. 8-9; Wetmor Dec. ¶¶ 55-56; Barton Dec. ¶¶ 55-56; Exhibit 6 to the Motion for PI, alleged copy of email.

assistant while he still worked for Project Veritas is not evidence of solicitation. The Project Veritas Entities assert that this access by O'Keefe took place after the February 6, 2023, Board meeting where O'Keefe's access to donor information was allegedly restricted, but the Project Veritas Entities have not offered any evidence that O'Keefe's access to donor information actually was restricted at the February 6, 2023 Board meeting. Nor did they explain how *accessing donor information* under such circumstances would constitute *donor solicitation* (DE 51, p. 28). As O'Keefe testified in his declaration, after O'Keefe's suspension and then termination, many people who had supported the Project Veritas Entities financially and otherwise over the years were very upset (Ex. 1, Dec. O'Keefe ¶ 11). O'Keefe was contacted—without solicitation—by over a thousand such people, who consistently indicated they wanted their previous contributions to the Project Veritas Entities returned (*Id.*) The communications between O'Keefe and his assistant in Exhibit 4 to the Motion for PI reflects O'Keefe's efforts to document that flood of requests and inquiries (*Id.* ¶ 18).

O'Keefe's girlfriend's alleged suggestion that he contact donors is also not evidence that O'Keefe solicited donors. And the single email the Project Veritas Entities cite as allegedly having been sent to two Project Veritas donors on its face plainly does not amount to a solicitation of a donation or any attempt to convert those donors from Project Veritas to OMG.

The Project Veritas Entities also include assertions in the Motion for PI concerning O'Keefe's alleged founding of OMG and his alleged public statements about his intent to "start anew" (DE 51, pgs. 7-8; *see also* Wetmore Dec. ¶¶ 43-53; Barton Dec. ¶¶ 43-53). But

again, this does not amount to — or even suggest — O'Keefe solicited any actual donors.[5]

It suggests merely that after Veritas suspended and then terminated O'Keefe, he intended

to move on to work with OMG.

Finally, the Project Veritas Entities have submitted in support of their Motion for

PI two nearly verbatim declarations that contain certain "testimony" so conclusory that

the probative value is no more than that of an allegation.  For instance, both declarations

contain the identical "testimony" that:

> O'Keefe took and failed to return Plaintiffs' donor lists and contact
> information, equipment, as well as already unreleased investigation
> publication by Project Veritas all of which are trade secrets.  O'Keefe
> misappropriated Plaintiffs' said trade secrets as set forth above by
> converting them to the use of OMG in competition with Plaintiffs.

Wetmor Dec. ¶ 84; Barton Dec. ¶¶ 84.[6]  This "testimony," as with much of the copy and

pasted testimony in the two declarations, repackages verbatim identical allegations

appearing in the Amended Compliant and have no probative value (*See, eg.*, DE 16, ¶¶

140-141).

Indeed, what is remarkable is that the Project Veritas Entities have even continued

with this lawsuit (much less sought a preliminary injunction) considering that the Project

Veritas Entities apparently have access to all of O'Keefe's personal and professional

---

[5] The most that Plaintiffs could possibly assert about the founding of OMG is that it was not
permitted under the Employment Agreement's "Prohibited Outside Activities" provision at
Paragraph 15, but of course, any duty of O'Keefe's not to engage in certain activities outside of
his work for Veritas expired no later than his alleged May 2023 termination and therefore is not
subject to injunctive relief.

[6] *See also* the respective paragraphs 58 of both the Wetmore and Barton Declarations, which are
identical: "O'Keefe also has misappropriated Project Veritas property by taking Project Veritas'
equipment, donor lists and intellectual property for his own use with OMG."

Telegram communications during the time he worked for Veritas and have not been able to generate any more "evidence" than what is described above.  (DE 51, pg. 5).

**Paragraph 11:** Paragraph 11 prohibits O'Keefe from certain uses of Veritas' "Confidential Information."   Other than conclusory allegations and accusations, the Project Veritas Entities' only evidence of such alleged misuse is the same evidence they presented in support of their claim that O'Keefe engaged in solicitation of donors.  Just as this evidence did not suggest a likelihood of success in showing a breach of Paragraph 17, neither does this evidence suggest a likelihood of success in showing breach of the Paragraph 11, confidential information provision.

**Paragraph 22**: Paragraph 22 requires O'Keefe to return Project Veritas' property after terminating his employment.  The Project Veritas Entities have failed to present any evidence of any property of Project Veritas' that remains in O'Keefe's possession, whether the "donor list" (which O'Keefe does not have) or otherwise. The Project Veritas Entities' only evidence of failure to return property is the same evidence they presented to support their claim that O'Keefe had engaged in solicitation. Thus, the Project Veritas Entities do not have a likelihood of success in showing O'Keefe breached this Paragraph 22 either.

2.   <u>Violation of the Defend Trade Secrets Act</u>

The Project Veritas Entities' do not have a likelihood of success on the merits on their Count 2 claim for violation of the Defend Trade Secrets Act ("DTSA"), because they have offered no evidence of a violation of the DTSA beyond what they have offered for breach of contract.   Neither O'Keefe's Telegram exchanges with his assistant and

girlfriend, nor the alleged email he sent to two alleged Project Veritas donors urging them to "stay tuned," are evidence O'Keefe misappropriated trade secrets. *See* Section II.B.1, above. Likewise, O'Keefe's alleged founding of OMG and his alleged public statements about his intent to "start anew" are also not evidence of any misappropriation of trade secrets. *See* Section II.B.1, above.

### 3. Tortious interference with OMG

As an initial matter, the Project Veritas Entities do not have any likelihood of success on the merits on their Count 8 claim for tortious interference against OMG, because this count fails to state a cause of action. A claim for tortious interference with contract requires "the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019). !!!

Count 8 appears to be a pleading maneuver to bring OMG into a case where it does not belong.  The incidences of tortious interference allegedly engaged in by OMG in Count 8 mirror the incidences of breach of contract allegedly engaged in by O'Keefe in Count 1, because, as alleged, OMG's alleged tortious interference simply was the "procuring" of O'Keefe's breaches (*See* DE 16, ¶¶ 108-137, 177-211).  Count 8 alleges that O'Keefe was the managing member and principal officer of OMG, such that the various alleged incidences of tortious interference by OMG were undertaken by O'Keefe (*i.e.* by breaching the Employment Agreement), yet somehow separately procured by OMG (in

interference with Employment Agreement between O'Keefe and Project Veritas) (DE 16, ¶¶ 177-211).

Count 8 fails to state a cause of action because it does not include any non-conclusory allegations of "procurement" by OMG that would show the alleged breaches of contract were done at OMG's behest (as opposed to O'Keefe's). *See Rich,* 939 F.3d 126-27 (claim for tortious interference must allege procurement).   Without sufficiently alleging procurement against OMG, all the Project Veritas Entities are left with is a claim for tortious interference against O'Keefe, and, under New York law, a party cannot tortiously interfere with its own contract.   *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F.Supp.2d 325, 331 (S.D.N.Y. 2000). O'Keefe cannot interfere with himself.

Even if Count 8 stated a cause of action, the Project Veritas Entities have not submitted any evidence supporting this count beyond what has been discussed regarding the Project Veritas Entities' breach of contract claims above.   Because the Project Veritas Entities have not offered any probative evidence of breach of contract, they have not offered any probative evidence of tortious interference by OMG beyond conclusory allegations.   Further, the Project Veritas Entities attempts to show likelihood of success on the merits also fails on evidentiary grounds for failure to present any evidence of procurement on the part of OMG.

### C.    Likelihood of Irreparable Injury in the Absence of an Injunction

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l,*

*Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (internal quotation marks omitted). "'To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y. 2013) (quoting *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Furthermore, a plaintiff must show "that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) (internal quotation marks omitted).[7]

While courts are willing to find irreparable harm in cases involving breaches of restrictive covenants, it remains the moving party's burden to show that harm is likely to take place. *McKay v. Communispond, Inc.,* 581 F. Supp. 801, 809 (S.D.N.Y. 1983) ("[D]efendant has not shown that it lost business or customers as a direct result of plaintiff's conduct, militating against a finding that defendant has been irreparably harmed."); *compare with Johnson Controls v. A.P.T. Critical Sys.*, 323 F. Supp. 2d 525, 532

---

[7] As noted in Section II.B, above, the question of irreparable harm is a non-starter with regard to Paragraph 16's prohibition of solicitation of employees or contractors.   This is because the restrictions in Paragraph 16 — by its own terms — apply only "during Employee's employment and for a period of 12 months after termination of Employee's employment with Project Veritas" (See Employment Agreement at Motion for PI, Ex. 1).   The Motion for PI acknowledges that O'Keefe was terminated on May 15, 2023, and that the one-year time limit in Paragraph 16 "has now expired" (DE 51, p. 12).   Clearly, an injunction preventing O'Keefe from "contacting or soliciting Plaintiffs' employees or contractors" cannot be necessary to avoid irreparable harm to the Project Veritas Entities since there is no dispute that O'Keefe is now legally entitled to make such contacts and solicitations (DE 51, p. 22).

(S.D.N.Y. 2004) ("[B]ecause defendants acknowledge soliciting and providing competitive services to these clients since leaving JCI, it is clear JCI faces irreparable harm in this regard, absent injunctive relief.")

A <u>delay</u> in seeking a preliminary injunction will weaken a claim for irreparable harm, because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 964 (2d Cir. 1995) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d. DCA 1985)).  Thus, such a delay by itself may "preclude the granting of preliminary injunctive relief." *Id.* (quoting *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985)).  Delay is thus a factor a court will consider in "determining whether a plaintiff will, in fact, suffer irreparable harm in the absence of a preliminary injunction." *New Look Party Ltd. v. Louise Paris Ltd.*, Case No.: 11 Civ. 6433, 2021 WL 251976 *10 (S.D.N.Y, Jan. 11, 2012).

Where substantial delay exists, courts will demand a basis justifying the delay. *See, e.g., Marks Organization, Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. Mar. 18, 2011); *Juicy Couture, Inc.*, 930 F.Supp.2d at 504.

Here, the Project Veritas Entities delayed nearly a year after filing their initial complaint before filing their motion for a preliminary injunction. And then, the Project Veritas Entities were spurred to act only because of Defendants' motion to compel arbitration—not because of any actual urgency posed by any legitimate prospective harm.  The Project Veritas Entities do not offer any viable justification for their year-long delay.  Sometimes, new facts justifying an injunction emerge later, after the filing of the

complaint.  That is not the case here.  Rather, *all of the evidence relied on here by the Project Veritas Entities in the Motion for PI was in the Project Veritas Entities possession from the very beginning*.

The Project Veritas Entities argue that they delayed because they were trying to "resolve the matter without incurring unnecessary litigation expenses on all sides" (DE 51, fn. 8)   But this is insufficient, and it is also inconsistent with the Joint Status Report filed in this case on March 25, 2024, which states that the settlement conference attended by the parties failed to result in a resolution on March 18, 2024  (DE 38).

Even if obscure "negotiations to avoid expenses" provided a sufficient basis to wait a year prior to filing a motion for preliminary injunctive relief, the most recent settlement efforts in this case had broken down over ten weeks before the May 29, 2024, Motion for PI was filed.  (DE 51).  The timing of the Motion for PI is much more easily explained as a strategic response to O'Keefe/OMG's motion to compel arbitration, as demonstrated by the fact that the Project Veritas Entities filed their Motion for PI only 2 days before the pre-motion hearing on O'Keefe/OMG's motion to compel arbitration (DE 40, 42, 51, 52).

The Project Veritas Entities' complaints have, from the start, sought (at least nominally) preliminary relief preventing O'Keefe from soliciting Plaintiffs' donors and misusing Confidential Information (DE 1 ¶ 115, DE 16 ¶ 134, DE 51, pgs. 23-23).  There is no reason why settlement negotiations should have caused the Project Veritas Entities to have delayed seeking preliminary injunctive relief, since the Project Veritas Entities argue these alleged violations are existential (DE 51, pgs. 23-23).

The Project Veritas Entities also seek to explain their delay by arguing that they were "awaiting O'Keefe's and OMG's defenses" (DE 51, fn. 8).  Again, even if the Project Veritas Entities were in fact "awaiting O'Keefe's and OMG's defenses," it would not justify or explain in any way waiting *a year* to seek a preliminary injunction if the Project Veritas Entities truly believed they were experiencing irreparable harm.

Equally important, the Project Veritas Entities have offered no evidence of any actual harm *caused by* any alleged wrongdoing of O'Keefe.  To be sure, O'Keefe/OMG are aware that, since O'Keefe left Project Veritas, it has burned through millions of dollars in cash and has laid off much of its workforce (Ex. 1, Dec. O'Keefe ¶ 12).

It is likely that, through no fault of Defendants, the Project Veritas Entities *have* lost donors, goodwill, revenue/donations, and their ability to produce reliably high-quality content (though the Project Veritas Entities have not even provided evidence of these harms).  However, the Motion for PI shows no evidence that any such harm was *caused by* some wrongdoing of O'Keefe.  Much more likely is that any harm experienced by the Project Veritas Entities results from having terminated its founder, fundraiser, team leader, and public "face".  Indeed, while the Project Veritas Entities insist that "[n]o one person is Project Veritas," they have presented no evidence that the Project Veritas Entities can even sustain themselves without O'Keefe.  (DE 51, p. 13).

Consequently, the Project Veritas Entities are left with nothing on which to base their claim of irreparable harm but the language of Paragraph 23.B of the Employment Agreement stating that O'Keefe "recognizes" that breach of the Employment Agreement "will result in irreparable harm."  (DE 16-1).  Some courts have considered such clauses

"arguably" relevant to the question of whether an employer has demonstrated irreparable harm. But "no authority indicat[es] that such a contract provision entitles the plaintiff to a per se finding of irreparable harm." *Int'l Creative Mgmt. v. Abate*, 2007 WL 950092 *6 (S.D.N.Y, March 28, 2007); *see also Baker's Aid, Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[T]he contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."). In fact, "the significance of this provision further diminishes" because it "was not specially negotiated and included" in O'Keefe's agreement but, rather, is included in many of Veritas' employees' agreements. *Int'l Creative Mgmt.*, 2007 WL 950092 at *7 (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999)); *see also* Exhibits B and C to the Amended Complaint, respectively Paragraphs 25 to the employment agreements of Iatropoulos and Maxwell. The Project Veritas Entities thus "cannot rely on the contract provision alone to demonstrate irreparable harm," especially not where that provision is a boilerplate term in Veritas' agreements applicable to many employees. *Int'l Creative Mgmt.*, 2007 WL 950092 at *6.

The Plaintiffs have not met the required element of likelihood of irreparable injury absent an injunction. The Motion for PI is due to be denied.

### D.   The Balance of the Hardships

The balance of the hardships tips in favor of O'Keefe/OMG.  As to the Project Veritas Entities, the Motion for PI has provided no basis for believing the Project Veritas Entities have any legitimate need for an injunction.  The Project Veritas Entities do not

show any harm they have or will suffer as a result of some wrongdoing by O'Keefe or OMG.

By contrast, burdening O'Keefe and OMG with the stigma of a court-ordered injunction as O'Keefe works to rebuild a business in the same media niche where he previously built Project Veritas into a thriving enterprise would place a great hardship on O'Keefe and OMG. The Project Veritas Entities, in filing this lawsuit, do not seek a business or even legal win, but rather, a public relations win in their bad-faith dispute with their founder.  !

### E.      The Public Interest

Preliminary injunctive relief "is an extraordinary and drastic remedy." *Moore.*, 409 F.3d at 510. Without O'Keefe, Project Veritas is an entity that has no hope of sustaining the media business O'Keefe built under its banner. It therefore seeks to invoke this Court's jurisdiction to issue an injunction that will have an anti-competitive effect, hobbling the reputation of O'Keefe and OMG as they seek to rebuild what was lost when the Project Veritas Entities terminated O'Keefe. This is not what the "extraordinary and drastic" remedy of preliminary injunctive relief is for, and injunctive relief under the circumstances is therefore against the public interest.

### CONCLUSION

For the foregoing reasons, the Project Veritas Entities are not entitled to any of the preliminary injunctive relief they have requested, and their Motion for PI should be denied in its entirety.

**DEFENDANTS, JAMES O'KEEFE AND O'KEEFE MEDIA GROUP'S, RENEWED CROSSMOTION TO COMPEL ARBIRATION AND STAY PROCEEDINGS**

### III.  PRELIMINARY STATEMENT

In addition to denying the Project Veritas Entities Motion for PI, this Court should also grant O'Keefe/OMG's Motion to Compel and Stay, ordering the parties to arbitration and staying any non-arbitrable claims.

This lawsuit arises out of the Employment Agreement, which contains a broad arbitration agreement that is subject to the Federal Arbitration Act ("FAA").  The broad arbitration provision appears at Paragraph 23.A. of the Employment Agreement (the "Arbitration Agreement").  It states:

> Except as otherwise provided, all disputes, controversies, or claims arising out of or relating to this Agreement or any alleged breach hereof shall be submitted to mandatory and binding confidential arbitration before, and in accordance with the then-applicable rules of the American Arbitration Association ("AAA").

The Project Veritas Entities' Amended Complaint contains eight counts against Defendant O'Keefe and three counts against Defendant OMG.[8]  The eight counts against O'Keefe include counts for breach of contract, violation of the Defend Trade Secrets Act, breach of fiduciary duty, breach of loyalty, conversion, replevin, indemnification, and a count for declaration of ownership of copyright.  All arise out of or relate to the Employment Agreement or alleged breaches thereof and thus, on the face of the Arbitration Agreement, they should be referred to arbitration.

---

[8] Plaintiffs' claims against Defendants RC Maxwell and Anthony Iatropoulos (Counts 9 and 10) were settled during a March 18, 2024, settlement conference before Magistrate Judge Andrew E. Krause (DE 38).  Defendant Iatropoulos was dismissed from this case with prejudice on May 13, 2024 (DE 48).

The three counts against OMG allege that OMG tortiously interfered in Veritas'

contracts with—respectively—O'Keefe, RC Maxwell, and Anthony Iatropoulos.  These

three counts should also be referred to arbitration because although OMG is not a party

to the Employment Agreement, OMG's tortious interference—as alleged—was

intimately founded in and intertwined with the Employment Agreement.

The only exception to the broad scope of the Arbitration Agreement can be found

at Paragraph 23.B., which allows for Veritas to *seek injunctive relief* in "court or from the

AAA" to "enforce or restrain" "threatened or actual breaches" of the Employment

Agreement by O'Keefe (the "Court Exception").

This exception applies to few, if any, of the Project Veritas Entities' claims.  To the

extent the Court does find any of Plaintiffs' claims non-arbitrable, O'Keefe/OMG urge

the Court to exercise its discretion to stay this case in its entirety on the basis that the

arbitrable claims predominate and the non-arbitrable claims are of questionable merit.

## IV.  MEMORANDUM OF LAW

### F.  The Factors for a Motion to Compel Arbitration and Stay Court Proceedings

Where a court in the Second Circuit is asked to compel arbitration or stay

proceedings pending arbitration under the Federal Arbitration Act, it must address the

following questions:

> [F]irst, it must determine whether the parties agreed to arbitrate;
> second, it must determine the scope of that agreement; third, if federal
> statutory claims are asserted, it must consider whether Congress
> intended those claims to be nonarbitrable; and fourth, if the court
> concludes that some, but not all, of the claims in the case are arbitrable,
> it must then decide whether to stay the balance of the proceedings

pending arbitration.

*Oldroyd      v.      Elmira      Sav.      Bank*, 134      F.3d      72,      75–76      (2d

Cir.1998); *accord Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987).[9]

### G.    The Parties Agreed to Arbitrate

The first element in the *Oldroyd* test is whether the parties agreed to arbitrate. *Id.*

Here, there is currently no dispute that the Employment Agreement contains a valid

Arbitration Agreement.  (DE 16, Amended Complaint ¶10).  Therefore, the first question

under the *Oldroyd* test—whether the parties agreed to arbitrate—is answered yes.

### H.    Congress did not Intend the Federal Statutory Claims to be Non-arbitrable

Where a complaint asserts federal statutory claims, the *Oldroyd* test will also ask if

Congress intended those claims to be non-arbitrable. The Amended Complaint alleges

two federal statutory claims: its Count 2 claim for violation of the Defend Trade Secrets

Act, 18 U.S.C. § 1839(3), and its Count 13 request for a declaration that Veritas is the owner

of certain copyrights under 17 U.S.C. § 101.  Here, case precedent shows that both of the

alleged federal statutory claims are arbitrable.  *See Mavel, A.S. v. Rye Dev., LLC*, 626 F.

Supp. 3d 331, 343 (D. Mass. 2022) (compelling arbitration of Defend Trade Secrets Act

cause of action); *LDS, Inc. v. Metro Canada Logistics, Inc*, 28 F. Supp. 2d 1297, 1300-01 (D.

---

[9] Not stated in *Oldroyd* is the further requirement that in order for the FAA to apply, the contract in question must "evidenc[e] a transaction involving commerce", a lenient standard that is easily met here since Project Veritas is a media provider whose content is viewed all over the country and the world.  *See* 9 U.S.C. § 2; *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("the phrase 'involving commerce' in the FAA is the 'functional equivalent of the more familiar term "affecting commerce,"' which signals the broadest possible exercise of Congress' Commerce Clause power.")

Kan. 1998) (compelling copyright infringement claim to arbitration where the court was "aware of nothing in the text of the Copyright Act evincing a Congressional intent to preclude arbitration, nor are we aware of any legislative history indicating Congress' intent to prohibit arbitration of copyrights infringement claims.").  Plaintiffs are thus unable to meet their burden to demonstrate that the arbitrability of their statutory causes of action are precluded by the intent of Congress. *Gen. Media, Inc. v. Shooker*, No. 97 CIV.510 (DAB), 1998 WL 401530, at *10 (S.D.N.Y., July 16, 1998) (burden on plaintiffs to show preclusion by intent of Congress).

## I.    The Scope of the Arbitration Agreement Applies to Plaintiffs' Claims

The next element under the *Oldroyd* test is whether the claims O'Keefe/OMG seek to have arbitrated fall within the scope of the Arbitration Agreement.

Interpretation of an arbitration clause is "ordinarily a matter of state law" to which Federal courts will defer, *DIRECTTV, Inc. v Imburgia,* 577 U.S. 47, 54 (2015), and it is a principle of New York contract interpretation that "a court's interpretation of a contract 'should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 162 (S.D.N.Y 2014) (quoting *Givati v. Air Techniques, Inc.,* 960 N.Y.S 2d 196, 198 (2013).

Here, the parties entered into a broad arbitration agreement, which provides:

> Except as otherwise provided, all disputes, controversies, or claims arising out of or relating to this Agreement or any alleged breach hereof shall be submitted to mandatory and binding confidential arbitration before, and in accordance with the then-applicable rules of the American Arbitration Association ("AAA")

(Ex. 2, Employment Agreement, ¶23.A).

Plaintiffs, however, ask the Court to interpret the Arbitration Agreement with reference to the narrow exception in Paragraph 23.B of the Employment Agreement, reading that exception so broadly as to make the Arbitration Agreement itself meaningless surplusage.  Paragraph 23.B states:

> Employee recognizes that the actual or threatened breach of Employee's restrictions and obligations contained herein will result in irreparable harm to Project Veritas and that, notwithstanding anything herein to the contrary, Project Veritas may seek a preliminary and/or final injunction, either in court or from the AAA to enforce those restrictions and obligations or to restrain any actual or threatened breach of those restrictions and obligations, in addition to any and all additional remedies available at law.

This exception to the broad Arbitration Agreement—the "Court Exception"—is narrowly drafted to allow court proceedings only "to seek a preliminary and/or final injunction" in order to "enforce" or "restrain any actual or threatened breaches of…restrictions and obligations" in the Employment Agreement.  In other words, to the extent a claim otherwise falls within the Arbitration Agreement, Veritas has the choice to bring that claim in court only in so far as such claim (i) seeks an injunction, (ii) to restrain or enforce a, (iii) breach of the Employment Agreement.   That is all.

However, the Project Veritas Entities grossly misread the last clause of the Court Exception (i.e. "in addition to any and all additional remedies available at law") arguing that it allows them to "pursue in this Court 'any and all additional remedies available at law,' notwithstanding the arbitration provisions of the Employment Agreement." (DE 16, ¶10).   Effectively, the Project Veritas Entities are arguing that the facially broad

Arbitration Agreement is virtually dissolved by the Court Exception, such that Plaintiffs may bring all legal (and apparently) statutory claims in "court" where they may seek damages as a remedy therefore.

Of course, even on the face of the Court Exception, it is clear this is not what is meant by the phrase "in addition to any and all additional remedies available at law." This clause simply clarifies that the narrow injunctive "court" relief made available by the Court Exception should not be read to prevent Veritas from pursuing relief other than the relief defined in the Court Exception through arbitration or in another permissible venue.  To read the Court Exception to allow the Project Veritas Entities to pursue in "court" *both* injunctive relief for breaches of the Employment Agreement *and* "any and all additional remedies available at law," would mean that almost any dispute the Project Veritas Entities could envision bringing against O'Keefe/OMG would be captured by the broad Arbitration Agreement only to be immediately carved out by the Court Exception.

Plaintiffs urge the Court not to interpret the Employment Agreement in this way. On this reading, the Arbitration Agreement would be rendered largely meaningless surplusage in violation of New York principles of contract interpretation.  *See Ward,* 3 F. Supp. 3d at 162.

With a clear understanding of the effect of the last clause of the Court Exception, Defendants now analyze Plaintiffs' specific claims and demonstrate that each falls within the scope of the Arbitration Agreement.

        i.   <u>Counts 2-7 and 13 fall within the Scope of the Arbitration Agreement</u>

Counts 2-7 and 13 of the Amended Complaint are all brought against Defendant O'Keefe, and they all fall within the scope of the Arbitration Agreement.

These counts allege violations of the Defend Trade Secrets Act, breach of fiduciary duty, breach of loyalty, conversion, replevin, indemnification, and a count for declaration of ownership of copyright. Each of these counts share their factual basis with a breach of the Employment Agreement alleged by the Project Veritas Entities in their Count 1. These claims are thus simply claims for breach of the Employment Agreement repackaged into new legal theories. Consequently, they all "aris[e] out of or relat[e] to the" Employment Agreement (Ex. 2, Employment Agreement, ¶23.A).

Specifically, as to Count 2 alleging violation of the Defend Trade Secrets Act, *compare* Amended Complaint ¶141 (Count 2) *with* ¶¶ 113-115 (Count 1); as to Count 3 alleging breach of fiduciary duty, *compare* Amended Complaint ¶152 (Count 3) *with* ¶¶ 112-13, 115-16, 121-122, 123-26, 130-31 (Count 1); as to Count 4 alleging a breach of fiduciary duty, *compare* Amended Complaint ¶158 (Count 4) *with* ¶¶ 112-13, 115-16, 121-122, 123-26, 130-31 (Count 1); as to Count 5 alleging conversion, *compare* Amended Complaint ¶¶ 162-164 (Count 5) *with* ¶¶ 115-116 and 129-130 (Count 1); as to Count 6 alleging replevin, *compare* Amended Complaint ¶¶ 169 (Count 6) *with* ¶¶ 114-115 (Count 1); as to Count 13 for declaration of ownership of copyright *compare* Amended Complaint ¶¶ 267-75 (Count 13) *with* ¶¶ 114-116 (Count 1).[10]

---

[10] In addition, Count 7 for indemnification is not ripe. It seeks to hold O'Keefe liable "[t]o the extent Plaintiffs may be subject to investigation and/or action against them" in the future. This is a speculative injury that is likely to never occur. *Ross v. Bank of America,*

Therefore, all of these counts "aris[e] out of or relat[e] to this Agreement or any alleged breach thereof" and thus fall within the Arbitration Agreement (Ex. 2, Employment Agreement, ¶ 23.A).  At the same time, none of Counts 2-7 and 13 fall within the exception in Paragraph 23.B of the Employment Agreement.  Even where these counts seek injunctive relief, none of them sound in contract and thus the relief they seek is not for the purpose of remedying "any actual or threatened breaches of" of the Employment Agreement (Ex. 2, Employment Agreement, ¶ 23.B).  Consequently, these counts are all arbitrable.

### ii.   Counts 8, 11, and 12 fall within the Scope of the Arbitration Agreement

Counts 8, 11, and 12 allege that OMG tortiously interfered with Project Veritas' employment agreements with, respectively, O'Keefe, RC Maxwell, and Anthony Iatropoulos.

All of these counts (8, 11, and 12) "aris[e] out of or relat[e] to this Agreement or any alleged breach thereof" and therefore fall within the Arbitration Agreement.  At the same time, none of these counts fall within the Court Exception, because even where they seek injunctive relief, none of them sound in contract and thus the relief they seek is not for the purpose of remedying "any actual or threatened breaches" of the employment agreements (Ex. 2, Employment Agreement ¶23.B.)

Though OMG is not a party to the Employment Agreement, it may nonetheless

---

*N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (claim not ripe where "the injury is merely speculative and may never occur.")

compel arbitration of these counts under a theory of estoppel. *Thomson-CSF, S.A. v. Amer. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (estoppel theory is an exception to the rule that an arbitration agreement will apply only to signatories). Under estoppel theory "[a] signatory will be estopped 'to avoid [ ] arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Chase Mortg. Co.-West v. Bankers Trust Co.*, No. 00 Civ. 8150 (MBM), 2001 WL 547224 at *2 (S.D.N.Y. May 23, 2001), *quoting Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, *supra*, 198 F.3d 88, 98 (2d Cir. 1999). The two factors a court will consider in determining whether intertwinement is present are whether the non-signatory's claims arise under the subject matter of the underlying agreement and whether there is a "close relationship" between the defendant signatory and the defendant non-signatory. *Chase Mortg. Co.-West*, 2001 WL 547224 at *2–*3.

Plaintiffs' Count 8 alleges that OMG interfered with the Employment Agreement "through its managing member and principal officer, O'Keefe" (DE 16, Amended Complaint, ¶¶ 186, 189, 192, 195, 198, 201, 205). And the interference alleged in Count 8 is precisely the procuring of O'Keefe's supposed breaches of the Employment Agreement alleged at Count 1 (DE 16, Amended Complaint, *compare* ¶¶108-137 *with* ¶¶177-211). In effect, Count 8 contends O'Keefe interfered with the Employment Agreement by causing himself to breach it. Therefore, the "issues [OMG] is seeking to resolve in arbitration are intertwined with the agreement that [Veritas] has signed." *Chase Mortg. Co.-West*, 2001 WL 547224 at *2–*3.

30

And there is a close relationship between the defendant signatory (O'Keefe) and the defendant non-signatory (OMG), insofar as Plaintiffs allege O'Keefe is the founder and principal member of OMG, which O'Keefe allegedly formed immediately after being placed on leave by Project Veritas (DE 16, Amended Complaint, ¶4, ¶¶52-55).

Counts 11 and 12 are also intertwined with the Employment Agreement. Count 11 alleges that Iatropoulos, a former employee of Project Veritas, breached a provision of his employment agreement with Project Veritas by failing to return its equipment. Count 12 makes essentially the same allegations as does Count 11, only regarding Maxwell's employment agreement with Project Veritas. They further allege that "OMG through its managing member and principal officer, O'Keefe, intentionally and improperly procured" these breaches, thus tortiously interfering with these contracts.[11]

Regarding both of these counts, there is once again a close relationship between the defendant signatory (O'Keefe) and the defendant non-signatory (OMG), as addressed above. (DE 16, Amended Complaint, ¶4, ¶¶52-55); *Chase Mortg. Co.-West*, 2001 WL 547224 at *2–*3. Plaintiffs' claims also arise under the same subject matter of the Employment Agreement in that the alleged breaches by Iatropoulos and Maxwell (and alleged procurement thereof by OMG) were part of the same series of transactions and occurrences by which O'Keefe left his employment with Veritas.[12]  *Id.*

---

[11] *See* DE 16, Amended Complaint, ¶¶243-47 and ¶¶255-62; *See also* DE 16, Ex. B, the employment agreement between Iatropoulos and Project Veritas *and* DE 16, Ex. C, the employment agreement between Maxwell and Project Veritas.

[12] Alternatively, OMG invokes the estoppel doctrine to compel arbitration under the arbitration provisions in the Iatropoulos Agreement and the Maxwell Agreement, respectively, which are materially identical to the one in O'Keefe's Employment Agreement (DE 16, Amended

Therefore, Counts 11 and 12 against OMG are intertwined with the employment agreements and OMG may seek to compel arbitration of these counts as a non-signatory on the basis of estoppel.

iii.   <u>Count 1 is Arbitrable</u>

The Project Verita Entities' Count 1 brings nine separate alleged bases for breach of contract against O'Keefe. All nine bases fall within the scope of the Arbitration Agreement.  They are all "disputes, controversies, or claims arising out of or relating to" the Employment Agreement "or any alleged breach" thereof because they allege breaches of the Employment Agreement (Ex. 2, Employment Agreement, ¶23.A).  Consequently, the only real question is whether any of these claims are non-arbitrable because the Court Exception carves them out of the Arbitration Agreement to the extent they seek injunctive relief.

To the extent the breaches alleged in Count 1 seek monetary damages, the Court Exception will not apply to these claims since the Court Exception does not apply to damages and damages can only be pursued in arbitration. This is because the Court Exception is limited to efforts to "enforce or restrain" "by preliminary or final injunction" "threatened or actual breaches" of the Employment Agreement (Ex. 2, Employment Agreement, ¶23.B).

---

Complaint, Ex. B ¶ 25; Ex. C ¶ 29). Under these agreements, there is a close relationship between the signatories (Iatropoulos and Maxwell) and the defendant non-signatory (OMG), since OMG is alleged to effectively be O'Keefe, for whom Iatropoulos and Maxwell are alleged to have worked at both Project Veritas and OMG.  Likewise, the claims against OMG arise under the same subject matter as the Iatropoulos Agreement and the Maxwell Agreement since Counts 11 and 12 allege tortious interference with these very agreements.

Further, many of the breaches alleged in Count 1 are not captured by the Court Exception even to the extent they purport to seek injunctive relief because such claims concern alleged obligations contained in the Employment Agreement that are no longer binding on O'Keefe and thus the Court Exception cannot be invoked to seek to "enforce or restrain" "by preliminary or final injunction" "threatened or actual breaches" of such obligations (Ex. 2, Employment Agreement, ¶ 23.B).  This applies to the alleged breaches of Paragraphs 1.B (O'Keefe's duty to devote his full working time, attention, and best efforts to the performance of his job), 15 (O'Keefe's duty to refrain from prohibited outside activities while employed by Project Veritas), 27 (O'Keefe's duty, during his employment with Veritas, to abide by the Veritas handbook and policies) and 16 (O'Keefe's duty to not solicit Veritas past and present employees and contractors for 12 months after his employment)  (*See* DE 16, Amended Complaint, ¶¶ 112, 121, 123, 130). Thus, Count 1's claims for violations of these supposed duties-even to the extent they seek injunctive relief—do not fall within the Court Exception and must be arbitrated.

Certain other breaches alleged in Count 1 concern provisions of the Employment Agreement that conceivably can be interpreted to continue to apply to O'Keefe. These include the alleged breach of Paragraphs 10.A (work product derived from O'Keefe's services belongs to Project Veritas), 11 (confidentiality requirement), 12 (non-disparagement provision), 17 (non-solicitation provision concerning donors), and 22 (duty to return Project Veritas' property on termination of employment) (*See* DE 16, Amended Complaint, ¶¶ 114, 117, 119, 125, 127-129).

As to each of these supposed duties, Plaintiffs' Amended Complaint alleges past

breaches, but does not allege these supposed breaches are ongoing nor that there is a basis to believe they are "threatened" to happen again in the future. The Court Exception only applies to claims seeking an injunction to "enforce" or "restrain" an "actual or threatened breach", not past breaches (Ex. 2, Employment Agreement, ¶ 23.B). Therefore, of the nine breaches alleged in Count 1, the sole supposed breach that might be seen to fall within the Court Exception arises under Paragraph 22 of the Employment Agreement, which requires O'Keefe to return Veritas' property on separation from employment (Dkt. 16, Amended Complaint, ¶¶ 127-129, Ex. A ¶ 22)

Further, as shown in O'Keefe's/OMGs Opposition to Plaintiffs Motion for PI above, the Project Veritas Entities have presented no probative evidence that these provisions have been violated (including Paragraph 22), and thus, (see following section) arbitrable claims predominate and the Project Veritas Entities request for injunctive relief for alleged breaches of these paragraphs of the Employment Agreement should be stayed pending arbitration.

### J.      Any Non-arbitrable Claims Should be Stayed

Finally, the *Oldroyd* test requires that if the "court concludes that some, but not all of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Oldroyd,* 134 F.3d at 75-72. "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket" *Genesco, Inc.*, 815 F.2d at 856 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, fn. 20 (1983)).

In exercising its discretion "[t]he Court must consider factors such as the

desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017) "A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Id.* at 110-11 (quotation omitted); *see also Moore v. Interacciones Glob., Inc.*, No. 94-CV-4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). Broad stay orders are particularly appropriate if the arbitrable claims predominate in the lawsuit and the non-arbitrable claims are of questionable merit. *Genesco, Inc.*, 815 F.2d at 856 (citing *NPS Commc'ns, Inc v. Continental Group, Inc.*, 760 F. 2d 463, 465 (2d Cir. 1985)).

Even to the extent the Court finds that some non-arbitrable claims are present in this case, it should exercise its discretion to stay the entire case pending arbitration. It is desirable to avoid piecemeal resolution of the various disputes in this case, especially since the potentially non-arbitrable claims share common issues of law and fact with the arbitrable claims. Specifically, the questions of whether O'Keefe should be enjoined for certain alleged violations of the Employment Agreement overlap factually and legally with the other claims in the case which concern, broadly, whether O'Keefe violated his duties to Project Veritas as an employee and board member and through his leadership of OMG. *Katsoris*, 237 F. Supp. 3d at 110-11 (S.D.N.Y. 2017). The arbitrable claims thus predominate, and, as shown above, any non-arbitrable claims are of questionable merit.

*Genesco, Inc.*, 815 F.2d at 856.  This lack of merit is particularly present regarding the claims on which the Project Veritas Entities base their Motion for PI, as demonstrated in O'Keefe's/OMG's above Opposition to the Plaintiffs' Motion for PI.

Finally, it cannot be suggested that there is any urgency to resolve any non-arbitrable claims for injunctive relief in this Court.  As addressed in detail in O'Keefe/OMG's Opposition to Plaintiffs' Motion for PI above, the Project Veritas Defendants have displayed a thorough lack of urgency in seeking injunctive relief in this case by waiting nearly a year to file their Motion for PI.   In light of this history, there is no urgency for the Court to resolve any non-arbitrable claim of Plaintiffs, and all claims in this dispute should be stayed pending resolution of the arbitrable claims.

## CONCLUSION

Based on the above, Defendants request an order from this Court (i) compelling arbitration of all arbitrable claims asserted in the Amended Complaint and (ii) staying all remaining claims in this litigation until arbitration is complete.

WHEREFORE, Defendants respectfully request that the Court enter an order denying Plaintiffs Motion for PI, compelling arbitration of all claims it deems arbitrable, staying this proceeding as to all counts, and granting Defendants such other relief as the Court deems just and proper.

Dated this 26th day of June 2024.



2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104 fax 407-209-3870

*/s/ Seldon J. Childers*

Seldon J. Childers

Florida Bar No. 61112
jchilders@smartbizlaw.com
notice@smartbizlaw.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically with the Clerk of the Court using CM/ECF on June 26, 2024, which served same electronically upon all counsel of record.

*s/ Seldon J. Childers*
Attorney