**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
 PROJECT VERITAS and PROJECT          :
 VERITAS ACTION FUND,                 :   Civil Action No. 7:23-cv-04533
                                      :
                     Plaintiffs,      :
                                      :
        -against-                     :
                                      :
 JAMES O'KEEFE, TRANSPARENCY 1,       :
 LLC d/b/a O'KEEFE MEDIA GROUP, RC    :
 MAXWELL, and ANTHONY                 :
 IATROPOULOS,                         :
                                      :
                     Defendants.      :
-----------------------------------------------------------x
```

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION**
**FOR A PRELIMINARY INJUNCTION**

**-AND-**

**RESPONSE IN OPPOSITION TO DEFENDANTS' RENEWED CROSS**
**MOTION TO COMPEL ARBITRATION AND STAY PROCEEDING**

RANDAZZA │ LEGAL GROUP

## TABLE OF CONTENTS

1.0     FACTUAL OBSERVATIONS ........................................................................................ 1

2.0     A PRELIMINARY INJUNCTION SHOULD ENTER ................................................. 3

2.1     O'Keefe Breached His Employment Agreement ........................................................ 3

2.2     O'Keefe Violated the Defend Trade Secrets Act ...................................................... 7

2.3     OMG Tortiously Interfered with O'Keefe's Employment Agreement ...................... 7

2.4     The Remaining Factors Favor Entry of Injunctive Relief ......................................... 9

3.0     ARBITRATION SHOULD NOT BE COMPELLED .................................................. 12

3.1     Plaintiffs' Claims Are Not Within the Scope of the Agreement to Arbitrate ........... 12

3.1.1   The Claims are Non-Arbitrable Where an Action Seeking Preliminary or
        Permanent Injunction is Brought ........................................................................ 13

3.1.2   Defendants have Breached the Agreement and/or Threaten Breach ................... 15

3.1.3   The Claims Against OMG are Non-Arbitrable ..................................................... 17

3.2     The Matter Should Not be Stayed ............................................................................ 19

4.0     CONCLUSION ............................................................................................................ 19

RANDAZZA | LEGAL GROUP

# TABLE OF AUTHORITIES

## CASES

*Arena Invs., L.P. v. DCK Worldwide Holding Inc.*,
  215 A.D.3d 155 (1st Dep't 2023) .......................................... 8

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008).............................................. 11

*Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*,
  517 F. Supp. 2d 1089 (D. Minn. 2007)................................. 15

*Carter v. Payback Repo, Inc.*,
  No. CV 22-5083 (JMA)(ARL), 2023 U.S. Dist.
  LEXIS 150415 (E.D.N.Y. Aug. 25, 2023)............................. 18

*Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers
  Union Local 812, Int'l Bhd. of Teamsters*,
  242 F.3d 52 (2d Cir. 2001)................................................... 14

*Cortes v. Twenty-First Century Fox Am., Inc.*,
  285 F. Supp. 3d 629 (S.D.N.Y. 2018) ................................... 8

*Democracy Partners, LLC, et al. v. Project Veritas Action Fund, et al.*,
  Case No. 1:17-cv-01047-PLF (D.D.C. filed Jun. 1, 2017) .......... 13

*Doe v. Trump Corp.*,
  6 F.4th 400 (2d Cir. 2021) ................................................... 18

*Givati v. Air Techniques, Inc.*,
  960 N.Y.S 2d 196  (2013)..................................................... 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010).......................................................... 17, 18

*Int'l Creative Mgmt. v. Abate*,
  2007 U.S. Dist. LEXIS 22964 (S.D.N.Y. Mar. 28, 2007) ........... 10

*Jasper v. Bovina Music, Inc.*,
  314 F.3d 42 (2d Cir. 2002).................................................... 12

*Lexington Ins. Co. v. United Health Grp.*,
  2011 U.S. Dist. LEXIS 14929 (D. Mass. Feb. 15, 2011) ........... 15

*Local Union 97, IBEW v. Niagara Mohawk Power Corp.*,
  67 F.4th 107 (2d Cir. 2023) ................................................ 17, 18

RANDAZZA | LEGAL GROUP

*Oldroyd v. Elmira Sav. Bank*,
    134 F.3d 72  (2nd Cir.1998) ............................................................................ 12

*Ross v. Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008) ............................................................................ 18

*Smith v. Spizzirri*,
    144 S. Ct. 1173 (2024) .................................................................................... 19

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
    198 F.3d 88 (2d Cir. 1999) ........................................................................ 17, 18

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) ............................................................................ 18

*Thistle v. Englert*,
    103 A.D.2d 268 (App. Div. 4th Dept. 1984) ................................................... 11

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63  (2d Cir. 1999) ............................................................................. 10

*Trs. of the N.Y. State Nurses Ass'n Pension Plan v. Hakkak*,
    No. 22-cv-5672 (ER), 2023 U.S. Dist. LEXIS 135393 (S.D.N.Y. Aug. 2, 2023) ................... 18

*Velo-Bind, Inc. v. Scheck*,
    485 F.Supp. 102  (S.D.N.Y. 1979) ................................................................... 10

*Ward v. TheLadders.com, Inc.*,
    3 F. Supp. 3d 151 (S.D.N.Y 2014) ................................................................... 13

**STATUTES**

18 U.S.C. § 1836 ................................................................................................. 7, 12

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 766 (comment j) (1979) ........................................ 8

RANDAZZA | LEGAL GROUP

James O'Keefe acknowledges he has Plaintiffs' confidential donor information. He acknowledges that he obtained certain donor information from his assistant at the time he was suspended, in February 2023.  He does not deny that he contacted and/or solicited Plaintiffs' donors based upon the information from his assistant or that he had otherwise had in his possession. This malfeasance must be enjoined.  Relatedly, there is no basis for O'Keefe's demand this matter be shunted to arbitration merely because O'Keefe does not like the contract he agreed-to and this Court should not compel an arbitration to which the parties did not agree.

## 1.0    FACTUAL OBSERVATIONS

In response to Plaintiffs' motion for preliminary injunction, and in support of his cross-motion to compel arbitration (ECF No. 52), O'Keefe submitted two exhibits.  The second is a copy of his employment agreement, executed September 30, 2022 (ECF No. 52-2), which is identical in all respects to the copy filed by Plaintiffs in support of their motion (ECF No. 51-3).[1]  The other exhibit (ECF No. 52-1), O'Keefe's declaration, is primarily designed for media consumption, and it is far more informative in what it does not say than what it does:

1)    At Paragraph 4, O'Keefe addresses his termination as CEO and removal from the Board of Directors in 2023.  What he does not specify is the precise date; he does not contest that the Board removal occurred on April 24, 2023, and his employment was not terminated until May 15, 2023 (*contrast* Declarations of Ben Wetmore and Joseph Barton) (ECF Nos. 51-1 & 51-2) at ¶¶ 30 & 31).  Thus, he was still employed and a Board member when he took donor information, formed competitor O'Keefe Media Group ("OMG"), and began soliciting Plaintiffs' donors for the benefit of himself and OMG.

---

[1] O'Keefe's version also redacts his otherwise publicly available address (in addition to phone number and email address).

1

RANDAZZA | LEGAL GROUP

2)     He admits at Paragraph 11 to contacts with "over a thousand" of Plaintiffs' donors following his suspension (some of which occurred after his termination) regarding their donations to Plaintiffs.  He did not seek to dissuade these donors from suspending donations to Plaintiffs.  He does not say he did not encourage them to suspend donations to Plaintiffs.  And, he does not deny soliciting them himself for the benefit of himself and/or OMG.  That is, whether or not they reached out to him, he violated Paragraph 17 of his employment agreement, prohibiting all contact, solicitation, and communication with donors he met through his work for Project Veritas.

3)     He admits at Paragraph 13 that he operates on the misguided assumption that past donations to Plaintiffs were donations for the benefit of himself.

4)     He admits at Paragraph 14 to accepting donations for OMG and does not deny that revenue comes from prior donors to Plaintiffs.

5)     At Paragraph 15, he acknowledges the allegations in the amended complaint and the declarations of Mr. Wetmore and Mr. Barton, and he denies none of them. Although he asserts on p. 4 of his memorandum (ECF No. 52) that he "generally denies" the allegations, this assertion is unsupported by any evidence or even a self-serving declaration. [2]

6)     In Paragraph 16, he denies taking a "centralized 'donor list'[.]"  What O'Keefe does not

---

[2] Although O'Keefe attempts (ECF No. 52 at 5) to impugn the declarations of Mr. Wetmore and Mr. Barton as containing identical text to the Amended Complaint, it functionally serves as verifying the complaint.  A verified complaint is standard procedure when seeking a preliminary injunction.  *See Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd*., 74 F.R.D. 621, 624 n.1 (S.D.N.Y. 1977)("Because a 'verified complaint or affidavits standing undenied may be presumed true,' 7 Moore's para. 65.04[3] at 65-63, a court may grant a preliminary injunction on the basis of pleadings and affidavits, even where no witnesses have been called. *Semmes Motors, Inc. v. Ford Motor Co*., 429 F.2d 1197, 1204-05 (2d Cir. 1970).")  Here, as O'Keefe presents no admissible evidence in opposition, the declarations of Mr. Wetmore and Mr. Barton stand undenied and may be presumed true.

2

deny is retaining and using donor contact information he obtained from other sources, including from his assistant, from documents he may have retained containing some donor contact information, and from his own collection of data (e.g., contacts he may have stored on his smartphone), that would serve to recreate all or part of the donor list.  As he admits to being "chiefly responsible" for Plaintiffs' fundraising (¶ 8), he would necessarily possess significant donor contact information in his mobile phone, email, and social media accounts.

7)   In Paragraph 17, he claims he solicited a list of disgruntled donors from his assistant in order to "document" them, but as he had already formed OMG by that date and cleared out his office, he does not deny that the purpose of "document[ing]" them was to be able to contact them in violation of his employment agreement.

8)   At no point in his declaration does O'Keefe assert an understanding of the arbitration clause consistent with the argument of his counsel.

Simply put, O'Keefe has had a full opportunity to attempt to offer evidence contradicting the evidence proffered by Plaintiffs that O'Keefe took and used Plaintiffs' confidential information and used it to solicit donors.  Instead, he essentially admitted to having done so.

## 2.0   A PRELIMINARY INJUNCTION SHOULD ENTER

Plaintiffs are likely to succeed on the merits of their claims and the remaining factors similarly favor Plaintiffs.  The preliminary injunction should enter forthwith.

### 2.1   O'Keefe Breached His Employment Agreement

O'Keefe focuses primarily on his breach of Paragraph 17 of his contract: non-solicitation of donors.  Plaintiffs are likely to succeed in their claims for breach of this provision and of the remaining provisions at issue.

3

**RANDAZZA** | LEGAL GROUP

As to Paragraph 17, O'Keefe first argues that covenanting not to solicit Plaintiffs' donors is an unenforceable restrictive covenant.  Contrary to O'Keefe's assertion, this provision does not turn the provision into a non-compete agreement—O'Keefe remains free to engage in competitive journalism.  He simply cannot use Plaintiffs' donors to do so—there are plenty of other proverbial fish in the sea.

The provision is reasonable.  Though it is unbound in time and area, Project Veritas is not a local business—it has a global impact.  "[W]here an employer's business is conducted worldwide to a global customer base, 'the lack of a geographic restriction is necessary.'"  *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (*quoting Reed Elsevier Inc. v. TransUnion Holding Co*., No. 13-cv-8739, 2014 U.S. Dist. LEXIS 2640 (S.D.N.Y. Jan. 8, 2014)).  And, O'Keefe admits to having been the "face" (ECF No. 52-1 at ¶ 10) to the donors, necessitating a lifetime restriction.  Although O'Keefe cites to *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 504 (S.D.N.Y. 2011) to suggest that the provision is unreasonable, that case dealt with an actual non-compete agreement and it is silent as to restrictions on solicitation of donors.  In fact, to the extent that donors may be analogized to customers, New York law provides no time or area restriction, nor any contractual requirement of a restrictive covenant.  Rather, where there "has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service." *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 391-92 (1972).  This is what O'Keefe did, and it must be enjoined, especially as O'Keefe agreed to such a restriction.  To the extent, of course, the agreement is overbroad in time or area, Paragraph 29 of the agreement would require it be given maximum legal effect. *See Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 277 (E.D.N.Y. 2002) ("If a court finds a limitation

RANDAZZA | LEGAL GROUP

to be unreasonable, it can 'blue pencil' the covenant to restrict the term to a reasonable geographic limitation, and grant partial enforcement for the overly broad restrictive covenant")(*citing BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 394 (1999)).

O'Keefe claims that it is impractical for him to know how to comply.[3]  While it is understandable that O'Keefe might not be able to identify every person who donated online as a Project Veritas donor, he cannot plead ignorance of the donors he personally communicated with over his tenure.  In fact, he readily admits to having spoken to certain disgruntled donors—it cannot be said he could not identify them as donors.  Nor does O'Keefe truly have anything to fear from the issuance of an injunction; O'Keefe would only be in contempt for a knowing violation of an injunction—if it is truly an innocent violation, he would not be in contempt.

As to prospective donors, O'Keefe cites cases where client development was independent of the former employee's work.  To the extent it can be said that O'Keefe developed a relationship with someone who might have donated to Plaintiffs independently, that is one thing, but it is entirely different for O'Keefe to divert potential donors where such relationship development was bought and paid for by Plaintiffs.  The cases cited by O'Keefe (ECF No. 52 at 9) are, therefore, inapposite and distinguishable.

O'Keefe claims the evidence in support of Plaintiffs' claims is thin—it is not.  And, O'Keefe offers nothing to contradict Plaintiffs' claims.  He acknowledges that his assistant, Ms. Bolton, sent him a list of donors while he was employed (albeit suspended) and had just formed OMG; he acknowledges his communications with his girlfriend demonstrating a plan to use such donor information and does not deny he did so; and he acknowledges reaching out to at least two

---

[3] Although he cites in his argument to Paragraph 17 of his declaration (ECF No. 52 at 8), that paragraph is silent as to ability to comply.

5

known donors of Project Veritas for the benefit of OMG (and Plaintiffs anticipate that discovery would demonstrate he did so for many more),[4] and directed recipients to a means of donation. Nothing else is needed to show he violated Paragraph 17 and there is nothing to suggest the violation is not ongoing.

While it is correct that Plaintiffs do not name a single donor whose donations were actually diverted, that is not the point. The provision bars the solicitation—he solicited. Moreover, the fact that O'Keefe and OMG have not revealed their own list of donors/financial supporters in response (even under seal) to show that none were Project Veritas donors is telling. And, though he claims he was not prohibited from accessing donor information, the only purpose for him to have accessed it was to solicit them. Thus, there is a strong likelihood of success on the merits of the claim for breach of Paragraph 17.

As to Paragraph 11, breach of his contractual duty to maintain confidentiality, O'Keefe merely adopts his factual arguments in opposition to Paragraph 17 (he makes no legal argument as to enforceability). Thus, as Plaintiffs have demonstrated that O'Keefe did violate his duty of confidentiality, there is a strong likelihood of success on the merits of the claim for breach of Paragraph 11.

As to Paragraph 22, O'Keefe claims he did not violate his duty to return company property because he does not have the centralized donor list. His opposition is a game of wordplay and misdirection, hoping that the Court mistakenly thinks that Plaintiffs are only seeking the return of

---

[4] O'Keefe suggests that Plaintiffs should have more evidence in their possession, due to their access to some of his Telegram communications which O'Keefe gave Plaintiffs prior to his termination, and that the absence of submission of additional evidence is somehow evidence of the absence of other solicitation. (ECF No. 52 at 12-13). Plaintiffs only have some of his Telegram communications and it is unlikely that Telegram records would show all violations. Of course, O'Keefe could have averred under oath he did not solicit Plaintiffs' donors, but such denial is conspicuously absent.

RANDAZZA | LEGAL GROUP

the so-called centralized donor list.  However, O'Keefe does not deny that he possesses donor information belonging to Plaintiffs—that is what he failed to return, whether it is in the form of a formal list (such as what Ms. Bolton prepared) or individual contact data.  All property of Plaintiffs must be returned, and Plaintiffs are likely to succeed on their claim for breach of Paragraph 22.

O'Keefe makes no argument as to Paragraph 16, non-solicitation of employees or contractors, asserting that it is uncontested and time-barred.  (ECF No. 52 at 7 n. 1).  However, this is inaccurate.  While the 12-month period following termination has expired, the harm from that breach is ongoing and, to the extent O'Keefe continues to employ or otherwise enjoy the fruits of his prior violation of that provision, such is still capable of being enjoined, and should be enjoined.  As O'Keefe makes no substantive argument as to the enforceability of the provision or his violation thereof, it should be deemed conceded.

### 2.2    O'Keefe Violated the Defend Trade Secrets Act

O'Keefe devotes but a single paragraph to his argument that he did not violate the Defend Trade Secrets Act.  He merely says that the evidence that shows he took Plaintiffs' confidential information, had a plan to use Plaintiffs' confidential informant, and used Plaintiffs' confidential information, means that Plaintiffs cannot show a likelihood of success on the merits.  He offers no evidence in opposition.  Thus, Plaintiffs are likely to succeed on the merits of this claim.

### 2.3    OMG Tortiously Interfered with O'Keefe's Employment Agreement

OMG's argument against a finding of likelihood of success on the tortious interference claim is that OMG did not "procure" the breaches, O'Keefe did. (ECF No. 52 at 15).  Although OMG cites *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019), which identifies procurement as an element of the claim, OMG stops there.  In *Rich*, the Second Circuit reversed the dismissal of a tortious interference claim where the defendant "kn[ew] that the interference

RANDAZZA | LEGAL GROUP

[was] certain or substantially certain to occur as a result of [their] action." 939 F.3d at 112 (quoting Restatement (Second) of Torts § 766 (comment j) (1979))(alterations in original). OMG knew that having its principal, O'Keefe, solicit donors, use Plaintiffs' confidential information, and retain such information for OMG's benefit would violate O'Keefe's contract. OMG cannot disregard its own liability by blaming O'Keefe. The acts of a corporation's agent and the knowledge acquired by the agent are presumptively imputed to the corporation. *See Weinberg v Mendelow*, 113 AD3d 485, 486, 979 NYS2d 29 (1st Dept 2014).

OMG misapplies the "stranger" doctrine to wrongly assert it could not tortiously interfere with the agreement. To be sure, "[d]efendants cannot, as a matter of law, have tortiously interfered with their own contract." *Cortes v. Twenty-First Century Fox Am., Inc*., 285 F. Supp. 3d 629, 640 (S.D.N.Y. 2018) (quotations omitted), *aff'd*, 751 F. App'x 69, 74 (2d Cir. 2018). The rationale is that the "plaintiff ha[s] an adequate remedy for breach of contract [since the] defendant [is] alleged to have breached its own duties to [the] plaintiff under the contract." *Arena Invs., L.P. v. DCK Worldwide Holding Inc*., 215 A.D.3d 155, 158, 189 N.Y.S.3d 117 (1st Dep't 2023). But here, it is OMG's breach of duty, not O'Keefe's, that is at issue. OMG was not a party to the agreement. And, Plaintiffs might not have an adequate remedy against O'Keefe, since OMG is a distinct legal entity that O'Keefe could sell at any moment, and OMG would continue to possess and potentially use Plaintiffs' confidential information. The only way the "stranger" doctrine would apply is if OMG is the alter-ego of O'Keefe. However, O'Keefe does not argue this and Plaintiffs do not, at this point, claim OMG is O'Keefe's alter ego.

OMG otherwise reasserts O'Keefe's failed arguments as to lack of probative evidence of breach when the evidence, in fact, demonstrates such a breach. Similarly, OMG asserts there is no evidence it procured O'Keefe's breach, while disregarding the actions O'Keefe took on OMG's

RANDAZZA | LEGAL GROUP

behalf, as well as the e-mail solicitations directly sent by OMG.  Thus, Plaintiffs are likely to succeed on the tortious interference claim.

### 2.4    The Remaining Factors Favor Entry of Injunctive Relief

As to the remaining factors—irreparable harm, balance of equities, and public interest—Defendants devote most of their argument to the assertion that Plaintiffs would not be irreparably harmed by the ongoing retention of their confidential donor information or allowing O'Keefe and OMG to continue to solicit Plaintiffs' donors to the detriment of Plaintiffs.  This argument lacks plausibility.  And, notably, Defendants offer nothing to suggest they are not, in fact, wrongly retaining and using such information.  The closest they come is to say it is the unevidenced argument of counsel that it is "likely" not their fault.  (ECF No. 52 at 19).

Curiously, Defendants argue that Plaintiffs have not shown harm while, at the same time, pointing to Plaintiffs' substantial drop in donations.  *Compare* ECF No. 52-1 at ¶ 12.  In fact, O'Keefe explicitly asserts that Plaintiffs' ongoing donations are sourced only from those who *do not know* O'Keefe left.  *Id.* at ¶ 13.  Thus, the supposition of counsel for Defendants as to "likely" fault must give way to O'Keefe's own taking of credit for it.

Defendants' primary argument on the issue of irreparable harm is alleged delay.  Plaintiffs filed suit less than a month after O'Keefe was formally removed.  While they did not immediately move for an injunction, the purpose, as Defendants acknowledge, was to attempt to resolve the matter—not so moving was in the interest of judicial economy.  (ECF No. 52 at 18 (citing ECF No. 51)).  Defendants do not deny such negotiations were occurring.  Nor is the Joint Status Report somehow inconsistent—once negotiations broke down, it made sense for Plaintiffs, at that point, to await Defendants' response to the Amended Complaint in order to properly address likelihood

9

of success on the merits arguments.  Once Defendants responded, albeit with a motion to compel arbitration, Plaintiffs sought injunctive relief in a timely manner thereafter.

And, of course, O'Keefe admitted to irreparable harm in the contract.  O'Keefe attempts to deflect by asserting that it was a standard term, not specifically negotiated for, pointing to the agreements of other former employees.  However, what O'Keefe does not do is aver in his declaration that he did not expressly negotiate the terms of his own contract.  O'Keefe's own caselaw states that such an admission of irreparable harm "is not without significance[.]"  *Int'l Creative Mgmt. v. Abate*, 2007 U.S. Dist. LEXIS 22964, at *19 (S.D.N.Y. Mar. 28, 2007).  In fact, such a provision would "strengthen[] significantly" Plaintiffs' other demonstrated evidence of irreparable harm.  *Id.* (citation omitted).  And, as that same case further sets forth:

> An employer may suffer irreparable harm when a former employee violates a non-compete clause and thereby causes the former employer to lose client relationships and customer good will that the employer had built up over years. As the Court of Appeals for the Second Circuit has explained, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69-70 (2d Cir. 1999); *see Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm …. What is at stake here is plaintiff's good will built up over the years, which is not …. monetarily ascertainable.").

2007 U.S. Dist. LEXIS 22964, at *9.  O'Keefe's violations caused the loss of donor relationships and goodwill.  Irreparable harm has been shown.

As to the balance of hardships, the balance tips in favor of Plaintiffs.  Defendants offer no evidence of harm were an injunction to enter.  At worst, they speculate that entry of an injunction

10

RANDAZZA | LEGAL GROUP

would harm Defendants in the marketplace from a reputational standpoint.[5]  But, that is the same harm Defendants would suffer in losing this case, and Plaintiffs already have a substantial likelihood of success. Further, just as "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected[,]" Defendants cannot complain that an injunction against their bad acts should not enter.  *Broadcom Corp. v. Qualcomm Inc*., 543 F.3d 683, 704 (Fed. Cir. 2008).  Thus, there is no additional harm in entering the injunction.  Moreover, such harm is merely speculative; in contrast, the lack of an injunction continues to compound the harms imposed on Plaintiffs.  Thus, the balance favors Plaintiffs.

Finally, the public interest favors Plaintiffs.  Defendants only argue that an injunction would have an "anti-competitive effect[.]"  (ECF No. 52 at 21).  This is false.  O'Keefe remains free to continue to raise revenue and produce content in the ordinary course without relying on Plaintiffs' donors.  The public would not be harmed if O'Keefe were held to his agreement; it is harmed when contracts can be breached without consequence.  *See Thistle v. Englert*, 103 A.D.2d 268, 270, 479 N.Y.S.2d 921, 922 (App. Div. 4th Dept. 1984) (recognizing a "public interest in the enforcement of contracts").  Thus, the public interest favors an injunction.

***

In light of the foregoing, as all four factors favor Plaintiffs, the injunction should enter forthwith.

---

[5] While Defendants accuse Plaintiffs of bad-faith litigation merely for public relations purposes, their filing unnecessarily makes argument and accusation as to O'Keefe's separation, and casts unevidenced aspersions on Plaintiffs' business in the months since, none of which is relevant to the issues in the motion or cross-motion.

RANDAZZA | LEGAL GROUP

**3.0    ARBITRATION SHOULD NOT BE COMPELLED**

Contrary to the assertion of Defendants, no part of this action should be referred to arbitration.[6]  Simply put, while circumstances might have arisen where there could be claims between the parties subject to arbitration, Plaintiffs' claims here, in these circumstances, are expressly exempted.  O'Keefe is not some low-level employee who had this agreement thrust upon him—he was the founder and Chief Executive Officer.  The agreement was executed for Project Veritas by John Sullivan, the General Counsel, over whom O'Keefe had authority.  He had a full and fair opportunity to negotiate and direct its terms.  Buyer's remorse is no reason to ignore the language of the agreement.

**3.1    Plaintiffs' Claims Are Not Within the Scope of the Agreement to Arbitrate**

While some hypothetical claims between the parties could be arbitrable, the second factor of *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75–76 (2nd Cir.1998) is not met—this case is not within the scope of the arbitration agreement.[7]  This matter is "is exempt from arbitration, as this

---

[6] As set forth in the First Amended Complaint ("FAC"), Plaintiffs bring the following claims against Defendants: 1) Breach of Contract vs. O'Keefe; 2) Violation of Defend Trade Secrets Act vs. O'Keefe; 3) Breach of Fiduciary Duty vs. O'Keefe; 4) Breach of Duty of Loyalty vs. O'Keefe; 5) Conversion vs. O'Keefe; 6) Replevin vs. O'Keefe; 7) Indemnification vs. O'Keefe; 8) Tortious Interference vs. OMG (re: O'Keefe); 11) Tortious Interference vs OMG (re: Iatropoulous); 12) Tortious Interference vs. OMG (re: Maxwell); 13) Declaration of Ownership of Copyright vs. O'Keefe.  (ECF No. 16).  Arbitration cannot be compelled as to any of the claims.

[7] Defendants make argument about whether federal statutory claims are arbitrable.  Plaintiffs do not assert that a Defend Trade Secrets Act claim could not be arbitrable if it were solely for money damages and no other claims seeking equitable relief were asserted.  But, here, as this is an action in equity, as well as in law, none of the claims may be arbitrated.  Plaintiffs separately note that the question of copyright ownership is not a federal statutory claim—it is a creature of state law contractual interpretation.  *See Jasper v. Bovina Music, Inc.*, 314 F.3d 42, 46 (2d Cir. 2002) ("Specifically, if the case concerns a dispute as to ownership of a copyright, and the issue of ownership turns on the interpretation of a contract, the case presents only a state law issue[.]")

Similarly, Defendants devote a lot of space to whether individual state law claims are arbitrable.  Plaintiffs do not deny that they would be arbitrable in the absence of the equitable claims.

RANDAZZA | LEGAL GROUP

is an action to seek preliminary and final injunctive relief to enforce the restrictions and obligations of the Employment Agreement and to restrain actual breach of those restricts and obligations, and it may, therefore, pursue in this Court 'any and all additional remedies available at law,' notwithstanding the arbitration provisions of the Employment Agreement." (ECF No. 16 at ¶ 10).

### 3.1.1   The Claims are Non-Arbitrable Where an Action Seeking Preliminary or Permanent Injunction is Brought

As Defendants themselves highlight, "a court's interpretation of a contract 'should not read a contract so as to render any term, phrase, or provision meaningless or superfluous." *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 162 (S.D.N.Y 2014) (*quoting Givati v. Air Techniques, Inc.,* 960 N.Y.S 2d 196, 198 (2013). (ECF No. 52 at 25).  Yet, Defendants expressly seek to render meaningless that portion of the agreement that expressly states:

> Notwithstanding anything herein to the contrary, Project Veritas may seek a preliminary and/or final injunction, either in court or from the AAA to enforce those restrictions and obligations or to restrain any actual or threatened breach of those restrictions and obligations, in addition to any and all additional remedies available at law.

Employment Agreement at ¶ 23.B.  Defendants do not deny that Plaintiffs are entitled to move for a preliminary injunction or seek a final injunction in this Court.[8]  While Defendants purport that this exemption does not apply, they cannot handwave it away.  Courts recognize that arbitration

---

Defendants also argue that Claim 7, for indemnification, is somehow not ripe.  However, O'Keefe presently has an obligation to indemnify Plaintiffs for at least one action—*Democracy Partners, LLC, et al. v. Project Veritas Action Fund, et al.*, Case No. 1:17-cv-01047-PLF (D.D.C. filed Jun. 1, 2017).  Plaintiffs and O'Keefe are defendants in that action and O'Keefe's duty to indemnify applies to such case—both as to prior and ongoing costs of defense and liability, if any.  Thus, the Court should not rely on representations made by Defendants' counsel where it appears Defendants are not being forthright with their counsel.

[8] Defendants elsewhere argue that the motion for preliminary injunction was filed merely to defeat the motion to compel arbitration, but Plaintiffs were and are entitled to proceed in this forum simply to seek a final injunction.  Even were a preliminary injunction motion not filed or denied, this action is not arbitrable.

RANDAZZA | LEGAL GROUP

clauses may be limited where parties "have done so explicitly." *Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812, Int'l Bhd. of Teamsters*, 242 F.3d 52, 57 (2d Cir. 2001). Plaintiffs and O'Keefe explicitly limited their agreement. Thus, the terms of the agreement render this action non-arbitrable.

Defendants attempt to excise the phrase "in addition to any and all additional remedies available at law" from the portion of the agreement rendering the claims brought herein non-arbitrable. They say Plaintiffs "grossly misread" it (ECF No. 52 at 26), but they offer nothing by way of evidence or argument, other than *ipse dixit*, to support this. Plenty of claims would be subject to arbitration where Plaintiffs might not have had cause to seek injunctive relief. If they merely had a hypothetical claim arising to recoup an overpayment, that would be arbitrated. If they were merely seeking to enforce the indemnification provision, that would be arbitrated. If they were hypothetically making a claim arising from property damage, that would be arbitrated. However, Defendants are engaged in ongoing violations and causing irreparable harm, thus Plaintiffs had no choice but to seek injunctive relief here and, thereupon, litigate the remaining claims at law here in addition.

While Defendants argue about surplusage, they would render the "in addition to" portion unnecessary surplusage to accord Defendants their interpretation. Under their claimed interpretation, it reads that Plaintiffs can bring their equitable claims here, but must arbitrate their other claims. As a practical matter, such might be an appropriate agreement to enter into if one is only making an exception for a preliminary injunction, relying on arbitration to handle everything thereafter. But, this agreement also says that matters seeking a "final injunction"—which occurs after full discovery and trial—are not required to be arbitrated. Thus, Defendants would have the parties litigate the same issues of fact and law simultaneously in two forums, with Plaintiffs

RANDAZZA | LEGAL GROUP

pursuing their claims in equity here and their monetary claims in arbitration. Such could even result in the Court reaching contradictory outcomes—if Plaintiffs first won here, an arbitrator is not required to accord *res judicata*, and this Court would then also be in a position of confirming such an award. It makes little sense that the parties would agree to that.

If Defendants' interpretation were accurate, the "in addition to" language would be unnecessary. The paragraph would read the same with or without it. In fact, Defendants' interpretation would actually have required the parties to write "notwithstanding" the claims at law. But, the parties used "in addition to" and that has a meaning. It means "on top of" the preceding provision. *Lexington Ins. Co. v. United Health Grp*., 2011 U.S. Dist. LEXIS 14929, at *19 (D. Mass. Feb. 15, 2011) *citing Carlson Mktg. Grp., Inc. v. Royal Indem. Co*., 517 F. Supp. 2d 1089, 1115-16 (D. Minn. 2007). In *Lexington Ins.*, "in addition to" meant that the defendant had to do both types of reports and in *Carlson*, it meant that the defendant had to provide both coverages at issue. Webster's Dictionary uses the following example to demonstrate the meaning: "In addition to soup, several salads were served."[9] That is, soup and salads were both served. As applied here, then, the clause means that, if equitable claims are brought, then both equitable and legal claims may be brought in whichever forum the equitable claims are brought. Thus, because Plaintiffs are seeking equitable relief, and chose to seek such relief here, the remaining claims are outside the scope of the arbitration agreement.

### 3.1.2   Defendants have Breached the Agreement and/or Threaten Breach

Defendants make one other argument as to arbitrability—they claim that because there is no actual or threatened breach of the employment agreement, the Court should ignore the fact that

---

[9] *See*  https://www.merriam-webster.com/dictionary/in%20addition%20to  (last accessed Jul. 5, 2024).

RANDAZZA | LEGAL GROUP

Plaintiffs seek a preliminary and final injunction. (ECF No. 52 at 29). The Court should not accept this invitation. First, as demonstrated as to the preliminary injunction, there is actual and threatened breach. It is illogical to suggest that the injunctive relief sought does not seek to enforce or restrain actual breaches—O'Keefe stole the donor lists and the injury is ongoing—he has not returned them and he is likely still using them. And, Court can enjoin him from continuing to enjoy the fruits of his past violations. Nor has he surrendered the copyrights to the books authored by Project Veritas that bear his name—property that must be returned to Project Veritas.

Neither can Defendants force some of the equitable claims to be arbitrated (*see* ECF No. 52 at 33-34). Contrary to Defendants' arguments, Counts 2-7 and 13 all relate to actual breaches of the agreement and Plaintiffs seek to remedy that through injunction. As Defendants do not offer any explanation as to why they purportedly do not relate to breaches of the agreement, Plaintiffs will not invent any arguments for them. Plaintiffs' desire for injunctive relief stems directly from the contract. Counts 3, 4, 7 and 13 directly arise from O'Keefe's Employment Agreement—the duties and allocation of property are explicit terms or otherwise arise from implicit duties at law. Count 2 specifically arises because the misappropriation occurred on the job, as do Counts 5 & 6. And, Count 1 is expressly a contract claim upon which injunctive relief is sought. In fact, Defendants explicitly argue the other claims are arbitrable because they "share their factual basis with a breach of the Employment Agreement" thereby belying their own assertion. (ECF No. 52 at 28). On the one hand, Defendants argue that Counts 2-7 & 13 are arbitrable under the contract, while on the other hand, they argue that Plaintiffs' invocation of this Court's equity powers related to those counts must be ignored. This makes little sense. Thus, as they agree they relate to breach of the Employment Agreement, the claims relate to actual or threatened breaches subject to injunctive relief and are exempt from arbitration.

16

RANDAZZA | LEGAL GROUP

But, even if the Court determines that a preliminary injunction is not warranted, Plaintiffs

remain entitled to pursue the action to final adjudication and determination of whether entry of a

final injunction is proper.  Defendants are engaged in question-begging—the time and place for

determining actual or threatened breach is at trial (or summary judgment), not here.  And, as noted

above, even if the equitable claims fail, the monetary claims remain properly before this Court

because of the manner in which this case was brought.

### 3.1.3   The Claims Against OMG are Non-Arbitrable

In opposition to the motion for preliminary injunction, OMG argues that it cannot be held

responsible for tortious interference with O'Keefe's contract with Plaintiffs.  But, just as OMG is

a separate entity from O'Keefe, subject to liability for tortious interference, it is a separate entity

with respect to the agreement to arbitrate.

Defendants cannot be compelled to arbitrate any claims against OMG.  Defendants agree

that OMG is not a party to any agreement with Plaintiffs.  To attempt to take advantage of the one

in the O'Keefe contract (and/or the ones in the contracts of the other defendants) OMG relies on

the "estoppel theory," based on the jurisprudence of *Smith/Enron Cogeneration Ltd. P'ship, Inc.*

*v. Smith Cogeneration Int'l, Inc*., 198 F.3d 88, 99 (2d Cir. 1999) (ECF No. 52 at 30), which relied

on a "presumption of arbitrability." Such a presumption no longer appears to be good law; as the

Supreme Court subsequently held, "a court may order arbitration of a particular dispute only where

the court is satisfied that the parties agreed to arbitrate that dispute."  *Granite Rock Co. v. Int'l*

*Bhd. of Teamsters*, 561 U.S. 287, 288 (2010) (emphasis in original).  "Under *Granite Rock*, the

presumption of arbitrability is a court's last, rather than first, resort." *Local Union 97, IBEW v.*

*Niagara Mohawk Power Corp.,* 67 F.4th 107, 114 (2d Cir. 2023).  In fact, the Second Circuit in

*Niagara Mohawk*, referencing *Smith/Enron,* and its holding that "doubts should be resolved in

RANDAZZA | LEGAL GROUP

favor of coverage" determined that *Granite Rock* meant that *Smith/Enron* and other cited "decisions cannot be good law" where they were inconsistent with *Granite Rock.* 67 F.4th at 114. The estoppel theory is no longer good law.[10] Plaintiffs did not agree to arbitrate any dispute with OMG and such should not be presumed.

Moreover, estoppel would not apply—OMG meets none of the relationship types identified in *Doe v. Trump Corp.*, 6 F.4th 400, 413-14 (2d Cir. 2021). The relationship must be a "corporate" one. *Id.* citing *Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008). OMG is not a subsidiary of O'Keefe or vice versa, nor can that corporate relationship exist, as O'Keefe is a natural person. In fact, none of the examples in *Trump Corp.* involved one of the related parties being a natural person. Moreover, "[w]here, however, the non-signatory is alleged to be a third-party wrongdoer as it is here, [the Second Circuit has] made clear that the arbitration contract 'in no way' extends to the non-signatory." *Id.* quoting *Ross, supra* at 145. OMG is not being held to answer for O'Keefe's breaches and other violations—it is being held to answer for its own tortious interference as a third-party wrongdoer. And, a tortious interference claim is precisely the type of claim the Second Circuit in *Ross* identified as one where estoppel could not compel arbitration. 547 F.3d at 145, *citing Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008). Thus, even if the Court determines that the estoppel theory has not been abrogated, it cannot compel Plaintiffs to arbitrate with OMG.

---

[10] Plaintiffs are aware of two cases, *Carter v. Payback Repo, Inc.*, No. CV 22-5083 (JMA)(ARL), 2023 U.S. Dist. LEXIS 150415 (E.D.N.Y. Aug. 25, 2023) and *Trs. of the N.Y. State Nurses Ass'n Pension Plan v. Hakkak*, No. 22-cv-5672 (ER), 2023 U.S. Dist. LEXIS 135393 (S.D.N.Y. Aug. 2, 2023), where district courts in the Second Circuit utilized the estoppel theory after *Niagara Mohawk* was decided, but neither decision referenced *Niagara Mohawk* or *Granite Rock* and, thus, neither have any persuasive value as it was not an issue *sub judice.*

18

### 3.2     The Matter Should Not be Stayed

Should any part of the matter be referred to arbitration, Defendants seek a stay of the remainder.  A stay should not enter as to non-arbitrable claims,[11] should the Court otherwise agree with any part of Defendants' motion and, thereupon, compel arbitration in part.  Plaintiffs are entitled to a prompt resolution of their claims, especially in light of the delays Defendants procured by inducing Plaintiffs to attempt to negotiate in good faith.  As the Court is aware, an injunction necessarily requires a finding of irreparable harm, and the Court should not back-burner harms that are ongoing and irreparable.  Injunctive relief is key and the equitable claims predominate.  Further, there is no reasonable basis on which to find the claims here are of questionable merit as they have a substantial likelihood of success.  Moreover, issues decided by this Court as to non-arbitrable matters may help the arbitrator, if any are to be arbitrated, and the parties would, unlike in arbitration, have the full measure of discovery available to them—both from each other and from third parties.  In light of the foregoing, no stay should enter.

### 4.0     CONCLUSION

O'Keefe voluntarily entered into an agreement that restricts his ability to solicit Plaintiffs' donors and employees and steal their confidential information.  He voluntarily entered into an agreement that requires him to litigate these claims in this Court because his own actions necessitate injunctive relief.  While O'Keefe and OMG may prefer to attempt to hide their wrongdoing in an arbitration proceeding, they agreed these claims are non-arbitrable.  Defendants enjoy no special exemption from the ordinary and customary enforcement of contracts as written.

---

[11] Although Defendants do not cite to it, Plaintiffs note that *Smith v. Spizzirri*, 144 S. Ct. 1173, 1178 (2024), may indicate that a stay is required if any part of this matter is referred to arbitration. However, as such an argument was not brought by Defendants, it should be deemed waived.

19

In light of the foregoing, the requested preliminary injunction should enter and the Court should deny the motion to compel arbitration.

Dated: July 12, 2024.                    Respectfully Submitted,

                                         */s/ Jay M. Wolman*
                                         Jay M. Wolman (JW0600)
                                         RANDAZZA LEGAL GROUP, PLLC
                                         100 Pearl Street, 14th Floor
                                         Hartford, CT 06103
                                         Tel: (888) 887-1776
                                         Email: jmw@randazza.com

RANDAZZA | LEGAL GROUP

Civil Action No. 7:23-cv-04533

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 12, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully Submitted,

*/s/ Jay M. Wolman*
Jay M. Wolman (JW0600)

21

RANDAZZA | LEGAL GROUP