```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ---------------------------------------x
 3   PROJECT VERITAS and PROJECT VERITAS
     ACTION FUND,
 4
                              Plaintiffs,
 5
                                    23 CV 4533
 6      -vs-
                              PRELIMINARY INJUNCTION
 7                            HEARING/BENCH RULING

 8   JAMES O'KEEFE, TRANSPARENCY 1, LLC
     d/b/a O'KEEFE MEDIA GROUP, RC MAXWELL,
 9   and ANTHONY IATROPOULOS,

10                        Defendants.

11   ---------------------------------------x

12                              United States Courthouse
                                White Plains, New York
13
                                July 30, 2024
14

15   Before:  THE HONORABLE CATHY SEIBEL, District Judge

16
     A P P E A R A N C E S:
17
     RANDAZZA LEGAL GROUP, PLLC
18        Attorneys for Plaintiffs
     JAY M. WOLMAN
19
     CHILDERS LAW, LLC
20        Attorneys for Defendants
     NICHOLAS P. WHITNEY
21   SELDON J. CHILDERS

22
     ALSO PRESENT:
23
     James O'Keefe
24   Steven Saldana

25
```

073024.1                          Proceedings

1          THE COURT:  Good morning.  Everybody can have a seat.

2          If the parties would like to give me a mini summation,

3 I will hear it now.  Mr. Wolman?

4          MR. WOLMAN:  Good morning, Your Honor.  And for the

5 record, Jay Wolman of the Randazza Legal Group for plaintiffs

6 Project Veritas and Project Veritas Action Fund.

7          Yesterday we took in evidence on our motion for

8 preliminary injunction.  We believe it should be allowed.  We

9 are at this point withdrawing as moot, based upon absence of

10 impeachable testimony as to whether or not there were any

11 current OMG personnel who are Project Veritas employees, so to

12 the extent we were requesting injunctive relief on the breach of

13 the non-solicitation of employees, that request we believe is

14 presently moot.

15          As to the remaining aspects, we have a likelihood of

16 success, irreparable harm, the balance of equities favors

17 plaintiffs, and an injunction is in the public interest.

18          Turning to likelihood of success, on the breach of

19 contract claim, we have an enforceable contract, Exhibit 1.  At

20 worst, it needs to be blue-penciled, but we don't think that

21 there is necessarily any need to do so because this is not a

22 standard noncompete.  This is akin to a non-solicitation of

23 customers and clients.  Just as Mr. O'Keefe testified, it was

24 customer relations management software that was used.  The

25 donors are akin to customers in that respect.  But if there

1  needs to be a limitation, I can appreciate if Your Honor feels

2  that way.  However, it is otherwise fully enforceable.

3  Mr. O'Keefe breached that contract.  That contract prohibited

4  both communications and solicitations of donors and potential

5  donors, and as we heard, all former donors are, in fact,

6  potential donors.

7          The contract requires maintenance of confidentiality

8  that Mr. O'Keefe used and gave that information for the benefit

9  of OMG, a distinct legal entity.  It's not credible that

10 Mr. O'Keefe didn't solicit any donors; that he just listened.

11 Ms. Bolton testified that the list was compiled for one thing,

12 settle.  She wasn't -- she was acting out his request, and this

13 was on February 22, 2023.  But Mr. O'Keefe claims he believed he

14 was terminated on February 10, 12 days prior.  Well,

15 constructively terminated merely because he was suspended.  But

16 we don't actually understand what the difference in his mind

17 then is between suspension and termination.  It simply isn't

18 credible.  It is common for employees to be suspended pending

19 investigations, and, by definition, since you don't know when

20 the end of an investigation is going to be, that will of course

21 be indefinite.  And he had just formed O'Keefe Media Group, OMG,

22 on February 17th, just five days prior.  Moreover, he chose not

23 to believe Project Veritas's own counsel repeatedly saying that

24 he wasn't terminated.  Burying your head in the sand does not

25 make you a credible witness.

073024.1                         Proceedings

1          Moreover, there is no logical basis or legal basis to

2   suggest that anyone should think that they were constructively

3   discharged.  It requires significant, significant detrimental

4   effects on your employment.  One need only look at a case

5   decided on June 2nd, 2022, in the Southern District, *Maron vs.*

6   *Legal Aid Society*, 605 F.Supp.3d 547, where fellow employees

7   made a public -- a public letter against their co-worker who was

8   in the public eye, and she felt she was constructively

9   discharged on account of it being so hostile, but the Court

10  didn't even find that it was a hostile work environment.  That

11  was a Title VII claim, and there were race issues, which the

12  Court found, but it didn't rise to the level of hostile work

13  environment, and constructive discharge is beyond that.

14          So there is no reason or basis to think -- for

15  Mr. O'Keefe to think that he was constructively discharged,

16  especially on the advice of Attorney Panuccio.  Mr. Panuccio

17  certainly should understand what it means.

18          Moreover, even granting he was constructively

19  discharged, then what he did was even worse because now he is

20  not an employee.  He has no "for when things settle down."  He

21  has only to use going forward in his own endeavors and in the

22  endeavors of O'Keefe Media Group.  It's not credible to suggest

23  that -- for him to testify that he simply listened and did

24  nothing when he's sending donors to a law firm to make requests

25  that their donations come back to the detriment of Project

1   Veritas because this doesn't -- the prohibition isn't simply

2   prohibiting him from communicating and soliciting for his own

3   aggrandizement, but it also prohibits it from being to the

4   detriment of the employer.

5          His declaration was evasive.  He attempted to evade

6   testifying, and when he ultimately did, he lacked credibility

7   in light of the testimony of Ms. Bolton.  As I will note

8   separately, Mr. Hughes, his phone records, and the messages, he

9   had a plan.  Ms. Rose outlined that plan, that he should collect

10  donor information, and he even knew that his contract prohibited

11  it.  She highlighted that, and he acted on that.  It serves no

12  purpose for him to collect donor information if not to contact

13  them.

14         He breached the contract in other ways, of course, by

15  forming OMG while he was still technically employed, which is in

16  direct competition.  Both Mr. O'Keefe and Mr. Barton testified

17  that they both engaged in similar types of journalism.  The

18  contract required return of equipment.  He didn't.  Mr. Hughes

19  credibly testified that Mr. O'Keefe failed to return his iPhone

20  and laptop, and it is not credible that Mr. Hughes would tell

21  Mr. O'Keefe, "keep your iPhone" or that Mr. Hughes would forget

22  somehow that Mr. O'Keefe returned his laptop.

23         It is a severe breach of contract to release and use

24  confidential donor information.  Mr. O'Keefe, Mr. Hughes,

25  Mr. Barton, and Ms. Bolton all testified that donor information

1   is kept confidential.  There is restricted access.  There's

2   passwords.  They used confidentiality agreements.  He may not

3   have directly accessed the centralized Raiser's Edge database,

4   but he had information from Ms. Bolton.  He had information in

5   his possession from when he was contacting donors beforehand

6   that necessarily then resided on his phone, which he prevented

7   Project Veritas from wiping, having previously been in the

8   capacity of CEO.

9           So we believe that there is a strong likelihood of

10  success on the breach of contract claim.

11          Similarly, there is a strong likelihood of success on

12  the Defend Trade Secrets Act claim.  There should be no doubt

13  that the donor information, as with the confidentiality, was a

14  trade secret.  Reasonable measures were kept, and Project

15  Veritas derives independent economic value both from donations

16  and, as Mr. Barton testified, from news tips provided by donors,

17  and it was misappropriated.  It was used for the benefit of

18  Mr. O'Keefe and OMG and to the detriment of Project Veritas, and

19  it was not returned or deleted despite requests, repeated

20  requests.  We have a strong likelihood of success on that claim.

21          As for the tortious interference claim against OMG,

22  it's run by Mr. O'Keefe.  He is their chief, the sole owner.  We

23  heard Mr. Saldana and Mr. O'Keefe testify that it has

24  information held by Mr. O'Keefe, and there is a valid contract

25  as noted before, Exhibit 1.  They ignored the contract, and they

1  procured the breach through Mr. O'Keefe.  I should note of

2  course should the Court not agree on that aspect, O'Keefe Media

3  Group would otherwise be bound, and we would like the injunction

4  to explicitly highlight under Rule 64(d)(2)(C), which binds all

5  other persons who are in active concert or participation with

6  anyone described in Rule 65(d)(2)(A) or (B), which would be

7  Mr. O'Keefe.  And so it can't be denied that OMG is in active

8  concert or participation with Mr. O'Keefe.

9          As to irreparable harm, donors are not merely monetary

10 donors.  They provide tips.  They help with respect to Project

11 Veritas's reputation, which is difficult to quantify; nor is it

12 easy to quantify the financial losses where donors don't have

13 infinite funds.  Even if you can expand the pie a little bit, a

14 donor who has $5 to give to Project Veritas might suddenly have

15 $3.50 to give to Project Veritas and $3.50 to give to OMG, but

16 even if you expand the donation pie a little, that is money lost

17 from Project Veritas, and we know that they are in competition.

18         Moreover, irreparable harm is ongoing communications

19 Mr. O'Keefe would have with Project Veritas donors.  The -- he

20 has previously defamed Project Veritas, and there is no reason

21 to believe he would not continue to do so for his benefit or

22 merely for the revenge, which is best served cold.  That kind of

23 harm is irreparable.  The balance of the equities favors

24 plaintiffs.  We heard no testimony or received no evidence from

25 the defendants as to any harm they would suffer on account of an

073024.1                          Proceedings

1  injunction, and as a result, similarly, we don't believe any

2  significant bond should be required.

3          And finally, public interest.  The enforcement of

4  contracts, even if blue-penciled, is in the public interest.  We

5  need to protect employers.  We need to protect the donors.  As

6  Mr. O'Keefe testified, there is a significant First Amendment

7  issue here.  We don't want information simply available to

8  whomever may have it, and Project Veritas can't control what

9  Mr. O'Keefe does with the information in his possession and

10 protect its people who choose to anonymously associate with

11 Project Veritas.

12         And similarly, the statutory purposes of the Defend

13 Trade Secrets Act favors the public interest.  The public wants

14 confidential information developed by a company not to be

15 stolen.  It helps spur the economy.

16         With that in mind, Your Honor, we do ask that the

17 motion for preliminary injunction be allowed.  Thank you.

18         THE COURT:  Thank you.

19         Mr. Childers?  Mr. Whitney?

20         MR. WHITNEY:  Your Honor, may it please the Court.

21         Project Veritas is seeking an extraordinary and

22 drastic remedy.  That's *Mazurek vs. Armstrong*, U.S. Supreme

23 Court 1997.  In order to prevail on its motion, Project Veritas

24 is required to make a clear showing.  Again, that's *Mazurek*.  It

25 should not be granted unless the movant, by a clear showing,

1  carries the burden of persuasion.  Plaintiffs' counsel ignored

2  this burden in his argument.  Project Veritas is a thousand

3  miles away from a preponderance of the evidence, yet alone a

4  clear showing.

5          What documentary evidence has Project Veritas put

6  before this Court?  Telegram messages between Mr. O'Keefe and

7  Ms. Bolton, his executive assistant, containing a screen shot of

8  a document of irate donors demanding their money back from

9  Project Veritas, but not the document itself; telegram messages

10 between Mr. O'Keefe and Ms. Rose, his girlfriend at the time, in

11 which Ms. Rose suggested Mr. O'Keefe should back up his donors'

12 emails, to which Mr. O'Keefe responded, "I need to sleep on it."

13 There is no evidence of Mr. O'Keefe actually backing up donor

14 emails.  What other documents are in evidence?  An email

15 forwarded to the Project Veritas board by Ms. Hinckley, one of

16 the board member's moms.  No evidence -- there is no evidence

17 that Ms. Hinckley diverted funds away from Project Veritas to

18 OMG; a Verizon call log that showed Mr. O'Keefe made some

19 outbound phone calls to his doctor; an upset donor trying to

20 mediate a peace plan between Project Veritas and Mr. O'Keefe at

21 the time in February of 2023 and two donors; though

22 inexplicably, as this Court has noted, no donor list or even a

23 subset of the donor list has been submitted to the Court.

24          In addition, they offered Project Veritas board

25 meeting minutes prepared in the midst of the PR disaster that

1  Project Veritas created when they fired their founder and

2  figurehead.

3          And lastly, they offered a self-serving declaration by

4  Mr. Barton, who served as Project Veritas's president for ten

5  months following Mr. O'Keefe's separation, and that declaration

6  is identical to the declaration of Mr. Wetmore down to the

7  paragraph numbers and the language.  These declarations, as the

8  Court noted, lack any specific facts, just mere allegations.

9          In terms of testimonial evidence, Project Veritas

10  offered Mr. Barton's testimony.  The most poignant testimony

11  that Mr. Barton offered was that there existed this voicemail

12  where an unidentified donor said the magic words that

13  Mr. O'Keefe had disparaged Project Veritas and solicited them.

14  As the Court noted, that alleged voicemail from an unidentified

15  donor was not offered into evidence.

16          The only other testimonial evidence they offered was

17  Mr. Hughes' testimony, the IT director, that Project Veritas was

18  in possession of the complete set of Mr. O'Keefe's telegram

19  messages and iMessages during his tenure at Project Veritas.

20  And with that, plaintiff's counsel offered two telegram

21  messages.  The Court picked up on this.  Frankly, it is all a

22  bit far-fetched.

23          Project Veritas must make a clear showing of actual

24  and imminent harm.  That's *Kamerling* from the Second Circuit in

25  2002.  Let's take those in order, actual and imminent harm.

1            Actual harm:  Project Veritas has offered zero

2    evidence of actual harm.  Not a single donor diverted from

3    Project Veritas to OMG.  Not a single disparaging remark by

4    Mr. O'Keefe.  No evidence that Mr. O'Keefe has the amorphous

5    Project Veritas donor list in his possession or has somehow

6    breached Raiser's Edge to steal that data.  There is no evidence

7    of actual harm.

8            With respect to imminent harm, it is important to note

9    that all of the documentary evidence previously described

10   derives from February of 2023, before Project Veritas claims it

11   even terminated Mr. O'Keefe.  The exception to all of the

12   evidence being from February 2023 is the email from the board

13   member's mother, which was May of 2023.  Over the last 14 months

14   as this case has been live, there has not been a single piece of

15   evidence of any actual or imminent harm.  On this record there

16   can be no showing of actual or imminent harm, whatever the

17   evidentiary standard.

18           Moving to the elements necessary to support Project

19   Veritas's desired preliminary injunction, I won't belabor this

20   because I am sure the Court is well-versed in the four elements,

21   but these elements are what is required to grant the

22   extraordinary relief that Project Veritas seeks, and this comes

23   from *Benihana*, Second Circuit 2015.  So first, a likelihood of

24   success on the merits.  Project Veritas claims a breach of

25   contract, but they fired him.  And the restrictive covenants

1  they seek to enforce are limited in time and scope and void as a

2  matter of public policy.  Project Veritas seeks to enforce a

3  worldwide restrictive covenant, even though they admittedly do

4  not solicit donations in 35 of the 50 United States.

5         Second, irreparable harm.  Project Veritas was

6  required in this hearing to demonstrate that, absent the

7  injunction, it will suffer an injury that is neither remote nor

8  speculative, but actual and imminent.  That's *Juicy Couture*,

9  Southern District of New York, 2013.  If there is something

10 imminent, Project Veritas would have proven -- shown evidence of

11 something this year, 2024.  February 2023 is ancient history.

12        Third, the balance of hardships must tip in Project

13 Veritas's favor.  They offered zero evidence to support this

14 element.

15        And last, the public interest must not be disserved by

16 the injunction.  Again, Project Veritas put on zero evidence to

17 support this element.  If anything, the testimony of both

18 Mr. Barton and Mr. O'Keefe was consistent in that each party

19 performs investigative journalism, and that all parties agree

20 this is in the public interest.

21        It's not enough for plaintiffs' counsel to ask the

22 Court to draw inference after inference to support their desired

23 injunction.  There must be a clear showing.

24        Two final points:  Project Veritas is asking this

25 Court to enter an unenforceable injunction.  In the absence of

1  Project Veritas's donor list, Mr. O'Keefe and OMG, if enjoined,

2  would be left to guess:  Who is a donor of Project Veritas?

3  Project Veritas's representatives testified that there is no way

4  for Mr. O'Keefe to know who is a donor of Project Veritas.

5  Mr. Barton testified himself it would be impossible to memorize

6  thousands and thousands of names of donors.  The same goes for

7  Mr. O'Keefe.  Project Veritas chose not to submit the donor

8  list, whatever that term means, to the Court.  An injunction

9  cannot be left to guesswork.

10        Lastly, everything that has transpired over the course

11  of this hearing and yesterday confirms that the motion for

12  preliminary injunction brought by Project Veritas was a pure

13  tactic to avoid arbitration.  The Court can review the record

14  and see that Project Veritas waited more than a year to move for

15  a preliminary injunction, and only did so when we, representing

16  the defendants, moved to compel arbitration.  At that point,

17  Project Veritas discovered the injunctive relief carveout was in

18  the arbitration provision in the employment agreement, and so

19  here we are.

20        In circumstances like these, the moving party must

21  justify its delay.  Project Veritas, again, put on zero evidence

22  to justify its more than one year delay.  Delay like this may,

23  "standing alone, preclude the granting of preliminary injunctive

24  relief.  The failure to act sooner undercuts the sense of

25  urgency and suggests that there is, in fact, no irreparable

1  injury."  That's the Second Circuit in *Tough Traveler*.

2           We ask that the Court deny plaintiffs' request for a

3  preliminary injunction.

4           THE COURT:  Thank you.

5           MR. WOLMAN:  May I respond to a misrepresentation,

6  Your Honor?

7           MR. CHILDERS:  Before that, I would like add a

8  procedural point, Your Honor, and good morning.

9           Mr. O'Keefe has a hard stop at 11:30, and he wanted to

10 make sure that you knew when he snuck out, that it wasn't

11 because of anything that anybody said.

12          THE COURT:  No problem.

13          MR. WOLMAN:  I want to clarify.  We didn't discover in

14 May of this year any carveout.  It's in our complaint that we

15 filed originally, explicitly stated.

16          THE COURT:  I am sorry.  You didn't discover any?

17          MR. WOLMAN:  Mr. Whitney asserted that we discovered

18 some carveout of the arbitration provision in May of this year,

19 which is directly contrary to the fact that in the original

20 complaint filed, we reference that this is not an arbitrable

21 matter.

22          THE COURT:  Okay.  Thank you.  Just give me a second.

23 I just want to review my notes of everything you just said; both

24 of you just said.

25          (Pause)

Proceedings

```
 1            THE COURT:  Okay.  First of all, let me apologize for
 2   how long this is going to take.  It would have been a lot
 3   shorter if I had had more time, as somebody famously said, and I
 4   am also apologizing in advance for it not being as well
 5   organized as it would be if I had more time, but I thought it
 6   better to rule while everything was fresh in my mind, and I
 7   think -- I don't know if there really is a Rule 50 equivalent
 8   for a preliminary injunction hearing, but it didn't seem to make
 9   sense to waste the time with the defendants' case if defendants
10   were correct that plaintiff had not made the required showing on
11   its case.
12            And as will be clear, my law clerk and I did a lot of
13   work on this before the hearing based on the declarations and
14   have since incorporated the hearing testimony into my thinking.
15            I am going to deny the motion, and I'm going to tell
16   you why.
17            First, by way of background, on a motion for a
18   preliminary injunction, the Court need not accept the
19   allegations in the complaint as true, but rather the moving
20   party must demonstrate by a preponderance of the evidence that
21   the requisites for the injunction are met.  See *Geico vs.*
22   *Barakat*, 2024 Westlaw 22769 at page 4, E.D.N.Y., January 2nd,
23   2024; *Gilead vs. Safe Chain Solutions*, 684 F.Supp.3d 51 at 63,
24   S.D.N.Y. 2023.  See also *FedEx vs. Federal Espresso*, 201 F.3d
25   168 at 177.
```

1          I'm going to summarize the facts.  I get them from the

2  declarations of the parties, as well as the testimony of the

3  witnesses and the exhibits at the PI hearing, and my findings

4  are by a preponderance of the evidence.  The declarations I am

5  talking about are Mr. Wetmore's, which is ECF 51-1 and

6  Plaintiff's Exhibit 4 at the hearing, the president of Project

7  Veritas or PV; the declaration of Joseph Barton, the president

8  of Project Veritas Action Fund or PVA, which is ECF 51-2, and

9  Plaintiff's Exhibit 5; and the declaration of defendant O'Keefe,

10 which is ECF 52-1.

11         Plaintiff PV is a 501(c)(3) nonprofit corporation

12 formed under Virginia law and headquartered in Westchester

13 County.  Project Veritas Action Fund, which collectively with PV

14 I am going to call the PV entities or plaintiffs, is a 501(c)(4)

15 affiliate of Project Veritas also formed under Virginia law with

16 a headquarters in Westchester.  Defendant O'Keefe founded PV in

17 2010 and was the president -- I'm sorry -- was the PV CEO, the

18 president of PVA, and a member of the board of both

19 organizations, including being chair of PV's board until his

20 suspension from the board on February 6, 2023.

21         PV investigates private and public institutions,

22 reporting on them to expose corruption, dishonesty,

23 self-dealing, waste, fraud, and other misconduct.  PV relies on

24 private donors to support these activities, and it maintains a

25 database of the donors' information, including the names and

1  contact information.  PV maintains that it's confidential and

2  that it protects that database from disclosure by, among other

3  things, restricting who can access it, storing the information

4  on password-locked computers, and requiring employees with

5  access to it to acknowledge that it is confidential and agree

6  not to expose it.  This is mostly from the plaintiff

7  declarations paragraphs 4 through 11, and also supported by

8  testimony at the hearing.

9          O'Keefe entered into an employment agreement with PV,

10 which has a provision saying it also applies to PVA, the

11 operative version being the one signed on September 30, 2022.

12 It's Exhibit 3 to the Wetmore Declaration 16-1, and it was

13 received as Plaintiff's Exhibit 1 at the hearing; and under that

14 agreement, O'Keefe and PV agreed to certain terms and conditions

15 of employment, some of which extend beyond O'Keefe's separation

16 from the PV entities.  I'm not going to take the time to read

17 the provisions that are relevant to this decision into the

18 record.  It will just take too long and be incredibly boring, so

19 I will incorporate by reference the following paragraphs that

20 the parties have suggested are relevant.

21         First, Paragraph 10.A is -- relates to the

22 intellectual property of Project Veritas and how all of it

23 belongs to PV and not to Mr. O'Keefe.  Paragraph 11 contains an

24 acknowledgment regarding confidential information, and it's

25 Mr. O'Keefe's acknowledgement of what information will be

1    considered confidential; and 11.B is obligation to maintain all

2    of that information confidentially, and 11.A provides the

3    definition for confidential information, which includes

4    information regarding donors and potential donors; and 11.D

5    provides that the terms of Paragraph 11 survive the conclusion

6    of O'Keefe's employment.

7          There are also two non-solicitation provisions.

8    Paragraph 16, which is a 12-month bar on soliciting or employing

9    Project Veritas employees or contractors; and Paragraph 17,

10   which is short enough that I will read it.  It says, "Employee

11   warrants and agrees that during and after employee's employment,

12   employee shall not contact, solicit or otherwise communicate

13   with any person or entity that is a donor or prospective donor

14   to Project Veritas whom employee learns of or with whom employee

15   otherwise comes into contact as a result of employee's

16   employment by, or work for, Project Veritas."

17         Paragraph 22 requires the return of PV property upon

18   termination of employment, and Paragraph 23 is a dispute

19   resolution paragraph.  And I incorporate all of those paragraphs

20   by reference as if I had fully set them forth.

21         According to the Wetmore Declaration, during O'Keefe's

22   employment, the board of PV learned from employees about what

23   plaintiffs describe as serious allegations of workplace and

24   financial misconduct by O'Keefe.  On February 6, 2023, as set

25   forth in minutes received as Plaintiff's Exhibit 17, the board

1    voted to put O'Keefe on paid leave for 180 days, suspending his

2    authority to hire and fire, restricting his access to

3    proprietary information, and requiring him to give up his

4    corporate credit card.

5            At that time, he still remained as CEO and board

6    member, but he was suspended from those positions on

7    February 10th when he allegedly refused to participate in a

8    board meeting regarding financial findings.  Wetmore

9    paragraph 29, and the minutes are Plaintiffs' Exhibit 18.

10           The board formally removed O'Keefe on April 24, 2023,

11   and he was formally terminated on May 15, 2023.  See Wetmore

12   paragraphs 30 and 31, and Plaintiffs' Exhibit 19 and 20.

13           PV asserts that in response to his suspension, O'Keefe

14   began to breach the employment agreements, obligations, and

15   restrictive covenants.  I am going to call the Employment

16   Agreement the EA for short.  Plaintiffs allege that telegram

17   messages between O'Keefe and his executive assistant, Asha

18   Bolton, show that O'Keefe was soliciting PV entities' donors and

19   receiving a list of those donors.  The witnesses refer to the

20   database where PV donor information was held as the Raiser's

21   Edge database.  PV showed that it maintained those messages --

22   I'm sorry -- the telegram messages which were received at the

23   hearing as Plaintiff's Exhibit 7 and were attached to the

24   Wetmore Declaration at ECF 51-5 were maintained on PV's systems,

25   and because O'Keefe was using PV devices, and that's how

1  plaintiff has them.  I'm sorry.  The messages are 51-4 and
2  Plaintiff's Exhibit 6.  The messages appear to show that Bolton
3  was assembling a list of donors who were taking O'Keefe's side
4  in the dispute by asking PV for their money back, and indeed,
5  that's what she testified to.  PV also asserts -- also provides
6  telegram messages between O'Keefe and his -- at least then-
7  girlfriend Alexandra Rose, or someone he was dating, I guess he
8  put it, which are attached as 51-5 to the Wetmore Declaration
9  and were received as Plaintiff's Exhibit 7.  In those messages
10 she encouraged him to back up his donors' emails.  She also
11 asked if he had a noncompete or non-circumvention employment
12 agreement, and then opined that whoever wrote the employment
13 contract for PV had "screwed O'Keefe over."

14          On February 20, 2023, O'Keefe recorded and published a
15 video in which, according to the Wetmore Declaration, he said he
16 was "packing up his personal belongings and intended to start
17 anew."  He further stated that the mission continues, and
18 although it may no longer be called Project Veritas, he "will
19 need a bunch of people around" him, and he would "make sure you
20 know how to find me."  Plaintiffs allege that this video was
21 published on behalf of OMG as its agent and was designed to
22 solicit employees.  Plaintiffs allege, without further
23 specification, that O'Keefe continues to solicit PV's donors,
24 employees and contractors in violation of the EA and on behalf
25 of OMG.  See Wetmore paragraphs 52 to 54.

1       O'Keefe says that -- in his declaration that he never

2  had ready access to the centralized donor list, and he did not

3  take any donor list, and he does not have any such list and

4  never had any such list.  The telegram messages with Bolton he

5  says reflect his attempt to document the flood of requests and

6  inquiries from contributors who demanded their money be returned

7  upon learning that O'Keefe was suspended.  It's in his

8  declaration in 16 and 17.

9       At the hearing, Bolton testified that she had been

10 O'Keefe's executive assistant for about five years.  She was

11 aware of the video that O'Keefe created addressing the PV staff,

12 and she only communicated once with him about PV donors between

13 the time of the video and her leaving PV, which was before April

14 when she started a new job.  Bolton testified that during that

15 period, several donors were calling the office over the battle

16 between O'Keefe and PV; that there was a lot of uncertainty, and

17 that people were scared about the future of PV.  She said she

18 created the list of names and telephone numbers of the

19 disgruntled callers to capture who they were as damage control,

20 which she described as creating a list to figure out a way to

21 salvage the situation by contacting the donors once the dust

22 settled.  The list she compiled contained the name, email or

23 phone number, and what the donor said at the time.  In other

24 words, the messages they left and what they told her when

25 calling into the office.  She sent O'Keefe a link to the list,

1  which is a Word document, but she does not know what, if

2  anything, he did with it.  She continued to work on adding

3  callers to the list as they came in, but at some point she said

4  PV's development team had the document, and she doesn't know

5  what anybody did with it.  She said she was told by the

6  development team that some of the callers had not, in fact,

7  donated or were low-dollar donators -- low-dollar donors.

8       She testified that PV retained donor data in a

9  Raiser's Edge database, which was password-protected, and that

10  only limited individuals could access.  She did not have access

11  to it.  She testified she never took any electronic files or

12  delivered any files or property to O'Keefe apart from the Word

13  document, and I found her testimony credible.

14       O'Keefe testified that after his suspension in

15  February of 2023, he started receiving calls from hundreds or

16  thousands of PV donors.  Plaintiffs' Exhibit 28, which is the

17  phone bill associated with his PV cellphones, does not show

18  nearly that level of activity in the period on or after

19  February 10th.  The bill -- well, there's been no testimony

20  explaining what kind of calls are or are not detailed on the

21  bill, and it does reflect thousands of minutes of calls and

22  hundreds of texts, but based on the preponderance of the

23  evidence at the hearing, I think O'Keefe was exaggerating the

24  call volume, but at the same time, I find there likely were a

25  significant number of disgruntled donors.

073024.1                         Proceedings                         23

1          Regarding the telegram messages with Bolton, O'Keefe

2    testified that he communicated with her regarding the donors who

3    were calling because this was an extraordinary situation.  Many

4    of the donors demanded their money and wanted to speak with him,

5    and he wanted the information to find out what was going on and

6    to respond to the donors.  He also testified that many of the

7    same people publicly tweeted about the situation, and that many

8    donors were furious to the point that many previously

9    confidential donors went public and that he believed that PV's

10   board was aware of this.  Barton testified he wasn't, which I

11   did not find credible.  O'Keefe also testified that he never

12   logged into Raiser's Edge, and that if he needed information

13   from it, he would get it from other staffers, generally, the

14   development department.  He did testify that if he were given

15   contact information for a donor and saved it to his phone, he

16   would not delete it after whatever efforts he made toward that

17   donor.

18          Based on the testimony at the hearing and the

19   declarations, plaintiffs have shown that Bolton sent O'Keefe the

20   list that she compiled of donors who were calling into the PV

21   office with complaints.  I see no evidence that O'Keefe took the

22   Raiser's Edge database or information from it aside from

23   whatever contacts may have been in his phone that may have

24   originated from that database.

25          On February 17, 2023, O'Keefe formed defendant

 1  Transparency 1, LLC d/b/a O'Keefe Media Group or OMG.  OMG notes

 2  on its website that it's located here in Westchester.  Like PV,

 3  OMG engages in investigative journalism with an emphasize on

 4  video exposés on government and corporate corruption and

 5  malfeasance.  See Wetmore paragraphs 43 to 47 and O'Keefe

 6  paragraph 5.  PV contends that the formation of OMG violated the

 7  EA's provision on prohibited outside activities, see Wetmore

 8  paragraph 48 and EA paragraph 15, which doesn't seem relevant to

 9  the instant motion.  And that plaintiffs -- and plaintiffs

10  further allege that O'Keefe misappropriated PV's confidential

11  information by taking "donor lists and contact information,

12  equipment, as well as unreleased investigation publications by

13  Project Veritas rebranded as OMG material."  That's Wetmore

14  paragraphs 49 and 58.  No evidence regarding unreleased

15  investigations has been provided.

16          Joshua Hughes, PV's information technology director,

17  testified that O'Keefe did not return a PV laptop, phone and

18  iPad.  Plaintiffs also allege that O'Keefe solicited PV's

19  employees and contractors to join OMG.  The hearing testimony

20  suggested that at least Anthony Iatropoulos and RC Maxwell

21  worked for PV and then for OMG; and for purposes the hearing,

22  I assume that O'Keefe and OMG did hire PV employees during the

23  one-year period following his separation from PV.

24          On May 25, 2023, plaintiffs allege that O'Keefe sent

25  from his OMG email address a form solicitation email to at least

1  two PV donors with the subject line:  "Hey there, I know you

2  have been a supporter of my work in the last year" discussing an

3  alleged "bomb shell video" and providing a link to OMG's

4  subscription web page.  See Wetmore 55.  One of those emails is

5  attached to Wetmore's Declaration as Exhibit 5, ECF No. 51-6,

6  and was received at the hearing as Plaintiffs' Exhibit 8.

7  Wetmore paragraph 57 and Barton in the corresponding paragraph

8  allege, without further explanation, that the only way O'Keefe

9  knew that donor's contact information or those donors' contact

10  information was by using PV's confidential list.

11          At the hearing Barton testified that the solicitation

12  email sent to Tina Hinckley, that's Plaintiffs' Exhibit 8, who

13  is the mother of a PV board member -- sorry.  Barton testified

14  that Tina Hinckley, who received that email, and who was the

15  mother of a PV board member, was on PV's donor list, and that PV

16  had not provided the contact info for Ms. Hinckley to O'Keefe or

17  OMG.  O'Keefe testified he did not know how OMG got Ms.

18  Hinckley's email address, but that he never accessed Raiser's

19  Edge, so could not have gotten it from there, and he also

20  testified that OMG bought mailing lists and sent out blast

21  emails.

22          Before O'Keefe's separation from the PV entities, a

23  significant following identified him with PV to the point where

24  the statement "James O'Keefe is Project Veritas" trended on

25  Twitter.  Wetmore paragraph 76.  O'Keefe concurs that he was the

1    face of PV according to the public given his typical screen

2    appearances as the lead journalist in PV's exposés.  He also

3    says as the founder, fundraiser, leader and public face of PV,

4    his termination upset many of PV's financial supporters.  Again,

5    over a thousand of whom he says contacted him without his

6    solicitation to inform him that they contributed to PV on the

7    understanding that he would be leading the organization, and if

8    he wasn't going to be, they wanted their money back.

9            He believes PV has gone into steep decline since his

10   departure given the depletion of millions in cash reserves and

11   widespread lay-offs in August of 2023.  Paragraphs 10 through 12

12   of the O'Keefe Declaration.  At the hearing he testified that

13   when he received these calls from people who wanted their money

14   back, he was careful not to disparage PV, and he essentially

15   just listened, which seems like it would be superhuman, although

16   I imagine you could respond in a non-committal and non-improper

17   way.  And he suggested that he did that by saying things like,

18   you know, "You have to do what you think is best."  I don't

19   believe that he said nothing in response, but I see no evidence

20   that in response to those calls he encouraged people to stop

21   giving money to PV or to start giving it to OMG.

22           OMG is a subscription model.  It doesn't rely only on

23   donations like PV.  OMG accepts donations, but they are not

24   deductible as they would be with PV.  That's O'Keefe

25   paragraph 14.

1          On May 31, 2023, plaintiffs filed their original

2    complaint setting forth the following claims against O'Keefe:

3    One, breach of contract; two, violation of the Defend Trade

4    Secrets Act or DTSA; three, breach of fiduciary duty; four,

5    breach of duty of loyalty; five, conversion; six, replevin; and

6    seven, indemnification.  See the complaint, ECF No. 1,

7    paragraphs 89 through 155.  The original complaint also had a

8    claim for breach of contract as to Iatropoulos and Maxwell, and

9    three claims for tortious interference with contract as to OMG

10   relating to O'Keefe by Iatropoulos and Maxwell, respectively.

11   See paragraphs 156 to 190 and 217 to 244.

12         On October 12th, plaintiffs filed an amended complaint

13   adding an additional claim for a declaration of ownership of

14   copyright against O'Keefe.  That's ECF No. 16.

15         On March 25, 2024, the parties reported that a

16   settlement had been reached with Iatropoulos and Maxwell.  On

17   May 13th, plaintiffs filed a stipulation of dismissal as to

18   Iatropoulos.  I haven't gotten that yet with respect to Maxwell,

19   but I assume it will be forthcoming.

20         On April 17, 2024, defendants filed a motion to compel

21   arbitration and stay this proceeding, which I denied without

22   prejudice for failure to follow Section 2.A of my individual

23   practices, which requires either a pre-motion letter with a

24   pre-motion conference to follow or a letter explaining why that

25   procedure should not be required.  I scheduled a pre-motion

073024.1                          Proceedings                          28

 1   conference and directed plaintiffs to respond to the letter.
 2   See ECF Nos. 40 through 44.  Two days before the scheduled
 3   pre-motion conference, plaintiffs filed the instant motion for a
 4   preliminary injunction under Rule 65, seeking to enjoin
 5   defendants from contacting or soliciting plaintiffs' donors,
 6   contacting or soliciting plaintiffs' employees or contractors,
 7   obtaining, using or disclosing any of plaintiffs' confidential
 8   information in violation of the EA or the DTSA; and keeping and
 9   failing to return any property belonging to plaintiffs.  ECF
10   No. 50.
11            At the May 31st conference, I set a briefing schedule
12   on the motions and scheduled the hearing for yesterday.
13            Turning now to the legal standard, to obtain a
14   preliminary injunction, which I am going to abbreviate PI, a
15   plaintiff must show:  A likelihood of success on the merits or
16   sufficiently serious questions going to the merits to make them
17   a fair ground for litigation, and a balance of hardships tipping
18   decidedly in the plaintiffs' favor; that they are likely to
19   suffer irreparable injury in the absence of an injunction; that
20   the balance of hardships tips their way, and that the public
21   interest would not be disserved by the injunction.  *Mendez v.*
22   *Banks*, 65 F.4th 56 at 63 to 64, Second Circuit, 2023.
23            And, by the way, unless I say otherwise, any case
24   quotations today omit internal citations, quotation marks,
25   footnotes, and alterations.

1           Sometimes the Circuit frames the test as having three

2    parts:  Irreparable harm, either likelihood of success on the

3    merits or serious question, plus balance of hardships, and

4    third, public interest.  *Spanski Enterprises vs. Telewizja*

5    *Polska*, 832 F.App'x 723 at 724.  Either way, a preliminary

6    injunction is an extraordinary remedy never awarded as of right.

7    *Winter vs. NRDC*, 555 U.S. 7.

8           Courts in this Circuit routinely consider hearsay

9    evidence in determining whether to grant a PI, and while PI

10   proceedings involve less formal procedures and less complete

11   evidence than trials, they should not be resolved on disputed

12   issues when there are disputed issues of fact.  Sorry.  They

13   should not be resolved on the basis of affidavits when there are

14   disputed issues of fact.  *725 Eatery vs. City of New York*, 408

15   F.Supp.3d 424 at 455, S.D.N.Y. 2019.  New York law applies per

16   the EA, paragraph 23.B.

17          I am going to start with breach of contract.  To show

18   a breach of contract, the plaintiff has to show the existence of

19   the contract, adequate performance by the plaintiff, breach by

20   the defendant, and damages.  *Eternity Global Master Fund vs.*

21   *Morgan Guaranty*, 375 F.3d 168 at 177.

22          Now some general background about restrictive

23   covenants in employment agreements.  "Under New York law, a

24   restrictive covenant is rigorously examined and only enforced if

25   it is reasonable in terms of its time, space or scope and not

1  oppressive in its operation." *Singas Famous Pizza vs. New York*

2  *Advertising*, 468 F.App'x 43 at 45.  See *IBM vs. Lima*, 883

3  F.App'x 911 at 912, which said, "A restrictive covenant between

4  an employer and employee will only be subject to specific

5  enforcement to the extent that it is reasonable in time and

6  area, necessary to protect the employer's legitimate interests,

7  not harmful to the general public, and not unreasonably

8  burdensome to the employee."  See *Willis Re vs. Heriott*, 550

9  F.Supp.2d 68 at 102, S.D.N.Y. 2021; *BDO Seidman vs. Hirshberg*,

10  93 N.Y. 2d 382 at 388 to 89; and *Harley Marine vs. Moore*, 2024

11  WL 532496 at page 7, N.D.N.Y., February 9, 2024.

12          If a restrictive covenant is found to be reasonable,

13  courts will enforce it only to the extent necessary:  "To

14  prevent an employee's solicitation or disclosure of trade

15  secrets; to prevent an employee's release of confidential

16  information regarding the employer's customers, or in those

17  cases where the employee's services to the employer are deemed

18  special or unique."  *Ticor Title vs. Cohen*, 173 F.3d 63 at 70;

19  see *Mercer vs. DiGregorio*, 307 F.Supp.3d 326 at 349, S.D.N.Y.

20  2018.

21          Non-solicitation provisions are types of restrictive

22  covenants, and therefore, the employer must show the restriction

23  is necessary to protect the employer's legitimate business

24  interests.  *Pure Power Boot Camp vs. Warrior Fitness Boot Camp*,

25  813 F.Supp.2d 479 at 510, S.D.N.Y. 2011.  But to satisfy the

1 merits prong of the PI test, the plaintiff seeking to enforce a

2 restrictive covenant just has to show likelihood that the

3 covenants are enforceable and that the defendant breached them.

4 *Willis Re* at 104, collecting cases.

5        I am going to start with the provision regarding

6 non-solicitation or employment of PV employees or contractors.

7 There is no dispute that the EA exists regarding likelihood of

8 success that O'Keefe breached paragraphs 16 of the EA by

9 soliciting past and present employees and contractors beginning

10 February 20, 2023.  I find that the provisions in paragraphs 16

11 are reasonable and thus likely enforceable under New York law.

12 The provision is a one-year post employment timing restriction

13 and limits solicitation to current PV employees and contractors

14 or anyone who was an employee or contractor within the 12 months

15 before the termination of the employee's employment.  That

16 appears reasonable.  See *Marsh vs. Schuhriemen*, 183 F.Supp.3d

17 529 at 535, S.D.N.Y. 2016, which said that New York courts

18 routinely find one-year restrictions to be reasonable, and that

19 state courts have upheld non-solicitation agreements as to

20 clients without geographic limitation.  And *Mercer*, 307

21 F.Supp.3d at 349.

22        But the fact that the provision appears reasonable --

23 and I note that the cases were talking about clients, not

24 employees -- but assuming for the sake of argument that the

25 provision is reasonable, it only applies under its express terms

1  during the employee's employment and for a period of 12 months

2  after termination.  I will assume for purposes of the hearing

3  that employees from PV came to work at OMG, but the termination,

4  the formal termination was May 15, 2023, and more than 12 months

5  have passed since that date, so the provision no longer applies

6  to O'Keefe.  Thus, there can be no risk of irreparable harm

7  relating to O'Keefe's future solicitation of PV employees, and

8  to the extent that plaintiffs rely on past breaches to support

9  their motion, the preliminary injunction cannot be issued based

10 on past harm because the purpose of a preliminary injunction is

11 to prevent future irreparable harm.  *Fisher vs. Goord*, 981

12 F.Supp.2d 140 at 168, Western District 1997.

13         Thus, I need not decide if the February 20, 2023 video

14 amounts to a solicitation of PV employees, though I tend to

15 think it is a solicitation of the people who would include that

16 group; but assuming the likelihood of success on the merits

17 regarding this claim, there's been no showing of future

18 irreparable harm, and therefore, an injunction prohibiting

19 solicitation of employees and contractors is not warranted.

20         The only conceivable future harm was mentioned by

21 Barton in his testimony.  He said that O'Keefe's past

22 solicitation of PV employees makes it harder for PV to hire new

23 employees, but he did not describe any hiring difficulties, give

24 any examples of anyone who turned down a job with PV because of

25 O'Keefe or OMG, or otherwise explain the basis for his

1  conclusion that any difficulty PV might be having in hiring was

2  attributable to O'Keefe's violation of paragraph 16 of the EA.

3  Nor did he provide evidence that PV was even in a financial

4  position to hire new employees.  So I don't find the plaintiff

5  has shown any imminent irreparable harm in that regard.

6          Plaintiffs took the position at the hearing that the

7  remedy for O'Keefe's violation of paragraph 16 was not what they

8  asked for in their motion, which was an order that he not

9  contact or solicit their employees or contractors, but rather an

10 order that he fire any employee or contractor that he or OMG had

11 previously hired.  No authority for that proposition has been

12 provided.  Moreover, now that the year has expired, even if I

13 ordered the defendant to fire any former PV employees,

14 defendants can rehire them the next day without breaching the

15 agreement.  "The legitimate interest of the employer has to

16 protect against unfair competition, not competition generally."

17 See *In re:  Document Techs Litigation*, 275 F.Supp.3d 454 at 466

18 to 67, S.D.N.Y. 2017.  Having let the year expire without

19 seeking preliminary relief, plaintiffs cannot establish

20 irreparable harm with respect to O'Keefe's seeming violation of

21 paragraph 16.

22          Turning now to the provision prohibiting non-

23 solicitation of or communication with donors.  Plaintiffs argue

24 that plaintiff breached that paragraph, EA paragraph 17, because

25 its donors are akin to clients, and the non-solicitation non-

1 communication provision as to donors is reasonable because it

2 serves plaintiffs' legitimate interest of preventing O'Keefe

3 from diverting key donors.  That's in their brief at page 11.

4 They say it's enforceable under New York law because it's

5 necessary to prevent O'Keefe's use of plaintiffs' trade secrets,

6 prevent his release of confidential information about

7 plaintiffs' donors, and to address his special or unique

8 presence as PV's past figurehead, and to prevent him from using

9 the donor list that developed -- that was developed while he was

10 at PV.

11          As a factual matter, I do not credit Barton's

12 testimony that Barton and the board received messages and

13 voicemails from donors that said something to the effect of, I

14 have been solicited by O'Keefe, and I am pulling my donation

15 based on that solicitation.  I don't think that's how people

16 talk.  And in any event, Barton's testimony was of out-of-court

17 statements made by unknown declarants offered for their truth,

18 which I admitted, but to which I attach little reliability.

19          Given that plaintiffs did not present any of the

20 messages themselves as evidence at the hearing, and one would

21 think emails and voicemails would exist, I am dubious that such

22 specific statements were made.  I do believe that donors pulled

23 their donations in the wake of the split between O'Keefe and the

24 board, but I do not find a preponderance of the evidence that

25 donors said they were doing so because O'Keefe had asked them

1  to.  But there is no question that O'Keefe has communicated with

2  PV donors since he left, as he admitted, and I assume, as I

3  think he also did, that some of the people he has asked to

4  support OMG were PV donors at some point.

5          Even accepting all of the testimony presented at the

6  hearing in the light most favorable to plaintiffs, and assuming

7  that O'Keefe solicited and continues to solicit PV donors,

8  plaintiffs have not shown a likelihood of success on the merits

9  because the provision restricting communications with donors is

10 not reasonable or enforceable.  The provision contains no

11 geographic limitation and no temporal litigation -- no temporal

12 limitation.  Plaintiffs argue their business has a global

13 impact.  That's in their reply brief at four; and if so, that

14 could excuse the lack of a geographic restriction.  See

15 *MasterCard vs. Nike*, 164 F.Supp.3d 592 at 601, S.D.N.Y. 2016,

16 but I've seen no evidence of that.  Furthermore, Barton

17 testified that plaintiffs' website currently contains a

18 disclaimer that PV does not solicit in 35 states or Washington,

19 D.C. based on legal requirements in those jurisdictions, and so

20 it certainly seems overbroad that the EA would prohibit O'Keefe

21 from soliciting in regions that plaintiffs themselves cannot

22 solicit.

23         Moreover, plaintiffs have provided no justification

24 for the extremely broad scope and the indefinite length of the

25 provision.  Where courts have found provisions containing either

1 no geographic limit or broad geographic limits to be reasonable,

2 those provisions also included limitations on time or scope or

3 both.  See, for example, *Willis Re* 550 F.Supp.3d at 104 where

4 there was a 24-month restriction and limitations as to what

5 clients it covered.  *Mercer Health*, 307 F.Supp.3d at 349, which

6 was limited to covered clients for one year.  *Alves vs.*

7 *Affiliated Home Care*, 2017 WL 4350283 at page 4, S.D.N.Y.

8 September 28, 2017, where the covenant applied only to clients

9 actually assigned to the plaintiff.

10         Thus, I find that this provision in all likelihood

11 would be found unreasonable under New York law.  See *Pure Power*,

12 813 F.Supp.2d at 507 at 511, where the covenant was

13 unenforceable because it had a ten-year prohibition, no

14 geographic limitations, and the terms were overly broad and

15 ambiguous.

16         Additionally, under New York law, an employer's

17 legitimate business interests are generally limited to

18 protection against misappropriation of the employer's trade

19 secrets or of confidential customer lists, or protection from

20 competition by a former employee whose services are unique or

21 extraordinary.  *Pure Power* at 510, quoting *BDO Seidman* at 389.

22 *BDO Seidman* at 390 suggests that where an employee is unique or

23 extraordinary, courts give wider latitude to restrictive

24 covenants preventing that employee from competing.  But there is

25 no noncompete provision in O'Keefe's EA.  So any relief here

1 would have to be based on the trade secrets or the donor list.

2 An employer has a legitimate interest in preventing former

3 employees from exploiting or appropriating the goodwill of the

4 client or customer, which had been created and maintained at the

5 employer's expense to the employer's competitive detriment. *BDO*

6 *Seidman* at 392.  See *Pure Power* at 510, and *Willis Re* at 103.

7          Even if I were to construe the provisions of the EA as

8 a noncompete rather than non-solicitation or non-communication,

9 in order to show unique or extraordinary services, the employer

10 has to show that the employee was irreplaceable and his

11 departure caused some special harm to the employer, meaning the

12 services are truly special, unique or extraordinary and not

13 merely of high value.  *Pure Power* at 510.

14          Plaintiffs argue on the one hand that O'Keefe was

15 special or unique because he was PV's chairman, CEO, president

16 and figurehead.  See plaintiffs' memorandum at 14 and Wetmore

17 paragraphs 79 to 80.  On the other hand, they also assert that

18 no one person is Project Veritas.  I'm sorry.  They assert that,

19 "No one person is Project Veritas; a successor CEO, Hannah

20 Giles, for example, was as much responsible for the ACORN story

21 that led to the formation of Project Veritas as O'Keefe was."

22 That's paragraph 77.  Plaintiffs also assert that PV is strong

23 enough to function without O'Keefe.  Wetmore 78.

24          So plaintiffs have not shown how O'Keefe was

25 irreplaceable exactly, although he does seem to have been the

1  public face of the company; but assuming he was unique and

2  extraordinary, protection against competition by a former

3  employee whose services are unique and extraordinary can be a

4  legitimate employer interest, but such restrictions must still

5  meet *BDO Seidman's* remaining criteria for enforcement. *JLM*

6  *Couture*, 91 F.4th at 106. See *Data Communication vs. Dirmeyer*,

7  514 F.Supp. 26 at 33, E.D.N.Y. 1981, finding a noncompete

8  ostensibly unenforceable because its broad sweeping language was

9  unrestrained by any limitations keyed to uniqueness, among other

10 reasons. Here, the non-solicitation of donors provision does

11 not meet *BDO Seidman's* remaining criteria for enforcement.

12          A provision will be rejected if it's overly broad by

13 seeking to prohibit the employee from soliciting clients of the

14 employer with whom the employee did not have a relationship

15 through his or her employment or if it extends to clients

16 recruited through the employee's own independent efforts. *Pure*

17 *Power* at 511; *Permanens Cap vs. Bruce*, 2022 WL 3442270 at

18 page 10, S.D.N.Y. July 22, 2023. Report and recommendation

19 adopted 2022 WL 4298731, September 19, 2022; and *Nebraskaland*

20 *vs. Brody*, 2010 WL 157496 at page 3, S.D.N.Y., January 13, 2010.

21          Because plaintiffs have not shown solicitation of any

22 particular individual, they have not shown that anybody

23 solicited was not somebody that Mr. O'Keefe brought with him to

24 PV.

25          Additionally, former employees can use their

1   recollection of information about customers, and such

2   recollected information is not considered confidential for

3   purposes of informing -- enforcing restrictive employment

4   covenants.  *Pure Power* at 510.

5           Moreover, a restriction on soliciting dormant or

6   prospective clients is overbroad.  See *Mercer Health* at 351,

7   *Marsh vs. Schuhriemen*, 183 F.Supp.3d at 535, and *Leon M. Reimer*

8   *& Co. vs. Cipolla*, 929 F.Supp.2d 154 at 159.  The first two

9   relate to prospective clients' inclusion in a non-solicitation

10  agreement as not being reasonable, and the latter relates to

11  dormant clients and restrictions on them being overbroad.

12          Here, the provision is overbroad not only because it

13  lacks a geographic or temporal element, but because it

14  encompasses prospective and dormant donors.  See *Permanens* at

15  10.  Moreover, the provision also prohibits more than

16  solicitation.  Its express terms also prohibit contact or

17  communication with donors or prospective donors.  Under this

18  language, O'Keefe would be prohibited from engaging with anyone

19  or any entity that voluntarily initiated the communication with

20  him, and such a provision is unenforceable.  See *Permanens* at

21  11, collecting cases.  Thus, the EA paragraph 17 would be

22  unenforceable even if it contained reasonable geographic and

23  time restrictions, which it does not.

24          Finally, in the absence of evidence that O'Keefe or

25  OMG have or had the PV donor database, it's impossible to see

1  how they would know the universe of individuals who comprise PV

2  donors or prospective donors, a problem Barton acknowledged in

3  his testimony.  Moreover, the lack of clarity on who "is" a

4  donor -- in other words, is that someone who donated last week,

5  last year, last decade -- is another reason why the provision is

6  likely unenforceable.

7          Turning to the blue-penciling, New York courts have

8  expressly recognized and applied the judicial power to sever or

9  granted partial enforcement for an overbroad employee

10 restrictive covenant.  *Pure Power* at 508.  Partial enforcement

11 may be justified where the employer shows an absence of over-

12 reaching or coercion or other anticompetitive conduct, but that

13 it in good faith sought to protect a legitimate business

14 interest consistent with reasonable standards of fair dealing,

15 and that's the employer's burden.  Again, *Pure Power* at 508.

16         In *BDO Seidman*, the New York Court of Appeals said a

17 court could sever portions of a restrictive covenant that were

18 overbroad and thus render it partially enforceable, but it noted

19 in that case that no substantive terms were required to be

20 added, the existing time and geographic limitations remained

21 intact, and the only change the court made was to narrow the

22 class of clients to which the covenant applied.  See 93 N.Y.2d

23 at 395.

24         Plaintiffs point to EA paragraph 29 as requiring the

25 Court to give EA paragraph 17 its maximum legal effect.  I will

1  incorporate by reference the full wording of paragraph 29, which

2  basically says, if any provision is unenforceable, it should be

3  modified, if permissible, or severed.  But paragraph 17 is not

4  salvageable by the Court.  The Court may blue-pencil an

5  overbroad, restrictive covenant to enforce only its reasonable

6  provisions, but it "should not attempt to partially enforce a

7  [restrictive covenant] where its infirmities are so numerous

8  that the Court would be required to rewrite the entire

9  provision." *Permanens* at 11.  I find, as in *Permanens*, EA

10 paragraph 17 is irredeemably overbroad and cannot be enforced.

11 So plaintiffs have not shown a likelihood of success on the

12 merits regarding the breach of that paragraph.

13        Turning to non-disclosure of confidential information,

14 such covenants are enforceable under New York law if the

15 restrictions are reasonable and related to the disclosure of

16 confidential customer information or trade secrets.  *Integra*

17 *Optics vs. Nash*, 2018 WL 2244460 at page 7, Northern District,

18 April 10, 2018.  The parties don't really argue this point in

19 the papers.  Plaintiffs make a conclusory argument there is a

20 likelihood of success on the merits regarding O'Keefe's breach

21 of paragraph 11 because he used the donor list and contact

22 information, he used plaintiffs' equipment, and he rebranded

23 unreleased investigations as OMG material.  They repeat the same

24 argument with respect to the tortious interference claim.  They

25 don't expand on this argument or on any irreparable harm in

073024.1                    Proceedings                    42

1   connection with this purported breach except to point out that
2   the EA contained a clause saying that any breach was irreparable
3   harm.  See plaintiffs' opening brief at 19 and its reply at 10.
4   Plaintiffs did not provide any additional support for this claim
5   at the hearing.  As far as I can tell, to the extent these
6   claims are not conclusory, they overlap with the same evidence
7   regarding the non-solicitation of donors or the trade secrets
8   claim.  Plaintiffs have the burden and have not shown what
9   disclosure of confidential information occurred, so they have
10  not shown likelihood of success on the merits; and even if that
11  had occurred, plaintiffs would have to show that such disclosure
12  is causing ongoing irreparable harm, which they have not done.
13          As to the provision of the agreement requiring a
14  return of property, plaintiffs argue that O'Keefe did not return
15  the donor lists and contact information, equipment, and the
16  unreleased investigations.  Defendants argue there is no
17  evidence of that.  I agree as to the list and to unreleased
18  investigations.  At the hearing, however, plaintiffs' head of
19  IT, Joshua Hughes, testified that O'Keefe received company
20  devices, and that he did not return one laptop, one phone, and
21  one iPad.  He conceded he does not know if O'Keefe still has
22  these items, but he infers it from the fact that O'Keefe never
23  returned them.  I will assume for the sake of argument that
24  there is a likelihood of success on the merits of the failure to
25  return that equipment.  O'Keefe claimed that he was told he

1  could keep the phone, which is sort of 50/50 between Hughes and

2  O'Keefe.  I don't really know who to believe on that, but he

3  didn't have any testimony about a laptop or an iPad, so I am

4  assuming that he has retained those.  But plaintiffs do not

5  explain what irreparable harm is ensuing in connection with his

6  continued possession.  Obviously, he has an obligation to

7  maintain those if he has them just by virtue of the lawsuit, but

8  plaintiffs have not shown that -- what irreparable harm would be

9  averted by an order now that he return them.

10         Turning to the DTSA, it provides a private cause of

11 action where a plaintiff can show it possessed a trade secret

12 and the defendant misappropriated it.  See *ExpertConnect*, 2019

13 WL 3004161 at page 3, and *Nielsen vs. Circana*, 2023 WL 5917751

14 at page 6, S.D.N.Y., September 11, 2023.

15         Under the DTSA, the definition of "trade secret" is

16 very broad.  It includes all kinds of business information

17 provided the owner has taken reasonable measures to keep it

18 secret, and that the information has economic value from being

19 secret and not readily ascertainable by others.  *ExpertConnect*

20 at 4, citing 18 U.S.C. Code Section 1839(3).  Courts generally

21 require plaintiffs to plead trade secrets with sufficient

22 specificity to inform defendants of what they are alleged to

23 have misappropriated.  *ExpertConnect* at 4.  See *Elsevier vs.*

24 *Doctor Evidence*, 2018 WL 557906 at page 4, S.D.N.Y., January 23,

25 2018.  The question of whether a customer list is a trade secret

1  is generally a question of fact.  *LoanDepot vs. Cross Country*
2  *Mortgage*, 2023 WL 3884032 at page 5, S.D.N.Y., June 8, 2023.

3          Under New York law, courts look to six factors to
4  determine whether something is a trade secret, and federal
5  courts sometimes look to those factors as guide posts, but the
6  DTSA does not require those factors to be individually pleaded.
7  See *AA Medical vs. Almansoori*, 2023 WL 7688688 at page 9,
8  E.D.N.Y., October 4th, 2023, r&r adopted 2024 WL 168332,
9  January 16, 2024; *Zabit vs. Brandometry*, 540 F.Supp.2d 412 at
10 422, S.D.N.Y. 2021; and *Bronx Conservatory of Music vs. Kwoka*,
11 2024 WL 53569 at page 3, S.D.N.Y. January 4th, 2024.

12         Those six factors are:  The extent to which the
13 information is known outside the business, the extent to which
14 it's known by employees and others involved in the business, the
15 extent of measures taken by the business to guard the secrecy of
16 the information, the value of the information to the business
17 and its competitors, the amount of effort or money expended by
18 the business in developing the information, and the ease or
19 difficulty with which the information could be properly acquired
20 or duplicated by others.  *AA Medical* at 9.

21         Generally, information not readily ascertainable
22 through public sources -- sorry.  Try that again.  Information
23 readily ascertainable through public sources or a former
24 employee's recollection of its former employer's operations
25 cannot be a trade secret.  *New York Packaging vs. Mustang*, 2022

1  WL 604136 at page 5, E.D.N.Y., March 1, 2022.

2          On the other hand, where customers are not readily

3  ascertainable, but must be cultivated with great effort and

4  secured through the expenditure of considerable time and money,

5  the names of those customers are protectable trade secrets.

6  *Bronx Conservatory* at 4.

7          So customer lists generally are trade secrets where

8  they are developed through substantial effort and kept in

9  confidence and protected against disclosure.  *Bullion Shark vs.*

10 *Flip A Coin*, 2023 WL 8455669 at page 6, E.D.N.Y., December 6,

11 2023.  Reconsideration denied, 2024 WL 22780, January 2nd, 2024,

12 and amended and superseded 2024 WL 87763, January 5th, 2024.

13 See *Mercer Health vs. DiGregorio,* 307 F.Supp.3d 326 at 352.

14         Plaintiffs argue that donor list, employee list and

15 unaired programming are trade secrets.  That's in their brief at

16 15.  They contend they have taken measures to keep the

17 information secret such as nondisclosure agreements, restricting

18 access, and password protection.  See Wetmore paragraphs 8 and

19 82, and similar testimony at the hearing.  They further argue

20 that these trade secrets have independent value, are not

21 generally known, and are not readily ascertainable.  See

22 plaintiffs' brief at 15 and Wetmore paragraph 83.

23         "At the outset, the Court notes that the plaintiff has

24 not actually submitted any of the lists, making it difficult for

25 the Court to verify whether they are, in fact, compilations of

1  information generally required for this to constitute a trade

2  secret." *Bronx Conservatory* at 3.  Here, plaintiffs have not

3  provided any version of the Raiser's Edge database, nor have

4  they explained how they created the list, and while they have

5  produced evidence both by declaration and through the testimony

6  of multiple witnesses that access to the database is restricted

7  and password-protected, and that employees with access must

8  acknowledge the confidentiality of it and agree not to disclose

9  it, there is arguably a question as to whether or to what extent

10 the donors' identities and contact information is not otherwise

11 readily ascertainable given the testimony that at least some

12 portion of donors have gone public about their donations.

13         So there is an argument that plaintiffs' evidence

14 about how the database was compiled is too lacking in

15 particulars to rise to the level of a trade secret.  *New York*

16 *Packages vs. Mustang*, 2022 WL 604136 at page 7, E.D.N.Y.,

17 March 1, 2022.  But I am assuming for purposes of the motion

18 that the donor information in Raiser's Edge and in spreadsheets

19 and other documents created using that data are, in fact, trade

20 secrets.

21         But plaintiffs still have not shown the likelihood of

22 success on the merits.  The plaintiff still has to show that the

23 defendant misappropriated the trade secret.  *New York Packaging*

24 at 6 and *Nielsen* at 8.  The DTSA defines misappropriation to

25 include the acquisition of the trade secret by someone who knows

1   or has reason to know that the secret was acquired by improper

2   means or disclosure or use of another's trade secret without

3   consent.  That's a condensed version of what 18 U.S. Code

4   Section 1839 Subsection (5) says.  See *LoanDepot* at 7.  To meet

5   this element, the plaintiff has to show that the defendant

6   acquired a trade secret by improper means or disclosed it

7   without consent.  See *ExpertConnect* at 6, *Intertek vs. Pennisi*,

8   443 F.Supp.3d 303 at 340, E.D.N.Y. 2020.

9           But while plaintiffs have shown that O'Keefe took a

10  list of donors who had messaged asking for their demotions back,

11  which was compiled by his assistant, there is no evidence that

12  he took a donor list maintained by PV, such as the Raiser's Edge

13  list, or that the list Bolton compiled contained information

14  from any such list.  See *In re:  Document Techs*, 275 F.Supp.3d

15  at 465, finding no likelihood of success on noncompete claims

16  where there was no showing that the defendant used trade secrets

17  to populate the spreadsheet or inappropriately solicited

18  clients.

19          Both Bolton and O'Keefe testified they did not have

20  access to Raiser's Edge and did not take information from that

21  list, and defendants -- excuse me -- plaintiffs who have access

22  to Raiser's Edge did not show any such contact between Bolton or

23  O'Keefe and that database.  The list created by Bolton, which

24  was essentially a list of people who were calling her, does not

25  appear to be a trade secret.  See *Bronx Conservatory* at 5, which

1  noted that the Conservatory had failed to offer evidence beyond

2  mere conclusory allegations and speculation that the defendant

3  had misappropriated the student list in compiling his own

4  mailing list, and that it had pointed to no evidence countering

5  the defendant's statement that he did not use the purported

6  trade secret list belonging to the plaintiff in compiling his

7  own list.  See *Bronx Conservatory* at pages 4 and 5.

8          Nor have plaintiffs provided any evidence of any

9  unaired programming or employee list that O'Keefe allegedly

10 took, and they have not shown that the devices that O'Keefe

11 failed to return are trade secrets.

12         At the hearing, O'Keefe testified that he responded to

13 PV donors in the wake of his suspension from the board.  Hughes

14 also testified that an excerpt of O'Keefe's phone bill -- well,

15 PV's phone bill relating to O'Keefe's phone -- in February 2023

16 contained outgoing calls to donors on the Raiser's Edge list.

17 Assuming that these communications count as soliciting, the mere

18 solicitation of PV donors standing alone is not enough to show

19 that O'Keefe used plaintiffs' trade secrets, such as the

20 Raiser's Edge list, in doing so.  See *Robert Half Intern vs.*

21 *Dunn*, 2013 WL 10829925 at page 8, Northern District, October,

22 29, 2013.  For example, regarding the May 25th email

23 solicitation to Hinckley, which is the only solicitation in the

24 record, O'Keefe testified that OMG buys mailing lists and sends

25 out emails to thousands of people on those lists.  Without more,

1    plaintiffs have not shown that O'Keefe's solicitation attempts

2    have used any of PV's confidential donor information.

3           Turning to the tortious interference claim, under New

4    York law, you have to show:  The existence of a valid contract

5    between the plaintiff and a third party, defendant's knowledge

6    of that contract, defendant's intentional procuring of the

7    breach, and damages.  *White Plains Coat & Apron vs. Cintas*, 460

8    F.3d 281 at 285; see *Rich vs. Fox News*, 939 F.3d 112 at 126 to

9    27.  Plaintiff also has to show proximate causation.  *Rich* at

10   127.

11          Plaintiffs' arguments with respect to tortious

12   interference are repetitive of its arguments for the breach

13   contract claims.  The only addition is that plaintiffs argue in

14   conclusory fashion that OMG, "Intentionally and improperly

15   procured such violations."  That's in their brief at 17 to 18.

16   That conclusory allegation is not enough to meet the third

17   element.  And plaintiffs likely have not met the first element

18   with respect to paragraph 17 based on my earlier analysis of

19   that paragraph.  See *Pure Power* at 532, which noted that where

20   the provision of an EA is unenforceable, the plaintiff can't

21   satisfy the first element of a tortious interference claim with

22   respect to that provision.

23          Further, the amended complaint alleges that OMG knew

24   of the employment agreement because its managing member and

25   primary officer and agent was O'Keefe, a party to the contract,

 1    see paragraph 181; and that OMG procured O'Keefe's breaches of

 2    the EA through its managing member and principal officer

 3    O'Keefe.  See paragraphs 182 to 205.  But as a matter of law,

 4    you cannot tortiously interfere with your own contract.  *Cortes*

 5    *vs. Twenty-first Century Fox*, 285 F.Supp.3d 629 at 640, S.D.N.Y.

 6    2018, affirmed 761 F.App'x 69.  I conclude the plaintiff has not

 7    shown a likelihood of success on the tortious interference with

 8    contract claim.

 9            And the analysis with respect to irreparable harm

10    mirrors the analysis with respect to the breach of contract

11    claims.

12            Some general thoughts on irreparable harm.  First of

13    all, it's the linchpin of a court's determination whether a PI

14    is available.  *Levy vs. Young Adult Institute*, 2015 WL 170442 at

15    page 4, S.D.N.Y., January 13, 2015.  See *Faiveley vs. Wabtec*,

16    559 F.3d 110 at 118, and *American Airlines vs. Imhoff*, 620 F.

17    Supp.2d 574 at 579, both saying it's the single-most important

18    prerequisite for a PI.

19            To satisfy the irreparable harm requirement, the

20    plaintiff has to show that without a PI, it will suffer an

21    injury that is neither remote nor speculative, but actual and

22    imminent, and one that cannot being remedied if the Court waits

23    until the end of trial to resolve the harm.  *Grand River vs.*

24    *Pryor*, 481 F.3d 60 at 66.  Where money damages can sufficiently

25    compensate, there is no irreparable injury, and it's the moving

1   party who has to show that money can't compensate. *Shapiro vs.*

2   *Cadman Towers*, 51 F.3d 328 at 322, *Grand River* at 66.

3           Loss of goodwill or harm to reputation can be

4   irreparable harm if imminent and nonquantifiable. *Tom Doherty*

5   *vs. Saban*, 60 F.3d 27 at 37 to 38; see *JTH Tax vs. Agnant*, 62

6   F.4th 658 at 673, and the loss of client relationships and

7   goodwill that would result from the breach of a noncompete

8   clause generally is irreparable harm. *Schuhriemen* at 536.  But

9   again, there is no noncompete agreement here.

10          Where somebody breaches a noncompete or takes a client

11  list, injunctive relief can be appropriate because it would be

12  hard to calculate money damages that would successfully redress

13  the loss of a relationship that might have produced

14  indeterminate businesses in the years to come. *Register.com vs.*

15  *Verio*, 356 F.3d 393 at 404; see *Ticor Title vs. Cohen*, 173 F.3d

16  63 at 69.

17          But a PI should not issue based on a plaintiff's

18  imaginative worst-case scenario of the consequences flowing from

19  a defendant's alleged wrong absent a concrete showing of

20  imminent irrevocable injury. *DeVivo vs. Nationwide Mutual*, 2020

21  WL 2797244 at page 5, E.D.N.Y. May 29, 2020, collecting cases.

22          Here, plaintiffs argue that if O'Keefe and OMG are not

23  enjoined, they will continue to lose donors and employees and

24  suffer injury to their reputation and goodwill.  But evidence of

25  that was not provided -- I am sorry -- that argument is in their

073024.1                      Proceedings                    52

1  brief at page 18.  Evidence of ongoing donor and employee loss

2  was not shown.  Plaintiffs focused most of their argument on the

3  provision of the EA where O'Keefe acknowledges that breaches

4  would cause irreparable harm.  First, the Second Circuit has

5  rejected that irreparable harm must inevitably be assumed in

6  breach of covenant cases.  *JTH* at 673, *Singas* at 76, and *Vortexa*

7  *vs. Cacioppo*, 2024 WL 2979313 at page 7, S.D.N.Y., June 12,

8  2024.  Rather, it depends on the particulars, *Singas* at 46.

9         Second, plaintiffs have not shown a likelihood that

10  defendants are breaching enforceable restrictive covenants as

11  discussed above, and clauses and contracts agreeing to

12  irreparable harm may be given weight, but they do not control

13  the question of whether a PI is appropriate.  *JTH* at 674;

14  *BakeMark vs. Negron*, 2024 WL 1075280 at 21, S.D.N.Y. January 12,

15  2024, collecting cases.  It might weigh in favor, but it doesn't

16  alone justify finding irreparable harm, especially when it comes

17  in a boilerplate agreement.  *West vs. Coiteux*, 2017 WL 4339486

18  at page 4, S.D.N.Y., August 28, 2017.

19         Moreover, any potential irreparable harm is undercut

20  by plaintiffs' lengthy delay in filing their motion.  "While

21  delay does not always undermine an alleged need for a

22  preliminary relief, months-long delays in seeking preliminary

23  injunctions have repeatedly been held by courts in the Second

24  Circuit to undercut the sense of urgency accompanying a motion

25  for preliminary relief."  *Silent Gliss*, 2022 WL 1525484 at

1  page 8, which concluded that four months was an unreasonable

2  delay, and collecting cases.  Here, plaintiffs delayed for

3  nearly a year before they filed their PI motion.  The complaint

4  was filed May 31st, 2023, and the PI motion was filed May 29,

5  2024.  Plaintiffs argue they delayed in filing the PI motion

6  because they were attempting to negotiate, and they were

7  awaiting O'Keefe's and OMG's defenses.  That's in their brief at

8  page 13, note 8 and their reply at 9.  I do not find those to be

9  persuasive justifications for such an unreasonable delay.

10          Rather, the delay suggests in contrast that no -- or

11  that no -- sorry -- rather, the delay suggests in contrast, that

12  no irreparable harm was accruing and that the PI motion was a

13  tactical choice.

14          Furthermore, plaintiffs haven't shown enough regarding

15  future irreparable harm here.  They have shown that PV's

16  business has suffered since O'Keefe left, but they have not

17  shown that that harm is due to the breaches they allege in it,

18  the amended complaint, as opposed to their constituency choosing

19  loyalty to O'Keefe over loyalty to PV.  But even if I assume

20  that some quantum of the harm is from the former, based on the

21  evidence, the damage has been done.  Plaintiffs have provided no

22  evidence that an injunction now would do anything to undo that

23  damage.

24          So I find that plaintiffs have shown -- have failed to

25  meet the requirements for a PI on likelihood of success and

```
 1   irreparable harm, and I therefore need not consider the

 2   remaining factors.

 3              I am going to deny the motion, which is -- let's

 4   see -- ECF No. 50, and I will get to the motion to compel

 5   arbitration as soon as I can.

 6              And don't forget to paper whatever the agreement is

 7   with Maxwell and get that to me.  Let's go off the record for a

 8   moment.

 9              (Discussion off the record)

10              THE COURT:  I will, as I said, try to get to the

11   motion to compel as soon as I can; and in the meantime, I hope

12   the parties will think about trying to resolve it and will let

13   me know if they think the court mediator or a magistrate judge

14   will be helpful, but I do tend to think a private mediator might

15   be the way to go.

16              Anything else we should do this morning?

17              MR. WOLMAN:  I don't think so, Your Honor.

18              MR. CHILDERS:  No, Your Honor.

19              THE COURT:  All right.  And I will do an order saying

20   that for the reasons set forth on the record today, I am denying

21   the motion.  Again, I do apologize for the length and imperfect

22   organization of my ruling, but I think you understand the

23   points.  All right.  We are adjourned.  Thank you.

24              MR. WHITNEY:  Thank you, Your Honor.

25              MR. WOLMAN:  Thank you, Your Honor.
```

-o0o-

I, Darby Ginsberg, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Darby Ginsberg