UNITED STATES DISCRIT COURT
SOUTHERN DISTRICT OF NEW YORK

PROJECT VERITAS and PROJECT
VERITAS ACTION FUND,

　　　　　　　Plaintiffs,

　　　v.

JAMES O'KEEFE, TRANSPARENCY 1,
LLC d/b/a O'KEEFE MEDIA GROUP, RC
MAXWELL, and ANTHONY
IATROPOULOS,

　　　　　　　Defendants.

Civil Action No. 7:23-cv-04533

**DEFENDANTS O'KEEFE AND O'KEEFE MEDIA GROUP'S
ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' FIRST
AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
AND DEFENDANTS' COUNTERCLAIMS AGAINST PLAINTIFFS**

　　　Defendants, JAMES O'KEEFE ("O'Keefe") and TRANSPARENCY 1, LLC d/b/a

O'KEEFE MEDIA GROUP ("OMG") (together "Defendants"), hereby file their Answer,

Affirmative Defenses, and Counterclaims against Plaintiffs, PROJECT VERITAS and

PROJECT VERITAS ACTION FUND'S ("Plaintiffs"), in response to Plaintiffs' First

Amended Complaint and Demand for Jury Trial [ECF No. 16], and state:

## I.　　GENERAL DENIAL, DEMANDS, AFFIRMATIVE DEFENSES

　　　Pursuant to Fed. Rule Civ. Pro. 8(b)(3), Defendants generally deny the allegations

within Plaintiffs' First Amended Complaint, except for the following numbered

paragraphs that are strictly admitted. In response to the Prayer for Relief and the

Wherefore Clause following paragraph 275 in the First Amended Complaint, Defendants O'Keefe and OMG assert that Plaintiffs are not entitled to the relief they seek.

**PARAGRAPHS ADMITTED**:

Defendants admit paragraphs 3, 4, 16, 44, 47, 90, 92, 93, 95, 96, and 99.

**DEMAND FOR JURY TRIAL**

Defendants demand a trial by jury on all claims so triable.

**DEMAND FOR ATTORNEY'S FEES**

Defendants demand their costs and attorney's fees from Plaintiffs.

## AFFIRMATIVE DEFENSES

Defendants O'Keefe and OMG assert the following affirmative defenses to the claims pleaded in Plaintiffs' First Amended Complaint. Defendants reserve the right to amend these defenses as discovery proceeds.

### First Affirmative Defense

Unenforceability (Liquidated Damages Provision) (All Relevant Counts). The Employment Agreement's liquidated damages provision (Paragraph 13) is unenforceable under New York law. The provision stipulates liquidated damages of $100,000.00 per breach of the non-disclosure and/or non-disparagement clauses. It is an impermissible penalty rather than any reasonable estimate of actual damages.

Under New York law, a liquidated damages provision is enforceable only if (1) the amount fixed is a reasonable measure of the probable actual loss in the event of a breach, and (2) the actual loss suffered is difficult to determine precisely. *See Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977).

The $100,000.00 per-breach amount specified in Paragraph 13 of the Employment Agreement bears no reasonable relationship to any actual damages Project Veritas ("PV") might suffer from a breach of the non-disclosure or non-disparagement provisions. This amount is arbitrary, excessive, and disproportionate to any conceivable actual loss. Furthermore, any actual damages resulting from such breaches are not inherently difficult to determine with precision.

Therefore, the Employment Agreement's liquidated damages provision operates as a penalty designed to coerce compliance rather than a legitimate pre-estimate of probable losses. As such, it is void and unenforceable under New York law.

### Second Affirmative Defense

Unenforceability (Donor Non-Solicitation Provision) (all Relevant Counts).  The donor non-solicitation provision in Paragraph 17 of the Employment Agreement is unenforceable under New York law as an overbroad restrictive covenant imposing an unreasonable restraint on trade and cannot be saved through judicial modification.

Under New York law, restrictive covenants are disfavored and will only be enforced to the extent they are reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999).

The donor non-solicitation provision in Paragraph 17 of the Employment Agreement is unreasonable and overbroad for the following reasons:

1. It has no temporal limitation, purporting to restrict Defendant O'Keefe "during and after" his employment with Project Veritas;

2. It has no geographic limitation, effectively imposing a worldwide restriction;

3. It extends to all donors and prospective donors, regardless of whether Defendant O'Keefe had any meaningful contact with them or whether Project Veritas has a protectable interest in the relationship;

4. It prohibits not just solicitation but any form of communication with donors or prospective donors;

5. It unreasonably restricts Defendant O'Keefe's ability to work in his chosen field and pursue his livelihood, particularly given his role as the founder and public face of Project Veritas.

This provision goes well beyond what is necessary to protect Project Veritas's legitimate business interests, and imposes an undue hardship on Defendant O'Keefe. Moreover, it harms the public interest by restricting the free flow of information and ideas in investigative journalism and political discourse.

Under New York law, the Court may blue-pencil an overbroad, restrictive covenant to enforce only its reasonable provisions, but it "should not attempt to partially enforce a [restrictive covenant] where its infirmities are so numerous that the Court would be required to rewrite the entire provision." *Permanens Capital L.P. v. Bruce*, 2022 WL 3442270, at *11 (S.D.N.Y. Sept. 19, 2022) (citing *Mister Softee, Inc. v. Tsirkos*, No. 14-CV-1975, 2014 WL 2535114, at *9 (S.D.N.Y. June 5, 2014)). Plaintiffs' donor non-solicitation provision is so overbroad that it cannot be saved through partial enforcement without fundamentally rewriting the provision, which New York courts are not permitted to do.

Therefore, the donor non-solicitation provision is void and unenforceable in its

entirety under New York law.

**Third Affirmative Defense**

<u>Failure to State a Claim (Defend Trade Secrets Act) (Count II)</u>.  Plaintiffs have failed to state a claim upon which relief can be granted under the Defend Trade Secrets Act (DTSA) for the following reasons:

1. Plaintiffs have not adequately alleged the existence of a trade secret as defined by the DTSA. The complaint fails to identify with sufficient particularity the alleged trade secrets, instead making vague references to "donor lists and contact information, equipment, as well as unreleased investigation publications." This lack of specificity is insufficient to establish the existence of protectable trade secrets under the DTSA, or provide Defendants notice of what, exactly, they are being accused of doing.

2. Plaintiffs have not adequately alleged that they took reasonable measures to keep the purported trade secrets secret, as required by 18 U.S.C. § 1839(3)(A). The complaint lacks specific allegations regarding security measures or confidentiality protocols implemented by Plaintiffs to protect the alleged trade secrets.

3. Plaintiffs have failed to adequately allege that the purported trade secrets derive independent economic value from not being generally known or readily ascertainable, as required by 18 U.S.C. § 1839(3)(B). The complaint does not set forth facts demonstrating how the alleged

trade secrets provide economic value due to their secrecy.

4.  Plaintiffs have not adequately alleged misappropriation as defined by the DTSA. The complaint fails to distinguish between information that may constitute protectable trade secrets and information that is merely Defendant O'Keefe's general skills, knowledge, and experience, which he is entitled to use even if acquired during his employment with Plaintiffs.

5.  Plaintiffs have failed to allege facts sufficient to show that any purported trade secrets were not independently developed by Defendants, which would negate a claim of misappropriation under the DTSA.

6.  Plaintiffs have not adequately alleged that the purported trade secrets have remained secret, as required for protection under the DTSA. The complaint fails to address whether the alleged trade secrets may have entered the public domain, such as by donor self-disclosure on social media, which would preclude their protection under the DTSA.

Therefore, Plaintiffs have failed to state a claim upon which relief can be granted under the DTSA.

### Fourth Affirmative Defense

Federal Preemption and Invalid Transfer (All Copyright-related Claims and Count XIII). Plaintiffs' claim for declaration of copyright ownership is barred by federal preemption and fails to allege a valid transfer of copyright for the following reasons:

1.  Federal Preemption: Plaintiffs' claim for declaration of copyright

6

ownership is preempted by the Copyright Act of 1976, 17 U.S.C. § 101 et seq. The Copyright Act exclusively governs all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright. 17 U.S.C. § 301(a). Plaintiffs' attempt to use state contract law to determine copyright ownership is preempted by federal copyright law.

2. Invalid Transfer of Copyright: The Employment Agreement, as alleged in the complaint, does not effect a valid transfer of copyright under federal law. The Copyright Act requires that any transfer of copyright ownership be "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). The Employment Agreement, as described in the complaint, does not meet the specific requirements for a valid transfer of copyright ownership under federal law.

3. Registered Copyright Holder: As alleged in paragraphs 92, 95, and 99 of the complaint, Defendant O'Keefe is the registered copyright holder for the works in question ("Breakthrough," "American Pravda," and "American Muckraker"). Under 17 U.S.C. § 410(c), a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright and of the facts stated in the certificate, including copyright ownership.

4. Work Made for Hire: To the extent Plaintiffs claim ownership under a

"work made for hire" theory, such a claim is insufficient to overcome the presumption of ownership established by the copyright registrations. The determination of whether a work is "made for hire" within the meaning of 17 U.S.C. § 101 is a matter of federal copyright law, not state contract law.

5. Statute of Limitations: Any claim by Plaintiffs challenging the validity of the copyright registrations or asserting ownership contrary to the registrations is barred by the three-year statute of limitations under 17 U.S.C. § 507(b), as the registrations were made more than three years prior to the filing of this action.

Therefore, Plaintiffs' claim for declaration of copyright ownership is preempted by federal law, fails to allege a valid transfer of copyright under the Copyright Act, is barred by the applicable statutes of limitation, and cannot overcome the presumption of ownership established by the copyright registrations in Defendant O'Keefe's name.

**Fifth Affirmative Defense**

No Breach of Fiduciary Duty Due to Prior Constructive Termination (Count III).
Plaintiffs' claims for breach of fiduciary duty fail because:

1. Constructive Termination: On February 16, 2023, the Board of Directors of Project Veritas voted to place Defendant O'Keefe on "indefinite suspension without pay." This action (not Plaintiffs' only relevant act) constituted a constructive termination of O'Keefe's employment and effectively ended his fiduciary relationship with Plaintiffs.

2. Breach by Plaintiffs: The "indefinite suspension without pay" imposed by Plaintiffs was itself a breach of the Employment Agreement and Project Veritas's Bylaws, as neither document provides for such a remedy or action against the CEO and Board member. This prior breach by Plaintiffs relieved O'Keefe of any continuing fiduciary obligations.

3. No Fiduciary Duty at Time of Alleged Acts: As a result of the constructive termination on February 16, 2023, O'Keefe no longer owed fiduciary duties to Plaintiffs at the time of the alleged breaches. Specifically: a) The formation of OMG occurred after O'Keefe's constructive termination; b) Any solicitation of employees and/or contractors to join OMG occurred after the constructive termination; c) Any solicitation of donors to donate to OMG occurred after the constructive termination.

4. Business Judgment Rule: To the extent any actions were taken while O'Keefe was still a fiduciary, such actions were protected by the business judgment rule, as they were made in good faith and in the best interests of the organization as O'Keefe understood them at the time.

5. Failure to Allege Damages: Plaintiffs have failed to allege any actual damages resulting from the alleged breaches of fiduciary duty, instead relying on speculative claims about donations that "may have inured to the benefit of Plaintiffs" (underline supplied).

6. Unclean Hands: Plaintiffs come to the court with unclean hands, having

first breached their obligations to O'Keefe by imposing an improper and unauthorized indefinite suspension without pay.

Therefore, Plaintiffs cannot establish that O'Keefe breached any fiduciary duties owed to them, as any such duties had been terminated by Plaintiffs' own actions prior to the alleged breaches, and for the other reasons set forth herein.

**Sixth Affirmative Defense**

<u>Waiver, Estoppel, and Acquiescence to Alleged Financial Practices (Breach of Fiduciary Duty) (Count III)</u>. Plaintiffs' claim for breach of fiduciary duty based on alleged lavish expenses fails for the following reasons:

1. Waiver: Plaintiffs, through their Board of Directors, waived any right to claim breach of fiduciary duty based on the alleged financial practices. By knowingly allowing these practices to continue for over ten years without objection, Plaintiffs voluntarily and intentionally relinquished their right to challenge such practices. This long-standing waiver bars Plaintiffs from now asserting that these practices constitute a breach of fiduciary duty.

2. Promissory Estoppel: Plaintiffs, through their words, conduct, and long-standing acquiescence, made implied promises that the financial practices now at issue were acceptable. Defendant O'Keefe reasonably relied on these implied promises to his detriment. It would be unjust to allow Plaintiffs to now claim these practices as a breach of fiduciary duty.

3.  Ratification: By consistently approving financial reports, budgets, and audits that included or reflected the now-challenged expenses over a period of more than ten years, Plaintiffs ratified these financial practices. This ratification precludes Plaintiffs from now claiming these practices as a breach of fiduciary duty.

4.  Laches: Plaintiffs' delay of over ten years in challenging these financial practices is unreasonable and prejudicial to Defendants. This inexcusable delay in asserting their rights bars Plaintiffs' claim under the equitable doctrine of laches.

5.  Course of Dealing: The long-standing financial practices established a course of dealing between the Parties. This course of dealing became an implied term of O'Keefe's employment and cannot now be unilaterally recharacterized as a breach of fiduciary duty.

6.  Business Judgment Rule: The challenged financial decisions were made in good faith and with the reasonable belief that they were in the best interests of the organization. As such, they are protected by the business judgment rule and do not constitute a breach of fiduciary duty.

7.  Statute of Limitations: To the extent any of the alleged lavish expenses occurred outside the applicable statute of limitations period for breach of fiduciary duty claims, such claims are time-barred.

8.  Failure to Allege Specific Harm: Plaintiffs have failed to allege with specificity how the organization was harmed by the alleged lavish

expenses, particularly given the organization's growth and success during the period in question.

For these reasons, Plaintiffs are barred from asserting a claim for breach of fiduciary duty based on the alleged lavish expenses that were known, accepted, and implicitly approved for over a decade.

### Seventh Affirmative Defense

<u>No Breach ( Duty of Loyalty) (Count IV)</u>.  Plaintiffs' claim for breach of duty of loyalty fails for the same reasons their claims for Breach of Fiduciary Duty fail, to wit:

1. Constructive Termination: As previously stated in the Fifth Affirmative Defense, Defendant O'Keefe was constructively terminated on February 16, 2023, when the Board of Directors of Project Veritas voted to place him on "indefinite suspension without pay." This action effectively ended O'Keefe's employment relationship with Plaintiffs and, consequently, his duty of loyalty.

2. No Duty at Time of Alleged Acts: As a result of the constructive termination, O'Keefe no longer owed a duty of loyalty to Plaintiffs at the time of the alleged breaches, including: a) The formation of OMG; b) Any solicitation of employees and/or contractors to join OMG; c) Any solicitation of donors to donate to OMG.

3. Breach by Plaintiffs: The "indefinite suspension without pay" imposed by Plaintiffs was itself a breach of the Employment Agreement and Project Veritas's Bylaws. This prior breach by Plaintiffs relieved O'Keefe

of any continuing duty of loyalty.

4.  Waiver and Estoppel: As outlined in the Sixth Affirmative Defense, with respect to the alleged lavish expenses: a) Plaintiffs waived their right to claim breach of duty of loyalty by allowing these practices to continue for over ten years without objection. b) Plaintiffs' long-standing acquiescence to these financial practices created an implied promise upon which O'Keefe reasonably relied, estopping Plaintiffs from now claiming these practices as a breach of duty of loyalty.

5.  Ratification: By consistently approving financial practices now characterized as lavish expenses over a period of more than ten years, Plaintiffs ratified these practices, precluding a claim of breach of duty of loyalty.

6.  Laches: Plaintiffs' delay of over ten years in challenging the financial practices is unreasonable and prejudicial to Defendants, barring this claim under the equitable doctrine of laches.

7.  Course of Dealing: The long-standing financial practices established a course of dealing between the Parties, which became an implied term of O'Keefe's employment and cannot now be unilaterally recharacterized as a breach of duty of loyalty.

8.  Business Judgment Rule: To the extent any actions were taken while O'Keefe was still employed, such actions were protected by the business judgment rule, as they were made in good faith and in the best interests

13

of the organization as O'Keefe understood them at the time.

9. Unclean Hands: Plaintiffs come to the court with unclean hands, having first breached their obligations to O'Keefe by imposing an improper and unauthorized indefinite suspension without pay.

For these reasons, Plaintiffs cannot establish that O'Keefe breached any duty of loyalty owed to them, as any such duty had been terminated by Plaintiffs' own actions prior to the alleged breaches, or the alleged breaches were long-standing practices that Plaintiffs had waived, ratified, or are estopped from challenging.

### Eighth Affirmative Defense

<u>Failure to State a Claim (Conversion) (Count V)</u>. Plaintiffs' claim for conversion fails for the following reasons:

1. Voluntary Provision of Property: The work-related tools allegedly converted, including but not limited to laptops, cell phones, and other equipment, were voluntarily provided to Defendant O'Keefe by Plaintiffs for the purpose of performing his duties as CEO. This voluntary provision negates any claim of wrongful possession or interference with Plaintiffs' right to possession.

2. Failure to Allege Interference with Possession: Plaintiffs have failed to adequately allege how Defendants interfered with Plaintiffs' right of possession of the allegedly converted property, particularly given that the property was intentionally placed in O'Keefe's possession by Plaintiffs themselves.

14

3. Lack of Specificity: The complaint fails to describe the allegedly converted property with sufficient specificity to maintain a claim for conversion. Vague references to "donor lists and contact information, equipment, as well as unreleased investigation publications" do not provide the level of detail required to establish a conversion claim under New York law.

4. Federal Preemption of Copyright Claims: As previously stated in the Fourth Affirmative Defense, to the extent Plaintiffs' conversion claim relates to copyrighted works, such claims are preempted by the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

5. Registered Copyright Holder: As alleged in the complaint, Defendant O'Keefe is the registered copyright holder for the works in question, constituting prima facie evidence of copyright ownership under 17 U.S.C. § 410(c).

6. Intangible Property: To the extent Plaintiffs' conversion claim relates to intangible property such as donor information or unreleased publications, such a claim is not cognizable under New York law.

7. Authorized Use: Any use of Project Veritas property by Defendant O'Keefe was authorized by virtue of his position as CEO and board member of the organization. The complaint fails to allege facts showing that such authorization was properly revoked prior to the alleged conversion.

8.  Failure to Allege Demand and Refusal: For any property not initially acquired wrongfully (which includes all property voluntarily provided to O'Keefe), Plaintiffs have failed to allege that they made a demand for the return of the property and that Defendants refused such a demand, as required under New York law for a conversion claim.

9.  Statute of Limitations: To the extent any alleged acts of conversion occurred outside the three-year statute of limitations period for conversion claims in New York, such claims are time-barred.

10. De Minimis Value: The complaint fails to allege that the allegedly converted property has more than de minimis value, which is required to maintain a conversion claim under New York law.

11. Failure to Allege Damages: Plaintiffs have failed to allege specific damages resulting from the alleged conversion, instead relying on vague and speculative claims of harm.

12. Constructive Termination: As outlined in previous defenses, O'Keefe was constructively terminated on February 16, 2023. Plaintiffs have failed to allege that they demanded the return of any company property following this constructive termination, or that O'Keefe refused any such demand.

Therefore, Plaintiffs have failed to state a valid claim for conversion under New York law.

**Ninth Affirmative Defense**

<u>Failure to State a Claim for Replevin (Count VI)</u>.  Plaintiffs' claim for replevin fails

for the following reasons:

1.  Inapplicability to Intangible Property: Replevin is a remedy designed
    for the recovery of specific, tangible personal property. Plaintiffs' claim
    for replevin of "donor lists and contact information" and "unreleased
    investigation publications" fails as a matter of law because these items
    constitute intangible property to which replevin does not apply under
    New York law.

2.  Lack of Specificity: Plaintiffs have failed to identify with sufficient
    specificity the exact items of tangible personal property they seek to
    recover through replevin. A replevin action requires a precise
    description of the property to be recovered, which Plaintiffs have failed
    to provide.

3.  Failure to Allege Superior Right of Possession: Plaintiffs have not
    adequately alleged facts demonstrating their superior right of
    possession to any tangible property in Defendants' possession,
    particularly given that any such property was voluntarily provided to
    Defendant O'Keefe in his capacity as CEO.

4.  Failure to Allege Wrongful Detention: Plaintiffs have not sufficiently
    alleged that Defendants are wrongfully detaining any tangible property.
    Given that the property was voluntarily provided to O'Keefe, Plaintiffs

must allege and prove a demand for its return and a refusal by Defendants, which they have failed to do.

5. Preemption of Intellectual Property Claims: To the extent Plaintiffs' replevin claim relates to copyrighted works or other intellectual property, such claims are preempted by federal law, including the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

6. Lack of Immediate Right to Possession: Plaintiffs have failed to allege facts demonstrating their immediate right to possession of the property at the time the action was commenced, as required for a replevin claim under New York law.

7. Adequate Remedy at Law: Plaintiffs have an adequate remedy at law for any alleged damages resulting from the claimed retention of property, making the equitable remedy of replevin inappropriate.

8. Failure to Post Bond: Plaintiffs have not alleged their willingness or ability to post a bond, which is typically required in replevin actions to protect the defendant's interests.

9. Statute of Limitations: To the extent Plaintiffs' replevin claim is based on any alleged wrongful taking or detention that occurred outside the applicable statute of limitations period, such claims are time-barred.

10. Constructive Termination: As outlined in previous defenses, O'Keefe was constructively terminated on February 16, 2023. Plaintiffs have failed to allege that they demanded the return of any company property

following this constructive termination, or that O'Keefe refused any such demand.

For these reasons, Plaintiffs have failed to state a valid claim for replevin under New York law.

### Tenth Affirmative Defense

<u>Failure to State a Claim for Indemnification (Count VII)</u>. Plaintiffs' claim for indemnification fails for the following reasons:

1. Improper Attempt to Create Entitlement to Attorney's Fees: Plaintiffs' indemnification claim is an improper attempt to create an entitlement to attorney's fees not provided for in the Employment Agreement. Under New York law, parties are responsible for their own attorney's fees unless there is a specific contractual provision or statutory authorization to the contrary. The Employment Agreement does not contain any provision requiring O'Keefe to indemnify Plaintiffs for their legal fees in actions against him.

2. Lack of Statutory Basis: Plaintiffs have failed to identify any statutory basis for their indemnification claim. New York law does not provide for automatic indemnification of a corporation by its former officers or directors in the absence of a specific agreement or statutory provision.

3. No Allegation of Third-Party Liability: Indemnification typically involves a claim for reimbursement for liability to a third party. Plaintiffs have not alleged any third-party claims against them for which

they seek indemnification from Defendants.

4. Plaintiffs' Own Conduct: To the extent Plaintiffs face any potential liability or legal action, such liability arises from Plaintiffs' own conduct and decisions, including their treatment of Defendant O'Keefe, rather than from any actions taken by O'Keefe within the scope of his employment.

5. Lack of Specific Allegations: Plaintiffs have failed to allege with specificity any actual or potential claims against them for which they seek indemnification, rendering their claim impermissibly vague and speculative.

6. Constructive Termination: As outlined in previous defenses, O'Keefe was constructively terminated on February 16, 2023. Any alleged actions taken by O'Keefe after this date were not within the scope of his employment and thus cannot give rise to an indemnification claim.

7. Unclean Hands: Plaintiffs come to the court with unclean hands, having first breached their obligations to O'Keefe by imposing an improper and unauthorized indefinite suspension without pay. This prior breach precludes Plaintiffs from seeking equitable relief in the form of indemnification.

8. Public Policy: Allowing indemnification in this context would be contrary to public policy, as it would effectively require an employee to fund an employer's lawsuit against him, creating a chilling effect on

employees' ability to defend themselves against employer claims.

9.  Failure to Mitigate: Plaintiffs have failed to allege any efforts to mitigate potential damages or liabilities for which they now seek indemnification, as required under New York law.

10. Lack of Causation: Plaintiffs have failed to allege a direct causal link between any specific actions of Defendant O'Keefe and any potential liability they may face.

11. Failure to Make Demand: Plaintiffs have failed to allege that they made a proper demand for indemnification to Defendant O'Keefe before initiating this legal action. Under New York law, a demand for indemnification is generally required before bringing a claim, unless such a demand would be futile. Plaintiffs have neither alleged that they made such a demand nor provided facts showing that a demand would have been futile. This failure to make a pre-litigation demand for indemnification renders their claim premature and procedurally defective.

Therefore, Plaintiffs have failed to state a valid claim for indemnification under New York law.

### Eleventh Affirmative Defense

Failure to State a Claim for Tortious Interference (Count VIII-Plaintiffs v. OMG).

Plaintiffs' claim for tortious interference against OMG fails for the following reasons:

1.  Interference with Own Contract: Plaintiffs allege that O'Keefe owns and

controls OMG (Complaint ¶4), and that O'Keefe acted as an agent of OMG (Complaint ¶¶58, 60, 62, 64, 66, 68, 71, 73, 75, 78). In essence, Plaintiffs are alleging that O'Keefe interfered with his own contract through OMG. Under New York law, a party cannot be held liable for tortious interference with its own contract. Therefore, if O'Keefe controls OMG and acts as its agent, OMG cannot be held liable for tortious interference with O'Keefe's contract with Plaintiffs.

2. Lack of Proximate Causation: Plaintiffs have failed to allege facts supporting proximate causation between any actions by OMG and the alleged breaches of contract by O'Keefe. The Complaint lacks specific allegations demonstrating how OMG's actions directly caused O'Keefe to breach his contractual obligations.

3. Conclusory Allegations of Improper Procurement: The Complaint merely offers conclusory allegations that OMG "intentionally and improperly procured" breaches of contract without providing specific facts to support this claim. Such bare assertions are insufficient to sustain a claim for tortious interference under New York law.

4. Unenforceability of Underlying Provision: Claims based on paragraph 17 of the Employment Agreement (non-solicitation of donors) fail because that provision is unenforceable as an overly broad restrictive covenant under New York law, as detailed in our previous affirmative defenses.

5. Privileged and Justified Interference: Any alleged interference by OMG was privileged and justified as it was in pursuit of OMG's legitimate financial interests. Under New York law, a defendant is not liable for tortious interference when acting to protect its own legal or financial stake in the breaching party's business.

6. Lack of Improper Means: Plaintiffs have failed to allege that OMG used any improper means to interfere with the contract, such as fraud, misrepresentation, or threats. Mere persuasion to breach a contract is insufficient to sustain a tortious interference claim.

7. Lack of Specificity: The Complaint fails to identify with sufficient specificity which contractual provisions were allegedly interfered with and how such interference occurred.

8. Failure to Allege Actual Breach: For some of the alleged interferences, Plaintiffs have failed to allege an actual breach of the contract by O'Keefe, which is a necessary element of a tortious interference claim.

9. Economic Interest Defense: As an entity formed and controlled by O'Keefe, OMG has an economic interest in O'Keefe's professional activities, which provides a complete defense to tortious interference claims under New York law.

10. Lack of Knowledge: Plaintiffs have failed to adequately allege that OMG had knowledge of all material terms of the Employment Agreement at the time of the alleged interference.

23

11. No Allegation of But-For Causation: The Complaint fails to allege that but for OMG's actions, O'Keefe would have complied with all terms of the Employment Agreement.

Therefore, Plaintiffs have failed to state a valid claim for tortious interference against OMG under New York law.

**Twelfth Affirmative Defense**

<u>Failure to State a Claim for Tortious Interference (Counts XI and XII—OMG re Iatropoulos, Maxwell's Agreements)</u>. Plaintiffs' claim for tortious interference against OMG regarding the Iatropoulos Agreement fails for the following reasons:

1. Lack of Distinct Corporate Action: Plaintiffs allege that O'Keefe owns and controls OMG (Complaint ¶4), and that O'Keefe acted as an agent of OMG (Complaint ¶¶58, 60, 62, 64, 66, 68, 71, 73, 75, 78). Given this alleged unity of interest and ownership, Plaintiffs have failed to distinguish any actions by OMG that are separate from O'Keefe's individual actions. Under New York law, to maintain a claim for tortious interference against a corporate entity, the plaintiff must allege specific actions by the corporation distinct from those of its controlling individual. Here, the Complaint fails to allege any corporate action by OMG that is separate from O'Keefe's personal conduct.

2. Lack of Proximate Causation: Plaintiffs have failed to allege facts supporting proximate causation between any actions by OMG and the alleged breaches of contract by Iatropoulos or Maxwell. The Complaint lacks specific allegations demonstrating how OMG's actions directly caused Iatropoulos or Maxwell to

breach their contractual obligations.

3. Conclusory Allegations of Improper Procurement: The Complaint merely offers conclusory allegations that OMG "intentionally and improperly procured" breaches of contract without providing specific facts to support this claim. Such bare assertions are insufficient to sustain a claim for tortious interference under New York law.

4. Privileged and Justified Interference: Any alleged interference by OMG was privileged and justified as it was in pursuit of OMG's legitimate business interests. Under New York law, a defendant is not liable for tortious interference when acting to protect its own legal or financial interests.

5. Lack of Improper Means: Plaintiffs have failed to allege that OMG used any improper means to interfere with the contract, such as fraud, misrepresentation, or threats. Mere persuasion to breach a contract is insufficient to sustain a tortious interference claim.

6. Lack of Specificity: The Complaint fails to identify with sufficient specificity how OMG allegedly interfered with the Iatropoulos or Maxwell Agreements.

7. Failure to Allege Actual Breach: Plaintiffs have failed to allege an actual breach of the contract by Iatropoulos or Maxwell, which is a necessary element of a tortious interference claim. The mere allegation that Iatropoulos may have lost a laptop does not necessarily constitute a breach of contract.

8. Economic Interest Defense: As a competing business entity, OMG has an economic interest in hiring qualified employees, which provides a defense to

tortious interference claims under New York law.

9.  No Allegation of But-For Causation: The Complaint fails to allege that but for OMG's actions, Iatropoulos and Maxwell would have complied with all terms of their agreement with Plaintiffs.

10. At-Will Employment: To the extent Iatropoulos and Maxwell were at-will employees, interference with at-will employment is generally not actionable under New York law unless the defendant used wrongful means or acted with malice.

11. No actionable claims. Counts XI and XII request injunctive relief, which has already been denied since Plaintiffs were unable to prove irreparable harm, including but not limited to the fact neither Maxwell nor Iatropoulos still works at OMG.

For these reasons, Plaintiffs have failed to state a valid claim for tortious interference against OMG regarding the Iatropoulos Agreement under New York law.

## COUNTERCLAIMS

Defendants (Counterclaim Plaintiffs)[1] JAMES O'KEEFE ("O'Keefe") and TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP ("OMG"), plead the following Counterclaims against Plaintiffs (Counterclaim Defendants) PROJECT VERITAS and PROJECT VERITAS ACTION FUND, and allege as follows:

---

[1] For economy and clarity, O'Keefe and OMG shall be referred to herein as "Defendants," and Project Veritas and Project Veritas Action Fund as "Plaintiffs."

## INTRODUCTION

1.      In the storied annals of investigative journalism, few tales are as tragic as the deliberate dismantling of Project Veritas (PV) by its own Board of Directors. This tale of betrayal, feigned incompetence, and shortsightedness serves as a stark reminder of how quickly an organization can crumble when those entrusted with its stewardship release their grip on its mission and the visionary who brought it to life.

2.      For nearly two decades, James O'Keefe stood as a beacon of fearless journalism, his name internationally synonymous with hard-hitting exposés shaking the foundations of power. From the halls of Congress to corporate boardrooms, O'Keefe's work through Project Veritas sparked national conversations and drove real change. His unique brand of investigative reporting, built on hidden cameras and undercover work, became the hallmark of an organization that dared to go where other media feared or refused to tread.

3.      Yet, in a bewildering turn of events, the very institution O'Keefe had nurtured from its inception turned against him. Over a matter of a few days, a Board — ironically, dedicated to truth and transparency — engaged in a calculated ambush of its founder, stripping him of authority and publicly humiliating him in front of the very team he had assembled. This was not a measured response to legitimate concerns, but a premeditated coup that ignored years of successful leadership and the unique value O'Keefe brought to the organization.

4.      The Board's actions, cloaked in the language of corporate governance, revealed a profound and willfully obtuse misunderstanding of what made Project Veritas

special. They failed to grasp that O'Keefe was not merely an employee, but the beating heart of an organization that thrived on his vision, his connections, and his public persona. In their myopic focus on alleged expense reports and management styles, they lost sight of the forest for the trees, jeopardizing the very mission they were sworn to uphold.

5.      As news of O'Keefe's ouster spread like wildfire, swift and devastating repercussions followed closely behind. Donors, who had given generously based on their trust in O'Keefe and his work, closed their wallets. Employees, witnessing the betrayal of their leader, departed in droves. Consumers closed their eyes. The organization that had once stood as a David against media Goliaths now found itself struggling for survival, its own credibility in tatters.

6.      These counterclaims are not merely about contractual disputes or corporate governance. They are about the willful destruction of a unique institution in American journalism. They are about a small group of individuals who, entrusted with safeguarding a vital public watchdog, instead chose to put it down. The Board's actions have not only harmed James O'Keefe personally but have deprived the public of a crucial voice at a time when investigative journalism is needed more than ever.

7.      The stakes in this case extend far beyond the individuals involved. This is a fight for the soul of independent journalism, for the right of visionaries to see their creations through to fruition, and for the public's right to know the truth, no matter how uncomfortable it may be for those in power. The Plaintiffs' reckless actions have silenced a vital voice and weakened our democratic discourse. It is time for them to be held

accountable.

## THE PARTIES

8.      Defendant James O'Keefe is an individual citizen of the State of New York and resides in Westchester County, New York.

9.      Defendant Transparency 1, LLC d/b/a O'Keefe Media Group is a Delaware Limited Liability Company with a principal place of business in Mamaroneck, New York.

10.     Plaintiff Project Veritas is a non-stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York.  It is registered in New York as a foreign not-for-profit corporation.

11.     Plaintiff Project Veritas Action Fund is a non-stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York as a foreign not-for-profit corporation.

## COMMON FACTUAL ALLEGATIONS

### The Board Constructively Terminates O'Keefe and Defames Him

12.     Plaintiffs' corporate sabotage began when on February 2, 2023, PV's Chief Financial Officer, Tom O'Hara ("O'Hara"), "confronted" O'Keefe over a $12,000 bill for a short-fused helicopter flight to visit a well-heeled donor. Never before in PV's history had the CFO complained of any problems with O'Keefe's travel expenses, including O'Keefe's occasional use of helicopters, which are commercially available for short-range flights in the Boston-New York-DC metro area.

13.     O'Keefe and O'Hara argued, and O'Keefe told the CFO he was fired.

14.     At the time, the Project Veritas Board included three members: James

O'Keefe, Matthew Tyrmand ("Tyrmand"), and John Garvey.

15.     The Board convened an emergency meeting four days later, on February 6, 2023.

16.     Ahead of the meeting, PV employees sensed that Tyrmand was leading PV off of a cliff, asking: "What if the board fails?" Tyrmand attempted to reassure the suspicious employees: "The board won't fail." (Spoiler alert: The board failed, leaving PV in disarray, hollowed out, and near bankruptcy.)

17.     During the meeting, Tyrmand moved to add the following new members to the Board: George Skakel, Joseph Barton, and Steve Alembik. All three were added over O'Keefe's objections. Together, the members (excluding O'Keefe) shall be referred to as the "Board," which at all relevant times acted as the Plaintiffs' agent.[2]

18.     O'Keefe abstained from voting to add the new members, requesting that the Board first discuss its business agenda, before bringing inexperienced new members into the meeting. O'Keefe was overruled.

19.     Board member Matthew Tyrmand orchestrated the radical board expansion, which doubled its size. Tyrmand intended to and did shift the 2-1 board configuration (against him) to 4-2 (under his control).

20.     In a first for the PV Board, Tyrmand moved to allow "observers" —non-Board members — into what had previously always been a private meeting. Ahead of the meeting, Tyrmand had lined up cherry-picked disgruntled current and former

---

[2] At other times, not relevant at this time to claims against Plaintiffs, certain Board members acted in their own separate interests, unauthorized by Plaintiffs. Those claims will be addressed separately.

employee "observers" to attend by phone and speak. Other employees, previously happy in their positions, were invited to attend and listen.

21.      Nobody except Tyrmand and the cherry-picked employees knew what was coming.

22.      First, in the now-public meeting, Tyrmand moved to read "into the record" a previously undisclosed letter of grievances written by disgruntled employees, invoking legalistic language.[3]

23.      The motion passed with O'Keefe again abstaining. O'Keefe objected that he had never seen the letter before.

24.      In other words, Tyrmand was leading an ambush.

25.      Tyrmand, having collected a pre-meditated list of alleged grievances from a small group of anonymous disgruntled current and former employees, then read aloud O'Keefe's supposed transgressions.

26.      The letter was intended to, and did, publicly humiliate O'Keefe.

27.      Following the reading of the grievances letter, Tyrmand began inviting a series of disgruntled current and former employees (attending by phone) to expand on the issues raised in the anonymous letter.

28.      O'Keefe —at the time, PV's Chief Executive Officer— was ambushed by the series of unscheduled appearances at a public Board meeting with much of the PV staff listening in.

---

[3] Presumably when Tyrmand referred to "the record," he meant the audio recording of the defamatory meeting that Project Veritas would later leak to the public.

29.    The hours-long series of comments from Tyrmand's cherry-picked employees published a long string of defamatory statements, such as:

    a.  "James has become a power-drunk tyrant and he's exactly who he pontificates on who we should be exposing."

    b.  "It's sad, embarrassing, and increasingly becoming James' standard for how he treats the [indiscernible]. Honestly, it's wild and incredibly irrational behavior for someone publicly and internally claiming to be the only one raising money."

    c.  "In recent donor meetings, James' behavior has been arrogant and dismissive of the donors, that they won't give us five or six-figure donations."

    d.  "I consider the workplace a hostile work environment, incredibly toxic, employees are continually shamed and bullied and discounted and appear to only be objects to one end, which is the furtherance of his personal agenda."

    e.  "He's a great leader when it comes to Project Veritas, but he's not good at managing people. He's not good at hiring and firing."

*See* Transcript of February 6, 2023, Board Meeting Audio, attached hereto as **Exhibit A**.

30.    The aired grievances were intended to, and did, publicly humiliate O'Keefe. By reading the grievance letter "into the record" and requiring O'Keefe to sit quietly and endure public castigation in front of the entire PV staff, Tyrmand hoped to provoke O'Keefe into an angry outburst that would provide cause for his immediate termination.

31.     But O'Keefe did not take the bait. He endured severe emotional distress and public humiliation but *did not lose his temper.*

32.     The entire meeting was intentionally intended to be defamatory. It was intended to strike O'Keefe where Tyrmand believed O'Keefe was weakest: in his pride. But legally speaking, it was a carefully planned session of pure defamation of O'Keefe's personality and ability. In other words, the Board organized and procured a six-hour struggle session of defaming O'Keefe's character and his fitness for his chosen occupation.

33.     Although the employees delivered the message, the Board intentionally created the defamatory environment, and encouraged the cherry-picked, allegedly dissatisfied employees to publicly complain. The Board invited the other, non-disgruntled employees to hear the defamatory comments first-hand. The Board recorded the defamation for publication to a wider audience. The Board did publish the audio of the February 6th meeting, including all the defamatory comments, to a wider audience, including providing it to journalists.

34.     Since O'Keefe kept his cool, the Board was frustrated in its plan to provoke O'Keefe. So, it shifted tactics, and —despite that none of the complained-of conduct was new or urgent— concluded the meeting by voting to radically re-define O'Keefe's job.

35.    The Board's February 6th minutes described the decision:

> The Board voted and passed the following:
> - The CFO and Chief Strategy Officer reinstated.
> - The CEO's ability to hire/fire staff is suspended for 180 days with such power transferred to the Executive Director in direct consultation with the Board.
> - The Executive Director reports to the Board
> - The CEO is placed on paid leave for two weeks
> - The CEO surrenders company credit card
> - The CEO's access to proprietary information, including donor lists, is restricted

36.    The Board's reconfiguration of O'Keefe's job was intended to and did frustrate his ability to carry out his duties. It eliminated his ability to travel for stories, to recruit reporters, hire or fire staff, or fund-raise, and cut off his access to donor information — all essential requirements for his job.  Excepting only hire/fire authority (removed for at least *six months*), the other changes were of indefinite duration.

37.    The February 6th public humiliation and gutting of O'Keefe's position was intended to, and did, create an impossible and intolerable hostile work environment. The Board expected O'Keefe to immediately resign.

38.    The Board wished to force O'Keefe to resign, rather than just directly firing him, because it selfishly believed doing so would mitigate the backlash from donors, employees, and consumers of the company's news products. The Board hoped O'Keefe would *do something* that would allow the Board to re-direct its donors anger towards O'Keefe.

39.    The Board's ill-conceived plan was self-destructive, displaying gross incompetence and a reckless disregard for the Board members' fiduciary duties, not to mention PV's future prospects and ability to operate as a going concern.

40.     O'Keefe had always been the most important figure in PV's news videos. News videos featuring O'Keefe's appearances were always viewed significantly more often than videos without the founder. It wasn't even close. O'Keefe had the ability to go viral: PV *without* O'Keefe did not.

41.     Likewise, O'Keefe had always been PV's most productive fund-raiser, consistently outraising the organization's entire development department. Even when outreach was initiated by the development department, donors (especially larger donors) preferred and expected to meet and communicate directly with O'Keefe, face-to-face.

42.     The Board's February 6th actions to force O'Keefe to resign also ensured O'Keefe could not appear in future PV videos or effectively fund-raise, disemboweling the organization and dooming its prospects. The Board's actions were corporate hara-kiri.

43.     But the Board's backup plan to force O'Keefe's resignation was thwarted when O'Keefe once again refused to take the bait, and did *not* immediately resign.

44.     So, the frustrated Board activated 'Plan C.'

**The Board Tries Again on February 10, 2023**

45.     Just four days after the February 6th meeting, the Board met again, this time without O'Keefe present, since he was still on two weeks of paid leave as ordered by the Board.

46.     This time, at the February 10th meeting, Tyrmand did <u>not</u> invite any employees, and did <u>not</u> move to record the meeting. With O'Keefe not present, the Board acted in secret.

47.    Instead, Tyrmand invited PV's disgruntled CFO (who O'Keefe had just fired a week before), Tom O'Hara ("O'Hara"), to deliver a searing report accusing O'Keefe of serial misspending. None of the issues O'Hara raised were new, or material, or urgent.

48.    The 'report' was a post-hoc rationalization attempting to backfill a valid rationale for the Board's February 6th actions. O'Keefe's alleged serial financial misconduct had never been raised at any previous Board meeting. Although O'Keefe had been at the helm for nearly two decades, until this February 10th 'report', neither the Board nor the CFO had ever notified O'Keefe that his expenses were "lavish" or inappropriate in any way.

49.    At the conclusion of the February 10th meeting on 'financial improprieties,' just four days after humiliating O'Keefe with an ambush of employee complaints about his management style, stripping all his authority, and placing O'Keefe on two weeks' *paid* leave, the Board took escalatory action. This time, the Board rescinded O'Keefe's pay entirely, not even waiting the two weeks, placing him on indefinite *unpaid* leave, and to add insult to financial injury, (at Tyrmand's suggestion) implied Mr. O'Keefe was crazy, thus unsuitable for his chosen occupation, by offering him free mental health treatment in the Board's written minutes.

50.    In trying to force O'Keefe's voluntary resignation, the Board was busily and enthusiastically fire-bombing PV's sterling reputation. If anyone needed mental health treatment, it was PV's Board of Directors.

51.    The Board recorded its escalatory, "Plan C" decision in its February 10th minutes (highlights supplied):

> The Board engaged further discussion, voted and the members present passed the following:
> - Authorized the Executive Director, Dan Strack, to approve expenditures above $20,000
>   - Adopted unanimously by the members present
> - Indefinite suspension of Mr. O'Keefe as CEO without compensation pending the results of the two-dimensional audit.
>   - In favor: Messrs. Tyrmand, Barton and Garvey
>   - Opposed: Messrs. Skakel and Alembik
>   - Passes 3-2
> - Offer to provide Mr. O'Keefe with mental wellness care/treatment/counseling with the sincere hope and goal of Mr. O'Keefe returning to the organization at the appropriate time under the appropriate circumstances to be determined.
>   - Adopted unanimously by the members present

52.    The Board subsequently published its Board minutes to many third parties. The minutes deliberately included the defamatory implication that O'Keefe lacked mental capacity and was thus unsuitable for his chosen occupation.

53.    At this point, O'Keefe had no authority, no pay, and no job, except an illusory promise of possible future re-employment "at the appropriate time under the appropriate circumstances *to be determined*."

54.    O'Keefe had no way to pay his bills. The Board's actions condemned O'Keefe to indentured servitude: O'Keefe was to indefinitely remain a PV employee, subject to the Board's whims, orders, and control, *without being paid,* and with no way to meet his own ongoing financial obligations.

55.    Nothing in O'Keefe's Employment Agreement[4] provided the Board with a

---

[4] Plaintiffs attached the Employment Agreement to their First Amended Complaint as its first exhibit.

remedy of indefinite suspension without pay (or any of its other creative remedies). The Board did not (directly) terminate O'Keefe's employment. The Board did not terminate the Employment Agreement.

56.    Instead, the Board breached the terms of the Employment Agreement including, non-exclusively, Paragraph 1 ("Responsibilities and Performance"), Paragraph 3 ("Compensation"), and Paragraph 4 ("At Will Employment").[5]

57.    Combined with those breaches, the Board also breached the duty of good faith and fair dealing it owed to O'Keefe.

58.    Showing remarkable restraint, O'Keefe waited six more days to respond. On February 16, 2023, at 1:11pm, O'Keefe emailed the entire PV Board, demanding that either the full PV Board resign, effective immediately, or else O'Keefe would be *forced* to resign (i.e., acknowledge his constructive termination):

> I cannot in good faith return to the employ of an organization with leaders who are attacking me personally, making false and unsupported claims of improper management of resources, improperly airing employment issues related to me and others at Project Veritas, ruining our reputation in front of supporters and donors, and leaking confidential information and fabricated stories. I will be forced for good reason to terminate my position as CEO of Project Veritas.

*See* O'Keefe Email to PV Board dated 2-16-23, attached hereto as **Exhibit B**.

59.    As a direct and predictable result of the Board's conduct, O'Keefe was substantially damaged.

---

[5] The Board will, predicably, make the self-defeating argument the Employment Agreement was "at will." But, again, the Board did not fire O'Keefe. The Board wishes to have it both ways. The Board cannot hide behind its specious argument it took some kind of 'at will' action when it did not actually fire O'Keefe, and it denies it intended to constructively terminate him.

60.    To recap the Board's intentional plan to constructively terminate O'Keefe:

    a.    Plan A was to ambush and humiliate O'Keefe in front of the staff and provoke him either to quit on the spot or into a rash response that would provide grounds for termination for cause. He kept his cool.

    b.    Plan B was to shred O'Keefe's authority, strip his duties, and prevent him from performing his contractual duties under the Employment Agreement. The Board thought O'Keefe would surely quit. He didn't.

    c.    Plan C stripped even O'Keefe's pay, and mocked him with suggestions of mental health problems. This time, the Board was sure it would work. And this time, it did.

### The Aftermath

61.    Following the Board's suspension of O'Keefe on February 6th and constructive termination of O'Keefe on February 10th, and O'Keefe's coming to terms with his termination on February 16th, the employees rebelled, donations dried up, consumers complained loudly and often, and the Board became increasingly unstable and erratic.

62.    For nearly two more months, the Board engaged in a mendacious public dispute with O'Keefe over whether O'Keefe had been fired or quit. The Board first misinformed the public O'Keefe had quit —despite their "best conciliatory efforts"— a reckless ruse intended to hold back a tsunami of rage from donors and consumers swamping its phone lines, emails, and social media.

63.     During this post-termination period from March to May 2023, the Board complained about nearly everything O'Keefe did, trying to manufacture further post-hoc rationalizations for their misconduct. For example, O'Keefe made a careful and measured video for followers and co-workers as he cleaned out his office. Even though O'Keefe did not defame PV or its Board members in the video, and even though the video was not prohibited by his Employment Agreement, the Board still accused O'Keefe of misfeasance.

64.     In the immediate aftermath of O'Keefe's suspension and constructive termination, not only did donations essentially stop, but PV experienced a historic and catastrophic wave of demands from donors for donation reimbursements. The backlash threatened to destroy the organization even before it could send more demand letters to O'Keefe, which it did frequently, with great enthusiasm.

65.     The Board —in particular Matthew Tyrmand— knew his actions would result in the immediate destruction of anything recognizable as Project Veritas, and this is exactly what he intended, and it is exactly what occurred. Tyrmand was the chief architect and engineer of the downfall of Project Veritas, but the other Board members aided and abetted him.

66.     Over the next weeks and months, their purpose achieved, Board members raced out of the boardroom like rats off a sinking ship, resigning one after another, not sticking around to clean up the mess they created. The employees who had challenged Tyrmand at the beginning, wondering aloud what would happen if the Board failed, were either laid off or forced to find new employment. The once-rapidly-growing

organization hemorrhaged cash. In a desperate gamble, PV hired a first-generation PV reporter as CEO, even though she lacked prior executive experience. It didn't work. She quit before she reached her six-month review.

67.     PV then drastically cut costs, making things even worse, and making donors and consumers even more furious, if that were possible.  With the drastic cost cuts in place, PV's content production dried up. It infamously announced it would stop funding the defense of its *own reporters* who'd been caught up in litigation while performing their jobs. It engaged in a series of layoffs reducing the staff from over 60 to around six.

68.     As of the drafting of these counterclaims, Project Veritas drips out lame videos, none of which go viral. PV's videos now generate only a handful of 'likes' and 'comments,' sometimes in the single digits, a pale shadow of its former reach and influence.

69.     On June 20, 2024, Rolling Stone published a long-form, magazine-style investigative article about Project Veritas headlined, "Inside the Rise and Fall of Project Veritas."[6]

70.     Among many other things, Rolling Stone reported two key facts: (1) Matthew Tyrmand instigated the corporate coup, and (2) the Board members had been advised by corporate counsel the most likely result of its actions would be James'

---

[6] Available at https://www.rollingstone.com/politics/politics-features/project-veritas-james-okeefe-rise-fall-1235036748/.

resignation — a result they secretly hoped to procure:

> After years of serious conversations and apologies and plans that went nowhere, the board had arrived at the Rubicon. "[O'Keefe] cannot be a steward of the org until he recognizes the org is now bigger than him," Matt Tyrmand, a board member and longtime friend to the CEO, wrote to the others in an email. "This is not a fiefdom anymore."
>
> Jeffrey Lichtman, who served as legal counsel, had reservations. "Giving James some kind of ultimatum will be received poorly by him at this very difficult time. He'll feel cornered and will lash out in defense. In the end I'm not sure you won't lose him."

71.    The emails exposed by the Rolling Stone article evidenced the Board's intent to force O'Keefe to quit. In other words, they *intended* to corner him, put him on defense, and create a work environment so hostile O'Keefe would have no choice but to resign.

72.    Shortly after O'Keefe's ouster and public humiliation, the Board conceived its next scheme, to further injure O'Keefe through relentless public defamation.

### The Board's Defamation Plot

73.    From February 2023 on, PV's Board members took to their social media accounts to spread false defamatory claims of O'Keefe's financial and personal failures — all going to O'Keefe's suitability for his chosen profession. It was all part of a premeditated, carefully planned scheme to destroy O'Keefe's ability to continue to pursue his investigative reporting career, which PV viewed as competitive, and win back the affections of disaffected donors and disappointed consumers.[7]

---

[7] PV was wrong that O'Keefe posed any competition. PV and O'Keefe's new reporting company, O'Keefe Media Group, are economically complimentary. They are not competitive substitutes. In other words, consumers of either firm are also likely to consume the information products of the other firm.

74.    PV still operated under the misguided belief that "it" was "now bigger than" James, and if PV could destroy James's reputation, PV would prosper and return to its previous glory. Tyrmand believed that if he went low enough, the "Board [would not] fail" and his plan would be recognized as the brilliant boardroom coup he had originally conceived.

75.    For one of many examples, on September 21, 2023, Board Member Tyrmand tweeted this pack of deliberate, intentional lies about O'Keefe, seen by at least 256 persons (not including re-tweets and forwards):



**Matthew Tyrmand** ✔
@MatthewTyrmand

He was fired for cause when lawyers investigated staff claims and documented his misappropriation of massive amounts of donor/non profit funds and all sorts of other malfeasance (such as: ya can't fly private to go on your vacation & lie about it, can't fire a cfo who tells you that you have to pay back personal inurements, can't spend donor money on your trash whore reality show gf, can't tell female employees they're not allowed to get pregnant, and can't do any of the hundreds of others things documented by lawyers that he did while acting as a fiduciary of a non profit). He violated these laws of both statute and decency. Not any of the staff, officers, or board- one person did all these things. And you idiots lick his balls as if he is a god- not the monster everyone who has ever known him or worked with him knows him to be.

2:49 PM · Sep 21, 2023 · **256** Views

76.    Board Member Joseph Barton frequently 'retweeted' (i.e. republished) statements originating on an anonymous account bearing the name of "James O'Keefe The Panty Thief" (the name was designed to appear prominently in Twitter user searches for "James O'Keefe"). On May 15, 2024, Barton published private (intimate) communications between O'Keefe and his then-girlfriend.



77.    Project Veritas admitted it has access to all O'Keefe private messages, during the same preliminary injunction hearing where Joseph Barton testified under oath in this case in July 2024.

78.    Project Veritas supplied the personal, private messages to 'James O'Keefe the Panty Thief.' And, then-Board Member Joseph Barton republished them.

79.     Plaintiffs' intentional public disclosure of O'Keefe's personal and private messages, which O'Keefe never intended to be made public, which had no public interest and were of no public concern, injured O'Keefe economically and caused him severe mental and emotional distress, anguish, and humiliation.

80.     Plaintiffs' intentional public disclosure of O'Keefe's personal and private messages exhibited extreme and outrageous conduct, going beyond all possible bounds of decency, and was utterly intolerable in a civilized society.

81.     Plaintiffs intended to cause O'Keefe emotional distress, or acted with reckless disregard for the likelihood of causing that distress.

82.     On May 31, 2023, PV filed its original Complaint (in this action), which is full of defamatory claims against O'Keefe. The First Amended Complaint included most of those same defamatory claims.[8]

83.     On or shortly after that date, Project Veritas posted a web page, prominently linked from its home page, titled, "James O'Keefe - Project Veritas' Board of Directors Chronology of Events."[9]

84.     The page, open to the public, includes numerous examples of defamation, defamation by implication, and false light defamation. The first example defamed

---

[8] Claims made in court filings are privileged. But Project Veritas used the complaint outside the court context to intentionally republish the defamatory content contained therein.

[9] Available at: https://www.projectveritas.com/james-okeefes-departure-what-really-happened. Last accessed August 12, 2024.

O'Keefe and injured his ability to hire future employees, through an obvious falsehood:

> • January 31, 2023: Volatile Senior Staff meeting leads to the request for Board intervention to address ==rampant mistreatment of employees creating a toxic work environment==, one individual's perceived consolidated authority to hire and fire employees as well as the implementation of revised guidance around expenditures and third-party payment approval process.

85.     But most damaging of all, PV included a link at the bottom of its web page which leads to a copy of the full original complaint — and all of its defamatory material. The complaint was not linked to the court docket, but was hosted on PV's website.[10]



86.     Upon information and belief, the complaint is located on the servers of Contentful, an image-hosting provider, under contract with PV.

87.     Since this action was filed on May 31, 2023, PV and its Board have continued to defame O'Keefe, intending to damage his reputation and ability to carry on in his

---

[10] It is linked through a third-party hosting service. The link leads to this document: https://assets.ctfassets.net/syq3snmxclc9/2YlSTg60tdlV112eV9xJzZ/688c264c5e0853aec40660680e578f39/Project-Veritas-v.-OKeefe-Complaint_5-31-23__1_.pdf. Last accessed August 12, 2024.

chosen profession.

88.    PV and its Board members have jumped at any opportunity to defame O'Keefe.

89.    When it became obvious to the public that PV was headed towards failure due to Tyrmand's and the Board's actions, Tyrmand doubled down and published false claims of O'Keefe's criminal status. On July 21, 2023, Tyrmand wrote:



90.    On September 8, 2023, Tyrmand again accused O'Keefe of serious crimes:



91.    On September 20, 2023, within hours or days of Project Veritas suspending

operations after Tyrmand's and the Board's corporate takeover failed, Tyrmand wrote:



92.     On September 25, 2023, Tyrmand again accused O'Keefe of "criminality":



93.    On November 1, 2023, Tyrmand leveled blame on O'Keefe and the
replacement CEO the Board selected for the destruction of Project Veritas:



94.    On April 24, 2024, Tyrmand republished private details of O'Keefe's personal life:



95.    As recently as June 6, 2024, PV Board members Matthew Tyrmand and Daniel R. Strack appeared on Episode 124 of Dangerous Rhetoric, and published multiple false, defamatory statements. Among them:

a.  Tyrmand on O'Keefe: "[H]e was a theatrical actor, LARPing as a journalist."

b.  Trymand repeatedly referred to O'Keefe as having Asperger's syndrome, referring to O'Keefe as "Mr. Aspergers Narcissist", and at other times referring to O'Keefe's "Aspergers manias". Continuing in this vein, Tyrmand stated: "That's how he was wired. He had this sort of Asperger's, didn't realize the narcissism was that deep. And those things are very weird to me because they're kind of different things. Asperger's and narcissism. Somehow, he's managed to, you know, circle that square. So, I knew we were dealing with some sort of special, beautiful mind."

c.  Trymand: "I'm going to shit on James a lot because he's one of the worst human beings in the history of the world."

d.  Tyrmand on O'Keefe: "[N]ot only was he a narcissistic sociopath driven by his own ego, self-love and the need for adulation, but he was also drug, totally drug addicted."

e.  Tyrmand on the Board's confrontation of O'Keefe at the February 6, 2023 Board meeting, repeatedly accused O'Keefe of criminal conduct: "[L]ike you've caused some problems, you've crossed a Rubicon on spending stuff that's like highly illegal. You know, did illegal spending and then lied about it. Which like compounds the issue, uh, committed outright fraud. I mean, we had a whistleblower

come to us inside the organization who basically said he was guilty of conspiracy and racketeering."

f.  Tyrmand accused O'Keefe of federal crimes: "[I]t was like, and it was across state lines. So, it's a federal crime. This is black and this is not gray stuff. This is fucking black, right? This is felonious behavior."

g.  Tyrmand made false claims: "You know, our New York Young Republican Club, all these people hated O'Keefe personally."

h.  Tyrmand falsely claimed that O'Keefe had tried to get him murdered: "And then he tried to get me murdered."

i.  Tyrmand intentionally tried to destroy O'Keefe's reputation and ability to earn a living: "[T]his is a guy who's the biggest fraud I've ever come across. More fraudulent than the fucking lefty dictators, idea collectivists, and fucking central European shitholes that I deal with. Other people, you know, that are on foreign government payrolls. I have never met a bigger fraud than this guy who's willing to knowingly jit up a mob."

j.  Tyrmand falsely claimed that O'Keefe caused Project Veritas employees to lose their jobs, deflecting from his and the Board's actions in driving Project Veritas to failure: "[H]e is a fucking cancer on society, and on the right, and deserves to be held in account. He destroyed 70 fucking jobs."

96.    On July 31, 2024, this tirade:



97.    And this:



**O'Keefe's Damages**

98.　The Employment Agreement provided O'Keefe an annual salary of $430,920.00.

99.　As the literal face of Project Veritas and its top fund-raiser, it is not speculative that, absent the Board's misconduct, O'Keefe would have remained in his position for the foreseeable future.

100.　O'Keefe's replacement position pays him substantially less than he earned under the Employment Agreement.

101.　As a result of his constructive termination, O'Keefe was also deprived of other valuable benefits, such as paid time off and health care insurance, provided under the Employment Agreement.

102.　As a direct and predictable result of the Board's misconduct, O'Keefe's reputation was substantially injured.

103.　O'Keefe's ability to effectively fund-raise for himself or his new company was substantially impaired by several factors directly caused by the Board.

     a.　Because O'Keefe lacked the resources of a larger investigative organization, some donors who would otherwise have made contributions decided to withhold donations.

     b.　Because the Board defamed O'Keefe by publicly accusing him of financial impropriety, many donors decided to withhold donations.

     c.　Because the Board defamed O'Keefe by publicly portraying his as unstable or mentally unwell, many donors decided to withhold

donations.

104.    O'Keefe has been damaged by Project Veritas in an amount exceeding ten million dollars ($10,000,000.00).

105.    As a result of the Board's misconduct, O'Keefe was required to retain counsel to defend himself and protect his rights.

### Project Veritas and its Donors

106.    PV claims to have a protected donor database of confidential donor names.

107.    Some PV donors require anonymity. But for others, perhaps many others, anonymity either provides no value, or they are required to disclose their donor status, or even desire public knowledge of their donor status.

108.    Some institutional PV donors are required by applicable law to publicly disclose their donations. For example, in 2020 the Bradley Group gave PV $6.5 million, which was disclosed on a schedule attached to its Form 990.[11]

| PROJECT VERITAS<br>1214 W BOSTON POST RD<br>MAMARONECK, NY 10543 | 27-2894856 | 501(C)3 | 6,510,825 | 0. | | GENERAL CHARITABLE<br>PURPOSES |
|---|---|---|---|---|---|---|

109.    Over the years, many smaller and individual donors have posted messages on social media platforms disclosing their donor status, either implicitly or explicitly.

---

[11] Bradly Group's 2020 Form 990, available at: https://www.washingtonpost.com/context/bradley-impact-fund-s-tax-filing-for-2020/edb0bf27-2ee8-43d2-9e2d-c316d308cfba/.

110.    Project Veritas's donors have long been a subject of media interest. Over the years, various stories have been published identifying some PV donors. For example, a headline from Buzzfeed in November 2017:

## Here Are Some Of Project Veritas's Funders

BuzzFeed News has identified more than two dozen donors from around the country who gave money to Project Veritas, the "investigative reporting project" that earlier this week failed to dupe the Washington Post. Some of the donors expressed doubts about the wisdom of the sting. But none said they would end their support for the controversial organization.

 **Kendall Taggart**
BuzzFeed News Reporter

Posted on November 29, 2017 at 8:37 pm

111.    The aftermath of O'Keefe's constructive termination produced immediate and predictable donor backlash, with countless PV donors identifying themselves, asserting they *were no longer* PV donors, and promising future support to O'Keefe. For one example (of many), posted mere days following O'Keefe's constructive termination:



**Casey Petersen** ✔ @CaseyAPetersen · Feb 20, 2023                    ···
#JamesOKeefeIsProjectVeritas
We won't be sending PV any more of our undercover video investigations and we just pulled our monthly recurring **donation**.

Just waiting for #JamesOKeefe to tell us where to send them.
#CaseyAndMykeShow

112.    Another example:



🟤Morals&Mischief😎 @Charlie56768595 · Feb 21, 2023                    ···
After evil corruption @ **project veritas** –

I not only unfollowed on all platforms but I requested my donations return.

I donated after James busted open the Pfizer fraud & this is my 2nd **donation**.

They will not run off with our money.

113.    Another example:



114.    Following O'Keefe's constructive termination, many donors contacted him directly using his personal cell phone, by email, or by direct message.

115.    While some donor names remain private and intentionally confidential, many others are available in the public domain. When combined with donors who contacted O'Keefe directly, Project Veritas cannot identify any allegedly diverted donors, even if the Employment Agreement's covenant restricting all contact with donors were enforceable, which it is not.

## FIRST COUNTERCLAIM
### (Breach of Contract — Employment Agreement)

116.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

117.    The Employment Agreement constituted a legally binding and enforceable contract between Project Veritas and O'Keefe.

118.    Since it was carried out until February 2023, the Parties observed the terms of the Employment Agreement as their normal custom and practice.

119.    The Employment Agreement was never modified, and its original terms were binding and enforceable in February 2023.

120.    Up and until the meeting convened by the Board on February 6, 2023, O'Keefe performed pursuant to the Employment Agreement and fulfilled his obligations under the terms of the Employment Agreement.

121.    The Board materially breached the Employment Agreement on February 6, 2023, when it stripped O'Keefe of the ability to travel, fund-raise, or supervise employees, placed him on two-week's paid leave, and frustrated his ability to perform under the contract.

122.    The Board materially breached the Employment Agreement again on February 10, 2023, when it stripped O'Keefe of the compensation guaranteed under the Employment Agreement, placed him on *indefinite* leave, imposed an extra-contractual mental-health treatment as an implied condition to receive pay, and frustrated his ability to perform under the contract.

123.    The Board's breaches proximately and directly damaged O'Keefe.

124.    Project Veritas is liable for all acts performed by the Board.

## SECOND COUNTERCLAIM
### (Defamation)

125.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

126.    Plaintiffs, by and through their agents, systematically defamed Defendant O'Keefe.

127.    The statements reproduced above in paragraphs 75, 76, 84, 85, 89, 90, 91, 92, 93, 94, 95, 96, and 97 were false.

128.    The statements contained in the aforementioned paragraphs were

published or otherwise communicated to third parties by PV and its Board.

129.    The aforementioned statements were made without authorization and were not privileged.

130.    PV and its Board members acted negligently, at minimum, in regards to the truth or falsity of their statements.

131.    The Plaintiffs acted in concert and aided and abetted each other.

132.    The Plaintiffs acted willfully, recklessly, and intended to harm to O'Keefe.

133.    The direct and predictable result of the Plaintiffs' defamation of O'Keefe was great injury to his financial condition, reputation, relationships, and future economic prospects.

134.    The aforementioned statements caused O'Keefe special harm and/or amounted to defamation per se, in that PV and its Board charged O'Keefe with serious crimes and the statements adversely reflected on O'Keefe's fitness to conduct his business or profession.

135.    Because PV's and its Board's statements amounted to defamation per se, damages are presumed.

### THIRD COUNTERCLAIM
### (Publication of Private Facts)

136.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

137.    Project Veritas servers hosted several of O'Keefe's personal, *private* (non-public) messaging accounts, including his Telegram and Apple iMessage accounts.

138.    After constructively terminating O'Keefe, Project Veritas accessed his

private messaging accounts without O'Keefe's permission. Project Veritas then went further, and published O'Keefe's private messages without his consent.

139.    Project Veritas published personal and private communications of an intimate nature, by providing them to wrongdoers for that express purpose, including but not limited to the Twitter Account "James O'Keefe The Panty Thief."[12] In doing so, PV published matters concerning O'Keefe's private life.

140.    The publication by PV of O'Keefe's private messages was highly offensive to a reasonable person.

141.    O'Keefe's private communications were communicated to the public at large, or were communicated to a sufficient number of people to make it substantially certain that the information would become public knowledge.

142.    The disclosure of O'Keefe's private messages was a gross violation of O'Keefe's privacy and highly offensive to a reasonable person.

143.    The disclosed messages had no legitimate public concern. Plaintiffs shopped O'Keefe's private messages to media platforms like Rolling Stone, which refused to publish them. In other words, the messages were not newsworthy and were not of public interest or public concern.

144.    Plaintiffs' conduct in disclosing O'Keefe's private messages was especially egregious, malicious, and reckless.

145.    The wrongful disclosure of O'Keefe's private messages injured his ability

---

[12] Upon information and belief, the "James O'Keefe the Panty Thief" Twitter account is controlled and/or managed by PV or its agents.

to raise funds to support his occupation, causing financial harm. The disclosures substantially harmed O'Keefe's reputation. The disclosures involved private and intimate information, causing O'Keefe to experience severe emotional distress, mental anguish, and humiliation.

146.    Plaintiffs knew and intended that the injuries to O'Keefe would be, and were, a direct, proximate, and predictable result of publicly disclosing O'Keefe's private information.

## FOURTH COUNTERCLAIM
### (Intentional Infliction of Emotional Distress)

147.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

148.    Plaintiffs intentionally inflicted severe emotional distress on O'Keefe by deliberately humiliating him in front of the PV staff to create an unbearably hostile work environment and force O'Keefe to resign.

149.    Plaintiffs intentionally inflicted severe emotional distress on O'Keefe by publicly disclosing his personal messages, which they obtained and used without O'Keefe's permission.

150.    Plaintiffs' extreme and outrageous conduct did, in fact, inflict severe emotional distress, anguish, and humiliation on O'Keefe.

151.    The wrongful disclosure of O'Keefe's private messages caused some donors to withhold donations. It also caused O'Keefe substantial personal embarrassment, making it impossible for O'Keefe to raise funds from certain donors, causing financial harm. It also caused damage to O'Keefe's personal and professional relationships.

152.    Plaintiffs knew and specifically intended that the injuries to O'Keefe would be, and were, the direct, proximate, and predictable result of publicly disclosing O'Keefe's private information in their attempt to inflict emotional distress on O'Keefe.

153.    In the alternative, Plaintiffs wrongful disclosure of O'Keefe's personal messages demonstrated, at a minimum, disregard of the substantial probability of causing O'Keefe severe emotional distress.

154.    Plaintiffs' conduct caused O'Keefe financial, emotional, and reputational harm, and just as the Plaintiffs intended, severe emotional distress.

### FIFTH COUNTERCLAIM
### (Declaratory Judgment—Donor Non-Solicitation Clause)

155.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

156.    The Employee Agreement includes a provision purporting to restrict O'Keefe from contacting any "donor or prospective donor" at any time, anywhere, in any manner, for an infinite amount of time (the "Donor Non-Solicitation Clause").[13]

157.    Defendant O'Keefe is currently subject to the Donor Non-Solicitation Clause,[14] and Plaintiffs continue to claim that the covenant is enforceable against Defendant O'Keefe.

158.    Plaintiffs have no legitimate business interest in enforcing the Donor Non-Solicitation Clause.

---

[13] The Donor Non-Solicitation Clause is located at Paragraph 17 of the Employment Agreement.

[14] In July 2024, this Court denied Plaintiff's motion for a preliminary injunction, finding among other things that it was substantially likely the Donor Non-Solicitation Clause was unenforceable and unsalvageable.

159.    In fact, Plaintiffs themselves are legally prohibited from soliciting donations in thirty-five states —including *New York*— and the District of Columbia, as indicated on Plaintiffs' website.[15]

> Project Veritas does not, and makes no effort to, solicit donations from residents in Washington DC, MS, NC, CO, LA, WV, NC, CO, ME, OK, SC, OH, ND, NH, NV, KY, VA, OR, MI, FL, NY, CA, PA, MA, MI, CT, TN, MD, RI, NM, AR, NJ, WI, WA, IL, GA.

160.    The Donor Non-Solicitation Clause is overbroad, lacks business justification, cannot be remedied by judicial modification, and is unenforceable.

161.    The Donor Non-Solicitation Clause is also unenforceable as a practical matter, as the term "donor" is undefined in the Employment Agreement and is unworkably imprecise, many donors' identities are already of public record, and Project Veritas cannot identify a discrete group of "donor[s] or prospective donor[s]" that would be subject to the restriction in the first place.

162.    As the Plaintiffs' First Amended Complaint evidences, there is an actual, genuine, substantial, and justiciable controversy between the Parties regarding the enforceability of this restrictive covenant, and Defendants seek declaratory relief in good faith and not out of mere curiosity.

163.    Declaratory relief is necessitated by the need to avoid the significant and imminent harm that would result from the Donor Non-Solicitation Clause's enforcement.

164.    The enforcement of the Donor Non-Solicitation Clause would cause

---

[15] Last accessed on August 13, 2024, at: https://www.projectveritas.com/donate. Scroll to the bottom of the page.

Defendants substantial harm, including but not limited to the loss of current and future employment opportunities and substantial, negative financial impact to O'Keefe and OMG, and would unduly restrict Defendants' ability to engage in otherwise lawful activities within the field of investigative journalism and associated fundraising and business operations.

165.    Defendants face current legal action by Plaintiffs regarding the Donor Non-Solicitation Clause. The declaratory relief sought here would have a direct and immediate impact on the rights of the parties involved.

166.    Defendants respectfully request that the Court enter a declaratory judgment finding that the Donor Non-Solicitation Clause is unenforceably broad, and that Defendants are not bound by its terms.

## SIXTH COUNTERCLAIM
### (Declaratory Judgment—Employment Agreement, Generally)

167.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

168.    In contrast to the Donor Non-Solicitation Agreement, the Employment Agreement's "Employee Non-Solicitation" provision (the Non-Solicitation of Project Veritas Employees or Contractors at paragraph 16 of the Employment Agreement) is limited in time, expiring by its terms 12 months following O'Keefe's termination.

169.    The Employment Agreement was an at-will contract, allowing either party to terminate the employment relationship, but it specified particular remedies and actions permissible under the contract.

170.    Plaintiff's unilateral action in placing Defendant O'Keefe on indefinite

unpaid leave on February 10, 2023, and imposing other extra-contractual conditions, constituted a material breach of the Employment Agreement, as it imposed conditions not agreed to by Defendant O'Keefe and not allowed under the contract.

171.    As a result of this material breach, the restrictive covenants contained in the Employment Agreement, including the 12-month Employee Non-Solicitation provision, are unenforceable against Defendant O'Keefe.

172.    Furthermore, the Employment Agreement does not contain any "savings" language that could preserve any of the covenants included therein after a prior breach by Employer.[16]

173.    When Plaintiff breached the Employment Agreement on February 10, 2023, the agreement terminated, and O'Keefe was relieved of all further obligations under the Employment Agreement, including but not limited to forward-looking restrictive covenants like the Employee Non-Solicitation Provision.

174.    An actual, genuine, and justiciable controversy exists between the Parties as Plaintiffs have asserted, and will continue to assert, the enforceability of the 12-month Employee Non-Solicitation provision, creating an actual need for judicial determination.

175.    The declaratory relief sought here will have a direct and immediate effect on the rights of the Parties involved in this action.

176.    Defendant O'Keefe seeks a judgment from this Court declaring that (1) that

---

[16] Such savings clauses are common but were not included in the Employment Agreement. An example of such a clause: "Notwithstanding any termination of this Agreement for any reason, including Employer's breach, the restrictive covenants contained in Sections X, Y, and Z of this Agreement shall remain in full force and effect for the duration of the period specified therein."

Plaintiffs' imposition of "indefinite unpaid leave" and other extra-contractual terms on Defendant O'Keefe constituted a material breach; and (2) the entire Employment Agreement, and particularly the 12-month Employee Non-Solicitation provision, is unenforceable due to Plaintiff's prior material breach.

## SEVENTH COUNTERCLAIM
### (Breach of the Duty of Good Faith and Fair Dealing)

177.    Paragraphs 1 through 115 are realleged as if fully set forth herein.

178.    The Employment Agreement was at-will but provided certain protections and benefits to Defendant O'Keefe, including agreed-upon remedies in the event of disputes or termination.

179.    The Employment Agreement contained an implied covenant of good faith and fair dealing, which obligated each party to act reasonably prudently to ensure the other party received the benefits of the contract.

180.    The implied covenant of good faith and fair dealing in O'Keefe's Employment Agreement prohibited the Plaintiffs from doing anything that could destroy or injure O'Keefe's right to receive the benefits of the contract.

181.    On February 10, 2023, Plaintiffs placed Defendant O'Keefe on "indefinite unpaid leave," a remedy not provided for under the Employment Agreement and not contemplated by the Parties.

182.    By placing Defendant O'Keefe on indefinite unpaid leave without contractual justification, Plaintiffs materially deprived O'Keefe of the compensation, employment stability, fruits of his efforts, and professional opportunities that were the

expected benefits of the Employment Agreement.

183.    Plaintiffs' conduct in placing Defendant on indefinite unpaid leave, without any contractual basis or justification, was done in bad faith, and deprived Defendant of the benefits of the Employment Agreement, thereby breaching the covenant of good faith and fair dealing.

184.    Plaintiffs further breached the covenant of good faith and fair dealing by attempting to force mental health treatment on O'Keefe as a condition for him to receive compensation, to be reinstated as CEO, and to have the duties, responsibilities, and authority bargained for under the contract returned to him. These actions were in bad faith and undermined the contract's agreed-upon objectives.

185.    O'Keefe, or any reasonable person in O'Keefe's position as a promisee under the contract, would be justified in understanding that the Plaintiffs could not unilaterally impose extra-contractual provisions never contemplated by the Parties as pre-conditions for O'Keefe to remain employed, receive compensation, and carry out his duties as CEO.

186.    Plaintiffs also breached the covenant of good faith and fair dealing by intentionally frustrating O'Keefe's ability to perform his job duties, thereby undermining the mutual consideration that formed the basis of the agreement.

187.    Plaintiffs' action in placing Defendant on indefinite unpaid leave and imposing other extra-contractual conditions without contractual basis or justification constituted an intentional frustration of the consideration underlying the Employment Agreement. By preventing Defendant from performing his duties, Plaintiffs deprived

Defendant of the benefits of the Employment Contract, including compensation and professional opportunities, thereby breaching the covenant of good faith and fair dealing.

188.   Plaintiffs' conduct undermined the fundamental objectives of the Employment Agreement, deprived O'Keefe of the expected benefits of the contract, and frustrated Defendant O'Keefe's ability to perform his contractual obligations. By placing Defendant on indefinite unpaid leave and imposing unreasonable conditions on O'Keefe's ability to continue performing under the contract, Plaintiffs effectively prevented Defendant O'Keefe from fulfilling his duties under the Employment Agreement, thereby impairing Defendant O'Keefe's ability to earn compensation and other benefits. This intentional interference with Defendant O'Keefe's job performance was a further breach of the covenant of good faith and fair dealing.

189.   As a direct and proximate result of Plaintiffs' breach of the covenant of good faith and fair dealing, Defendant O'Keefe has suffered damages, including but not limited to loss of income, damage to professional reputation, and emotional distress.

## EIGHTH COUNTERCLAIM
### (Breach of Fiduciary Duties)

190.   Paragraphs 1 through 115 are realleged as if fully set forth herein.

191.   O'Keefe founded and made Project Veritas successful, growing to a point at which it became necessary and prudent to bring in a Board. The Board of Project Veritas undertook a fiduciary duty to advise O'Keefe and guide Project Veritas towards further success.

192.   O'Keefe's success also made possible and justified the organization of

Project Veritas Action Fund to allow fundraising and political activities. Project Veritas Action Fund had a separate Board who undertook a fiduciary duty to advise O'Keefe and guide Project Veritas Action Fund towards further success.

193.    O'Keefe placed special trust and confidence in the Boards of Project Veritas and Project Veritas Action Fund.

194.    The Plaintiffs, through their Boards, committed gross misconduct through their actions of February 2023, driving both entities to failure – frail remnants of what they once were, limping along.

195.    In addition to the factual allegations incorporated into this Eighth Counterclaim, the Plaintiffs' misconduct was demonstrated by their gross disregard for the consequences of their actions in terminating O'Keefe, and even when challenged by O'Keefe and others, the Plaintiffs acted recklessly in removing O'Keefe without a plan to handle the predictable public backlash, precipitous drop in donations, and irretrievable damage to Project Veritas's reputation by the public battle waged by the Boards against O'Keefe.

196.    The Plaintiffs, through their misconduct and breaches of their fiduciary duties, directly and proximately caused damage to O'Keefe.

197.    As a direct and proximate result of Plaintiffs' breach of fiduciary duties, Defendant O'Keefe has suffered damages, including but not limited to loss of income, loss of the enterprise value of the organizations he built, damage to his professional reputation, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants O'Keefe and OMG pray for the following relief:

A.      A declaration the Donor Non-Solicitation Clause is unenforceable;

B.      A declaration that Plaintiffs' imposition of "indefinite unpaid leave" on Defendant O'Keefe constituted a material breach of the Employment Agreement;

C.      A declaration the entire Employment Agreement, including but not limited to the Employee Non-Solicitation Covenant, was and is unenforceable following Plaintiffs' prior breach;

D.      Judgment against Plaintiffs for Defendants' compensatory, consequential, special, and punitive damages in an amount to be determined at trial;

E.      An award of costs and expenses incurred in defending against Plaintiffs' claims and bringing these Counterclaims, including reasonable attorneys' fees; and

F.      Such other and further relief as the Court deems just and proper.


/


/


/


/

Dated this 21st day of August 2024.



CHILDERS LAW, LLC

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104 fax 407-209-3870

/s/ Nicholas P. Whitney

Florida Bar No. 119450
Seldon J. Childers
Florida Bar No. 61112
nwhitney@smartbizlaw.com
jchilders@smartbizlaw.com
notice@smartbizlaw.com

*Counsel for Defendants O'Keefe and OMG*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits and documents) electronically with the Clerk of the Court using CM/ECF on August 21, 2024, which served same electronically upon all counsel of record.

*s/ Nicholas P. Whitney*
Attorney