```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ---------------------------------------x
 3  PROJECT VERITAS, et al.,

 4                          Plaintiff(s),

 5                                            23 CV 4533 (CS)
         -vs-
 6                                            TELECONFERENCE

 7

    JAMES O'KEEFE, et al.,
 8
                            Defendant(s).
 9  ---------------------------------------x

10
         *Proceedings recorded via digital recording device*
11

12                                     United States Courthouse
                                       White Plains, New York
13
                                       May 31, 2024
14

15  Before:   THE HONORABLE CATHY SEIBEL,
                           District Judge
16

17  A P P E A R A N C E S:

18

    RANDAZZA LEGAL GROUP, PLLC
19       Attorneys for Plaintiffs
    BY:  JAY M. WOLMAN
20

21  CHILDERS LAW, LLC
         Attorneys for Defendants
22  BY:  SELDON J. CHILDERS
         NICK WHITNEY
23

24  ALSO PRESENT:

25       JOSEPH BARTON, Project Veritas Action Fund
                    Client Representative
```

                TABITHA R. DENTE, RPR, RMR, CRR
                        (914) 390-4027

1              THE DEPUTY CLERK:  Good afternoon, Judge.

2              Judge, this matter is Project Veritas v. O'Keefe.  We
3    have on the line representing Plaintiff Mr. Jay Wolman, and also
4    on is a client representative for Project Veritas, Mr. Joseph
5    Barton, and we also have on representing Defendant Mr. Jeff
6    Childers, and Anthony's on the line as well.

7              THE COURT:  All right, good afternoon, I guess it is,
8    to you all.

9              Let me ask you when you speak to please say your last
10   name and only your last name first.  Please do not say, "this is
11   Jay Wolman for Plaintiff."  Just say "Wolman."  That way, I'll
12   know right away who's speaking and I don't have to interrupt you
13   to ask, and if we ever need to transcribe the conference, the
14   transcriber will also know.

15             So we have sort of two motions flying around.  I
16   originally set this conference as a pre-motion conference
17   regarding Defendant's motion to compel, which they filed without
18   a pre-motion conference, so I wanted to have this conference
19   first, and I now have Plaintiff's May 24th letter on that
20   subject.  And then, in the meantime, Plaintiff has filed a
21   motion for a preliminary injunction, so we need to set a
22   schedule for all of that.

23             With respect to the motion to compel arbitration, the
24   provision in Paragraph 23 is a bit of a head scratcher because
25   it says basically everything relating to the agreement goes to

1  arbitration, but notwithstanding that, Plaintiff can seek a
2  preliminary injunction to restrain any actual or threatened
3  breach "in addition to any and all additional remedies available
4  at law."  If that means what it literally looks like, then the
5  whole clause makes no sense, so what that means somebody with
6  knowledge is going to have to explain.
7           Because if what you're saying is we're all --
8  everything is going to arbitration except the Plaintiffs can go
9  to court for an injunction and also go to court for anything,
10 then everything that comes before it is nonsensical, so I'll be
11 interested to see what the explanation is for that.  The -- but
12 the -- whether or not the damages claims have to be arbitrated,
13 even if they do, Plaintiff is still entitled to get an
14 injunction here.  I don't mean they're necessarily entitled to
15 an injunction, but they're entitled to ask for it here.
16          But what has me puzzled about that motion is, this is
17 old news.  I mean, this -- the conduct that you're asking me to
18 enjoin has been going on for over a year, and I can't really
19 understand why Plaintiff made the motion now except as a tactic.
20 Which doesn't make it wrong, it just makes it a tactic.
21          Is there something that's -- some sort of new harm
22 that's imminent?  That prompted the motion?
23          MR. WOLMAN:  And I apologize, your Honor, I'm not
24 going to be used to just saying my first name -- my last name
25 first, so bear with me.

1       First, I want to just correct the introduction.  It's
2  -- Mr. Barton is here for Project Veritas Action Fund.
3       As to the interpretation of the arbitration agreement,
4  we don't believe that it is nonsensical, but, rather, is
5  limited.  For example, had Project Veritas or Project Veritas
6  Action Fund simply brought a claim for indemnification, that
7  would be arbitrable.  It would go straight to arbitration.
8  There would be no injunctive relief sought.  It's just a
9  straight-up claim for money, money damages.  It's not affected
10 by the carveout for injunctive relief.
11      Project Veritas need not have been in a situation
12 where it was seeking injunctive relief for the harms, but this
13 does bring us to the other motion.  The harms are ongoing.
14 Project Veritas --
15      THE COURT:  I'm sorry, before we leave Paragraph 23,
16 I'm still baffled by that language, "in addition to any and all
17 additional remedies available at law."  But what does that mean?
18      MR. WOLMAN:  From the way I read it and I understand
19 it, it means that if we are seeking a preliminary or final
20 injunction in court, we may also ask the Court in that
21 proceeding for whatever other remedies at law are available.  If
22 were are not seeking a preliminary or final injunction, then any
23 claims at law for money damages must be arbitrated.
24      THE COURT:  And is it kosher that only -- under this
25 agreement only your team has that benefit?

1          MR. WOLMAN:  This was an agreement negotiated between
2   Mr. O'Keefe, who was running Project Veritas and Project Veritas
3   Action Fund at the time.  This is not, you know, something that
4   was thrust upon him.  He had a full and fair opportunity to
5   consider it and he agreed to these terms, and I don't believe
6   that the Federal Arbitration Act or New York law makes --
7   requires that there be reciprocal rights under an arbitration
8   agreement.
9          THE COURT:  Mr. Childers, do you want to say anything
10  about what that...Paragraph 23(c) means?  Or, actually, it's a
11  B; there is no C.
12         MR. CHILDERS:  Yes, your Honor, thank you.
13         So I don't -- I think -- we're reading this as a
14  pretty standard example of contractual interpretation where you
15  have a more general clause and then a more specific one, so, as
16  your Honor pointed out, 23(a) provides for the mandatory broad
17  arbitration requirement for any and all claims related to and so
18  forth, and then in 23(b), and this is fairly common in these
19  kinds of arbitration provisions, there's the carveout for
20  injunctive relief, with the obvious rationale being that if
21  there's an emergency, you don't have time to negotiate, you
22  know, finding an arbitrator and doing all that stuff and you
23  just need to go into court and get your injunction to negotiate,
24  so I think we have to read 23(b) in light of that standard
25  contractual rationale.

1      And then, because the clause that we're all focusing
2 on right now, that final subjective clause at the end of 23(b),
3 it follows that, all the prior language, and so I think the
4 reasonable and logical reading is that it -- the relief that's
5 applied gets narrower and narrower through that sentence and
6 that that final clause doesn't somehow explode and, and consume
7 everything in front of it.
8      So I think that it was inartfully worded, but it can
9 be compared to very standard, similar language in these
10 provisions where what they're saying is, and this is how we read
11 it, that if Project Veritas does need to seek a preliminary
12 and/or final injunction to enforce the restrictions and
13 obligations or restrain any actual or threatened breach, then
14 they can get that order and they don't want to be restricted to
15 what the Judge can include in that injunction order.
16      So if there's any additional relief that the judge
17 feels is appropriate or comes out as, you know, ancillary or
18 secondary relief to the injunction, then that relief would be
19 available to Project Veritas, and that's, I think, the only way
20 you can read that and have both paragraphs work harmoniously
21 with each other.
22      THE COURT:  Hmm.
23      MR. WOLMAN:  May I respond, your Honor?
24      THE COURT:  Yeah.
25      MR. WOLMAN:  What my colleague is arguing is that it's

1  a standard carveout for emergencies.  It is not.  It doesn't say
2  that.  It says explicitly a preliminary and/or final injunction,
3  meaning we need not seek a preliminary injunction, we could
4  litigate a case through jury and get a final injunction, a
5  permanent injunction, on a matter, and so therefore it makes
6  sense that if you're going to go that far, then, of course, you
7  would bring along with it the other disputes.
8             THE COURT:  Well, I'm going to wait and see what
9  authority you cite in your brief and what arguments you make,
10 but sitting here now, Plaintiff's interpretation makes a little
11 more sense to me, but, like I said, I'm not deciding anything
12 yet.
13            You were about to move on to the PI, Mr. Wolman.
14            MR. WOLMAN:  Yes, your Honor.  Thank you.
15            The -- as to the preliminary injunction, this case has
16 had an unusual procedural history.  It took us some effort to
17 serve all of the Defendants and the parties were attempting to
18 negotiate and even went to court-annexed mediation, and so as to
19 the timing of the motion, after all that time, it was our
20 anticipation that the Plaint -- the Defendant, rather, Mr.
21 O'Keefe at OMG, would be answering the complaint or otherwise
22 moving to dismiss.
23            And on a substantive basis, we were not anticipating
24 that the response deadline that they sought would be to move to
25 compel arbitration after all this time, and so we had,

1  therefore, waited until that deadline to see what the
2  substantive response would be, so that way, it could be
3  addressed in our motion for preliminary injunction, which
4  necessarily would require us to show a substantial likelihood of
5  success on the merits, and it seemed logical to wait just a
6  little longer to find out what the arguments were so that they
7  could be addressed and we wouldn't have cross-motions that
8  didn't consider each other.
9          So that's why the timing is now.  There is no tactical
10 --
11         THE COURT:  But don't you need to show, don't you need
12 to show imminent irreparable harm?  And, like, now this has been
13 going on at -- whatever it is you're trying to enjoin has been
14 going on for at least since April and maybe -- two Aprils ago
15 and maybe before that.
16         MR. WOLMAN:  Yes, but we had hoped to resolve it
17 amicably and --
18         THE COURT:  Well --
19         MR. WOLMAN:  -- our good faith should not be held
20 against us.
21         THE COURT:  Well, nobody's holding it against you, but
22 it might make it harder to show that you need emergency relief.
23 Part of what you're asking, the part about soliciting and
24 contacting and all that, is only applicable, as I understand it,
25 for a year, and isn't the year up?

1            MR. WOLMAN:  The year is up, yes, but to the extent
2   that it's a continuing course of conduct, you know, he shouldn't
3   be profiting off of his --
4            THE COURT:  You might get, you might get damages for
5   it, for the -- if the Defendant breached that provision during
6   the year it was in effect, you might well be entitled to damages
7   for it, but I don't think you get an injunction for it.  There
8   are other parts of what you're asking for that don't have that
9   one-year limitation.
10           And I have to say, I looked at the texts that you
11  cite, and it's not as clear to me as it is to you what's
12  actually going on there.  It looked to me -- and this could be
13  completely wrong and this is, this is why we have hearings, but
14  it looks to me like these conversations are occurring after
15  there's been a split between Mr. O'Keefe and the Board and now
16  the donors are lining up either with Team O'Keefe or Team Board.
17           And...you know, if the information that is being
18  assembled relates to people who Mr. O'Keefe already knew about
19  and already knew who -- that they were donors and already knew
20  who they were and how to reach them because, you know, he worked
21  with them and all that, then what makes it a trade secret?
22           MR. WOLMAN:  Because they weren't his to take with
23  him.  He developed that information in the course and scope of
24  his employment.  All of that information belongs solely to
25  Project Veritas and/or Project Veritas Action Fund.  It does not

1  --

2          THE COURT:  Well, your, your affidavits say basically,
3  without explaining why, that -- let me find it, that...and I
4  can't say I pored over these for hours, but I did see that the
5  affiants basically said -- like, the only way O'Keefe would have
6  this information is from working here, from working for Project
7  Veritas, which, you know, may be true, but I don't know what the
8  basis for that collusion is.

9          The...let me find the -- yeah, they say the only way
10 O'Keefe and OMG had these donors' contact information was
11 because it was part of a confidential list kept by Project
12 Veritas.  I -- that sounds right as to donors who were unknown
13 to him before he started working there, but are all those in
14 that category.  That seems like it has to be part of what you
15 have to prove, and, you know, you don't have to prove your whole
16 case in your papers, but that was something that jumped out at
17 me.

18          MR. WOLMAN:  Right.  And, your Honor --

19          THE COURT:  Sometimes you bring in a CEO because of
20 the CEO's connections, so if the people who were taking his side
21 weren't people he learned of through his employment, but people
22 he knew beforehand, then it seems like it's not a trade secret.
23 But --

24          MR. CHILDERS:  Childers, your Honor.

25          THE COURT:  I'm sorry, go ahead.

 1              MR. WOLMAN:  Excuse me.  We're happy to work with Mr.
 2    O'Keefe, as I was saying, with respect to anyone he knew
 3    beforehand, like, for example, his father, but he was the one
 4    out there on behalf of Project Veritas generating donors.  He
 5    had to request from Ashra Bolton the donor list.
 6              Any ones that he otherwise knew, it could be
 7    analogized, your Honor, to a scientist who comes up with a
 8    secret formula in the course and scope of their employment, they
 9    can't suddenly just go to a new company with the secret formula
10    because they have it in their head.
11              THE COURT:  Well, that's certainly true.  On the other
12    hand, if, you know, there -- they also are allowed to keep their
13    knowledge of chemistry that they have before they went to work
14    for Coca-Cola and put that knowledge to work.
15              I mean, look, all this just shows that the devil is in
16    the details, as, as is usually the case, I'm not making any, any
17    decisions today, but, you know, the -- it does look like Mr.
18    O'Keefe is asking his assistant to assemble information.  It
19    doesn't look like there's a pre-existing donor list that he
20    downloaded, but it does look like he's asking somebody who's
21    still there to find details about these people.
22              So why would, why would that be okay, Mr. Childers?
23              MR. CHILDERS:  Thank you, your Honor.
24              With regard to what the assistant may or may not have
25    provided Mr. O'Keefe, you know, I think we're going to get into

1  that in discovery and find out if she even sent him anything,
2  and, if so, what it contained and if he did anything at all with
3  it.  I think those are all factual issues that are undeveloped.
4           With regard to the trade secret claim, however, I find
5  that is very interesting.  I think that's a really good metaphor
6  for the case at large, because what this case is really about,
7  your Honor, is the lack of a non-solicitation clause and the
8  lack of a non-compete clause in Mr. O'Keefe's employment
9  contract, and so what they're doing, the reason why these claims
10 are so attenuated, is that they're trying to manufacture these
11 missing restrictive covenants that, I guess, in hindsight, they
12 probably wish they had gotten and didn't.
13          I've litigated lots of trade secret cases, I'm sure
14 your Honor has seen a ton of them, and, you know, I look forward
15 to ultimately arguing, whether it's in your Honor's courtroom or
16 with an arbitrator, whether the bare knowledge of the existence
17 of a donor could possibly be a trade secret.  I, I have some
18 fairly profound questions about that.
19          THE COURT:  Well, I don't think they're saying the
20 knowledge of the existence is a trade secret, but he seems to be
21 asking for -- she seems to be creating a document that has --
22 it's hard to see in the screen shots, but she seems to be
23 creating a document that contains information about at least
24 some donors.  Whether it's just the ones that are going to be on
25 Team O'Keefe or all of them, hard to tell, but it looks like

1  he's asking her to document all the donors who want money back,
2  so I, you know, there is a bit of a mystery there, and it'll be
3  cleared up either in discovery or if we have a PI hearing.
4  Right now, let's set a schedule.
5              The Defendants' motion to arbitrate, to compel
6  arbitration, was already filed, so you can -- I, I think
7  probably the way to do it is for Defendant to re-file that
8  motion.  Then Plaintiff can oppose and cross move for a PI.
9              I mean, I know you've already made the motion, but
10 scheduling-wise, that you -- the Plaintiff would oppose the
11 motion to arbitrate and then the Defendant would reply on the
12 motion to arbitrate and oppose the PI motion, and then the
13 Plaintiff could reply on the PI motion.  I would rather do it
14 that way, you know, sort of pretending they're cross-motions,
15 because that way, you guys write and I read four briefs instead
16 of six.  If, if we put the two motions each on their own
17 individual tracks, you write and I, and I read six briefs.
18             So timing, I assume that Plaintiff -- excuse me,
19 Defendant can re-file his motion to arbitrate, you know, today.
20 Or Monday.
21             MR. CHILDERS:  Your Honor, I did have a question that
22 was on my list to ask that relates directly to that issue, and
23 the issues have been developed a little bit more through the --
24 this process of the letter in opposition and so forth, so I
25 would probably want to tweak our motion a little bit to make it

1 clearer and address some of the things that have come up in oral
2 argument and in the Plaintiff's response and then maybe
3 Plaintiffs could have its chance to respond to that and oppose,
4 so I would just want a little bit more time, maybe, to do that?
5      And I'm out the next week and a half, starting halfway
6 through next week, on summer holiday with the family.
7      THE COURT: All right, well, then, let's do this.  The
8 PI motion has been filed, so that, that can be the first motion,
9 and so we'll set a date for Defendants' opposition to the PI
10 motion and Defendants' motion to compel arbitration, and then
11 we'll set a date for Plaintiffs' reply on the PI and opposition
12 on the motion to compel and then a date for Defendants' reply on
13 a motion to compel.
14      So you're away -- see, I don't like to ruin people's
15 vacations.  So you're away basically through June 14th?  Is that
16 what you said?  Or June 16th?
17      MR. CHILDERS: First day back in the office will be
18 the 17th, your Honor.
19      THE COURT: All right, so when can you oppose the PI
20 motion and file the motion to arbitrate?
21      MR. CHILDERS: Two weeks would be great, but if your
22 Honor is concerned about the timing, then I would suggest Friday
23 the 21st.
24      THE COURT: That's just four days.
25      MR. CHILDERS: The 28th would be much better.

1            THE COURT:  Well, let me just think out loud, and I'm
2   concerned about my vacation as well.  If we're going to have --
3   let's see, the 28th and then if Plaintiff wanted the same couple
4   of weeks, that would take us to the 12th...that should be okay.
5   I'm turning into a pumpkin on August 2nd, but if -- let's just
6   play this out.
7            If Defendants' opposition and cross-motion is June
8   28th, then, Mr. Wolman, could you oppose the motion to compel
9   and reply on the PI by two weeks after that?  Which would be
10  July 12th?
11           MR. WOLMAN:  Yes, I believe so, your Honor, but one
12  thing I would ask is because, for example, the motion to compel
13  arbitration was itself 20 pages and a PI motion, I don't
14  remember how long mine was, but they tend to be rather long norm
15  -- and if we're going to be doing these combined responses, I
16  would ask probably, and I'm sure Mr. Childers would agree, a
17  little more liberty on the page limitations.
18           THE COURT:  All right, 35 for the Defendants' combined
19  opposition to the PI motion and the Defendants' motion to compel
20  arbitration, 35 for Plaintiffs' combined reply on the PI and
21  opposition on the motion to compel, which will be due July 12th,
22  and then Defendants' reply on the motion to compel would be July
23  19th.
24           And if we need a hearing, we would have to do it
25  either the week of July 22nd or the week of July 29th or it

1  would have to be in the end of August, and that is really --
2  that would turn on, I guess, two things.  One is how long you
3  think a hearing would be and whether you folks think you can be
4  ready that soon after the briefing or if you would rather do it
5  at the end of August as opposed to the end of July.
6            MR. CHILDERS:  The end of August is probably better
7  for me as well when, you know, the, the summer is always
8  difficult with everybody's vacation schedule, staff, and so
9  forth.  That would be my vote.
10           MR. WOLMAN:  You know, I, you know, would prefer to do
11 it towards the end of July, just because school then starts up
12 towards the end of August and camps are over and just getting
13 into court and planning for a particular day for a lengthy
14 argument is a little more harrowing for that.
15           THE COURT:  How long do you think a hearing would
16 take?  What do you think the -- and I know it's a little hard to
17 tell until you see the opposition, but are we talking about, you
18 know, Mr. O'Keefe testifying and one or two people from
19 Plaintiff testifying, or are we talking -- so a day?  Or are we
20 talking about, you know, three days?
21           MR. WOLMAN:  I guess it depends upon what the response
22 would be, your Honor.
23           THE COURT:  Let's do this -- how about we do this, why
24 don't we pick a day -- of course, this is subject to what Mr.
25 Clark can find, but why don't we pick a day during the last week

 1  of July, if I have one, and if that turns out to be not enough
 2  time, then we'll finish toward the end of August.
 3           Do we have a day that works, Walter?
 4           THE DEPUTY CLERK:  Just give me one moment, Judge.
 5           THE COURT:  And if it turns out that there is -- you
 6  know, there's a legal reason why I don't think we need a
 7  hearing, obviously, I'll tell you that as soon as I reach that
 8  conclusion.
 9           THE DEPUTY CLERK:  Judge, July 22nd is wide open for
10  the Court.
11           THE COURT:  That's a little tight for me.
12           THE DEPUTY CLERK:  That's a little tight?  Okay, I'm
13  sorry.
14           THE COURT:  The briefing isn't going to be done until
15  July 19th.
16           THE DEPUTY CLERK:  Okay.
17           THE COURT:  I was looking at the following week.
18           THE DEPUTY CLERK:  Okay, Judge.
19           THE COURT:  The 29th looks all right, too.
20           THE DEPUTY CLERK:  Yeah, Judge, July 29th is good for
21  the Court.
22           THE COURT:  All right, July 29th.
23           Let me make one more suggestion.
24           Now, both sides are really starting to spend real
25  money and real time, and I know you tried with Judge Krause and

1  he's an incredibly patient man, so if he, if he was fed up, I'm
2  sure there's a good reason for that.  I don't think either side
3  here really wants to make litigating this case their jobs and it
4  is going to be their jobs for the next few months and beyond, so
5  if there's -- you think there is any room for movement from
6  where you were last time, I understand these -- I'll call it a
7  business divorce even though it's a -- not a typical business.
8  I know these business divorces tend to get very personal, but
9  maybe it's time to start on both sides maybe being a little more
10 flexible to avoid all this work and all this expense.
11          Does anybody think that that makes sense at this
12 point, or is the blood so bad that everybody's willing to sink a
13 lot of time and treasure into what is now going to be a pretty
14 intense litigation over the next couple of months?
15          MR. CHILDERS:  Your Honor, we're -- we continue to be
16 open to a consensual resolution.
17          MR. WOLMAN:  We are, you know, amenable to discussing,
18 but not based upon the terms anywhere near what was last
19 proposed.
20          THE COURT:  Well, that's the question.
21          MR. WOLMAN:  Right.
22          THE COURT:  You know, are --
23          MR. WOLMAN:  So we would --
24          THE COURT:  -- is the possibility on either side.
25          MR. WOLMAN:  We would need an indication that there

1  would be substantial movement from Mr. O'Keefe before we resume
2  mediation.
3              THE COURT:  Well, Mr. Childers, I'll -- are you
4  talking about dollar-wise or other forms of relief?
5              MR. WOLMAN:  Well, those can be balanced against each
6  other, your Honor.
7              THE COURT:  All right.  Well, you know, 'substantial'
8  is always -- it means different things to different people, but
9  if Mr. O'Keefe would prepare to -- would prefer to get on with
10 his, his work and his new entity and is willing to give a little
11 to restart the conversations, even if the opening gambit doesn't
12 meet Mr. Wolman's definition of substantial, if it's significant
13 enough to get the conversation going again, I think it's
14 worthwhile.
15             So, Mr. Childers, I hope you will pass that on to your
16 client and I'm sure you understand and will make him understand,
17 you know, what -- that going forward, this is going to take up a
18 lot of his time, and if you get conversations going and you
19 think you're getting closer and you want to pause this schedule
20 or push it out to complete those conversations, I'm usually
21 amenable to that, but that's only if you really think you're
22 getting somewhere, so it sounds like the ball's in Mr. O'Keefe's
23 court.
24             And, Mr. Childers, I'm sure you'll reach out to Mr.
25 Wolman if there's something to discuss.

1  　　　　MR. CHILDERS:  Hundred percent, your Honor.  Thank
2  you.
3  　　　　THE COURT:  Anything further we should do this
4  morning?
5  　　　　MR. WOLMAN:  I don't believe so.
6  　　　　THE COURT:  All right.  I will look for your papers if
7  your discussions don't get anywhere, and I will see you in a
8  couple of months.
9  　　　　MR. WOLMAN:  Thank you, your Honor.
10 　　　　MR. CHILDERS:  Thank you, your Honor.
11 　　　　THE COURT:  Thank you.  Bye-bye.
12
13 Certified to be a true and accurate
14 transcript of the digital electronic
15 recording to the best of my ability.
16 _____
17 Tabitha R. Dente, RPR, RMR, CRR
18 U.S. District Court
19 Official Court Reporter
20
21
22
23
24
25