1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2
     ---------------------------------------x
3    PROJECT VERITAS and PROJECT VERITAS
     ACTION FUND,
4
                              Plaintiffs,
5
                                 23 CV 4533(CS)(AEK)
6        -vs-
                              DISCOVERY CONFERENCE
7
     JAMES O'KEEFE, TRANSPARENCY 1, LLC
8    d/b/a O'KEEFE MEDIA GROUP, RC MAXWELL,
     and ANTHONY IATROPOULOS,
9
                              Defendants.
10
     ---------------------------------------x
11
                              United States Courthouse
12                            White Plains, New York
                              December 13, 2024
13
                     ** VIA TEAMS VIDEOCONFERENCE **
14

15   Before:  THE HONORABLE ANDREW E. KRAUSE,
                         United States Magistrate Judge
16
     APPEARANCES:
17
     RANDAZZA LEGAL GROUP, PLLC
18       Attorneys for Plaintiffs
         100 Pearl Street, 14th Floor
19       Hartford, Connecticut 06103
     JAY M. WOLMAN
20
     CHILDERS LAW, LLC
21       Attorneys for Defendants, O'Keefe and O'Keefe Media Group
         215 Northwest 40th Terrace
22       Suite B
         Gainesville, Florida 32605
23   NICHOLAS P. WHITNEY

24   RC MAXWELL, *pro se* defendant

25   **Transcribed from digitally recorded proceedings**

121324                         Conference

```
 1              THE DEPUTY CLERK:  Good morning.  I am going to call
 2   the case right now.  In the matter of Project Veritas versus
 3   James O'Keefe, 23-cv-4533, the Honorable Andrew Krause
 4   presiding.
 5              Counsel, and parties appearing pro se, please note
 6   your appearances for the record, starting with plaintiffs'
 7   counsel.
 8              MR. WOLMAN:  Good morning, Your Honor.  This is Jay
 9   Wolman of Randazza Legal Group for plaintiffs Project Veritas
10   and Project Veritas Action Fund.
11              THE COURT:  Good morning, Mr. Wolman.
12              MR. WHITNEY:  Good morning, Your Honor.  Nick Whitney
13   appearing for James O'Keefe and O'Keefe Media Group, the
14   defendants.
15              THE COURT:  Good morning, Mr. Whitney.
16              MR. MAXWELL:  And good morning, Your Honor.  RC
17   Maxwell, as you know.
18              THE COURT:  Good morning, Mr. Maxwell.
19              All right.  Let's -- we have a number of issues to
20   discuss today.  I've reviewed the parties' pre-conference
21   submissions at ECF numbered 100 through 107, and we will dive
22   into the discovery issues in a moment.
23              But since Mr. Maxwell is here -- thank you for being
24   here, Mr. Maxwell -- let's just start with that issue,
25   recognizing that we are on the public record here, so we should
```

1  be circumspect in what we say in terms of the terms of any

2  settlement agreement, but I just want to understand a little bit

3  about where we are.

4          I understand when we were together for a settlement

5  conference months ago now, there had been an agreement in

6  principle between the plaintiffs and Mr. Maxwell to resolve the

7  plaintiffs' claims against Mr. Maxwell.  We recorded those

8  material terms of the agreement, and apparently the agreement

9  has not been finalized.  My understanding from Mr. Wolman's

10  filing, is that, Mr. Maxwell, you have some concern that you

11  have tried to go back and raise with plaintiffs' counsel, and so

12  that there has not been a meeting of the minds in your view as

13  to the settlement.

14          So from my perspective, this is where we are.  I

15  understood that a settlement had been reached, and I will hear

16  from you in a minute.  I understood that a settlement had been

17  reached.  There now seems to be a problem with that settlement.

18  When that happens, one possibility is that counsel or *pro se*

19  litigant may move for enforcement of the terms of the agreement.

20  There are some complexities to that, as far as I am concerned,

21  in this case.

22          The other thing is we could just put it aside and

23  litigate the case, and, you know, that's always a possibility.

24          Mr. Maxwell, you have not ever answered the complaint

25  here, and it seems like a process that may not really be worth

1   it since you were prepared to settle the claims against you

2   based on the terms that we had talked about at the settlement

3   conference.

4           There is always a possibility that if you walk away

5   from the settlement, and plaintiffs don't try to enforce the

6   agreement, they could move for a default judgment against you

7   since you haven't answered the complaint.  So there are a number

8   of possibilities here.

9           So, Mr. Maxwell, I will hear from you briefly as to

10  what the holdup is.  And again, I would suggest that we not talk

11  about the particular terms of the agreement because those might

12  not ever have to be public because the parties can reach private

13  agreements to settle a case and just reflect the fact of the

14  settlement on the docket.

15          So why don't you just give me a little bit of an

16  update with these things in mind?

17          MR. MAXWELL:  Yes.  Excuse me, Your Honor.  I'm sorry

18  for the not responding to the complaint.  My background is in

19  policy, and some of the procedural things here fall by the

20  wayside.

21          However, me and Mr. Wolman did have a few

22  conversations about some of the broader language that was used

23  in the agreement that was drawn up.  I do believe plaintiffs'

24  counsel agreed to remove some of that language, and we had some

25  further discussions about concerns.  I believe our last

1  discussion was about ten days ago in which Mr. Wolman attempted

2  to alleviate those concerns, and I actually still have my -- I

3  wouldn't consider them counsel, but they are a legal --

4  providing me legal advice at the moment.  I still have them

5  reviewing the terms of -- (inaudible) -- fine -- couple of

6  things to be looked into.  So at this time I am just asking for

7  an extension for me to be able to review the new agreement at

8  this time.

9          THE COURT:  Okay.  Mr. Wolman, any objection to that?

10         MR. WOLMAN:  No objection.

11         THE COURT:  Okay.  And that seems like a sensible way

12  to proceed.  And then, obviously, I understand you said this

13  group or person or whoever is providing you with legal advice is

14  not actually your counsel in the case.  There is always the

15  caution that needs to be exercised if somebody is providing

16  legal advice in the background, but hopefully, none of that's

17  really going to get to be an issue.  So why don't you just take

18  the next couple of weeks and figure that out?  Sounds like we

19  are on a productive path here.

20          I will ask, Mr. Wolman, for you to provide me with a

21  further update on the progress of the discussions with

22  Mr. Maxwell two weeks from -- I would say two weeks from today,

23  but that's right after Christmas.  It's not an ideal time.

24  Hopefully, folks are planning to take a little time off around

25  the holidays.  Why don't we make it three weeks from today,

121324                          Conference

 1  which is Friday, January 3rd?

 2          MR. MAXWELL:  Okay.

 3          THE COURT:  And hopefully that will be enough time to

 4  work through the issues and get everything resolved.  If not, if

 5  you need a little bit more time after that, I will be

 6  accommodating here as long as we are seemingly moving in a good

 7  direction, and it does sound like we are, so I am glad to hear

 8  that.  Thank you for that update, Mr. Maxwell.

 9          I think that's all that we need to address in terms of

10  the issue with Mr. Maxwell, Mr. Wolman, unless there is anything

11  further from the plaintiffs' perspective on that?

12          MR. WOLMAN:  I don't believe so.  I was going to make

13  sure that we had a date to follow back up with Your Honor, and

14  you gave us one.  Mr. Maxwell, of course, he knows is still a

15  litigant here.  You are welcome to participate in all

16  proceedings, including this one, the remainder of it.

17          Yeah, I think that's about it.

18          THE COURT:  Okay.  Mr. Maxwell, so Mr. Wolman is

19  certainly right -- go ahead, Mr. Wolman.

20          MR. WOLMAN:  If Mr. Maxwell does have counsel, I am

21  happy to discuss this with his counsel, certainly.

22          THE COURT:  I think -- he has not necessarily said

23  that.  Sounds like he may be just getting some friendly advice

24  on the side from friends and family, we will call it that, which

25  is okay.  There is nothing wrong with that.  A lawyer has

1  obligations when there is a representation that he or she has
2  entered into with a client.  But again, that's not within my
3  purview at the moment.  So hopefully we don't need to get into
4  any complexities there.
5          And as Mr. Wolman said, Mr. Maxwell, you are a party
6  in this case, so you are certainly welcome to participate in the
7  proceeding as an observer as we move forward.  It's also a
8  public proceeding, so you are welcome to participate in that way
9  as well.  But if you have other things to do, which I imagine
10 you might on a Friday morning, you are also welcome to log out
11 and go about the rest of your day.  It's completely up to you.
12 And I just want to ask you before you do, if there is anything
13 else that you wanted to raise or bring up as part of this issue
14 on your behalf?
15          MR. MAXWELL:  Not at this time, Your Honor.  Thank you
16 for your time.
17          THE COURT:  Okay.  Thank you, Mr. Maxwell.  Take good
18 care.
19          (Mr. Maxwell logs off)
20          THE COURT:  Okay.  Well, that seems like that's moving
21 in a productive direction.  Hopefully it will continue to do so,
22 and it will get wrapped up in the next couple of weeks.
23          All right.  Let's turn to the discovery issues that
24 the parties have identified.  I am going to just walk through
25 them in order.  Some of them I think we will be able to resolve

1  entirely today.  A couple of them may have some lingering issues

2  that need to be addressed, but we will see where that takes us.

3           The first issue that has been raised is an argument by

4  the defendants with respect to certain documents that had been

5  produced or were going to be produced by non-party witnesses who

6  were former board members of Project Veritas.  Project Veritas

7  has asserted a privilege over those documents.  One letter

8  referenced 107 documents, and then I think there was perhaps one

9  additional document, so we are talking about 108 documents in

10  all.

11           There are a couple of points about these documents

12  that were a source of confusion, including some questions about

13  the details in the privilege log and whether the plaintiffs were

14  asserting that these were all subject to the attorney-client

15  privilege or work product protections.  Some of that has been

16  clarified by Mr. Wolman in the letter exchanges here.  I believe

17  it's now clear that the plaintiffs are asserting attorney-client

18  privilege over this entire trove of documents, 108 documents or

19  so.

20           First of all, I guess let me ask you, Mr. Whitney,

21  have there been any further developments that I should be aware

22  of since the parties exchanged these letters about this issue?

23           MR. WHITNEY:  No further discussions between myself

24  and Mr. Wolman.

25           THE COURT:  Okay.

121324                          Conference

1          MR. WHITNEY:  I would say perhaps you consider the

2   development that our argument has evolved seeing Mr. Wolman's

3   response.  So --

4          THE COURT:  Okay.  Well, why don't you tell me about

5   that?

6          MR. WHITNEY:  Well, when Mr. Wolman and I spoke, he

7   seemed to be receptive to the idea of going back to his clients,

8   perhaps revisiting these attorney-client privilege claims or

9   work product claims as they were.  That did not happen, and they

10  have decided to sustain those privilege claims.

11         At the time that we met and conferred, my primary

12  discussion with him was about the fact that Mr. O'Keefe, the

13  defendant here, had access to all of these documents while he

14  was both the chairman of the board or president of the board of

15  Project Veritas and the chief executive officer of Project

16  Veritas up until 2023, and these documents on the privilege log

17  that we provided date back to as early as 2018.

18         It seems to us -- this is the evolution -- that they

19  have waived the attorney-client privilege claims in part by

20  putting the material of the matters at issue, and I have case

21  law to support that concept, and I am sure Your Honor is

22  familiar with it, but many of the documents as I can discern

23  from the privilege log deal with matters that are at issue and

24  at issue because plaintiffs brought this suit, included those

25  issues in their allegations.  So I am happy to walk the Court

1  through those, but I will leave it there for a moment.

2         THE COURT:  Okay.  Well, let me just clarify, then.

3  So you are abandoning the argument that these documents are not

4  privileged at least vis-à-vis Mr. O'Keefe because he had some

5  prior familiarity with the documents in his role as an employee

6  of Project Veritas.  You're abandoning that argument, which

7  seems sensible to me because I don't know what possible legal

8  basis there would be for that argument.

9         MR. WHITNEY:  I wouldn't go as far as saying I am

10  abandoning it, Your Honor, but --

11         THE COURT:  Well, then tell me what your argument is

12  in support of that principle that --

13         MR. WHITNEY:  Your Honor, I --

14         THE COURT:  That Mr. O'Keefe -- no, hold on.  Let me

15  ask the question.  That somehow Mr. O'Keefe is entitled to

16  privileged communications that where the privilege belonged to

17  his former employer, now simply because he is a former employee

18  who in his high level role at Project Veritas had seen these

19  documents.  I don't -- I genuinely don't understand the logic of

20  that argument considering that it's quite clear that the

21  privilege in that situation belongs to the organization, not to

22  Mr. O'Keefe, unless you are telling me that any of those

23  communications were somehow with Mr. O'Keefe in a capacity that

24  was not in his capacity as an employee and chairman and CEO of

25  the organization.

1          MR. WHITNEY:  Thank you, Your Honor.  I didn't mean to

2    interrupt you there.

3          THE COURT:  That's fine.

4          MR. WHITNEY:  I -- I would say the -- it seems to me

5    by looking at the privilege log, that attorney-client privilege

6    could not apply to the 107 documents on Mr. Skakel's production.

7    Some of those -- because many of them are not communications.

8    They are simply documents maintained by Mr. Skakel, and so you

9    will see if you have an opportunity to examine the privilege

10   log, that many of those are not emails or there is not

11   addressees.  There is no attorney copied on those

12   communications.  So it's unclear to me at this point how that

13   could be any privilege other than work product.

14         THE COURT:  Okay.  That's a little bit of a different

15   argument.  That's just an argument as to the viability of the

16   privilege claim and, you know, there may be challenges that

17   could be made to individual documents on that basis.  In other

18   words, just to say, this is not privileged; not that it's not

19   privileged because of Mr. O'Keefe's familiarity with the

20   documents because, again, it seems almost certain that as the

21   chairman and CEO of Project Veritas, Mr. O'Keefe would have been

22   privy to a number of the documents that would be privileged.

23         But if your point is that some of these documents, in

24   your view, just aren't privileged or can't possibly be

25   privileged based on what you know about them, then sure, that's

121324                        Conference

1   a more traditional argument.  And, you know, I am going to

2   encourage you to meet and confer about that at the appropriate

3   time.  I certainly can't rule on any of that here based on the

4   limited information that I have.  But if you were going to say

5   with respect to some of documents, sure, we recognize that those

6   communications because of who is -- who is on those

7   communications or the subject matter of those communications,

8   we'll acknowledge that those are privileged communications, but

9   we want to dispute 20, 30, 50, 80, however many of them, because

10  you don't have enough information to be able to concede that

11  they are privileged, well, that's a different issue.

12          And then of course the waiver point is not one that

13  you have raised, but I certainly am familiar with the concept of

14  the categorical waiver over certain types of things.  Although

15  it's tricky to make that argument not knowing exactly what the

16  documents are about, but -- and that gets to another point you

17  raised about the sufficiency of the privilege log, which we will

18  come to as well as part of the discussion.

19          So I guess what you are saying is, you think that

20  there's been some sort of subject matter waiver over at least

21  some of the documents.  At least some of the documents are not

22  privileged because you don't believe that they could be

23  attorney-client communications or reflective of attorney-client

24  communications, and so you may have a substantive challenge to

25  the assertion of privilege on those documents; but it's not

1   going to be based on the fact that Mr. O'Keefe happened to have

2   been employed there at the time and is now no longer employed

3   there; that you are not really advancing as an argument anymore.

4          MR. WHITNEY:  Correct, Your Honor.

5          THE COURT:  Okay.  All right.  Well, let's pause

6   there.  I mean, can you tell me a little bit more about the

7   waiver argument since that wasn't in your initial submission?

8   And again, we are going to have to have some further -- I will

9   tell you that the outcome of this issue today is going to be

10  that you are going to have to meet and confer about it some

11  more, and we will have some more substantial briefing submitted

12  on the issues.  I often say at initial conferences -- and I

13  probably did in this case, too, because I usually do -- I try to

14  resolve as many disputes as I can on the record at conferences

15  when there are discovery disputes, but sometimes we do need more

16  complete briefing, especially when we are getting into issues of

17  privilege, and this is obviously very much in that category.

18          So tell me about the waiver argument, though, a little

19  bit more while we are talking about it here today, Mr. Whitney.

20          MR. WHITNEY:  Yes, Your Honor.

21          So I'm not sure how familiar Your Honor is with the

22  general factual scenario in this case.

23          THE COURT:  I mean, I am familiar enough, presiding

24  over multiple proceedings and having read the pleadings.  So you

25  don't have to go through it all in chapter and verse, but you

1   might want to point me to specific aspects of the claims and

2   counterclaims that may bear on the waiver question.

3              MR. WHITNEY:  Understood.

4              Your Honor, in examining the first amended complaint,

5   which is at Doc. No. 16, specific allegations that are at issue

6   and are -- or seem to be spoken about in these documents or

7   discussed in these documents, for example, paragraphs 36 where

8   they -- plaintiffs have pled that the board learned of O'Keefe's

9   alleged financial misconduct; paragraph 38, they list specific

10  sort of transgressions of Mr. O'Keefe, including a $10,000

11  (indecipherable) helicopter flight; and five of these examples,

12  concluding with paying for black cars.  In essence, these

13  allegations all deal with the impropriety of Mr. O'Keefe's

14  expenses over the years, and we have testimony now from the

15  president of Project Veritas Action Fund that the financial

16  improprieties stretch back years.

17             In paragraph 40, the plaintiffs have pled that they

18  took immediate action in response to these troubling

19  allegations.  In 41, they created a special audit committee and

20  retained outside counsel to help conduct that investigation.  So

21  they brought their outside counsel here into the investigation,

22  and -- excuse me -- into the matters at issue in the complaint.

23             Paragraph 42, they talk about what specifically

24  happened at the board meeting on February 6th, and they quote

25  from the minutes that he -- that Mr. O'Keefe at the time remains

1  as CEO and member of the board.  I point that out, Your Honor,

2  because they have quoted directly from the board meetings

3  minutes, and you will see on the privilege log that they have

4  withheld board meeting minutes under this, I guess, blanket

5  claim of attorney-client privilege.  Those are directly at

6  issue.

7          THE COURT:  Just let me clarify on that point.  The

8  board meeting minutes were withheld in their entirety?  You

9  don't have a copy of the board meeting minutes at all?  I mean,

10 as opposed to draft minutes, communications about the minutes,

11 et cetera.  I mean, one could imagine a scenario where certain

12 communications or certain versions of the minutes might be

13 privileged even if the final version was not privileged.

14         MR. WOLMAN:  And I would interject if I may, Your

15 Honor.

16         THE COURT:  You will have your chance.  Mr. Wolman,

17 you will have your chance.  Just make a note.  Okay?  I am not

18 going to hear -- I will hear all that you would like to say.  I

19 just want to try to understand Mr. Whitney's position in the

20 first instance.

21         MR. WHITNEY:  Yeah.  We, at the time of filing our

22 counterclaims, had possession of the February 6th and

23 February 10th board meeting minutes, and those are attached to

24 our counterclaim.  So we have those minutes from those two

25 meetings.

1          The meeting minutes that were produced by former board

2   member George Skakel are meeting minutes from 2018 that are

3   described on the privilege log.  In coupling that --

4          THE COURT:  But -- but hold on.  But you just said

5   that the complaint in paragraphs 40, 42, 43 was talking about

6   meetings that took place in, what, 2021?

7          MR. WHITNEY:  Your Honor, I -- I'm sorry.  I think I

8   need -- what I need to point out is that the board, in

9   paragraph 40, they claim they took immediate action in

10  response to the allegations --

11         THE COURT:  When?  When did they take immediate

12  action?  What year?

13         MR. WHITNEY:  Well, they are claiming -- I guess 2023

14  is immediate action.

15         THE COURT:  2023.  That was what I was trying to

16  understand.  I said 2021, but I was mistaken.  2023.  Okay.

17         MR. WHITNEY:  And so if they are alleging that they

18  took immediate action, but in the privilege log there is

19  documents going back as early as 2018 and 2019 that they were

20  looking at his expenditures back then, and there is board

21  meeting minutes from that particularized period, we're -- we

22  should be allowed to challenge that, the allegation that they

23  took immediate action.  This was -- in other words, this was --

24         THE COURT:  Which of course you can.  But the question

25  is:  Are you entitled to -- is that a waiver, a categorical

1 waiver?  Are you saying that there is a categorical waiver of --

2 I understand what you're getting at; that you think that somehow

3 those allegations mean that there is a categorical waiver of all

4 board meeting minutes that may have to do with Mr. O'Keefe's

5 expenses, for example.

6          MR. WHITNEY:  Yes, Your Honor.  And beyond that, the

7 other allegations, but yes, and that's --

8          THE COURT:  And other allegations.  You are not

9 suggesting that because the complaint references board meetings,

10 that that's a subject matter waiver over all board meeting

11 minutes that were ever taken or prepared at Project Veritas; you

12 are trying to suggest that, in particular, there are perhaps

13 topics addressed at board meetings that may be subject to a

14 waiver based on the nature of the allegations.

15          MR. WHITNEY:  Yes.  And when they are quoting directly

16 from board meeting minutes and using those as a sword, they

17 can't claim the privilege as a shield.

18          THE COURT:  And they are quoting directly from board

19 meeting minutes that it sounds like you have, and that's a

20 little bit different than saying they are quoting directly and

21 incorporating into the complaint certain board meeting minutes.

22 I would assume that those have been produced because that would

23 be hard to imagine what the basis would be to withhold those,

24 but what you are turning around and saying is that board meeting

25 minutes from five years earlier also should be produced.  Those

121324                           Conference

1  can't be deemed privileged because of some allegation in the

2  complaint that would constitute a waiver of any protection over

3  those.

4           MR. WHITNEY:  Yes, Your Honor.  It's --

5           THE COURT:  Okay.

6           MR. WHITNEY:  -- prejudicial for us to try to counter

7  the claim that they took immediate action on these financial

8  improprieties when the privilege log indicates there is no

9  documents where there were compliance and audits of the

10 expenditures and perhaps board meetings discussing those

11 reviews.

12          THE COURT:  Okay.  I mean, that doesn't seem like a

13 frivolous argument.  I just -- I'm not -- I don't -- I am not

14 entirely convinced that what you have told me about constitutes

15 a waiver, but that's why you are going to have a chance to brief

16 it further; and before you do, you will have a chance to meet

17 and confer with Mr. Wolman to see if anything you have said is

18 persuasive to him about any of these documents and what should

19 continue to be withheld.  I am just looking at the log now,

20 which is a bit difficult to read in this form.

21          I assume, Mr. Wolman, that when you produced it, you

22 produced it as an Excel file that would be more legible, and to

23 file it with the Court, you had to reduce it into this, you

24 know, eight-point font with condensed columns, which again, is

25 perfectly fine.  I see that kind of thing all the time, but it's

 1  hard for me to know exactly what these things mean or say

 2  because, you know, the file names and the file subject fields in

 3  particular are truncated.  Again, not in any inappropriate way,

 4  but they are just not fully visible to the Court in the form in

 5  which they were submitted.  So, for example, it's hard for me to

 6  see on here anything that refers to board minutes from 2018

 7  other than the fact that it is clear that some of the documents

 8  at issue do date back to 2018.  I just don't see the references

 9  to board minutes.  I am not suggesting that they are not there.

10  I just don't see them.

11          So okay.  Are there other topics that you think have

12  been subject to a waiver or covered by waiver, Mr. Whitney?

13          MR. WHITNEY:  Yes, Your Honor.  And I should mention I

14  have taken an effort in highlighting the minute -- the privilege

15  log here, and I could share a screen if it would be helpful so

16  that you could see.

17          THE COURT:  Sure.  Happy to do that.

18          MR. WHITNEY:  I am not overly familiar with Teams.

19  Are you able to see my Excel spreadsheet here, Your Honor?

20          THE COURT:  No.  I was prepared to be impressed at the

21  screen sharing, but I would not know how to do that, either.

22  Even though I use this platform all the time, that's just not

23  something I am called upon to do very often.  It's okay.  If

24  it's not immediately obvious how to do it, I don't really need

25  to see it.

1          MR. WHITNEY:  My apologies.  I thought I was better

2 than I was.

3          THE COURT:  Okay.

4          MR. WHITNEY:  I know how to do it by Zoom, not Teams.

5 So, Your Honor, I just -- if you could indulge me for a moment.

6          There are approximately eight rows of data times seven

7 rows that deal with JOK expenses.  JOK is the acronym for James

8 O'Keefe.  I would point the Court to those documents.  Those are

9 directly at issue given the allegations in the complaint.

10         The complaint leans heavily on the 2022 employment

11 agreement that Project Veritas had Mr. O'Keefe sign, but at the

12 same time hinges on allegations that stretch back a span of

13 years predating that 2022 employment agreement.  And so within

14 that privilege log you will see multiple rows, 14 and 15, and

15 107 and 108, that purport to be a 2018 employment agreement, and

16 so that would be relevant to his conduct between the years 2018

17 and 2022, which they have brought at issue.

18         Third example --

19         THE COURT:  Again, let me just say about that, in my

20 immediate reaction, which is just to say, you know, this is not

21 definitive.  I am not -- someone with a canine friend joining us

22 for the conference?  I'm not ruling on any of these issues, but

23 one could imagine that the agreement itself would not be

24 privileged because, presumably, a final version of that document

25 is not going to be withheld on the basis of privilege.  But

1  communications about the drafting of the agreement or about the

2  terms of the agreement might still be subject to a privilege.

3  Again, I am not sure, and there are a number of arguments I

4  could imagine being made in either direction about that, but it

5  doesn't seem obvious to me that you are entitled to all

6  communications that might exist about a 2018 document just based

7  on the fact that some of the allegations in the complaint

8  concern things that happened prior to the entry of the 2022

9  employment agreement.

10          Again, this will be some material that you will have

11  to explain to me in greater detail in the submissions, but

12  that's my immediate thought in hearing your point there.

13          MR. WHITNEY:  (Inaudible)

14          THE COURT:  You are muted now, Mr. Whitney.

15          MR. WHITNEY:  Yes, Your Honor.  Of the four rows I

16  identified, only one was communication.  The other three are the

17  employment agreement or drafts thereof.

18          So on that issue, I have three more examples where I

19  believe there is waivers, Your Honor.

20          In Count Seven, the plaintiffs seek indemnification.

21  To the extent that plaintiffs may be subject to investigation

22  and/or action against them on account of actions taken by or the

23  errors on omissions of James O'Keefe, and if you look at rows 87

24  and 90 of the privilege log, you will see that the plaintiffs

25  are proactively communicating with law enforcement.  And so

1 without knowing more, and not having an opportunity to review

2 these documents, it appears that plaintiffs may be bringing law

3 enforcement action on themselves and then seeking

4 indemnification from the defendants for that.

5        THE COURT:  Okay.  That would be unusual, but okay.

6 It's not common that parties seek to invite law enforcement

7 activity directed at them, but fine.  I understand the point.

8 Some of this I think will be subject to some productive

9 hopefully meet-and-confer discussions between counsel, and then

10 we will have some further briefing on it if necessary.

11        If there are a handful of documents that may require

12 *in camera* review, that's a possibility as well, but okay.  So

13 there is one more category I think you mentioned?

14        MR. WHITNEY:  I have two more categories, Your Honor.

15        THE COURT:  Two more categories.  Okay.

16        MR. WHITNEY:  The plaintiffs lean on an audit report

17 produced by Dorsey & Whitney to substantiate their allegations

18 specifically in relation to these 2023 allegations of financial

19 improprieties, et cetera, and the audit and drafts of the audit

20 appear at rows 64, 67 and 80.  In connection, there are multiple

21 legal and compliance reports in rows 24, 37 that would

22 presumably deal with these inappropriate expenditures, but in

23 testimony, the president of Project Veritas Action Fund has

24 leaned on this audit report as substantiation for their claims,

25 and at the same time these documents are being withheld from us.

1           THE COURT:  You don't have the final audit report

2  even?

3           MR. WHITNEY:  We have the final audit report, but

4  there are documents in here that deal with the audit report and

5  do not appear to be communications.

6           THE COURT:  Okay.  I mean, you said that a couple of

7  times now, they don't appear to be communications, but of course

8  there could be documents that are privileged that aren't

9  communications.  I mean, documents that are subject to the

10 attorney-client privilege don't necessarily have to be

11 communications.  I mean, they could be documents that reflect

12 advice of counsel or that were prepared at the direction of

13 counsel or any number of other explanations.

14           So, again, I take the point that it may not be obvious

15 from the log or from the information that you have what the

16 basis for the privilege claim is, and you know, that's why you

17 are going to have to talk to Mr. Wolman some more and get some

18 more information on the log and from his own representations;

19 but, again, let's not get overly attached to the idea that some

20 of the documents are not communications.  That's not dispositive

21 as to whether they are subject to the attorney-client privilege

22 or not.

23           MR. WHITNEY:  Understood.  Then I would just emphasize

24 there that it's difficult to tell what these documents are based

25 on the --

1          THE COURT:  Right.

2          MR. WHITNEY:  -- the detail in the privilege log.

3          THE COURT:  And that I understand.  That's a fair

4  point, and I will take that up with Mr. Wolman in a minute but,

5  you know, the hope would be that once you gather some of that

6  additional information, both with some supplements to the log

7  and do some further individualized discussion with counsel, that

8  you will be able to narrow the scope of what you believe is

9  really in dispute and maybe resolve it entirely, but if not, you

10  will get to a point where there may only be a handful of

11  documents in dispute.  It sounds like you've already tried to

12  narrow it down by focusing on these particular rows that you

13  have identified, which is helpful.  Maybe you are just telling

14  me that those are examples; that you do want to make an argument

15  about all 108 documents.  Again, we will see, and we will see

16  what Mr. Wolman has to say about that.  But okay.  I take the

17  point so far.  And was there one more?

18          MR. WHITNEY:  Your Honor, I realize that I introduced

19  the board meeting minutes earlier, so that kind of concludes the

20  categories of documents I want to discuss.

21          THE COURT:  Okay.  Mr. Wolman, let me turn to you.

22  And, again, we are not going to resolve these issues today, so

23  you don't need to feel the need to address each and every point,

24  but I would like to hear your general response to the idea that

25  there has been any sort of categorical waiver.  If there are

1  particular points that you wanted to raise as to any of the

2  substantive facts identified by Mr. Whitney, you should do that;

3  and I know that there was at least one thing you wanted to say

4  in response that I didn't let you say, so you should certainly

5  work that in as well.  So I will turn it to you.

6          MR. WOLMAN:  Thank you, Your Honor.

7          On that last point, it's now been clarified I wanted

8  to highlight that, yes, the February 2023 minutes were already

9  made public.  That wasn't the issue here.

10         These are documents that were produced by Mr. Skakel,

11 plus one by Mr. Strack at -- in response to the subpoenas.  We

12 hadn't seen them in advance.  So they were produced.  Suddenly

13 had to get a hold of them and try to see, you know, were there

14 any privilege documents that were inadvertently produced that

15 otherwise these individuals had had because of their roles with

16 Project Veritas and Project Veritas Action Fund.

17         And with respect to 2018 board minutes, you know, I

18 should note that Mr. O'Keefe was on the board then and voted in

19 favor of where these were privileged.  A lot of these minutes

20 note specifically on them, you know, that they contained

21 privileged and confidential information.  So it's not like we

22 are issuing a blanket, you know, claim of privilege over all

23 prior minutes, but only the ones that on their face that

24 Mr. O'Keefe seemed to approve of were attorney-client privileged

25 or reflective of attorney-client privileged communications,

1  rather.

2          THE COURT:  But I mean, that often happens when we are

3  talking about board minutes in particular is that portions of

4  them are privileged because of the nature of the discussions

5  that are reflected there.  I think I have seen in many different

6  instances, both as an attorney and as a judge, documents that

7  are voted or marked as privileged in a sort of overinclusive way

8  because generally, until there is litigation, there is no real

9  need to try to parse it paragraph by paragraph as to what is or

10  isn't privileged.

11          So, you know, the markings on the document itself

12  won't be the only factor to consider.  For that reason, among

13  others, especially because Mr. Whitney is claiming and intends

14  to argue that there's been some sort of waiver.  That wouldn't

15  necessarily mean that there is a waiver, if I were to agree with

16  that analysis, of the contents of the entire document, but

17  perhaps there is a paragraph in those minutes that covers some

18  issue that has been alleged in the complaint.  I am not sure

19  that that's necessarily going to be the case, but, you know, the

20  fact that the documents may say that they are privileged on them

21  doesn't necessarily mean that they will be considered

22  privileged, whether or not Mr. O'Keefe had a role in approving

23  that designation.

24          MR. WOLMAN:  I should note that, you know, to the

25  extent they are trying to argue that the board in 2018 knew of

1  his financial improprieties, you know, he is free to argue that.

2  He hasn't yet, and if we are, you know, somehow then not able to

3  rebut that by showing that the minutes don't reflect that,

4  that's a different -- you know, then that's our problem, I

5  should note, but I am happy to try to go back and see, you know,

6  what might not be privileged and maybe do some form of redacted

7  production.  However, this was, you know, third-party documents,

8  and I had to make sure that Mr. Whitney set them aside.

9        THE COURT:  To be clear, Mr. Wolman, I am not faulting

10 you for the way you handled it.  It sounds like you did what you

11 needed to do, and that's fine.  There is -- sometimes we have to

12 take steps that are overinclusive just out of an abundance of

13 caution, and I am not suggesting that you did anything wrong.

14 It's just a matter of now figuring out if there is anything

15 further on closer inspection that may be subject to release and

16 working through those issues.

17        Again, we will see what happens, but I just point out

18 that, you know, if the point is that -- from Mr. Whitney that

19 the board was aware of Mr. O'Keefe's alleged spending practices

20 back in 2018, and that's somehow reflected in the board minutes,

21 that may be a point that is valid.  Again, I am not making any

22 final determination on that, but there may be a valid argument

23 there that that's certainly relevant to the issues in this case;

24 relevant to the defenses that are available, and maybe that

25 isn't really privileged because just because something is

1 discussed at a board meeting doesn't mean it's automatically

2 privileged.  Depends on the nature of what's reflected in those

3 minutes.  You know, the presence of a lawyer at a board meeting

4 doesn't mean that the minutes are automatically subject to

5 withholding when there is litigation that may implicate some of

6 that factual material.

7        So I understand how we have gotten here, and I think

8 there is just going to need to be a refined discussion.  I

9 appreciate that Mr. Whitney has gone through and tried to

10 identify the certain particular items on the log that he has

11 concerns about and, you know, you will talk about that further.

12        All right.  Mr. Wolman, back to you.

13        MR. WOLMAN:  Thank you.  Thank you, Your Honor.  I

14 mean, coming here today the only issue I knew about was

15 Mr. O'Keefe's claim of access based on his prior role, which now

16 does not seem to be the claim.  So none of these were anything I

17 was prepared to deal with, and don't know specifically which

18 documents Mr. Whitney is referring to.

19        THE COURT:  That's fine.

20        MR. WOLMAN:  You know, we have, you know, a discussion

21 of drafts of contracts of prior years.  As I recall from my

22 review, yes, they are drafts.  They reflect, you know, attorney-

23 client -- you know, the advice of counsel.

24        THE COURT:  And that's often the case.  I mean, if a

25 final document has been produced, it's very often the case that

1  drafts can be withheld because they do reflect the advice of

2  counsel.  I mean, the final version usually is something that is

3  subject to production, especially if it's a contract with a

4  counterparty.  It's hard to imagine what the privileged claim is

5  over the final version, but I could certainly understand why

6  there would be an argument that the drafts are privileged even

7  if the final version isn't, you know, unless there were some

8  sort of particular allegation about the process involved in

9  coming to those agreements.

10        But in any case, I'm not expecting you to sort of

11  address this all on the fly, Mr. Wolman, because as I have said

12  now multiple times, I am not ruling on these issues based on

13  today's arguments.  We are going to have to have a process here.

14  We will give you a chance to try to work through as many of

15  these things as you can, and whatever can't be worked out, you

16  will have to submit some more detailed briefing on.

17        Let's go to -- the privilege log itself, though,

18  excuse me.  You know, I take your point, Mr. Wolman, that you

19  believe that the documents were sufficiently described pursuant

20  to Rule 26(b)(5)(A)(ii).  The local civil rules in our District

21  or the joint local civil rules of the Southern and Eastern

22  Districts of New York, I think are designed to require a little

23  bit more than what is required by the federal rules.  So if you

24  look at Local Civil Rule 26.2(a)(2), the rule says that

25  documents for which there is a claim of privilege must contain

1  an explanation that includes the type of document, letter,

2  email, memorandum, et cetera, the general subject matter of the

3  document, and then the date, the author, the addressees, other

4  recipients, et cetera.

5          That general subject matter of the document term,

6  though, is where I think some of the entries on this privilege

7  log may not have enough for purposes of compliance with the

8  local civil rule.  It may be that the combination of the subject

9  field and the field next to the subject file title may in

10 certain instances be sufficient to communicate what the nature

11 of the document is, but there are quite a few documents where

12 there is no title or subject provided.  All you have is

13 something that reflects that something is an attachment or an

14 e-doc, whatever that means, or you know, an email.  I mean,

15 emails tend to have a subject line, but in any event, I do think

16 that it's fair for the defendants to ask here for some

17 additional information.

18         Again, the general subject matter of the document,

19 that's the language of Local Civil Rule 26.2(a)(2)(A), and I

20 think this is lacking here.  You know, in the interest of time

21 and efficiency, it may be, Mr. Whitney, that you don't insist on

22 that type of general subject matter recitation for all 108

23 documents, right, because again, some of these you may be

24 willing to concede that the assertion of privilege seems valid;

25 but to the extent you are not willing to concede that because

1 either:  A, you don't think you have enough information; or B,

2 you don't think that based on what you do know, there is a

3 privilege, you know, those are the ones, Mr. Wolman, where I

4 think providing the more complete recitation of the general

5 subject matter -- and, again, general subject matter doesn't

6 need to be paragraph line description.  It can really just be,

7 you know, a phrase or a sentence that explains generally what's

8 covered in those documents.  But, you know, at least for the

9 ones that are going to continue to be in dispute, I do think

10 that further language is going to be necessary.

11       MR. WOLMAN:  Your Honor, I am happy to supplement

12 where the ones Mr. Whitney isn't able to ascertain what they

13 are.

14       THE COURT:  Fine.  And again, it may be -- that's --

15 let's go from there, and again, there is going to need to be

16 some meeting and conferring to try to narrow the issues in

17 dispute, and I will order the plaintiffs to provide supplemental

18 information in a privilege log, but the exact nature of that

19 information I'm not going to specify here because I do want you

20 to talk to each other about it and see if it can be a little bit

21 more narrowly tailored as opposed to Mr. Wolman going back and

22 supplementing for all 108 documents.  If it turns out that that

23 can't be done, if they can't be narrowed, then, Mr. Wolman, you

24 may wind up having to provide a general subject matter

25 description for everything; but hopefully, again, in the course

1  of trying to figure out where the actual fault lines are, there

2  can be an efficiency and you can focus on the issues or the

3  documents that are really in dispute.

4          MR. WOLMAN:  Thank you, Your Honor.

5          I just want to briefly also note with respect to Count

6  Seven indemnification, I don't believe my clients invited any

7  form of investigation, and certainly any communications that

8  aren't otherwise, you know, prohibited from being disclosed to

9  the extent they even have any, that discuss that sort of thing

10 with, you know, the Westchester DA, for example, you know, that

11 wouldn't be privileged.  That's the internal deliberations.

12         THE COURT:  Not if you are communicating with the

13 Westchester DA, certainly not.

14         MR. WOLMAN:  Right.  And similarly, you know, with

15 respect to the Dorsey audit report, you know, the report itself

16 they have.  You know, that was somehow made public.  I am not

17 exactly sure of the circumstances of how that became public, but

18 it was made public.  But, you know, everything leading up to

19 that isn't, you know, really the good subject for discovery

20 here.  Yes, it's about Mr. O'Keefe; but it was -- they were

21 privileged communications with Dorsey Whitney, and while we say

22 what the findings were, we are not leaning on it.  You know, we

23 were able to independently substantiate those findings without

24 relying on what was in the Dorsey report.  The Dorsey report is

25 just a nice summary; and it's -- you know, it was well written.

1 And I am concerned also just that Mr. Whitney has been, you

2 know, relating what Mr. Barton may have testified to at his

3 deposition, which while we are here also to discuss the

4 confidentiality, you know, the designation is it's still

5 designated unless and until that designation is lifted.  And so

6 even if it's ultimately lifted, I am very concerned about

7 mishandling of confidential information by Mr. Whitney here.

8              THE COURT:  Okay.  Well, first of all, I didn't even

9 understand that that's what he was referring to.  You would have

10 to be a pretty -- a pretty good detective to know exactly what

11 he was referring to, but, you know, now you have clarified, I

12 guess, that that is what he was referring to.

13              So certainly if it has been designated as

14 confidential, then that material should be treated with the

15 appropriate sensitivity.  Although, again, disclosing that

16 information to me is not going to be a violation of any

17 confidentiality order.  I mean, we are in a public proceeding

18 even if nobody else is here, so we should be mindful of those

19 confidentiality protections and try to talk about it a little

20 bit -- in a little bit more of a circumspect way, especially

21 since we are going to get to that issue in a moment.

22              All right.  Where we are here is clearly that more

23 work needs to be done to figure out what is actually in dispute.

24              Mr. Wolman, was there anything else you wanted to add

25 before I chart a course here for the next steps on this?

1          MR. WOLMAN:  No, Your Honor.

2          THE COURT:  Okay.  So you guys are going to need to

3  meet and confer about this.  I think that's going to take a

4  little bit of time, but I do want to move that along as

5  efficiently as possible.  It's not a huge volume of documents,

6  so hopefully we can figure out where the actual disputes are.

7          If there is anything that can be produced or anything

8  where the defendants will accept the privilege claims, you know,

9  we should figure that out relatively quickly.

10         So I would like you to meet and confer at some point,

11 as many times as it takes between now and the end of next week.

12 So a week from today, that's December 20th, so we can at least

13 finish that up before the holiday season is upon us.  And I

14 would like an update on how many documents are still in dispute,

15 how many privileged documents you believe are documents for

16 which the plaintiffs have claimed privilege may not be

17 appropriately designated in that way, Mr. Whitney.  So I would

18 like you to send me a letter by December 23rd.  You don't need

19 to make your arguments.  I really just want to know how many

20 documents you believe are still in dispute after you meet and

21 confer; figure out a little bit more about the documents, and

22 then we can set a briefing schedule from there based on the

23 scope of what's remaining.  I am not going to make you brief it

24 right in the midst of Christmas and New Year's.  Again,

25 hopefully, you were planning to take a little bit of time away

1  from this case and others at the end of the year here, but we

2  will set a reasonable schedule for those issues to be presented

3  in January, and then we will try to turn around a decision on

4  that as quickly as possible to the extent necessary if you are

5  not able to work out the various issues that we have covered.

6          So meet and confer by no later than next Friday, and

7  don't leave until next Friday because I imagine this may be a

8  multi-step process, and then on December 23rd, Mr. Whitney, you

9  will tell me how many documents are still outstanding in terms

10  of your demand for production or challenges to the privilege

11  claims, and then we will set a schedule from there for further

12  submissions.

13          Okay.  The next issue has to do with the designation

14  of the deposition transcript of Mr. Barton as confidential.  The

15  main basis that seems to have been articulated here, Mr. Wolman,

16  is that the witness has faced death threats.  I understand there

17  is some back-and-forth about how that's come to be, and various

18  people have been outspoken on social media platforms about this

19  case and about their relationships.  I do certainly take

20  seriously any threats to the witness's safety and security, but

21  that's -- in and of itself it's not a basis to withhold the

22  entire transcript as confidential.  That's not one of the

23  reasons that was provided for in the protective order.

24  Certainly, if there is personal identifying information about

25  the witness such as his telephone number or home address or

1 things like that, I can't imagine why anybody would want to see

2 that information made public.  But the only thing that you say

3 about a basis for withholding that actually is grounded in the

4 protective order is that the designation was properly made

5 because it is "otherwise sensitive non-public information."  I'm

6 not sure I understand that.  You don't really get into what it

7 is that is supposedly sensitive and non-public about the

8 testimony.

9           So can you give me a little bit more context for that,

10 Mr. Wolman?

11           MR. WOLMAN:  Yes, Your Honor.  Be happy to.

12           Depositions, unlike in-court proceedings, are not

13 generally open to the public.  We don't invite the public into

14 them.  The only people with a presumptive right to attend are

15 parties.  I have seen in numerous cases where, you know, judges

16 are not happy when parties even start publishing copies of

17 deposition transcripts as part of, you know, updating the public

18 on a case, let alone the videos.  There is nothing, you know,

19 presumptively public about them.  These are private proceedings.

20 So, you know --

21           THE COURT:  But that -- that's not exactly right,

22 though, Mr. Wolman, because if that were true, then we wouldn't

23 need a protective order for a designation of deposition

24 testimony as confidential.  I mean --

25           MR. WOLMAN:  I understand.

1          THE COURT:  -- the deposition transcript is not

2  presumptively confidential.

3          MR. WOLMAN:  I am not saying it's presumptively

4  confidential, but it's presumptively private, and here the fact

5  that Mr. Barton --

6          THE COURT:  That's more by custom than by rule.

7          MR. WOLMAN:  True.  But I've seen judicial decisions,

8  you know, not happy with the publication, I would say.

9          THE COURT:  I am sure that's true, but --

10         MR. WOLMAN:  So, you know, it depends on the judge, I

11  would unfortunately have to say.

12         THE COURT:  Well, but that's all the more reason that

13  my point is correct, which is that there is no rule that

14  provides for deposition testimony to be treated as confidential.

15  So is what you're saying -- this is actually how I read your

16  letter in the first place, but then I concluded that I must have

17  not been reading it correctly, but it sounds like maybe I am

18  reading it correctly.

19         Are you saying that the testimony is otherwise

20  sensitive non-public information because it's deposition

21  testimony, and deposition testimony is not typically made

22  public?

23         MR. WOLMAN:  It's non-public, correct, and

24  Mr. Barton's specifically is sensitive because of the threats

25  he's received.

 1          THE COURT:  Okay.  That's not a very persuasive
 2  argument, Mr. Wolman, because if Mr. Barton said things in the
 3  deposition that are so inflammatory and incendiary that that is
 4  going to make him subject to some sort of threat, I mean, I am
 5  not sure what to say about that, but I don't -- you are going to
 6  have to provide me with some more compelling legal argument for
 7  why that falls within the ambit of the protective order in this
 8  case; that to say that his testimony as a whole needs to be
 9  withheld from potential public dissemination because of
10  potential threats to him, I mean, again, I'm sensitive to that
11  as a practical matter, but I don't see the legal basis for that
12  argument.  I really don't.
13          I mean, are you suggesting, for example, if there were
14  to be a summary judgment motion in this case, that excerpts of
15  the summary judgment -- excerpts of the deposition provided
16  either in support of or in opposition to a summary judgment
17  motion would have to be filed under seal?
18          MR. WOLMAN:  Probably not.  Depends on the portions,
19  certainly.  But just, you know, as a precautionary matter, you
20  know, especially given, you know, a history of publication of
21  deposition videos and transcripts, you know, we're being
22  specifically sensitive to Mr. Barton's.  You know, we're not
23  declaring everybody's confidential by any stretch.
24          THE COURT:  I mean, you made some reference here to
25  you interpreted the plaintiffs' -- excuse me -- the defendants'

1  letter as there being no dispute that the video itself should be

2  kept confidential, only the transcript.  Is that your position,

3  Mr. Whitney?  Because I didn't see that stated clearly in your

4  letter.  I mean, if that is your position, then so be it, but --

5           MR. WHITNEY:  No, Your Honor.  That's not our

6  position.  I think that was just interpretation because we used

7  the term "transcript" in our letter.

8           THE COURT:  Okay.  But that's what I thought also.

9           Mr. Wolman, I am going to give you an opportunity to

10 try to make line-by-line designations as you suggested you

11 would.  And, you know, meet and confer about those to the extent

12 necessary.  I really would strongly prefer not to be conducting

13 a line-by-line review of the deposition testimony to figure out

14 what should and shouldn't be designated as confidential under

15 the protective order, but I will do that if I have absolutely

16 have to.  It's just that the designations are going to have to

17 have the grounding in one of the categories in the protective

18 order for what constitutes a basis for withholding and, you

19 know, the general practice of not publishing deposition

20 testimony because it's a court proceeding that is not all taking

21 place in the public domain is not a legal argument.

22          MR. WOLMAN:  I understand.

23          (Cross-talk)

24          MR. WOLMAN:  I understand.  I wanted to make it clear

25 it's the fact that it's, you know, generally -- because it's not

1 in the public domain, it's generally non-public.  So that was

2 the first question.

3           So then the next question becomes:  Is it highly

4 sensitive or is it sensitive?  And here, Mr. Barton -- that

5 testimony is sensitive because of the threats he received.  So

6 that's how we get there.

7           THE COURT:  Okay.  I mean, if you are not able to --

8           MR. WOLMAN:  But if the Court --

9           THE COURT:  If you're unable to reach some sort of

10 agreement as to what is --

11           MR. WOLMAN:  If the Court wishes for us to go line by

12 line, you know, then we can.

13           THE COURT:  Yeah.  I think you are going to have to do

14 that and be judicious about it, and, again, I'm hopeful that

15 there can be some meeting of the minds as to what should or

16 shouldn't be made a part of the public domain in this case

17 potentially, but we will take that up as it comes.

18           So why don't you provide a line-by-line proposal,

19 Mr. Wolman, of the transcript?  I will give you two weeks to do

20 that.  I guess I will give you three weeks to do it so you are

21 not necessarily having to do it right after Christmas.  So you

22 will provide a proposed redacted version of the transcript, and

23 when I say "the transcript," I am going to refer to both the

24 video and the written transcript.  So there may be a need to

25 edit the video to reflect what is and isn't subject to

1  appropriate confidentiality designations, but we can do that on

2  paper first.  You don't need to provide a proposal that has both

3  the paper and the video because if there is going to be a

4  dispute about what is and isn't appropriate to withhold, we

5  shouldn't start creating new versions of the video until there

6  is a final agreed-upon or court-ordered scope of what can and

7  can't be public.  All right?

8           So we will start off just by doing this using the

9  paper written transcript and make appropriate adjustments to the

10  video as needed at the very end.  So by January 3rd, Mr. Wolman,

11  you will provide a draft proposal of testimony to be withheld

12  pursuant to the protective order.

13           MR. WOLMAN:  Yes, Your Honor.

14           THE COURT:  Okay.  I mean, listen, this is another one

15  of those examples which come up in litigation all the time that

16  the parties should think about a path here that is going to be

17  workable and agreeable for everybody.  Because I imagine,

18  Mr. Whitney, if you and your clients intend to do something with

19  public publication of any aspects of the deposition testimony in

20  this case, you can expect reciprocal treatment of deposition

21  testimony of your clients or witnesses favorable to your clients

22  in this case.

23           I don't think that it's really in the interests of the

24  parties, or certainly the Court, to be trying to litigate this

25  via Twitter or X.  That doesn't really seem like it's going to

 1  be productive, either for the witnesses themselves or for the

 2  parties.  So, again, I encourage everybody to be thoughtful

 3  about this and recognize that what comes around goes around,

 4  frankly, and I hope that we can all be sensible and appropriate

 5  about this.  And listen, I do take seriously, as I said, threats

 6  to witness safety.  I don't fully appreciate or understand

 7  exactly why Mr. Barton has been subjected to threats here other

 8  than to say, you know, passions seem to run high when it comes

 9  to some of the participants in this litigation, and that's going

10  to continue to be true as we move through the case.

11          So, again, let's all be thoughtful about that and

12  figure out how best to get to a solution that's going to be

13  workable, not only in this particular example, but more broadly.

14  And again, if we can't get to an agreement, that may be another

15  issue that needs to be presented to me for review and

16  consideration, and I will take that up if necessary.

17          The next issue seems to be the motion for alternative

18  service.  We are also -- we are also going to have to talk about

19  discovery extension, which the parties seem to be in agreement

20  on, but let's talk about the motion for alternative service and

21  efforts to serve -- is it Tyrmand?  Is that how we pronounce the

22  witness's name?

23          MR. WHITNEY:  I say Tyrmand, Your Honor, but I am

24  not --

25          THE COURT:  Tyrmand.  Okay.

1            MR. WHITNEY:  I am not an expert.

2            MR. WOLMAN:  I say it the same way as Mr. Whitney.

3            THE COURT:  All right.  Well, then we will go with

4    that.  You know the man, right?  Mr. Tyrmand.

5            MR. WHITNEY:  I've never met the guy.  I've never met

6    the man, but it's I think how I kind of heard it.

7            THE COURT:  You know people who know him, I guess,

8    which is more than I can say.  I think.

9            All right.  So Mr. Tyrmand, let's talk about the

10   application.  On its face, it seems as though there have been

11   substantial efforts to serve Mr. Tyrmand.  Do you get the sense

12   that he is deliberately avoiding service or you just haven't

13   been able to find him or it's something else?

14           MR. WHITNEY:  Your Honor, I get partial reports back

15   from the process server through my paralegal, but I understand

16   on an occasion or more than one occasion the process server has

17   been at the door and heard voices inside of the apartment where

18   he resides, and no answer.  So whether that's evasion of

19   service, it's difficult for me to say.

20           THE COURT:  Sure.

21           MR. WHITNEY:  So --

22           THE COURT:  Okay.  That's fair.  And then there does

23   seem to be, as Mr. Wolman pointed out in his letter, there does

24   seem to be a little bit of a -- hopefully it's a typo, although

25   I am not sure it even matters.  In one of the affidavits from

 1  the process server it indicates that attempts to serve a

 2  subpoena in the name of an individual named Barry Hinckley?  Is

 3  that somebody that's even affiliated with this case or is that

 4  someone just --

 5          MR. WHITNEY:  It is, Your Honor.

 6          THE COURT:  Okay.

 7          MR. WHITNEY:  And perhaps it's an inclusion by our

 8  office.  He is a separate witness we have been trying to get

 9  service of.

10          THE COURT:  I see.  Okay.  And it's not just an issue

11  with your office, though.  It's actually an issue with the

12  affidavit of non-service prepared by Mr. Pinto of Gleason

13  Investigations.  It says, "I, Henry Pinto, depose and say" that

14  he was not able to serve a subpoena to testify to Barry

15  Hinckley, "for the reason that I failed to find Matthew

16  Tyrmand."  I don't know how they get those two locations.

17          MR. WHITNEY:  All right.

18          THE COURT:  That's the problem.  Although I am not

19  sure that it matters.  I mean, if he had -- if Mr. Pinto, the

20  process server, had been able to serve Mr. Tyrmand, and he

21  served him with a deposition subpoena for Mr. Hinckley, well,

22  that would be a problem in terms of enforcement of the subpoena,

23  for sure, but since he wasn't actually able to serve him, I am

24  not sure that it really matters that he may or may not have had

25  the wrong document, especially because it may just be that

1  that's a copy-and-paste error on the part of the process server

2  in preparing the document.  I appreciate you flagging it,

3  Mr. Wolman, but in terms of what happened here, you know, the

4  process server was not able to serve anything, whatever he was

5  trying to serve on Mr. Tyrmand despite multiple attempts on

6  multiple different days at multiple locations.

7           So that -- that seems to provide a reasonably solid

8  basis for approving a motion for alternative service.

9           I will note that, at least at the New York location

10 where Mr. Tyrmand allegedly resides, the process server seems to

11 have said that he attempted to serve Mr. Tyrmand.  It's a little

12 difficult to read, but it seems to say -- and this is ECF

13 No. 101-2 at page 3 -- it seems to say that the person sought

14 doesn't live there, and is unknown to the tenant.

15          Am I reading that correctly, Mr. Whitney, as far as

16 you understand?

17          MR. WHITNEY:  Your Honor, I'm trying to pull it up.  I

18 am not -- I'm not familiar, so I don't have any answer for you.

19          THE COURT:  Okay.  Well, that address then, I mean,

20 the New York address doesn't seem to be -- at least if I am

21 reading that correctly, which I believe I am -- that doesn't

22 seem to be a particularly compelling argument for that service

23 having been even potentially effected if the only information

24 that we have about that apartment is that Mr. Tyrmand doesn't

25 live there and is unknown to the tenant.  I'm not sure where

1  that New York address came from.  Do you know?

2          MR. WHITNEY:  The New York address, Your Honor, I

3  think came through a search on Westlaw Service as to where he

4  might have resided recently.  I think my understanding is he

5  splits his time between New York and Miami.

6          THE COURT:  Okay.  But the Miami address was provided

7  by Mr. Wolman, right?

8          MR. WHITNEY:  It was, Your Honor.  And I think the New

9  York address was where we attempted to effect service before the

10  interrogatories were answered and the Miami address was

11  provided.

12          THE COURT:  Okay.  Well, that may be.  November 12th

13  is the date there.  I am not sure that tracks with the timing of

14  the affidavits, but in any event, so certainly efforts have been

15  made at serving Mr. Tyrmand in Miami.

16          The -- the idea of serving Mr. Tyrmand on X, I -- I

17  have never authorized that before, although it's been done, I

18  think.  I will note that in your motion, Mr. Whitney, you

19  included a number of screen shots.  I think in order to support

20  that portion of the application, you really should submit a

21  declaration, either from yourself or somebody else with

22  knowledge, attesting to the fact that these screen shots were

23  taken whenever they were taken, and they represent what you were

24  able to observe on, you know, a public X account or on a private

25  X account, whatever it may be, if they were direct messages.  I

1 am not an X expert, but I understand some information might be

2 available on the public-facing version.  Some might be direct

3 communications if people are tagged there.

4          But in any event, the representation just in a

5 memorandum of law is not really evidence, and so I will ask that

6 you submit an affidavit attesting to that piece of the factual

7 picture.  Okay?

8          MR. WHITNEY:  Yes, Your Honor.

9          THE COURT:  And that should be achievable within a

10 week.  So why don't you get that affidavit submitted by

11 December 20th?

12          I take your position to be, Mr. Wolman, that you don't

13 oppose granting the motion for alternative service, but you are

14 not conceding that Mr. Tyrmand is a relevant witness or that he

15 has any bearing on this case whatsoever.  You are not waiving

16 any defenses; you are not accepting any representations about

17 anything, you are just -- you are neutral basically as to that?

18          MR. WOLMAN:  Yes.  We are not --

19          THE COURT:  You are probably less than neutral.  You

20 actually have particular views as to Mr. Tyrmand, but whatever

21 those views are, you are just reserving your rights, and you

22 will take those up at the appropriate time.  You are not trying

23 to stand in the way of these alternative methods of service?

24          MR. WOLMAN:  Correct.  We are not saying he -- they

25 can't depose Mr. Tyrmand or shouldn't be able to get this type

1  of alternative service if it's appropriate.

2            THE COURT:  Okay.  Fair enough.  I appreciate that.

3            So I think I am likely to grant the application for

4  alternative service.  I will just also note we have had several

5  of these applications floating around at this moment in

6  different cases, and so I am just trying to remember.  Was there

7  also an effort to serve Mr. Tyrmand by email?  There was, right?

8            MR. WHITNEY:  There was, Your Honor.

9            THE COURT:  There was not?

10           MR. WHITNEY:  There was.

11           THE COURT:  There was.  And did you -- I'm looking

12 back at the papers here about the email attempts.  Just give me

13 one second.

14           MR. WHITNEY:  I can tell you right now.

15           THE COURT:  I jumbled them all up now on my desk, so

16 just give me one second.

17           MR. WHITNEY:  Sure.

18           (Pause)

19           THE COURT:  Right.  So you emailed Mr. Tyrmand a copy

20 of the subpoena on November 28th and asked Mr. Tyrmand to accept

21 service.  But, again, that's something you told me in your

22 memorandum of law.  I don't think you provided any documentation

23 of that, and I don't think that is part of any sort of sworn

24 declaration or affidavit.  I mean, you put it in the motion

25 paper, I believe, at ECF No. 101.  So --

1          MR. WHITNEY:  Your Honor, if I can interrupt you?

2          THE COURT:  Please.

3          MR. WHITNEY:  You are correct I did not provide a

4    declaration, but the email itself was attached to the motion at

5    Doc 101-5.

6          THE COURT:  Ah.  Thank you for that.

7          Oh, yes.  I did see this.  Okay.  And again, since you

8    are going to be doing a declaration or an affidavit anyway, I

9    would just like you to again make that representation in the

10   declaration.  I mean, you don't need to reserve the -- or

11   reattach the document.  You can just refer to 101-5 since it's

12   already on the docket, but you can just attest to, you know,

13   this is what it purports to be, which is what you did in the

14   motion; but, again, that's not really evidence because it's not

15   a sworn statement, and that will just be something to rely on,

16   and I know that it may seem like a belt-and-suspenders or overly

17   formal way of trying to cover that point, but my concern always

18   when approving a motion for alternative service is that there

19   may be some challenge to that at some point; and so I want to

20   make sure that we have that as buttoned up as possible and that

21   I have a basis to rely on those assertions.  I have no reason to

22   doubt that that email is what you say that it is, Mr. Whitney,

23   but as a pure legal matter, it should be reflected in a

24   declaration that it can rely on under the penalty of perjury.

25   Okay?

 1          MR. WHITNEY:  Yes, Your Honor.  Appreciate the Court
 2  (indecipherable) protecting us.
 3          THE COURT:  All right.  Just save us all a bunch of
 4  headaches down the line.
 5          So again, I am likely to grant that application based
 6  on the representations that have been made so far and the
 7  efforts that have been undertaken.  I mean, obviously, it's
 8  interesting that I did not -- I will confess, did not go and
 9  listen to those podcast episodes, but it's interesting that the
10  witnesses is saying that he's prepared to sit for a deposition.
11  Well, I guess we will see if that's really true when he is
12  served.  It's always different to say things and have to comply
13  with court orders.  Those are two different categories of
14  behavior.
15          So, anyway, you will submit that declaration by next
16  Friday, and again, we will try to get that turned around as
17  quickly as we can.
18          MR. WHITNEY:  Thank you, Your Honor.
19          THE COURT:  All right.  I think the next issue for us
20  to turn to is the discovery schedule, but are there any other
21  discovery disputes that I am forgetting at the moment,
22  Mr. Whitney?
23          MR. WHITNEY:  Not from the defendants' side.
24          THE COURT:  Okay.  Mr. Wolman?
25          MR. WOLMAN:  Not at this time, Your Honor.

121324                         Conference

1          THE COURT:  Okay.  So let's turn to the schedule.

2          Right now, the current case management plan -- sorry.

3   Now I am just -- current case management plan calls for all fact

4   discovery to be complete by March 14th with depositions to be

5   completed by February 14th, and the schedule says that the

6   preservation of expert discovery is TBD.  Although, again, I

7   will note that per Judge Seibel's standard form case management

8   plan, you do need to propose an expert discovery schedule

9   21 days before the fact discovery deadline.

10         Since the case is referred to me now, you can propose

11  that schedule to me or just let me know that there is not going

12  to be any expert discovery when we get to that, but the main

13  deadlines that we need to focus on here are the deadline for

14  depositions and the deadline for completion of all fact

15  discovery.

16         There are a number of references to different

17  depositions here.  Can you give me a sense, Mr. Wolman, from

18  your perspective what depositions are outstanding?  From the

19  plaintiffs' side, depositions you intend to take, and I will ask

20  Mr. Whitney the same question.

21         MR. WOLMAN:  We intend to take Mr. O'Keefe's

22  deposition, certainly.

23         THE COURT:  Obviously.

24         MR. WOLMAN:  We intend to take a deposition of the

25  corporate representative of OMG.  We intend to depose

1   Mr. Maxwell.

2            THE COURT:  Which may be Mr. O'Keefe, right?

3            MR. WOLMAN:  Yes.

4            THE COURT:  Right.

5            MR. WOLMAN:  But they are separate depositions.

6            THE COURT:  Totally.  And maybe you do that in a

7   two-day period because you have different questions for

8   Mr. O'Keefe in his individual capacity and in his corporate

9   representative capacity, but just maybe for efficiency that you

10  can do that in one consecutive block of time.  I mean, that's

11  generally more efficient for the lawyers and for the witnesses,

12  but okay.

13           It will be up to OMG to designate who the relevant

14  witnesses are going to be, so you will need to serve a 30(b)(6)

15  notice, right, Mr. Wolman, with a list of topics so that OMG can

16  determine who the appropriate witness should be, or witnesses?

17           MR. WOLMAN:  Sure.  Witness or witnesses, yes.

18  Exactly.  Not my first rodeo doing that.

19           THE COURT:  I am sure.  You would be surprised,

20  actually.  It's amazing how often lawyers intend to take

21  Rule 30(b)(6) depositions and don't think to serve a notice with

22  the topics, which -- and then it leads to a lot of confusion and

23  upset before me about what the witness should or shouldn't have

24  been prepared to testify about.  Well, you didn't tell them, the

25  corporation, what you wanted them to testify about.  So they

1  just guessed, so instead of that, make sure you serve the

2  appropriate notice.

3          MR. WOLMAN:  Yes.  The -- or also if -- I know

4  Mr. Whitney is planning to serve them, so the same Mr. O'Hara

5  and Mr. Hinckley would otherwise be on our lists.  You know, I

6  know Mr. Whitney has been, you know, moving forward on that

7  front and felt no need to cross-subpoena them.

8          THE COURT:  Those are nonparty witnesses, O'Hara and

9  Hinckley?

10         MR. WOLMAN:  Yes.

11         THE COURT:  I mean, it's fine to not cross-subpoena

12 them just so that you don't have to go through the additional

13 expense and headache of that, but I would just make sure that,

14 you know, this is another thing that sometimes percolates up to

15 the Court with disputes.  There is one party that served the

16 subpoena.  If the understanding and expectation is that both

17 sides are going to want to question the witness, you should talk

18 to each other and make sure you have a division of time worked

19 out in advance because I have seen in cases where the attorneys

20 have not gotten along with one another, that the party that's

21 issued the subpoena says, well, we issued the subpoena.  We are

22 entitled to seven hours of the witness's time.  I mean, okay,

23 but that's generally not a good way to think about it.  If you

24 know that you are both going to want to depose the witness, you

25 should figure out how you are going to divide the time in

 1  advance so that the witness is not inconvenienced, and you don't

 2  create problems for yourselves down the road.

 3          Okay.  So Mr. O'Keefe, a 30(b)(6) representative or

 4  representatives, and then the non-party witnesses O'Hara and

 5  Hinckley.  And, again, I am not going to forbid you from adding

 6  to that list, Mr. Wolman.  This is really just based on what we

 7  know now and our best guess as to the witnesses we are going to

 8  need, but is there anybody else that you are thinking you are

 9  going to need at this point?

10          MR. WOLMAN:  Not -- right now, those are my

11  priorities.

12          THE COURT:  Okay.  Mr. Whitney, what about you?

13          MR. WHITNEY:  Thank you, Your Honor.  As I mentioned,

14  Barry Hinckley and Tom O'Hara.  John Garvey is the former board

15  member of Project Veritas we intend to depose.  We have set the

16  corporate representatives of both plaintiffs, Project Veritas

17  and Project Veritas Action Fund, for late January.  Separately

18  we have scheduled deposition of a couple of supporters of

19  Project Veritas for, I believe, February 6th.  We would intend

20  to depose Hannah Giles, who was the successor CEO of Project

21  Veritas, and then I would say there would be a non-party witness

22  or two, donors, for example.  And then lastly I --

23          THE COURT:  The donors are different than supporters

24  or are those the same people?

25          MR. WHITNEY:  They are more or less the same folks.  I

1  guess I use those terms interchangeably.

2          THE COURT:  Well, you said a couple of supporters, and

3  then you said a couple of donors.  If you are just talking about

4  the same people, then you just happened to say them twice.

5  That's fine.

6          MR. WHITNEY:  I think I repeated myself, Your Honor.

7          THE COURT:  Okay.  That's fine.

8          MR. WHITNEY:  And then I would reserve --

9          THE COURT:  And of course, you haven't mentioned Mr.

10 Tyrmand.  Obviously, he is on the list, too.

11         MR. WHITNEY:  Ah, Mr. Tyrmand on the list, yes, Your

12 Honor.  Yes, he is.  Sorry.  We had him set for Monday, but

13 that's not happening.  So I overlooked that.

14         MR. WOLMAN:  Is Mr. Wetmore in his individual capacity

15 also still on your list?

16         MR. WHITNEY:  Mr. Wetmore in his individual capacity

17 is on our list, and we said it that way, Your Honor, because he

18 has been identified as the corporate representative for both

19 entities.  And then lastly, I would say it's a bit unique from

20 our point of view because there's been an entire changing of the

21 guard on the leadership of all of these organizations.  So we

22 may, depending on Mr. Wetmore's testimony, we may want to take

23 the depositions of the other current board members of these

24 organizations.

25         THE COURT:  All of them?  How many are there?

1          MR. WHITNEY:  There is -- I understand there is two

2     others on Project Veritas' board, and then two additional on

3     Project Veritas Action Fund because Joseph Barton serves there

4     as well.  And so, anyhow, that would be an additional four.

5          THE COURT:  Okay.  Wow.  That's quite a number of

6     depositions.

7          So, look, I'm happy to extend the deadline for the

8     completion of the depositions.  We will do that in a second.

9          One issue that you had flagged also, Mr. Whitney, is

10    that you are still waiting for the completion of plaintiffs'

11    document production, and whether or not, you know, the dates

12    were set based on the timing of the production is sort of

13    immaterial.

14         Mr. Wolman, I just want to have a firm date for you to

15    complete your document production.  So when are you going to be

16    able to do that?

17         MR. WOLMAN:  As I represented to Mr. Whitney, I

18    anticipate being able to do that by the end of the year.

19         THE COURT:  All right.  So 12/31 for the document

20    production to be completed.

21         Are there any documents outstanding from the defense

22    side, Mr. Whitney?

23         MR. WHITNEY:  Yes, Your Honor.  We are also on a

24    rolling production schedule currently.

25         THE COURT:  Okay.  But can that also be completed by

1  12/31?

2          MR. WHITNEY:  Yes, Your Honor.

3          THE COURT:  All right.  12/31 for the completion of

4  all document production.

5          And then right now the depositions are going to be

6  done by February 14th; fact discovery by March 14th.  If we made

7  the deposition deadline March 31, that's three months.  That

8  should be more than enough time to get these depositions done if

9  you work together to block out dates to get the depositions

10 done.  So often the problem in completing depositions is not the

11 witness's schedule, but the lawyers' schedule, their

12 availability.  So you should really talk to each other and block

13 out a number of dates in January and February.

14         Again, if I make it March 31, I then do not intend to

15 extend that deadline any further because that really should be

16 plenty of time to get it all done.  But let's do that because I

17 think that will just give you some breathing room to work

18 through the issues, and plus, we will need a little bit of time

19 potentially if there is motion practice, especially about the

20 privilege issues, that's going to hold up any of the

21 depositions.  We are going to need a bit of time to work through

22 those issues.  So we will make it March 31st for the completion

23 of depositions.

24         I am looking at Judge Seibel's scheduling order right

25 now.  The deadline for requests to admit and further

1  interrogatories was tied to the deadline for depositions, so we

2  will make -- we are amending paragraphs 4C, D and E of the

3  scheduling order at ECF No. 68, and we will make that deadline

4  March 31st, and then we will make the deadline for paragraph 4,

5  the overall deadline for completion of fact discovery, we will

6  move that from March 14th to May 1st.  All right?  So 3/31 for

7  depositions, requests to admit and further interrogatories, and

8  May 1st for all fact discovery.

9          Again, I think we should really be able to get

10  everything done by then.  What I sometimes do if the parties

11  seem to be struggling to put dates on the calendar for

12  depositions is I sometimes require you to submit a deposition

13  schedule with precise dates for all witnesses, and then I so

14  order that schedule so that it's then an order of the Court.  I

15  would typically then say that that order can only be modified

16  with an application from the parties, and that if there is an

17  application, it's likely to be granted if it's on consent and

18  wouldn't require changing any other deadlines, and it's likely

19  to be denied if it's not on consent or it would require changing

20  any other deadlines.

21          I am not going to do that yet because I like to give

22  the attorneys a chance to get it right the first time and work

23  out the dates and have the flexibility that comes with being

24  able to move things around and account for any changes or last-

25  minute developments.  If there is a schedule from the Court, you

1  have to be much more mindful of submitting applications to me

2  whenever there is a tweak to the schedule.  So I am not going to

3  require that from you right now, but if we wind up having any

4  problems, either getting things scheduled or, you know, people

5  are cancelling depositions at the last minute or anything like

6  that, we will take that step and require you to get the schedule

7  submitted to me with firm deadlines and a complete plan.

8          But again, I do really encourage you to talk to one

9  another in the next couple of days.  You are going to be meeting

10 and conferring over the course of the next week anyway.  You

11 should use that as an opportunity to block out some dates on

12 your calendar between January and March to get all of these

13 depositions done, and you can figure out how to slot the

14 witnesses in as time progresses.  Okay?

15         So we are going to put this down for another

16 conference, you know, sometime probably in mid to late January

17 just to have a date on the calendar in case there are any

18 disputes that you may need to raise based on the completion of

19 the document production at the end of December.  I think we will

20 probably look to the very end of January so that you will have

21 had a chance to review the document productions and submit any

22 dispute letters that you may have in advance of the conference,

23 maybe even the first week of February.  Again, that will give us

24 plenty of time to get those issues resolved and have answers for

25 you so you can still proceed with the discovery schedule.

1          We are going to put all of these dates in the minute

2    entry from today's proceeding, so that they will be reflected on

3    the docket, but let's pick a date for the conference.  We will

4    do it again by video.  Whether there are disputes or not, we

5    will just plan to do it by video.  It's easier that way.  So I

6    am going to look at the week of February 3rd.  I'm sorry.  Yes,

7    the week of February 3rd.  I could do a conference on either

8    February 4th -- that's a Tuesday -- at 11:30 a.m., or better

9    yet, the 6th or 7th at 10:00 a.m.  That's Thursday or Friday.  I

10   could do the Tuesday, but the 6th or 7th would be preferable if

11   those dates would work for you.  Mr. Whitney?

12          MR. WHITNEY:  Yes, Your Honor.  We have a deposition,

13   a couple of depositions on the 6th, so we prefer the 7th.

14          THE COURT:  Okay.  Mr. Wolman, February 7th at

15   10:00 a.m.?

16          MR. WOLMAN:  That's fine, Your Honor.

17          THE COURT:  All right.  So we will put that on the

18   calendar February 7, 10:00 a.m.

19          Any disputes that you may have that you want to

20   address at that conference must be submitted by letter

21   January 31st, and responses by February 4th.  So February 7,

22   10:00 a.m., dispute letters by January 31, responses by

23   February 4.  I will look for an update on the issue with

24   Mr. Maxwell by January 3rd, Mr. Wolman.

25          We are going to complete document production by

1 December 31st; extend the date for depositions, requests to

2 admit and interrogatories to March 31st, and the deadline for

3 all fact discovery to May 1st.

4         You are going to meet and confer about the privilege

5 issues by December 20th, and Mr. Whitney will submit a letter by

6 December 23rd.

7         And, Mr. Wolman, you are going to provide a draft of

8 the proposed redactions for confidentiality for Mr. Barton's

9 deposition by January 3rd.  Until then, just to be clear, the

10 confidentiality designation that has been made by the plaintiffs

11 will remain in place, so that deposition in its entirety should

12 be treated as confidential until there is an agreement as to the

13 scope of the withholdings and/or a ruling from the Court as to

14 the scope if you can't agree.  All right?

15        And when we see your letter on the 23rd, we may need

16 to set a briefing schedule on the privilege issues.  I will --

17 and if that does need to be briefed, I am going to probably set

18 a relatively short schedule just so that doesn't delay any other

19 aspects of the case as we are moving forward.  So I would

20 encourage you to try to resolve as much of that as you can, as

21 always.  That's what the Court would prefer, but, you know, if

22 we do have issues that need to be teased out through further

23 briefing and maybe *in camera* review, we are going to get that

24 done and at least submitted in early January with an eye towards

25 trying to resolve it by that February 7th conference.  Okay?

1          Any questions?  A lot of dates.  As I said, we are

2    going to put them in the minute entry.  But any questions about

3    anything we have covered so far or any further issues to raise,

4    Mr. Wolman, from the plaintiffs' perspective?

5          MR. WOLMAN:  No, Your Honor.

6          THE COURT:  Okay.  Mr. Whitney, from the defense

7    perspective?

8          MR. WHITNEY:  No, Your Honor.  Thank you for your time

9    this morning.

10          THE COURT:  All right.  Thanks, everybody.  We had a

11    lot to cover, and we've got a path forward here.  So I will look

12    forward to seeing you on February 7th.  If there is anything

13    that requires my immediate attention before then, please don't

14    hesitate to write to me, and if we need to get you back in

15    sooner, we certainly can.

16          If I don't see you, I wish you both and your families

17    a safe, happy and healthy holiday season and happy new year, and

18    we will be back together again soon.  Stand adjourned for now.

19    Thanks, everybody.

20          MR. WOLMAN:  Thank you, Your Honor.

21          THE COURT:  Take care.

22                              -o0o-

23          Certified to be a true and accurate transcript of the
digital electronic recording to the best of my ability.
24          /s/ Darby Ginsberg
          U.S. District Court
25          Official Court Reporter