UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

PROJECT VERITAS, et al.;

Plaintiffs,

v. 23 CV 4533(CS)(AEK)

TELEPHONE CONFERENCE

JAMES O'KEEFE, et al.,

Defendant.

------------------------------------x

United States Courthouse
White Plains, N.Y.
May 22, 2025

Before: THE HONORABLE CATHY SEIBEL, District Judge

APPEARANCES

LAW OFFICE OF MICHAEL J. HARRIS
Attorneys for Plaintiff/Counter-Defendant
MICHAEL J. HARRIS

CHILDERS LAW, LLC
Attorneys for Defendant/Counter-Claimant
NICHOLAS P. WHITNEY

*Proceeding recorded via digital recording device.

THE DEPUTY CLERK: Good afternoon, Judge.

Judge, this matter is Project Veritas v. O'Keefe.

We have on the line representing plaintiffs Mr. Michael Harris, and we also have on defendant James O'Keefe as well as his counsel, Mr. Nicholas Whitney. And Abby is on the line as well.

THE COURT: All right. Good afternoon, everyone.

Sorry to keep you waiting. I had a criminal matter that got a late start because the marshals are backed up.

I have your letters. I don't quite understand, and I'm sure, Mr. Whitney, you can enlighten me as to how you have a Stored Communications Act claim if the search was done of company servers or company devices. What is it that you think happened that violates the SCA.

MR. WHITNEY: Yes, your Honor. There's a heated factual dispute about whether the telegram messages and emails and text messages that certain board members or the IT director confiscated from Mr. O'Keefe's personal devices were in fact on company devices, as Project Veritas' counsel has represented. The case law under the Stored Communications Act provides that that exception will only provide relief for the plaintiff here, counter-defendant, if they were in fact on company devices and it's our position that these were not company devices nor are they company systems. These were third-party systems. And the case law like Pure Power Boot Camp provides that if the

employer goes out and accesses services like Gmail or Signal or Telegram without the former employee's permission, then that is exactly the type of violation that is provided for under the Stored Communications Act.

THE COURT: I'm sorry, but --

MR. HARRIS: We object to --

THE COURT: -- the physical devices -- your client's not saying that anybody at Project Veritas had physical control of his personal devices, I take it. How is it that you're alleging they performed this search?

MR. WHITNEY: We have been unable to determine how it is that they accessed Mr. O'Keefe's personal devices. So to answer your question, your Honor, not to be evasive, I would be speculating about how they did so, but it appears that he had perhaps logged into Telegram or i-Message or some of his personal accounts on the work computers or devices or perhaps they are in possession of his personal devices and they extracted those communications and then published those communications.

MR. HARRIS: And again, I was going to say, your Honor, just at the outset we object to the idea that Project Veritas attached their employee handbook and what they view as some sort of exculpatory clause here for the Court's consideration when we're here on a motion to amend and the Court is only allowed to consider our allegations and whatever

we attached to the complaint. We're getting into factual territory by the attachment of that employee handbook.

UNIDENTIFIED SPEAKER: Your Honor, may I respond, please?

THE COURT: I'm in the middle of trying to say something.

I think part of what you're going to have to allege in the amended complaint is why there was no authorization.

But I just want to go back to something you said a moment ago. Let's say I work for IBM and I understand that my use of an IBM device is not private, but I download Signal and I communicate over Signal and I send text messages through i-Message. Did you say that, under the SCA, IBM wouldn't be allowed to look at those?

MR. WHITNEY: Without some sort of express authorization that you provided to IBM, and that's not what happened here.

THE COURT: Well, what about like I agreed to work there knowing the device wasn't private.

MR. WHITNEY: I haven't encountered the case law just yet, your Honor, where there's some sort of explicit consent. The case law that I have reviewed in preparation for the hearing here had to do with express consent to review personal communications. And that was exactly the problem in the Pure Power Boot Camp case, that there may have been limited consent

to access company systems, but what the employer did, just like here, in Pure Power Boot Camp they went in after the fact and accessed the Gmail account of the former employee because that employee had at one point logged onto those systems using company devices. I don't know for sure, but I think that may be what we have here, that Mr. O'Keefe logged in on either a work device to his Signal account, his i-Message account, Telegram account, or on his personal device, which they retained. Because the factual record will show that, after his departure, Project Veritas was in possession of a lot of Mr. O'Keefe's personal possessions, many of which they used to embarrass him after the fact.

THE COURT: Well, he should be able to allege whether or not he possessed his personal device. That should be his within knowledge.

MR. HARRIS: Your Honor?

THE COURT: Yes, Mr. Harris.

MR. HARRIS: May I respond just briefly?

First of all, I think that's a misreading of Pure Power. Pure Power dealt with a different situation. Pure Power explicitly recognized that when there is an agreement or, you know, an employee handbook that notifies the employee that there is no expectation of privacy, courts commonly find that the SCA is not a basis -- you know, it does not supply a claim. I think the issue in Pure Power was that there were allegations

that potentially someone had hacked -- you know, had hacked a personal account that was not stored on company computers. That's my reading of Pure Power. So I just -- I just want to make that clear. So unless -- unless -- and I've already had this conversation with Mr. Whitney, but unless they're going to be claiming that somebody -- and they have a nonfrivolous basis for claiming that somebody went out and hacked his computers or his personal system, I don't think a claim under the SCA applies.

THE COURT: Well, it sounded like Mr. Whitney was alleging -- I don't know if he'll be able to do this plausibly under Rule 11 in the amended complaint, but it sounds like he was alleging that somehow your client got its hands on non-company devices and looked in them.

MR. HARRIS: And that is the first that I'm hearing it, so, you know.

I also want to point out, and perhaps this goes to Mr. Whitney's point that this may well be a factual matter, but, you know, Mr. O'Keefe made a very public display of his cleaning out his office and leaving Project Veritas, so, you know, if he left something behind -- again, I guess these are factual disputes, but it's an invitation to go down that path, and I don't think it makes very much sense particularly given that, you know, what we were really here to do today was to resolve PV's motion to dismiss, and this claim seems designed

to manufacture federal jurisdiction.

THE COURT: Well, the timing is suspicious, but --

MR. HARRIS: Well, you know, and that goes to the Rule 16 point that we raised in response to their letter, which is that they focused on the Rule 15 analysis, but your Honor had entered a scheduling order that was never amended as far as the deadline for amended pleadings and, you know -- so, you know, the focus really should be on the diligence and in their letter, they cite to testimony that goes back to July. So, you know, it's not totally clear to me. Certainly our position is that no good cause exists to allow them to amend the scheduling order at this late stage, particularly given that Judge Krause has entered an order -- well, an endorsement of our last joint status letter wherein he stated he won't be inclined to move the discovery deadline absent an agreement, and there's not going to be an agreement in that regard.

THE COURT: Well, I think what I would like to do is deal with the motion to amend first because with respect to the motion to dismiss the counterclaims, first of all -- who knows where we'll be at that time. It might be time for summary judgment. But I always, and I think I did it in this case, before I entertain a motion to dismiss, I always let the party bringing the claim amend to see if there's anything they want to add that can beef up their position. But I don't necessarily think that it makes sense to do that now because,

A, if I grant the motion to amend, there will be an amended complaint where any other amendments can be added, and if I deny the motion to amend, in all likelihood, I will decline to exercise subject supplemental jurisdiction. So I think I would like to entertain the motion to amend first. If I grant it, then the amended complaint can beef up the old claims, if doable, and add the new claim, but if I deny it, I'm probably going to wave goodbye to you people.

I did want to note that defendant argued that the statute of limitations will have been ^blown on some of these claims, which I don't think alone would carry the day anyway, but I'm pretty sure there is a provision of the CPLR that gives you a six-month window to recommence a claim if it's dismissed for lack of jurisdiction, and I have to think, although I didn't study it, that the same would apply to counterclaims. So that's something to think about with respect to the motion.

But I want to deal with the motion to amend first, so, Mr. Whitney, when would you be able to make that motion?

MR. WHITNEY: Let's see. If you could just give me a moment, your Honor. We have a couple critical depositions coming up in this case the first week of June. If I could have -- and then I'm on vacation. I was going to ask for two months, but if I could have until June 18th to make that motion, I would appreciate it.

THE COURT: Okay.

And then how long for opposition, Mr. Harris?

MR. HARRIS: I think two weeks should be fine.

I think June 18th is, you know -- I mean -- I just want to make clear for the record here we're going to be proceeding with these depositions and clocks are going to be expended and, you know, I think we --

THE COURT: Well, that work will have to be done whether I send you to state court or not, it seems to me, so I don't see any reason not to go forward with that. And June 18th is a reasonable time. I don't like to ruin people's vacations. But you tell me. You only want two weeks for your opposition?

MR. HARRIS: You know, just to play it safe, I'll take three if your Honor will give it to me.

THE COURT: That's fine. So that would be July 9th.

And reply, Mr. Whitney? Two weeks?

MR. WHITNEY: Ten days will be fine.

Did you say -- I didn't hear if you said one week or two weeks. My apologies.

THE COURT: All right. Well, that takes us into the weekend. Let's just make it two weeks to make it easy. July 23rd.

As you may recall, I offer the option of bundling the motion papers. What I mean by that is you serve one another, but you don't file anything on the docket until it's fully

briefed. I offer this option because it allows me to be more generous with extensions should one side or the other need one. The reason for that is relating to the dreaded six-month list where I have to tell the world if I have any motions lying around for more than six months. Six months starts to run from when the motion is filed, so if you file the motion and one or the other of you has a good reason why you need an extension, I'll be reasonable, you'll get an extension, but I may not be generous because it's coming out of my six months. If you bundle, meaning you don't file anything until it's fully briefed, I'll probably give you whatever you want because it's not coming out of my six months.

I don't require bundling. Only if both sides like the idea should you do it. If you agree to do it and then it comes to pass that you do have to ask for extra time, remember to put in your letter that you've agreed to bundle so I know to be not merely reasonable, but generous in reviewing your request.

Either way, I do want hard copies of the motion papers at the time they're served.

And I'll try to get to this before too long and then we can deal with part two, although I have to say I'm a little baffled, honestly, that, given the plaintiff has dropped all its claims, what exactly is going on here. I don't know, if the defendant succeeded, if there's even any money to collect.

Is there any money to collect if the plaintiff succeeds? Excuse me, if the defendant succeeds.

MR. HARRIS: You're asking me, your Honor, counsel for counterclaim defendant?

THE COURT: Well, yeah. I guess I'm asking, you know, what's the end game here. Do you think that, even if you prevail, the plaintiff is in a position to pay damages?

MR. WHITNEY: This is Mr. Whitney.

MR. HARRIS: I think you're asking --

THE COURT: Oh, I'm sorry. I'm asking the counterclaim plaintiff. I'm asking Mr. O'Keefe's counsel.

Do you think you're going to collect anything?

MR. WHITNEY: I understand the Court's suspicion about what is or is not going on here. I will just say that there are settlement talks under way and, without providing specifics, it's my understanding that there are some assets remaining at Project Veritas that our client could collect on.

THE COURT: Well, you've got Judge Reznik. I would suggest, in any divorce, it's always better to just get it wrapped up and cut the cord. This divorce is no different. If she can help you get to the finish line, I hope you'll take advantage of that, and then everybody can cut ties and get on with their lives. But in the meantime, we have a schedule, and if you can't finalize the divorce, I will get you my ruling as soon as I can.

All right. Anything else we can do at this time?

MR. HARRIS: May I say one thing? And I apologize.

This has not been brought before the Court yet, but I don't want the Court to be taken by surprise. There are some issues and settlement is currently stalled in part because of what we view as inappropriate behavior by Mr. O'Keefe and O'Keefe Media which involves essentially publication of the depositions and everything that's going on in this case, you know, including videos showing him chasing potential trial witnesses. So we're going to be seeking from the Court a protective order very soon. You know, this stuff is kind of happening day by day. And since O'Keefe is on the line, I'll just say it's not helpful to settlement talks. And I just want the Court to be aware that that is forthcoming.

THE COURT: All right. Well, that's for Judge Reznik in the first instance. You know, look, I don't want to comment on the tactics of either party, but I do agree if there are settlement talks going on, this is not the time for unnecessary provocations. Put it that way. That's all I'll say on the subject.

All right. Thank you all. I look forward to seeing the papers. Bye-bye.

MR. HARRIS: Thank you, your Honor.

MR. WHITNEY: Thank you, your Honor.