EXHIBIT A

**UNITED STATES DISCRIT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PROJECT VERITAS and PROJECT VERITAS ACTION FUND, <br><br> Plaintiffs/Counterclaim-Defendants, <br><br> v. <br><br> JAMES O'KEEFE and TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP, RC MAXWELL, and ANTHONY IATROPOULOS, <br><br> Defendants/Counterclaim-Plaintiffs. | Civil Action No. 7:23-cv-04533 |

**COUNTERCLAIM-PLAINTIFFS' AMENDED**
**COUNTERCLAIMS AGAINST COUNTERCLAIM-DEFENDANTS**

Defendants and Counterclaim-Plaintiffs, JAMES O'KEEFE ("O'Keefe") and TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP ("OMG") (together "Defendants"), hereby file their Amended Counterclaims against Plaintiffs and Counterclaim-Defendants, PROJECT VERITAS and PROJECT VERITAS ACTION FUND'S ("Plaintiffs"), and state:

**COUNTERCLAIMS**

Defendants ("Counterclaim-Plaintiffs")[1] JAMES O'KEEFE ("O'Keefe") and TRANSPARENCY 1, LLC d/b/a O'KEEFE MEDIA GROUP ("OMG"), plead the

---

[1] For economy and clarity, O'Keefe and OMG shall be referred to herein as "Defendants," and Project Veritas and Project Veritas Action Fund as "Plaintiffs."

following Counterclaims against Plaintiffs (Counterclaim Defendants) PROJECT VERITAS and PROJECT VERITAS ACTION FUND, and allege as follows:

## INTRODUCTION

1.      In the storied annals of investigative journalism, few tales are as tragic as the deliberate dismantling of Project Veritas (PV) by its own Board of Directors. This tale of betrayal, feigned incompetence, and shortsightedness serves as a stark reminder of how quickly an organization can crumble when those entrusted with its stewardship release their grip on its mission and the visionary who brought it to life.

2.      For nearly two decades, James O'Keefe stood as a beacon of fearless journalism, his name internationally synonymous with hard-hitting exposés shaking the foundations of power. From the halls of Congress to corporate boardrooms, O'Keefe's work through Project Veritas sparked national conversations and drove real change. His unique brand of investigative reporting, built on hidden cameras and undercover work, became the hallmark of an organization that dared to go where other media feared or refused to tread.

3.      Yet, in a bewildering turn of events, the very institution O'Keefe had nurtured from its inception turned against him. Over a matter of a few days, a Board — ironically, dedicated to truth and transparency— engaged in a calculated ambush of its founder, stripping him of authority and publicly humiliating him in front of the very team he had assembled. This was not a measured response to legitimate concerns, but a premeditated coup that ignored years of successful leadership and the unique value O'Keefe brought to the organization.

4.     The Board's actions, cloaked in the language of corporate governance, revealed a profound and willfully obtuse misunderstanding of what made Project Veritas special. They failed to grasp that O'Keefe was not merely an employee, but the beating heart of an organization that thrived on his vision, his connections, and his public persona. In their myopic focus on alleged expense reports and management styles, they lost sight of the forest for the trees, jeopardizing the very mission they were sworn to uphold.

5.     As news of O'Keefe's ouster spread like wildfire, swift and devastating repercussions followed closely behind. Donors, who had given generously based on their trust in O'Keefe and his work, closed their wallets. Employees, witnessing the betrayal of their leader, departed in droves. Consumers closed their eyes. The organization that had once stood as a David against media Goliaths now found itself struggling for survival, its own credibility in tatters.

6.     These counterclaims are not merely about contractual disputes or corporate governance. They are about the willful destruction of a unique institution in American journalism. They are about a small group of individuals who, entrusted with safeguarding a vital public watchdog, instead chose to put it down. The Board's actions have not only harmed James O'Keefe personally but have deprived the public of a crucial voice at a time when investigative journalism is needed more than ever.

7.     The stakes in this case extend far beyond the individuals involved. This is a fight for the soul of independent journalism, for the right of visionaries to see their creations through to fruition, and for the public's right to know the truth, no matter how

uncomfortable it may be for those in power. The Plaintiffs' reckless actions have silenced a vital voice and weakened our democratic discourse. It is time for them to be held accountable.

## THE PARTIES

8.    Defendant James O'Keefe is an individual citizen of the State of ~~New York~~ Florida and resides in ~~Westchester County, New York~~ Miami-Dade County, Florida.

9.    Defendant Transparency 1, LLC d/b/a O'Keefe Media Group is a Delaware Limited Liability Company with a principal place of business in Mamaroneck, New York.

10.    Plaintiff Project Veritas is a non-stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York.  It is registered in New York as a foreign not-for-profit corporation.

11.    Plaintiff Project Veritas Action Fund is a non-stock corporation organized under the laws of the Commonwealth of Virginia, with a principal place of business in Mamaroneck, New York as a foreign not-for-profit corporation.

## COMMON FACTUAL ALLEGATIONS

### The Board Constructively Terminates O'Keefe and Defames Him

12.    Plaintiffs' corporate sabotage began when on February 2, 2023, PV's Chief Financial Officer, Tom O'Hara ("O'Hara"), "confronted" O'Keefe over a $12,000 bill for a short-fused helicopter flight to visit a well-heeled donor. Never before in PV's history had the CFO complained of any problems with O'Keefe's travel expenses, including O'Keefe's occasional use of helicopters, which are commercially available for short-range flights in the Boston-New York-DC metro area.

4

13.    O'Keefe and O'Hara argued, and O'Keefe told the CFO he was fired.

14.    At the time, the Project Veritas Board included three members: James O'Keefe, Matthew Tyrmand ("Tyrmand"), and John Garvey.

15.    The Board convened an emergency meeting four days later, on February 6, 2023.

16.    Ahead of the meeting, PV employees sensed that Tyrmand was leading PV off of a cliff, asking: "What if the board fails?" Tyrmand attempted to reassure the suspicious employees: "The board won't fail." (Spoiler alert: The board failed, leaving PV in disarray, hollowed out, and near bankruptcy.)

17.    During the meeting, Tyrmand moved to add the following new members to the Board: George Skakel, Joseph Barton ("Barton"), and Steve Alembik. All three were added over O'Keefe's objections. Together, the members (excluding O'Keefe) shall be referred to as the "Board," which at all relevant times acted as the Plaintiffs' agent.[2]

18.    O'Keefe abstained from voting to add the new members, requesting that the Board first discuss its business agenda, before bringing inexperienced new members into the meeting. O'Keefe was overruled.

19.    Board member Matthew Tyrmand orchestrated the radical board expansion, which doubled its size. Tyrmand intended to and did shift the 2-1 board configuration (against him) to 4-2 (under his control).

20.    In a first for the PV Board, Tyrmand moved to allow "observers" — non-

---

[2] At other times, not relevant at this time to claims against Plaintiffs, certain Board members acted in their own separate interests, unauthorized by Plaintiffs. Those claims will be addressed separately.

Board members — into what had previously always been a private meeting. Ahead of the meeting, Tyrmand had lined up cherry-picked disgruntled current and former employee "observers" to attend by phone and speak. Other employees, previously happy in their positions, were invited to attend and listen.

21.    Nobody except Tyrmand and the cherry-picked employees knew what was coming.

22.    First, in the now-public meeting, Tyrmand moved to read "into the record" a previously undisclosed letter of grievances written by disgruntled employees, invoking legalistic language.[3]

23.    The motion passed with O'Keefe again abstaining. O'Keefe objected that he had never seen the letter before.

24.    In other words, Tyrmand was leading an ambush.

25.    Tyrmand, having collected a pre-meditated list of alleged grievances from a small group of anonymous disgruntled current and former employees, then read aloud O'Keefe's supposed transgressions.

26.    The letter was intended to, and did, publicly humiliate O'Keefe.

27.    Following the reading of the grievances letter, Tyrmand began inviting a series of disgruntled current and former employees (attending by phone) to expand on the issues raised in the anonymous letter.

28.    O'Keefe — at the time, PV's Chief Executive Officer — was ambushed by the

---

[3] Presumably when Tyrmand referred to "the record," he meant the audio recording of the defamatory meeting that Project Veritas would later leak to the public.

series of unscheduled appearances at a public Board meeting with much of the PV staff listening in.

29.    The hours-long series of comments from Tyrmand's cherry-picked employees published a long string of defamatory statements, such as:

a.  "James has become a power-drunk tyrant and he's exactly who he pontificates on who we should be exposing."

b.  "It's sad, embarrassing, and increasingly becoming James' standard for how he treats the [indiscernible]. Honestly, it's wild and incredibly irrational behavior for someone publicly and internally claiming to be the only one raising money."

c.  "In recent donor meetings, James' behavior has been arrogant and dismissive of the donors, that they won't give us five or six-figure donations."

d.  "I consider the workplace a hostile work environment, incredibly toxic, employees are continually shamed and bullied and discounted and appear to only be objects to one end, which is the furtherance of his personal agenda."

e.   "He's a great leader when it comes to Project Veritas, but he's not good at managing people.  He's not good at hiring and firing."

See Transcript of February 6, 2023, Board Meeting Audio, attached hereto as **Exhibit A**.

30.    The aired grievances were intended to, and did, publicly humiliate O'Keefe. By reading the grievance letter "into the record" and requiring O'Keefe to sit quietly and

endure public castigation in front of the entire PV staff, Tyrmand hoped to provoke O'Keefe into an angry outburst that would provide cause for his immediate termination.

31.    But O'Keefe did not take the bait. He endured severe emotional distress and public humiliation but *did not lose his temper.*

32.    The entire meeting was intentionally intended to be defamatory. It was intended to strike O'Keefe where Tyrmand believed O'Keefe was weakest: in his pride. But legally speaking, it was a carefully planned session of pure defamation of O'Keefe's personality and ability. In other words, the Board organized and procured a six-hour struggle session of defaming O'Keefe's character and his fitness for his chosen occupation.

33.    Although the employees delivered the message, <u>the Board</u> intentionally created the defamatory environment, and encouraged the cherry-picked, allegedly dissatisfied employees to publicly complain. The Board invited the other, non-disgruntled employees to hear the defamatory comments first-hand. The Board recorded the defamation for publication to a wider audience. The Board did publish the audio of the February 6th meeting, including all the defamatory comments, to a wider audience, including providing it to journalists.

34.    Since O'Keefe kept his cool, the Board was frustrated in its plan to provoke O'Keefe. So, it shifted tactics, and ─despite that none of the complained-of conduct was new or urgent─ concluded the meeting by voting to radically re-define O'Keefe's job.

8

35.     The Board's February 6th minutes described the decision:

> The Board voted and passed the following:
> - The CFO and Chief Strategy Officer reinstated.
> - The CEO's ability to hire/fire staff is suspended for 180 days with such power transferred to the Executive Director in direct consultation with the Board.
> - The Executive Director reports to the Board
> - The CEO is placed on paid leave for two weeks
> - The CEO surrenders company credit card
> - The CEO's access to proprietary information, including donor lists, is restricted

36.     The Board's reconfiguration of O'Keefe's job was intended to and did frustrate his ability to carry out his duties. It eliminated his ability to travel for stories, to recruit reporters, hire or fire staff, or fund-raise, and cut off his access to donor information — all essential requirements for his job.  Excepting only hire/fire authority (removed for at least *six months*), the other changes were of indefinite duration.

37.     The February 6th public humiliation and gutting of O'Keefe's position was intended to, and did, create an impossible and intolerable hostile work environment. The Board expected O'Keefe to immediately resign.

38.     The Board wished to force O'Keefe to resign, rather than just directly firing him, because it selfishly believed doing so would mitigate the backlash from donors, employees, and consumers of the company's news products. The Board hoped O'Keefe would *do something* that would allow the Board to re-direct its donors anger towards O'Keefe.

39.     The Board's ill-conceived plan was self-destructive, displaying gross

9

incompetence and a reckless disregard for the Board members' fiduciary duties, not to mention PV's future prospects and ability to operate as a going concern.

40.    O'Keefe had always been the most important figure in PV's news videos. News videos featuring O'Keefe's appearances were always viewed significantly more often than videos without the founder. It wasn't even close. O'Keefe had the ability to go viral: PV *without* O'Keefe did not.

41.    Likewise, O'Keefe had always been PV's most productive fund-raiser, consistently outraising the organization's entire development department. Even when outreach was initiated by the development department, donors (especially larger donors) preferred and expected to meet and communicate directly with O'Keefe, face-to-face.

42.    The Board's February 6th actions to force O'Keefe to resign also ensured O'Keefe could not appear in future PV videos or effectively fund-raise, disemboweling the organization and dooming its prospects. The Board's actions were corporate harakiri.

43.    But the Board's backup plan to force O'Keefe's resignation was thwarted when O'Keefe once again refused to take the bait, and did *not* immediately resign.

44.    So, the frustrated Board activated 'Plan C.'

**The Board Tries Again on February 10, 2023**

45.    Just four days after the February 6th meeting, the Board met again, this time without O'Keefe present, since he was still on two weeks of paid leave as ordered by the Board.

46.    This time, at the February 10th meeting, Tyrmand did <u>not</u> invite any employees, and did <u>not</u> move to record the meeting. With O'Keefe not present, the Board

acted in secret.

47.     Instead, Tyrmand invited PV's disgruntled CFO (who O'Keefe had just fired a week before), O'Hara to deliver a searing report accusing O'Keefe of serial misspending. None of the issues O'Hara raised were new, or material, or urgent.

48.     The 'report' was a post-hoc rationalization attempting to backfill a valid rationale for the Board's February 6th actions. O'Keefe's alleged serial financial misconduct had never been raised at any previous Board meeting. Although O'Keefe had been at the helm for nearly two decades, until this February 10th 'report', neither the Board nor the CFO had ever notified O'Keefe that his expenses were "lavish" or inappropriate in any way.

49.     At the conclusion of the February 10th meeting on 'financial improprieties,' just four days after humiliating O'Keefe with an ambush of employee complaints about his management style, stripping all his authority, and placing O'Keefe on two weeks' *paid* leave, the Board took escalatory action. This time, the Board rescinded O'Keefe's pay entirely, not even waiting the two weeks, placing him on indefinite *unpaid* leave, and to add insult to financial injury, (at Tyrmand's suggestion) implied Mr. O'Keefe was crazy, thus unsuitable for his chosen occupation, by offering ~~him~~ free mental health treatment in the Board's written minutes.

50.     In trying to force O'Keefe's voluntary resignation, the Board was busily and enthusiastically fire-bombing PV's sterling reputation. If anyone needed mental health treatment, it was PV's Board of Directors.

51.    The Board recorded its escalatory, "Plan C" decision in its February 10th minutes (highlights supplied):

> The Board engaged further discussion, voted and the members present passed the following:
> - Authorized the Executive Director, Dan Strack, to approve expenditures above $20,000
>   - Adopted unanimously by the members present
> - Indefinite suspension of Mr. O'Keefe as CEO without compensation pending the results of the two-dimensional audit.
>   - In favor: Messrs. Tyrmand, Barton and Garvey
>   - Opposed: Messrs. Skakel and Alembik
>   - Passes 3-2
> - Offer to provide Mr. O'Keefe with mental wellness care/treatment/counseling with the sincere hope and goal of Mr. O'Keefe returning to the organization at the appropriate time under the appropriate circumstances to be determined.
>   - Adopted unanimously by the members present

52.    The Board subsequently published its Board minutes to many third parties. The minutes deliberately included the defamatory implication that O'Keefe lacked mental capacity and was thus unsuitable for his chosen occupation.

53.    At this point, O'Keefe had no authority, no pay, and no job, except an illusory promise of possible future re-employment "at the appropriate time under the appropriate circumstances *to be determined*."

54.    O'Keefe had no way to pay his bills. The Board's actions condemned O'Keefe to indentured servitude: O'Keefe was to indefinitely remain a PV employee, subject to the Board's whims, orders, and control, *without being paid,* and with no way to meet his own ongoing financial obligations.

55.    Nothing in O'Keefe's Employment Agreement[4] provided the Board with a

---

[4] Plaintiffs attached the Employment Agreement to their First Amended Complaint as its first exhibit.

remedy of indefinite suspension without pay (or any of its other creative remedies). The Board did not (directly) terminate O'Keefe's employment. The Board did not terminate the Employment Agreement.

56.    Instead, the Board breached the terms of the Employment Agreement including, non-exclusively, Paragraph 1 ("Responsibilities and Performance"), Paragraph 3 ("Compensation"), and Paragraph 4 ("At Will Employment").[5]

57.    Combined with those breaches, the Board also breached the duty of good faith and fair dealing it owed to O'Keefe.

58.    Showing remarkable restraint, O'Keefe waited six more days to respond. On February 16, 2023, at 1:11pm, O'Keefe emailed the entire PV Board, demanding that either the full PV Board resign, effective immediately, or else O'Keefe would be *forced* to resign (i.e., acknowledge his constructive termination):

> I cannot in good faith return to the employ of an organization with leaders who are attacking me personally, making false and unsupported claims of improper management of resources, improperly airing employment issues related to me and others at Project Veritas, ruining our reputation in front of supporters and donors, and leaking confidential information and fabricated stories. I will be forced for good reason to terminate my position as CEO of Project Veritas.

*See* O'Keefe Email to PV Board dated 2-16-23, attached hereto as **Exhibit B**.

59.    As a direct and predictable result of the Board's conduct, O'Keefe was substantially damaged.

---

[5] The Board will, predictably, make the self-defeating argument the Employment Agreement was "at will." But, again, the Board did not fire O'Keefe. The Board wishes to have it both ways. The Board cannot hide behind its specious argument it took some kind of 'at will' action when it did not actually fire O'Keefe, and it denies it intended to constructively terminate him.

60.  To recap the Board's intentional plan to constructively terminate O'Keefe:

   a.  Plan A was to ambush and humiliate O'Keefe in front of the staff and provoke him either to quit on the spot or into a rash response that would provide grounds for termination for cause. He kept his cool.

   b.  Plan B was to shred O'Keefe's authority, strip his duties, and prevent him from performing his contractual duties under the Employment Agreement. The Board thought O'Keefe would surely quit. He didn't.

   c.  Plan C stripped even O'Keefe's pay, and mocked him with suggestions of mental health problems. This time, the Board was sure it would work. And this time, it did.

### The Aftermath

61.  Following the Board's suspension of O'Keefe on February 6th and constructive termination of O'Keefe on February 10th, and O'Keefe's coming to terms with his termination on February 16th, the employees rebelled, donations dried up, consumers complained loudly and often, and the Board became increasingly unstable and erratic.

62.  For nearly two more months, the Board engaged in a mendacious public dispute with O'Keefe over whether O'Keefe had been fired or quit. The Board first misinformed the public O'Keefe had quit —despite their "best conciliatory efforts"— a reckless ruse intended to hold back a tsunami of rage from donors and consumers swamping its phone lines, emails, and social media.

63.     During this post-termination period from March to May 2023, the Board complained about nearly everything O'Keefe did, trying to manufacture further post-hoc rationalizations for their misconduct. For example, O'Keefe made a careful and measured video for followers and co-workers as he cleaned out his office. Even though O'Keefe did not defame PV or its Board members in the video, and even though the video was not prohibited by his Employment Agreement, the Board still accused O'Keefe of misfeasance.

64.     In the immediate aftermath of O'Keefe's suspension and constructive termination, not only did donations essentially stop, but PV experienced a historic and catastrophic wave of demands from donors for donation reimbursements. The backlash threatened to destroy the organization even before it could send more demand letters to O'Keefe, which it did frequently, with great enthusiasm.

65.     The Board —in particular Matthew Tyrmand— knew his actions would result in the immediate destruction of anything recognizable as Project Veritas, and this is exactly what he intended, and it is exactly what occurred. Tyrmand was the chief architect and engineer of the downfall of Project Veritas, but the other Board members aided and abetted him.

66.     Over the next weeks and months, their purpose achieved, Board members raced out of the boardroom like rats off a sinking ship, resigning one after another, not sticking around to clean up the mess they created. The employees who had challenged Tyrmand at the beginning, wondering aloud what would happen if the Board failed, were either laid off or forced to find new employment. The once-rapidly-growing

15

organization hemorrhaged cash. In a desperate gamble, PV hired a first-generation PV reporter as CEO, even though she lacked prior executive experience. It didn't work. She quit before she reached her six-month review.

67.    PV then drastically cut costs, making things even worse, and making donors and consumers even more furious, if that were possible.  With the drastic cost cuts in place, PV's content production dried up. It infamously announced it would stop funding the defense of its *own reporters* who'd been caught up in litigation while performing their jobs. It engaged in a series of layoffs reducing the staff from over 60 to around six.

68.    As of the drafting of these counterclaims, Project Veritas drips out lame videos, none of which go viral. PV's videos now generate only a handful of 'likes' and 'comments,' sometimes in the single digits, a pale shadow of its former reach and influence.

69.    On June 20, 2024, Rolling Stone published a long-form, magazine-style investigative article about Project Veritas headlined, "Inside the Rise and Fall of Project Veritas."[6]

70.    Among many other things, Rolling Stone reported two key facts: (1) Matthew Tyrmand instigated the corporate coup, and (2) the Board members had been advised by corporate counsel the most likely result of its actions would be James'

---

[6] Available at https://www.rollingstone.com/politics/politics-features/project-veritas-james-okeefe-rise-fall-1235036748/.

resignation — a result they secretly hoped to procure:

> After years of serious conversations and apologies and plans that went nowhere, the board had arrived at the Rubicon. "[O'Keefe] cannot be a steward of the org until he recognizes the org is now bigger than him," Matt Tyrmand, a board member and longtime friend to the CEO, wrote to the others in an email. "This is not a fiefdom anymore."
>
> Jeffrey Lichtman, who served as legal counsel, had reservations. "Giving James some kind of ultimatum will be received poorly by him at this very difficult time. He'll feel cornered and will lash out in defense. In the end I'm not sure you won't lose him."

71.     The emails exposed by the Rolling Stone article evidenced the Board's intent to force O'Keefe to quit. In other words, they *intended* to corner him, put him on defense, and create a work environment so hostile O'Keefe would have no choice but to resign. Board member George Skakel wrote privately that Matt Tyrmand led the effort "indicting James James in the Board's mind".

72.     Shortly after O'Keefe's ouster and public humiliation, the Board conceived its next scheme, to further injure O'Keefe through relentless public defamation.

### The Board's Defamation Plot

73.     From February 2023 on, PV's Board members took to their social media accounts to spread false defamatory claims of O'Keefe's financial and personal failures— all going to O'Keefe's suitability for his chosen profession. PV's executives and Board members disseminated "talking points" to "influencers" and press outlets to defame O'Keefe. It was all part of a premeditated, carefully planned scheme to destroy O'Keefe's ability to continue to pursue his investigative reporting career, which PV viewed as competitive, and win back the affections of disaffected donors and disappointed

consumers.[7]

74.     On or about February 20, 2023, the PV Board released a statement defaming O'Keefe, falsely claiming that that O'Keefe had engaged in "financial malfeasance" by, among other things, "booking a $14,000 flight to meet someone to fix his boat." After the Board passed a resolution requiring O'Keefe to take a two-week leave of absence, it falsely published in its statement that "O'Keefe had skipped a Board meeting". Multiple Board members and former executives have since admitted the falsity of these statements regarding financial malfeasance, including George Skakel and Dan Strack, who admitted "James did nothing illegal."

75.     On May 10, 2023, PV's Board members and executives crafted "talking points" to feed influencers and press outlets in an coordinated effort to defame O'Keefe. The "talking points" crafted by PV contained multiple false, defamatory statements. PV fed influencers and press outlets these false "talking points". Among them:

a.  PV falsely stated that O'Keefe had spent "[$]200k on a Party to recover 13k Personally" and "[i]n order to recover a $13k personal deposit, he ended up spending $200k of organization money."

b.  "$12k Helicopter: One-way ride to Maine to get his yacht."

c.  "Repeated sexual harassment of employees.

d. "James created a hostile work environment for women. This

---

[7] PV was wrong that O'Keefe posed any competition. PV and O'Keefe's new reporting company, O'Keefe Media Group, are economically complimentary. They are not competitive substitutes. In other words, consumers of either firm are also likely to consume the information products of the other firm.

includes multiple instances of particular cruelty towards individual staffers. He made repeated statements towards female employees that he refused to correct, apologize, and remedy."

76.    Armed with these "talking points", what followed was a coordinated smear campaign led by PV and its Board members. PV retained a public relations firm to publicize its defamatory "talking points". Joe Barton, one of PV's Board members, cajoled PV's then-CFO to "cut the damn check" so that the PR firm could continue its work.

77.    On August 28, 2023, Karlyn Borysenko published the following on Substack through her 'Decode the Left' platform:



73.

78.    Ms. Borysenko confirmed in her Substack stories and YouTube videos that her work was informed by multiple PV Board members. PV's then Board member John Garvey claims to have diagnosed O'Keefe as a narcissistic sociopath. Ms. Borysenko echoed Mr. Garvey's claims regarding "James's narcissism". Ms. Borysenko used PV's

talking points and claimed that "James felt entitled to use the money he raised in any way he wanted", an allegation that could only have been made by PV and its Board, since any improper expenditures were known only internally at PV. Similarly, Ms. Borysenko used PV's talking point to allege that "James terrorized the staff at Project Veritas." Ms. Borysenko's reporting is replete with PV's "talking points" and falsely characterized internal PV information weaponized by PV and its Board to destroy O'Keefe.

79.     On September 6, 2023, New York magazine published the following:



80.     The Intelligencer article broadcast PV's "talking points", including the false claim that "the millennial ratf****r took a $12,000 helicopter from New York to Maine" to get his yacht and a "$14,000 chartered flight to get his boat fixed or $60,000 for what

Project Veritas described as "dance events."

81.    In September 2023, PV leaked its internal audit conducted by Dorsey & Whitney at the Board's request, which was published by the Washington Post and New York Times. Board member John Garvey has testified that the audit was intended to be private. Despite this, PV shared with prominent press outlets to further defame O'Keefe.

82.    Mediaite published PV's "talking points" and false claims from the internal audit on September 8, 2023, in an article titled "–'We're Bankrupt': Leaked Meeting Reveals Project Veritas on Verge of Collapse", repeating the defamatory claim that O'Keefe used company cash "including $12,000 to charter a helicopter for a trip to Maine for a saling trip."

83.    Similar articles, fed by PV's "talking points" and PV's leak of its internal audit following O'Keefe's termination, appeared throughout 2023, including articles populated with PV's "talking points" and defamatory claims in *The Rolling Stone, Esquire, Business Insider, Yahoo News,* and *National Review.*

74.84.  After O'Keefe's departure, PV still operated under the misguided belief that "it" was "now bigger than" James, and if PV could destroy James's reputation, PV would prosper and return to its previous glory. Tyrmand believed that if he went low enough, the "Board [would not] fail" and his plan would be recognized as the brilliant boardroom coup he had originally conceived.

75.85.  For one of many examples, on September 21, 2023, Board Member Tyrmand

tweeted this pack of deliberate, intentional lies about O'Keefe, seen by at least 256 persons

(not including re-tweets and forwards):



He was fired for cause when lawyers investigated staff claims and
documented his misappropriation of massive amounts of donor/non
profit funds and all sorts of other malfeasance (such as: ya can't fly
private to go on your vacation & lie about it, can't fire a cfo who tells you
that you have to pay back personal inurements, can't spend donor
money on your trash whore reality show gf, can't tell female employees
they're not allowed to get pregnant, and can't do any of the hundreds of
others things documented by lawyers that he did while acting as a
fiduciary of a non profit). He violated these laws of both statute and
decency. Not any of the staff, officers, or board- one person did all these
things. And you idiots lick his balls as if he is a god- not the monster
everyone who has ever known him or worked with him knows him to be.

2:49 PM · Sep 21, 2023 · **256** Views

76.86.  Board  Member  Joseph  Barton  frequently  'retweeted'  (i.e.  republished)

statements originating on an anonymous account bearing the name of "James O'Keefe

The Panty Thief" (the name was designed to appear prominently in Twitter user searches

for "James O'Keefe"). On May 15, 2024, Barton published private (intimate) communications between O'Keefe and his then-girlfriend.



77. 87.  Project Veritas admitted it has access to all O'Keefe's private messages, during the same preliminary injunction hearing where Joseph Barton testified under oath in this case in July 2024.

78. 88.  Project Veritas supplied the personal, private messages to 'James O'Keefe the Panty Thief.' And, then-Board Member Joseph Barton republished them.

79. 89.  Plaintiffs' intentional public disclosure of O'Keefe's personal and private messages, which O'Keefe never intended to be made public, which had no public interest and were of no public concern, injured O'Keefe economically and caused him severe

mental and emotional distress, anguish, and humiliation.

80.90.  Plaintiffs' intentional public disclosure of O'Keefe's personal and private messages exhibited extreme and outrageous conduct, going beyond all possible bounds of decency, and was utterly intolerable in a civilized society.

81.91.  Plaintiffs intended to cause O'Keefe emotional distress, or acted with reckless disregard for the likelihood of causing that distress.

82.92.  On May 31, 2023, PV filed its original Complaint (in this action), which is full of defamatory claims against O'Keefe. The First Amended Complaint included most of those same defamatory claims.[8]

83.93.  On or shortly after that date, Project Veritas posted a web page, prominently linked from its home page, titled, "James O'Keefe - Project Veritas' Board of Directors Chronology of Events."[9]

84.94.  The page, open to the public, includes numerous examples of defamation, defamation by implication, and false light defamation. The first example defamed

---

[8] Claims made in court filings are privileged. But Project Veritas used the complaint outside the court context to intentionally republish the defamatory content contained therein.

[9] Available at: https://www.projectveritas.com/james-okeefes-departure-what-really-happened. Last accessed August 12, 2024.

O'Keefe and injured his ability to hire future employees, through an obvious falsehood:

> • January 31, 2023: Volatile Senior Staff meeting leads to the request for Board intervention to address ==rampant mistreatment of employees creating a toxic work environment==, one individual's perceived consolidated authority to hire and fire employees as well as the implementation of revised guidance around expenditures and third-party payment approval process.

85.95.  ~~But most damaging of all~~Further damaging O'Keefe, PV included a link at the bottom of its web page which leads to a copy of the full original complaint — and all of its defamatory material. The complaint was not linked to the court docket, but was hosted on PV's website.[10]



86.96.  Upon information and belief, the complaint is located on the servers of Contentful, an image-hosting provider, under contract with PV.

87.97.  Since this action was filed on May 31, 2023, PV and its Board have continued

---

[10] It is linked through a third-party hosting service. The link leads to this document: https://assets.ctfassets.net/syq3snmxclc9/2YlSTg60tdIV112eV9xJzZ/688c264c5e0853aec40660680e578f39 /Project-Veritas-v.-OKeefe-Complaint_5-31-23__1_.pdf. Last accessed August 12, 2024.

to defame O'Keefe, intending to damage his reputation and ability to carry on in his chosen profession.

88.98.  PV and its Board members have jumped at any opportunity to defame O'Keefe.

89.99.  When it became obvious to the public that PV was headed towards failure due to Tyrmand's and the Board's actions, Tyrmand doubled down and published false claims of O'Keefe's criminal status. On July 21, 2023, Tyrmand wrote:



100.    Likewise, on September 6, 2023, the Washington Post reported on an interview with, Hannah Giles, the then CEO of Project Veritas.  Giles falsely characterized O'Keefe as an extravagant spender of PV's donor-generated funds, implying that O'Keefe had been taking advantage of elderly pensioners.  As quoted in the Washington Post:

> "If you're Bobby Axelrod from 'Billions,' it's fine to live like that," Giles said in an interview with The Post. "When you're paying your bills from a little old lady's Social Security checks, we're going to have problems."

90.101.    On September 8, 2023, Tyrmand again accused O'Keefe of serious crimes:



91.102.　　　On September 20, 2023, within hours or days of Project Veritas

suspending operations after Tyrmand's and the Board's corporate takeover failed, Tyrmand wrote:



92.103.    On September 25, 2023, Tyrmand again accused O'Keefe of "criminality":



93.104.        On November 1, 2023, Tyrmand leveled blame on O'Keefe and the

replacement CEO the Board selected for the destruction of Project Veritas:



94.105.    On April 24, 2024, Tyrmand republished private details of O'Keefe's

personal life:



95.106.    As recently as June 6, 2024, PV Board members Matthew Tyrmand

and Daniel R. Strack ("Strack") appeared on Episode 124 of Dangerous Rhetoric, and

published multiple false, defamatory statements. Among them:

a. Tyrmand on O'Keefe: "[H]e was a theatrical actor, LARPing as a journalist."

b. Trymand repeatedly referred to O'Keefe as having Asperger's syndrome, referring to O'Keefe as "Mr. Aspergers Narcissist", and at other times referring to O'Keefe's "Aspergers manias". Continuing in this vein, Tyrmand stated: "That's how he was wired. He had this sort of Asperger's, didn't realize the narcissism was that deep. And those things are very weird to me because they're kind of different things. Asperger's and narcissism. Somehow, he's managed to, you know, circle that square. So, I knew we were dealing with some sort of special, beautiful mind."

c. Trymand: "I'm going to shit on James a lot because he's one of the worst human beings in the history of the world."

d. Tyrmand on O'Keefe: "[N]ot only was he a narcissistic sociopath driven by his own ego, self-love and the need for adulation, but he was also drug, totally drug addicted."

e. Tyrmand on the Board's confrontation of O'Keefe at the February 6, 2023 Board meeting, repeatedly accused O'Keefe of criminal conduct: "[L]ike you've caused some problems, you've crossed a Rubicon on spending stuff that's like highly illegal. You know, did illegal spending and then lied about it. Which like compounds the issue, uh, committed outright fraud. I mean, we had a whistleblower

come to us inside the organization who basically said he was guilty of conspiracy and racketeering."

f.  Tyrmand accused O'Keefe of federal crimes: "[I]t was like, and it was across state lines. So, it's a federal crime. This is black and this is not gray stuff. This is fucking black, right? This is felonious behavior."

g.  Tyrmand made false claims: "You know, our New York Young Republican Club, all these people hated O'Keefe personally."

h.  Tyrmand falsely claimed that O'Keefe had tried to get him murdered: "And then he tried to get me murdered."

i.  Tyrmand intentionally tried to destroy O'Keefe's reputation and ability to earn a living: "[T]his is a guy who's the biggest fraud I've ever come across. More fraudulent than the fucking lefty dictators, idea collectivists, and fucking central European shitholes that I deal with. Other people, you know, that are on foreign government payrolls. I have never met a bigger fraud than this guy who's willing to knowingly jit up a mob."

j.  Tyrmand falsely claimed that O'Keefe caused Project Veritas employees to lose their jobs, deflecting from his and the Board's actions in driving Project Veritas to failure: "[H]e is a fucking cancer on society, and on the right, and deserves to be held in account. He destroyed 70 fucking jobs."

96.107.          On July 31, 2024, this tirade:



97.108.          And this:



109.    PV's defamation continued unabated through 2024 and through the present

day. In August 2024, even after PV had failed in its attempt to secure an injunction prohibiting O'Keefe from contacting donors due to the absence of any evidence that he had done so, PV continued to publish defamatory claims through its employees. Angelo Martinez, a PV employee at the time, posted the following, repeating PV's false claim that O'Keefe had "called up every major donor" after his separation from PV:



**Angelo Martinez** ✔
@Angel0Martinez3

**Follow**    ...

Stab the founder in the back??? How about having a turnover rate of 12-14 months at PV??? What about firing someone you hired to help raise PV money after just 3 months??? What about illegally firing your CFO????What about coming into a conference room and yelling "I can do your job, I can do your job, I can do your job," to everyone in the room when something doesn't go your way? Well one thing is for sure... you can't do my job mf. PV in 2019 brought in $17mil. In 2022 we peaked at 22mil. And when you left you decided to call up every major donor and fuck the team by having them remove their donations. You're a coward and I'd love to see you in person to say it to your face. You're a bitch James, without your online warriors, you're nothing. To quote the great Mike Tyson, "everyone's got something to say until you punch them in their fucking mouth." You were a good friend before the fame, now you're just another grifting sack of cunt

5:26 AM · Aug 1, 2024 · **19.1K** Views

### Actual Malice

110.    The instances of defamation alleged in this Counterclaim were made with knowledge of the falsity of the statements or with reckless disregard for whether the statements were false.

111.    Additionally, they were made with hatred, ill will, and spite and the defendants acted with malicious, wanton, reckless, or willful disregard for OMG/O'Keefe's rights.

112.    Multiple instances demonstrate that the motive and intent of PV, the Board, and PV employees were malicious and designed to harm O'Keefe without regard to the truth. These instances included but are not limited to:

   a.  On multiple occasions Board member Matthew Tyrmand voiced to other Board members and PV employees that he would like to "decapitate" O'Keefe and "carve his heart out and eat it with a spoon" and other statements to similar effect;

   b.  As provided at paragraph 95(c) above, when Tyrmand appeared on the Dangerous Rhetoric podcast, he expressed the following intention regarding O'Keefe: "I'm going to shit on James a lot because he's one of the worst human beings in the history of the world.";

   c.  Joseph Barton, who at all times relevant to O'Keefe's defamation claim served on the Board's of PV and/or PVAF, reposted dozens

39

of X posts by either Kyle Seraphin or the anonymous X account "James O'Keefe the Panty Thief" disparaging O'Keefe or his girlfriend and publishing highly personal, private communications of O'Keefe's, the purpose of which could only have been to humiliate O'Keefe and damage his reputation;

d.  In texts between Tyrmand and Daniel Strack, the former PV Chief Operating Officer, Tyrmand communicated to Strack that another associate of theirs, Kyle Seraphin, was "going to war" with O'Keefe on social media and that Tyrmand was "feeding [Seraphin] tons of stuff" in support of his effort, apparently referring to private, personal communications of O'Keefe's that Tyrmand had obtained.

**Unauthorized Access of Electronic Communications**

113.    The defamation campaign against O'Keefe by PV and its Board members ran alongside and relied upon PV's illegal obtaining of O'Keefe's private and personal electronic communications in violation of the Communications Storage Act, 18 U.S.C. §§ 2701 et. seq.

114.    While working for PV, O'Keefe sent and received certain Telegram, Instagram, text, and email messages which were made via private accounts or phone lines and not PV provided accounts or phone lines.  In some cases, these communications included embedded photos or images.

115.    All of these materials were created through the provision of an electronic communication service, *i.e.* Telegram, Instagram, email, and text

message.  At least some of these messages were stored in a facility through which such electronic communication services were provided, to wit, the servers on which the Telegram messages, Instagram, text messages, and emails were stored.

116.    O'Keefe intended these communications to remain private and not be publicly disclosed.  O'Keefe never authorized PV or any of its agents or representatives to access, obtain, or disclose any of these private materials.

117.    Regardless, PV did access and obtain these materials against O'Keefe's wishes, and then subsequently published a large number of these with the express purpose of embarrassing O'Keefe or harming his reputation.

118.    On information and belief, such access was intentional, and, in light of the apparent volume of data harvested and publicly disclosed by PV, could not have been unintentional.

119.    On information and belief, PV was able to access O'Keefe's personal and private communications, at least in part, as a result of information on devices PV took possession of after O'Keefe's departure from PV or as a result of passwords of O'Keefe's that had been obtained by PV employees.

120.    During the July 29, 2024, evidentiary hearing on PV's request for a temporary injunction in this case, Joshua Hughes, the Informational

Technology Director for PV, admitted under oath that he had accessed O'Keefe's private messages in his official role with PV.

121.     Joseph Barton, whose serial defamation of O'Keefe is detailed above, also admitted in his November 7, 2024, deposition in this case that he had accessed O'Keefe's private messages in his official role as a member of the Board of Directors of PV.

122.     Mathew Tyrmand also knew of PV's having accessed O'Keefe's private communications and had himself accessed those communications. OMG/O'Keefe have obtained through discovery in this case text messages between Tyrmand and Daniel Strack, the former PV Chief Operating Officer. These texts confirm Tyrmand's knowledge that PV had accessed and taken control of O'Keefe's private Telegram communications. Further, in these texts, Tyrmand communicated to Strack that another associate of theirs, Kyle Seraphin, was "going to war" with O'Keefe on social media and that Tyrmand was "feeding [Seraphin] tons of stuff" in support of his effort. Presumably the "stuff" Tyrmand referred to was O'Keefe's private communications that Tyrmand had obtained without authorization in his role with PV.

123.     As Tyrmand had predicted to Strack, Seraphin commenced an onslaught of abusive and embarrassing posts on X regarding O'Keefe in which, on information and belief, Seraphin revealed the private

communications he had been fed by Tyrmand.  An example is provided below.



124.     The most notorious, salacious, and prolific attacks using O'Keefe's private communications, however, have come from an anonymous X Account going by the name "James O'Keefe the Panty Thief," which account on April 27, 2024, celebrated "FLOODGGATES OPENING!!! New Data Dump may Take Days to Process."

125.     On information and belief, the "James O'Keefe the Panty Thief" account is controlled by PV, Matt Tyrmand, Joseph Barton, or more than one of these. In his deposition testimony provided in discovery in this case, George Skakel, a former member of the PV Board of Directors testified that he believed the account was controlled by Tyrmand or possibly Barton.

126.     Interestingly, Barton regularly reposts on his own X account postings from the "James O'Keefe the Panty Thief" X Account, suggesting a possible dynamic in which Barton supplies the content for the account and then reposts it after it has been published, thereby laundering his own responsibility for and role in the disclosures.  Just one of many examples of

Barton reposting from the "James O'Keefe the Panty Thief" account can be seen below.



127.     Almost all of the posts regarding O'Keefe from this account (and those of the accounts of Barton and Seraphin) are of no public interest and do not even relate to the dispute between PV and OMG/O'Keefe.  Instead, PV's disclosures focus on salacious details concerning O'Keefe's private life and his girlfriend, Alexandra Rose, with the goal of embarrassing O'Keefe and harming his reputation.

128.     Followers of Mr. Barton who read his disparaging posts regularly criticize him for disclosing the private communications of O'Keefe (and his

girlfriend), but Barton responds to these critiques with disdain, challenging

his followers to explain what about his actions could be considered wrong.



129.    Indeed both ~~Mr.~~ O'Keefe and Ms. Rose responded to the PV posts,

notifying those involved that the posts were a violation of their privacy and

appealing them to stop. But Barton's response was only derision and mockery.







**O'Keefe's Damages**

~~1.~~130.     The Employment Agreement provided O'Keefe an annual salary of $430,920.00.

~~2.~~131.     As the literal face of Project Veritas and its top fund-raiser, it is not speculative that, absent the Board's misconduct, O'Keefe would have remained in his position for the foreseeable future.

~~3.~~132.     O'Keefe's replacement position pays him substantially less than he earned under the Employment Agreement.

~~4.~~133.     As a result of his constructive termination, O'Keefe was also deprived of other valuable benefits, such as paid time off and health care insurance, provided under the Employment Agreement.

~~5.~~134.     As a direct and predictable result of the Board's misconduct, O'Keefe's reputation was substantially injured.

~~6.~~135.     O'Keefe's ability to effectively fund-raise for himself or his new company was substantially impaired by several factors directly caused by the Board.

    ~~a.~~e.Because O'Keefe lacked the resources of a larger investigative organization, some donors who would otherwise have made contributions decided to withhold donations.

    ~~b.~~f. Because the Board defamed O'Keefe by publicly accusing him of financial impropriety, many donors decided to withhold donations.

    g.   Because the Board defamed O'Keefe by publicly portraying hi~~m~~s as

unstable or mentally unwell, many donors decided to withhold donations.

    c.h.      Because the Board obtained and disclosed O'Keefe's private communications in order to embarrass him and harm his reputation, many donors decided to withhold donations.

7.136.    O'Keefe has been damaged by Project Veritas in an amount exceeding ten million dollars ($10,000,000.00).

8.137.    As a result of the Board's misconduct, O'Keefe was required to retain counsel to defend himself and protect his rights.

### Project Veritas and its Donors

9.138.    PV claims to have a protected donor database of confidential donor names.

10.139.    Some PV donors require anonymity. But for others, perhaps many others, anonymity either provides no value, or they are required to disclose their donor status, or even desire public knowledge of their donor status.

11.140.    Some institutional PV donors are required by applicable law to publicly disclose their donations. For example, in 2020 the Bradley Group gave PV $6.5 million, which was disclosed on a schedule attached to its Form 990.[11]

---

[11] Bradly Group's 2020 Form 990, available at: https://www.washingtonpost.com/context/bradley-impact-fund-s-tax-filing-for-2020/edb0bf27-2ee8-43d2-9e2d-c316d308cfba/.

| PROJECT VERITAS<br>1214 W BOSTON POST RD<br>MAMARONECK, NY 10543 | 27-2894856 | 501(C)3 | 6,510,825 | 0. | | | GENERAL CHARITABLE<br>PURPOSES |
|---|---|---|---|---|---|---|---|

12.141.    Over the years, many smaller and individual donors have posted messages on social media platforms disclosing their donor status, either implicitly or explicitly.

13.142.    Project Veritas's donors have long been a subject of media interest. Over the years, various stories have been published identifying some PV donors. For example, a headline from Buzzfeed in November 2017:



**Here Are Some Of Project Veritas's Funders**

BuzzFeed News has identified more than two dozen donors from around the country who gave money to Project Veritas, the "investigative reporting project" that earlier this week failed to dupe the Washington Post. Some of the donors expressed doubts about the wisdom of the sting. But none said they would end their support for the controversial organization.

Kendall Taggart
BuzzFeed News Reporter

Posted on November 29, 2017 at 8:37 pm

14.143.    The aftermath of O'Keefe's constructive termination produced immediate and predictable donor backlash, with countless PV donors identifying themselves, asserting they *were no longer* PV donors, and promising future support to O'Keefe. For one example (of many), posted mere days following O'Keefe's constructive termination:



Casey Petersen @CaseyAPetersen · Feb 20, 2023
#JamesOKeefeIsProjectVeritas
We won't be sending PV any more of our undercover video investigations and we just pulled our monthly recurring **donation**.

Just waiting for #JamesOKeefe to tell us where to send them.
#CaseyAndMykeShow

~~15.~~144.    Another example:



~~16.~~145.    Another example:



~~17.~~146.    Following O'Keefe's constructive termination, many donors contacted him directly using his personal cell phone, by email, or by direct message.

~~18.~~147.    While some donor names remain private and intentionally confidential, many others are available in the public domain. When combined with donors who contacted O'Keefe directly, Project Veritas cannot identify any allegedly diverted donors, even if the Employment Agreement's covenant restricting all contact with donors were enforceable, which it is not.

## FIRST COUNTERCLAIM
### (Breach of Contract—Employment Agreement)

~~19.~~148.    Paragraphs 1 through 1~~47~~15 are realleged as if fully set forth herein.

~~20.~~149.    The Employment Agreement constituted a legally binding and enforceable contract between Project Veritas and O'Keefe.

~~21.~~150.    Since it was carried out until February 2023, the Parties observed the terms of the Employment Agreement as their normal custom and practice.

~~22.~~151.    The Employment Agreement was never modified, and its original terms were binding and enforceable in February 2023.

~~23.~~152.    Up and until the meeting convened by the Board on February 6, 2023, O'Keefe performed pursuant to the Employment Agreement and fulfilled his obligations under the terms of the Employment Agreement.

~~24.~~153.    The Board materially breached the Employment Agreement on February 6, 2023, when it stripped O'Keefe of the ability to travel, fund-raise, or supervise employees, placed him on two-week's paid leave, and frustrated his ability to perform under the contract.

~~25.~~154.    The Board materially breached the Employment Agreement again on February 10, 2023, when it stripped O'Keefe of the compensation guaranteed under the Employment Agreement, placed him on *indefinite* leave, imposed an extra-contractual mental-health treatment as an implied condition to receive pay, and frustrated his ability to perform under the contract.

26.155.    The Board's breaches proximately and directly damaged O'Keefe.

27.156.    Project Veritas is liable for all acts performed by the Board.

## SECOND COUNTERCLAIM
### (Defamation)

28.157.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

29.158.    Plaintiffs, by and through their agents, systematically defamed Defendant O'Keefe.

30.159.    The statements reproduced above in paragraphs 74, 75, 776, 80, 82, 83, 84, 85, 89, 90, 91, 92, 93, 94, 95, 996, 100-104, and 106-109 and 97 were false.

31.160.    The statements contained in the aforementioned paragraphs were published or otherwise communicated to third parties by PV and its Board.

32.161.    The aforementioned statements were made without authorization and were not privileged.

33.162.    PV and its Board members acted negligently, at minimum, in regards to the truth or falsity of their statements.

34.163.    The Plaintiffs acted in concert and aided and abetted each other.

164.    The Plaintiffs acted willfully, recklessly, and intended to harm O'Keefe.

165.    The instances of defamation alleged in this Counterclaim were made with knowledge of the falsity of the statements or with reckless disregard for whether the statements were false.

166.    The instances of defamation alleged in this Counterclaim were made with hatred, ill will, and spite and the defendants acted with malicious, wanton, reckless, or willful disregard for the OMG/O'Keefe's rights.

167.    PV and its Board members, employees, and agents acted with actual malice in defaming O'Keefe.

98.

35.168.    The direct and predictable result of the Plaintiffs' defamation of O'Keefe was great injury to his financial condition, reputation, relationships, and future economic prospects.

36.169.    The aforementioned statements caused O'Keefe special harm and/or amounted to defamation per se, in that PV and its Board charged O'Keefe with serious crimes and the statements adversely reflected on O'Keefe's fitness to conduct his business or profession.

37.170.    Because PV's and its Board's statements amounted to defamation per se, damages are presumed.

**THIRD COUNTERCLAIM**
**(Publication of Private Facts)**

38.171.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

39.172.    Project Veritas had access to several of O'Keefe's personal, *private*

59

(non-public) messaging accounts, including his Telegram and Apple iMessage accounts.

40.173.    After constructively terminating O'Keefe, Project Veritas accessed his private messaging accounts without O'Keefe's permission. Project Veritas then went further, and published O'Keefe's private messages without his consent.

41.174.    Project Veritas published personal and private communications of an intimate nature, by providing them to wrongdoers for that express purpose, including but not limited to the Twitter Account "James O'Keefe The Panty Thief."[12] In doing so, PV published matters concerning O'Keefe's private life.

42.175.    The publication by PV of O'Keefe's private messages was highly offensive to a reasonable person.

43.176.    O'Keefe's private communications were communicated to the public at large, or were communicated to a sufficient number of people to make it substantially certain that the information would become public knowledge.

44.177.    The disclosure of O'Keefe's private messages was a gross violation of O'Keefe's privacy and highly offensive to a reasonable person.

45.178.    The disclosed messages had no legitimate public concern. Plaintiffs shopped O'Keefe's private messages to media platforms like Rolling Stone,

---

[12] Upon information and belief, the "James O'Keefe the Panty Thief" Twitter account is controlled and/or managed by PV or its agents.

which refused to publish them. In other words, the messages were not newsworthy and were not of public interest or public concern.

46.179.    Plaintiffs' conduct in disclosing O'Keefe's private messages was especially egregious, malicious, and reckless.

47.180.    The wrongful disclosure of O'Keefe's private messages injured his ability to raise funds to support his occupation, causing financial harm. The disclosures substantially harmed O'Keefe's reputation. The disclosures involved private and intimate information, causing O'Keefe to experience severe emotional distress, mental anguish, and humiliation.

48.181.    Plaintiffs knew and intended that the injuries to O'Keefe would be, and were, a direct, proximate, and predictable result of publicly disclosing O'Keefe's private information.

**FOURTH COUNTERCLAIM**
**(Intentional Infliction of Emotional Distress)**

49.182.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

50.183.    Plaintiffs intentionally inflicted severe emotional distress on O'Keefe by deliberately humiliating him in front of the PV staff to create an unbearably hostile work environment and force O'Keefe to resign.

51.184.    Plaintiffs intentionally inflicted severe emotional distress on O'Keefe by publicly disclosing his personal messages, which they obtained and used without O'Keefe's permission.

52.185.    Plaintiffs' extreme and outrageous conduct did, in fact, inflict severe

emotional distress, anguish, and humiliation on O'Keefe.

53.186.    The wrongful disclosure of O'Keefe's private messages caused some donors to withhold donations. It also caused O'Keefe substantial personal embarrassment, making it impossible for O'Keefe to raise funds from certain donors, causing financial harm. It also caused damage to O'Keefe's personal and professional relationships.

54.187.    Plaintiffs knew and specifically intended that the injuries to O'Keefe would be, and were, the direct, proximate, and predictable result of publicly disclosing O'Keefe's private information in their attempt to inflict emotional distress on O'Keefe.

55.188.    In the alternative, Plaintiffs' wrongful disclosure of O'Keefe's personal messages demonstrated, at a minimum, disregard of the substantial probability of causing O'Keefe severe emotional distress.

56.189.    Plaintiffs' conduct caused O'Keefe financial, emotional, and reputational harm, and just as the Plaintiffs intended, severe emotional distress.

### FIFTH COUNTERCLAIM
### (Declaratory Judgment—Donor Non-Solicitation Clause)

57.190.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

58.191.    The Employee Agreement includes a provision purporting to restrict O'Keefe from contacting any "donor or prospective donor" at any time, anywhere, in any manner, for an infinite amount of time (the "Donor Non-

Solicitation Clause").[13]

~~59.~~192.    Defendant O'Keefe is currently subject to the Donor Non-Solicitation Clause,[14] and Plaintiffs continue to claim that the covenant is enforceable against Defendant O'Keefe.

~~60.~~193.    Plaintiffs have no legitimate business interest in enforcing the Donor Non-Solicitation Clause.

~~61.~~194.    In fact, Plaintiffs themselves are legally prohibited from soliciting donations in thirty-five states —including *New York*— and the District of Columbia, as indicated on Plaintiffs' website.[15]

> Project Veritas does not, and makes no effort to, solicit donations from residents in Washington DC, MS, NC, CO, LA, WV, NC, CO, ME, OK, SC, OH, ND, NH, NV, KY, VA, OR, MI, FL, NY, CA, PA, MA, MI, CT, TN, MD, RI, NM, AR, NJ, WI, WA, IL, GA.

~~62.~~195.    The Donor Non-Solicitation Clause is overbroad, lacks business justification, cannot be remedied by judicial modification, and is unenforceable.

~~63.~~196.    The Donor Non-Solicitation Clause is also unenforceable as a practical matter, as the term "donor" is undefined in the Employment Agreement and is unworkably imprecise, many donors' identities are

---

[13] The Donor Non-Solicitation Clause is located at Paragraph 17 of the Employment Agreement.

[14] In July 2024, this Court denied Plaintiff's motion for a preliminary injunction, finding among other things that it was substantially likely the Donor Non-Solicitation Clause was unenforceable and unsalvageable.

[15] Last accessed on August 13, 2024, at: https://www.projectveritas.com/donate. Scroll to the bottom of the page.

already of public record, and Project Veritas cannot identify a discrete group of "donor[s] or prospective donor[s]" that would be subject to the restriction in the first place.

64.197.    As the Plaintiffs' First Amended Complaint evidences, there is an actual, genuine, substantial, and justiciable controversy between the Parties regarding the enforceability of this restrictive covenant, and Defendants seek declaratory relief in good faith and not out of mere curiosity.

65.198.    Declaratory relief is necessitated by the need to avoid the significant and imminent harm that would result from the Donor Non-Solicitation Clause's enforcement.

66.199.    The enforcement of the Donor Non-Solicitation Clause would cause Defendants substantial harm, including but not limited to the loss of current and future employment opportunities and substantial, negative financial impact to O'Keefe and OMG, and would unduly restrict Defendants' ability to engage in otherwise lawful activities within the field of investigative journalism and associated fundraising and business operations.

67.200.    Defendants face current legal action by Plaintiffs regarding the Donor Non-Solicitation Clause. The declaratory relief sought here would have a direct and immediate impact on the rights of the parties involved.

68.201.    Defendants respectfully request that the Court enter a declaratory judgment finding that the Donor Non-Solicitation Clause is unenforceably broad, and that Defendants are not bound by its terms.

## SIXTH COUNTERCLAIM
### (Declaratory Judgment—Employment Agreement, Generally)

69.202.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

70.203.    In contrast to the Donor Non-Solicitation Agreement, the Employment Agreement's "Employee Non-Solicitation" provision (the Non-Solicitation of Project Veritas Employees or Contractors at paragraph 16 of the Employment Agreement) is limited in time, expiring by its terms 12 months following O'Keefe's termination.

71.204.    The Employment Agreement was an at-will contract, allowing either party to terminate the employment relationship, but it specified particular remedies and actions permissible under the contract.

72.205.    Plaintiff's unilateral action in placing Defendant O'Keefe on indefinite unpaid leave on February 10, 2023, and imposing other extra-contractual conditions, constituted a material breach of the Employment Agreement, as it imposed conditions not agreed to by Defendant O'Keefe and not allowed under the contract.

73.206.    As a result of this material breach, the restrictive covenants contained in the Employment Agreement, including the 12-month Employee Non-Solicitation provision, are unenforceable against Defendant O'Keefe.

74.207.    Furthermore, the Employment Agreement does not contain any "savings" language that could preserve any of the covenants included

therein after a prior breach by Employer.[16]

~~75.~~208.    When Plaintiff breached the Employment Agreement on February 10, 2023, the agreement terminated, and O'Keefe was relieved of all further obligations under the Employment Agreement, including but not limited to forward-looking restrictive covenants like the Employee Non-Solicitation Provision.

~~76.~~209.    An actual, genuine, and justiciable controversy exists between the Parties as Plaintiffs have asserted, and will continue to assert, the enforceability of the 12-month Employee Non-Solicitation provision, creating an actual need for judicial determination.

~~77.~~210.    The declaratory relief sought here will have a direct and immediate effect on the rights of the Parties involved in this action.

~~78.~~211.    Defendant O'Keefe seeks a judgment from this Court declaring that (1) Plaintiffs' imposition of "indefinite unpaid leave" and other extra-contractual terms on Defendant O'Keefe constituted a material breach; and (2) the entire Employment Agreement, and particularly the 12-month Employee Non-Solicitation provision, is unenforceable due to Plaintiff's prior material breach.

---

[16] Such savings clauses are common but were not included in the Employment Agreement. An example of such a clause: "Notwithstanding any termination of this Agreement for any reason, including Employer's breach, the restrictive covenants contained in Sections X, Y, and Z of this Agreement shall remain in full force and effect for the duration of the period specified therein."

## SEVENTH COUNTERCLAIM
### (Breach of the Duty of Good Faith and Fair Dealing)

~~79.~~212.    Paragraphs 1 through 1~~47~~15 are realleged as if fully set forth herein.

~~80.~~213.    The Employment Agreement was at-will but provided certain protections and benefits to Defendant O'Keefe, including agreed-upon remedies in the event of disputes or termination.

~~81.~~214.    The Employment Agreement contained an implied covenant of good faith and fair dealing, which obligated each party to act reasonably prudently to ensure the other party received the benefits of the contract.

~~82.~~215.    The implied covenant of good faith and fair dealing in O'Keefe's Employment Agreement prohibited the Plaintiffs from doing anything that could destroy or injure O'Keefe's right to receive the benefits of the contract.

~~83.~~216.    On February 10, 2023, Plaintiffs placed Defendant O'Keefe on "indefinite unpaid leave," a remedy not provided for under the Employment Agreement and not contemplated by the Parties.

~~84.~~217.    By placing Defendant O'Keefe on indefinite unpaid leave without contractual justification, Plaintiffs materially deprived O'Keefe of the compensation, employment stability, fruits of his efforts, and professional opportunities that were the expected benefits of the Employment Agreement.

~~85.~~218.    Plaintiffs' conduct in placing Defendant on indefinite unpaid leave, without any contractual basis or justification, was done in bad faith, and

deprived Defendant of the benefits of the Employment Agreement, thereby breaching the covenant of good faith and fair dealing.

86.219.    Plaintiffs further breached the covenant of good faith and fair dealing by attempting to force mental health treatment on O'Keefe as a condition for him to receive compensation, to be reinstated as CEO, and to have the duties, responsibilities, and authority bargained for under the contract returned to him. These actions were in bad faith and undermined the contract's agreed-upon objectives.

87.220.    O'Keefe, or any reasonable person in O'Keefe's position as a promisee under the contract, would be justified in understanding that the Plaintiffs could not unilaterally impose extra-contractual provisions never contemplated by the Parties as pre-conditions for O'Keefe to remain employed, receive compensation, and carry out his duties as CEO.

88.221.    Plaintiffs also breached the covenant of good faith and fair dealing by intentionally frustrating O'Keefe's ability to perform his job duties, thereby undermining the mutual consideration that formed the basis of the agreement.

89.222.    Plaintiffs' action in placing Defendant on indefinite unpaid leave and imposing other extra-contractual conditions without contractual basis or justification constituted an intentional frustration of the consideration underlying the Employment Agreement. By preventing Defendant O'Keefe from performing his duties, Plaintiffs deprived Defendant O'Keefe of the

benefits of the Employment Contract, including compensation and professional opportunities, thereby breaching the covenant of good faith and fair dealing.

90.223.    Plaintiffs' conduct undermined the fundamental objectives of the Employment Agreement, deprived O'Keefe of the expected benefits of the contract, and frustrated Defendant O'Keefe's ability to perform his contractual obligations. By placing Defendant on indefinite unpaid leave and imposing unreasonable conditions on O'Keefe's ability to continue performing under the contract, Plaintiffs effectively prevented Defendant O'Keefe from fulfilling his duties under the Employment Agreement, thereby impairing Defendant O'Keefe's ability to earn compensation and other benefits. This intentional interference with Defendant O'Keefe's job performance was a further breach of the covenant of good faith and fair dealing.

91.224.    As a direct and proximate result of Plaintiffs' breach of the covenant of good faith and fair dealing, Defendant O'Keefe has suffered damages, including but not limited to loss of income, damage to professional reputation, and emotional distress.

## EIGHTH COUNTERCLAIM
## (Breach of Fiduciary Duties)

92.225.    Paragraphs 1 through 14715 are realleged as if fully set forth herein.

93.226.    O'Keefe founded and made Project Veritas successful, growing to a

point at which it became necessary and prudent to bring in a Board. The Board of Project Veritas undertook a fiduciary duty to advise O'Keefe and guide Project Veritas towards further success.

94.227.    O'Keefe's success also made possible and justified the organization of Project Veritas Action Fund to allow fundraising and political activities. Project Veritas Action Fund had a separate Board who undertook a fiduciary duty to advise O'Keefe and guide Project Veritas Action Fund towards further success.

95.228.    O'Keefe placed special trust and confidence in the Boards of Project Veritas and Project Veritas Action Fund.

96.229.    The Plaintiffs, through their Boards, committed gross misconduct through their actions of February 2023, driving both entities to failure – frail remnants of what they once were, limping along.

97.230.    In addition to the factual allegations incorporated into this Eighth Counterclaim, the Plaintiffs' misconduct was demonstrated by their gross disregard for the consequences of their actions in terminating O'Keefe, and even when challenged by O'Keefe and others, the Plaintiffs acted recklessly in removing O'Keefe without a plan to handle the predictable public backlash, precipitous drop in donations, and irretrievable damage to Project Veritas's reputation by the public battle waged by the Boards against O'Keefe.

98.231.    The Plaintiffs, through their misconduct and breaches of their

fiduciary duties, directly and proximately caused damage to O'Keefe.

99.232.   As a direct and proximate result of Plaintiffs' breach of fiduciary duties, Defendant O'Keefe has suffered damages, including but not limited to loss of income, loss of the enterprise value of the organizations he built, damage to his professional reputation, and emotional distress.

### NINTH COUNTERCLAIM
#### (Stored Communications Act)

233.     Paragraphs 1 through 147 are realleged as if fully set forth herein.

234.     Following Mr. O'Keefe's departure from Project Veritas in February 2023, Project Veritas intentionally accessed, without authorization or in excess of authorization, a facility through which an electronic communication service was provided.

235.     PV in so doing obtained or altered a wire or electronic communication while it was in electronic storage, specifically, Mr. O'Keefe's private communications, in violation of 18 U.S.C. §§ 2701 et seq.

236.     Project Veritas, through its unauthorized access of Mr. O'Keefe's private electronical communications in violation of SCA, and by its subsequent widespread dissemination of those communications with intent to harm O'Keefe, directly and proximately caused damage to O'Keefe.

237.     As a direct and proximate result of Plaintiffs' violation of SCA, Defendant O'Keefe has suffered damages, including but not limited to loss of income, loss of the enterprise value of the organizations he built, damage

to his professional reputation, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants O'Keefe and OMG pray for the following relief:

A.      A declaration the Donor Non-Solicitation Clause is unenforceable;

B.      A declaration that Plaintiffs' imposition of "indefinite unpaid leave" on Defendant O'Keefe constituted a material breach of the Employment Agreement;

C.      A declaration the entire Employment Agreement, including but not limited to the Employee Non-Solicitation Covenant, was and is unenforceable following Plaintiffs' prior breach;

D.      Judgment against Plaintiffs for Defendants' compensatory, consequential, special, and punitive damages in an amount to be determined at trial;

E.      An award of costs and expenses incurred in defending against Plaintiffs' claims and bringing these Counterclaims, including reasonable attorneys' fees; and

F.      Such other and further relief as the Court deems just and proper.


/


/


/

Dated: July ___, 2025.



**CHILDERS LAW, LLC**

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104 fax 407-209-3870

*/s/ Nicholas P. Whitney*

Florida Bar No. 119450
Seldon J. Childers
Florida Bar No. 61112
nwhitney@smartbizlaw.com
jchilders@smartbizlaw.com
notice@smartbizlaw.com

*Counsel for Defendants and Counterclaim
Plaintiff O'Keefe and OMG*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document (including any attached exhibits

and documents) electronically with the Clerk of the Court using CM/ECF on July ___, 2025,

which served same electronically upon all counsel of record.

*/s/ Nicholas P. Whitney*
Attorney