# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

PROJECT VERITAS *et al.*,

       *Counterclaim-Defendants,*

  *v.*

JAMES O'KEEFE *et al.*,

       *Counterclaimants.*

No. 7:23-CV-04533-CS-AEK

# COUNTERCLAIM-DEFENDANTS' BRIEF IN OPPOSITION TO
# COUNTERCLAIMANTS' MOTION TO AMEND

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................. 2

LEGAL STANDARD ............................................................................ 9

ARGUMENT......................................................................................... 10

     I.   THE GOOD CAUSE STANDARD UNDER RULE 16
          APPLIES TO COUNTERCLAIMANTS' MOTION ............ 11

     II.  COUNTERCLAIMANTS' MOTION MUST BE DENIED
          BECAUSE COUNTERCLAIMANTS CANNOT
          ESTABLISH GOOD CAUSE FOR THEIR
          AMENDMENT UNDER RULE 16 ...................................... 13

     III. EVEN UNDER THE MORE LENIENT STANDARD OF
          RULE 15, COUNTERCLAIMANTS' MOTION MUST
          BE DENIED ......................................................................... 21

CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................... 24

*Capak v. Epps,* No. 18-CV-4325,
   2020 U.S. Dist. LEXIS 63479 (S.D.N.Y. Apr. 7, 2020) ........................ 10

*Kassner v. 2nd Ave Delicatessen, Inc.,*
   496 F.3d 229 (2d Cir. 2007)............................................................ 10, 14

*Rent-A-Center, Inc. v. 47 Mamaroneck Ave Corp.,*
   215 F.R.D. 100 (S.D.N.Y. 2003) ................................................. 10, 13, 14

*Sacerdote v. New York Univ.,*
   9 F.4th 95 (2d Cir. 2021) ................................................................ *passim*

*Tatintsian v. Vorotyntsev*, No. 16-CV-7203,
   2024 U.S. Dist. LEXIS 185079 (S.D.N.Y. Oct. 9, 2024)....................... 21

## Statutes

17 U.S.C §§ 101 *et seq*................................................................ 3

18 U.S.C. § 1836 ...................................................................... 2

18 U.S.C. § 2701 ...................................................................... 5

## Rules

Fed. R. Civ. P. 12(b)(6) .............................................................. 6

Fed. R. Civ. P. 15(a)(1) ............................................................. 9

Fed. R. Civ. P. 15(a)(2) ............................................................. 9, 22

FED. R. CIV. P. 16(b)(4)......................................................................... 9, 11, 14

Counterclaim-Defendants Project Veritas and Project Veritas Action Fund (collectively, "PV") hereby file their brief in opposition to the motion to amend (Dkt. 175; Dkt. 176) filed by Counterclaimants James O'Keefe ("O'Keefe") and Transparency 1, LLC d/b/a O'Keefe Media Group ("OMG") (collectively, "Counterclaimants") on June 18, 2025.[1]   For at least the reasons set forth herein, the Court should deny Counterclaimants' motion, and dismiss this case for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

Almost four months after PV voluntarily dismissed its federal claims against Counterclaimants, this case still remains active.   But, because this case no longer involves any federal claims, it should be dismissed for lack of jurisdiction.   While Counterclaimants seek to keep this case going by adding a federal claim under the Stored Communications Act, their efforts fail.   Counterclaimants have not, and

---

[1] PV notes that Counterclaimants' brief in support of their motion does not comply with this Court's Individual Rules of Practice, which require, for example, that "[m]emoranda of ten (10) pages or more shall contain a table of contents and table of authorities."

cannot, establish that good cause exists to allow amendment at this late stage of the game – they have had all of the information they purportedly needed to assert their futile claim under the Stored Communications Act for over one year. But, even if the Court did not deem good cause necessary – it is necessary – Counterclaimants plainly delayed in seeking to amend, their motion was filed in bad faith, and they have not plausibly pleaded a violation of the Stored Communications Act. Never mind that allowing an amendment at this eleventh-hour would serve no purpose other than to encourage O'Keefe's vengeful behavior and to prejudice PV. In short, regardless of the standard that the Court applies to Counterclaimants' motion to amend, Counterclaimants' motion must be denied, and this case should be dismissed for lack of subject matter jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

PV commenced this action against O'Keefe, PV's founder and former CEO, on May 23, 2023, shortly after O'Keefe's contentious departure from PV. (*See* Dkt. 1). In its original complaint, PV alleged claims for, *inter alia*, violation of the Defend Trade Secrets Act (18 U.S.C. § 1836), breach of contract, breach of fiduciary duty, breach of the duty of

loyalty, conversion, and tortious interference with contract. (*See id.*). On October 12, 2023, PV also amended its original complaint to include a request for a declaration that PV is the lawful owner of certain copyrighted works under the Copyright Act (17 U.S.C §§ 101 *et seq.*). (*See* Dkt. 16).

On May 29, 2024, PV moved for a preliminary injunction based, in part, on O'Keefe's misappropriation of PV's confidential donor information for the benefit of O'Keefe and OMG. (*See* Dkt. 51). In support of its motion for preliminary injunction, PV specifically cited to a series of O'Keefe's Telegram messages, which showed, in part, that Asha Bolton – a PV employee – was funneling confidential information concerning PV's donors to O'Keefe. (*See id.* at 5-7). As PV noted in its motion for preliminary injunction, "O'Keefe had saved his Telegram communications to [PV's] servers, which were otherwise part of [PV's] records." (*Id.* at 5, n.3). O'Keefe has, thus, had notice of PV's possession of O'Keefe's Telegram messages since at least as early as May 29, 2024. (*See id.*).

O'Keefe has also had notice, since at least as early as May of 2020, that such Telegram messages, together with "all features of [PV's]

electronic communication systems, including, without limitation, computers, laptops, e-mail, the internet, [PV]-issued tablets, [PV]-issued cell phones, severs, clouds, and any other internal or external networks, voicemail, faxes, telephones, and any other form of electronic communications used by Employees" (collectively, "ECS") of PV are the "sole and exclusive property" of PV, and that O'Keefe had "no expectation of privacy when it comes to information transmitted over, received by, or stored in or on ECS owned, leased, or operated by, or on behalf" of PV. (*See* Hughes Decl.[2] at ¶ 1, Ex. 1).  At least by May of 2020, O'Keefe had further notice that PV "reserve[d] the right to gain access and monitor any information received or transmitted by, or stored in or on, any [PV] ECS," by O'Keefe, "at any time," and "with or without advanced notice." (*See id.*).  Indeed, O'Keefe himself signed the introductory letter to PV's ECS policy specifying exactly that!  (*See id.*).

On July 30, 2024, following an evidentiary hearing, the Court denied PV's motion for preliminary injunction.  (Dkt. 65).  Shortly thereafter, the Court entered a scheduling order, pursuant to which,

---

[2] "Hughes Decl." refers to the Declaration of Joshua Hughes, filed concurrently herewith.

"[a]mended pleadings may not be filed . . . except with leave of the Court"
and "[a]ny pre-motion conference in connection with a motion to
amend . . . must [have been] requested by" October 28, 2024.  (Dkt. 68 at
¶ 2).  On August 21, 2024, Counterclaimants answered PV's amended
complaint, and asserted several counterclaims, including for, *inter alia*,
publication of private facts.  (Dkt. 73).  Despite having been on notice of
PV's ECS policy since at least as early as May 2020 (Hughes Decl. at ¶ 1,
Ex. 1), and that PV possessed O'Keefe's Telegram messages, since at least
as early as May 29, 2024 (Dkt. 51 at 5, n.3), O'Keefe did not assert a claim
under the Stored Communications Act (18 U.S.C. § 2701) or move to
amend his pleading to add any such claim by October 28, 2024, the
deadline set in the scheduling order (Dkt. 68).

Following the Court's entry of the scheduling order,
Counterclaimants took, among others, the deposition of Joseph Barton, a
former member of the PV Board, on November 7, 2024.  (*See, e.g.*, Dkt.
176 at 5).  Shortly thereafter, in and around December 2024, PV's original
counsel sought to withdraw from this matter.  (*See* Dkt. 110-115).  Judge
Krause then held "[a]ll discovery deadlines" in abeyance "pending the
resolution" of PV's original counsel's motion to withdraw.  (Dkt. 117).

While discovery was held in abeyance, the case remained otherwise active. (*See id.*). On January 8, 2025, Judge Krause granted PV's prior counsel's motion to withdraw (Dkt. 128), and on February 21, 2025, PV's current counsel entered an appearance (Dkt. 133). Discovery resumed on March 10, 2025, with a three-month extension of the close of fact discovery. (*See* Mar. 10, 2025 Minute Entry).

On March 18, 2025, the parties stipulated to the dismissal of PV's claims against Counterclaimants, by voluntary agreement, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Dkt. 140). As a result, on April 11, 2025, PV moved for a pre-motion conference regarding its anticipated motion to dismiss Counterclaimants' state law claims, in part, for lack of subject matter jurisdiction (Dkt. 144 at 1).[3]  On May 6,

---

[3] PV also moved to dismiss Counterclaimants' state law claims under Federal Rule of Civil Procedure 12(b)(6). (*See* Dkt. 144). Given that this Court has indicated its preference to "deal with the motion to amend first," (Dkt. 168-1 at 7), PV does not herein address the full scope of its intended motion to dismiss under Rule 12(b)(6), or otherwise, except as necessary to address the futility of Counterclaimants' proposed amended claim under the Stored Communications Act.  PV reserves the right to raise these issues, to the extent necessary, at a later date.

2025, almost one month later, Counterclaimants requested a pre-motion conference regarding their anticipated motion to amend their counterclaims to add a federal claim under the Stored Communications Act, allegedly based on "evidence and testimony confirming that [PV] intentionally accessed Mr. O'Keefe's private communications without authorization after his departure from the organization in February 2023." (Dkt. 150 at 1). Again, O'Keefe was on notice of PV's possession of O'Keefe's Telegram messages, and other communications stored on PV's ECS, since at least as early as May 29, 2024. (*See* Dkt. 51 at 5, n.3). O'Keefe was further on notice that PV had the right to gain access and monitor any information received or transmitted by, or stored in or on, any PV ECS, at any time, and with or without advanced notice. (*See* Hughes Decl. at ¶ 1, Ex. 1).

The Court conducted a pre-motion conference on May 22, 2025. (*See* May 22, 2025 Minute Entry). During that conference, the Court questioned Counterclaimants, noting that the Court did not "quite understand" how Counterclaimants "have a Stored Communications Act claim if the search was done of company servers or company devices." (Dkt. 168-1 at 2). Without any support, Counterclaimants responded

that there is "a heated factual dispute about whether the [T]elegram messages and emails and text messages . . . were in fact on company devices." (*Id.*). In response, the Court succinctly stated that O'Keefe "should be able to allege whether or not he possessed his personal device." (*Id.* at 5). The Court also stated that "part of what" O'Keefe "ha[s] to allege in the amended complaint is why there was no authorization." (*Id.* at 4). In response to the Court's astute examination, Counterclaimants dodged every critical question about their proposed amendment, stating, for example, that they had not "encountered the case law just yet," and that they just "don't know for sure." (*Id.* at 4-5).

During the May 22, 2025 hearing, PV noted that Counterclaimants' proposed amendment "seems designed to manufacture federal jurisdiction." (*Id.* at 6-7). The Court agreed that "the timing is suspicious." (*Id.* at 7). Nonetheless, the Court granted Counterclaimants leave to file their motion to amend, noting that if the motion is granted "there will be an amended complaint where any other amendments can be added," and if the motion is denied, the Court will likely "decline to exercise [] supplemental jurisdiction." (*Id.* at 7-8). Counterclaimants

filed their motion to amend on June 18, 2025. (Dkt. 176), and the instant response follows.

## LEGAL STANDARD

"The ability of a plaintiff to amend the complaint is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure which, when read together, set forth three standards for amending pleadings that depend on when the amendment is sought." *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021). *First*, "[a]t the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission." *Id.*; *see also* FED. R. CIV. P. 15(a)(1). *Second*, "[a]fter that period ends . . . the plaintiff must move the court for leave to amend" under Rule 15(a)(2), which the district court may deny "upon a showing of delay, bad faith, [or] futility." *Sacerdote*, 9 F.4th at 115; *see also* FED. R. CIV. P. 15(a)(2). *Third*, "if the district court issues a scheduling order setting a date after which no amendment will be permitted," the "period of liberal amendment" under Rule 15(a)(2) ends, and a plaintiff may amend its pleading "only upon a showing of the 'good cause' that is required to modify a scheduling order under Rule 16(b)(4)." *Sacerdote*, 9 F.4th at 115; *see also* FED. R. CIV. P. 16(b)(4).

The "good cause" inquiry turns primarily "on the diligence of the moving party." *Rent-A-Center, Inc. v. 47 Mamaroneck Ave Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003); *see also Kassner v. 2nd Ave Delicatessen, Inc.*, 496 F.3d 229, 243 (2d Cir. 2007). "In other words, the movant must show that the deadlines cannot reasonably be met despite its diligence." *Rent-A-Center*, 215 F.R.D. at 104. If the movant was not diligent, the good cause inquiry ends, and the Court need not reach the Rule 15(a) analysis. *See id.*; *see also Capak v. Epps,* No. 18-CV-4325, 2020 U.S. Dist. LEXIS 63479, at *4 (S.D.N.Y. Apr. 7, 2020).

## ARGUMENT

Counterclaimants' motion to amend must be denied. The good cause standard applies to Counterclaimants' motion because this Court entered a scheduling order setting a date after which amendments would not be allowed, and Counterclaimants did not request a pre-motion conference before that date. Having been on notice of the facts forming the basis of Counterclaimants' futile claim under the Stored Communications Act since at least as early as May 29, 2024 – nearly five months before the deadline – Counterclaimants slept on their rights. Worse yet, Counterclaimants waited more than six months after the

deadline to finally request a pre-motion conference regarding their motion amend. Put simply, Counterclaimants' were everything but diligent in seeking to amend, and thus, they cannot establish the good cause required under Rule 16. Moreover, even if the Court were to apply the less stringent standard under Rule 15 – the Court should not – Counterclaimants' motion must still be denied because Counterclaimants unduly delayed, their request was made in bad faith and, if granted, would prejudice PV, and Counterclaimants' proposed amendment would be futile.

For at least the reasons stated herein, Counterclaimants' motion must be denied.

## I. THE GOOD CAUSE STANDARD UNDER RULE 16 APPLIES TO COUNTERCLAIMANTS' MOTION

As an initial matter, there can be no debate that the good cause standard under Rule 16(b) applies to Counterclaimants' motion to amend. Counterclaimants admit – as they must – that "[t]his case is subject to a scheduling order issued on August 2, 2024, which set a deadline of October 28, 2024, for requesting a pre-motion conference for motions to amend." (Dkt. 176 at 2). Specifically, the scheduling order provides that "[a]mended pleadings may not be filed . . . except with leave

of the Court" and "[a]ny pre-motion conference in connection with a motion to amend . . . must [have been] requested by" October 28, 2024. (Dkt. 68 at ¶ 2). Thus, the scheduling order plainly set a deadline after which the good cause standard under Rule 16 would apply.

The Second Circuit's decision in *Sacerdote* is instructive. In *Sacerdote*, the Second Circuit addressed whether the good cause standard applied to a scheduling order that provided that "[a]mended pleadings may not be filed, and no party may be joined, without leave of Court more than 10 days after the filing of th[e] Order or the filing of a responsive pleading, whichever occurs first." 9 F.4th at 114. Although the Second Circuit held that the good cause standard did not apply, it did so because "the scheduling order set the deadline (ten days) for amending *without* leave of court, but "set no expiration after which all amendments were prohibited" with leave of court. *Id.* at 115 (emphasis in original). In other words, because the scheduling order in *Sacerdote* necessarily permitted amendments with leave of court after the ten-day deadline, the less stringent standard under Rule 15 applied.

Unlike the scheduling order at issue in *Sacerdote*, the scheduling order in this case mandates that "[a]ny pre-motion conference in

12

connection with a motion to amend . . . *must* [have been] requested by"
October 28, 2024. (Dkt. 68 at ¶ 2 (emphasis added)). It thus plainly
forecloses a request to amend after October 28, 2024. In other words, it
necessarily set a date after which a request to amend was prohibited. *Cf.*
*Sacerdote*, 9 F.4th at 115. And, just as the plaintiffs in *Sacerdote*, PV was
"entitled to rely on the plain meaning suggested by the plain language"
of the scheduling order. *Cf. id.* "The reason is simple – scheduling orders
are designed to offer a degree of certainty in pretrial proceedings,
ensuring that at some point both the parties and the pleadings will be
fixed and the case will proceed." *See Rent-A-Center*, 215 F.R.D. at 101.

In short, the good cause standard under Rule 16 applies to
Counterclaimants' motion to amend and because, as set forth *infra* Sec.
II, Counterclaimants cannot satisfy that standard, their motion to amend
must be denied.

## II.  COUNTERCLAIMANTS' MOTION MUST BE DENIED BECAUSE COUNTERCLAIMANTS CANNOT ESTABLISH GOOD CAUSE FOR THEIR REQUESTED AMENDMENT UNDER RULE 16

Having established that the good cause standard under Rule 16
applies to Counterclaimants' motion to amend, Counterclaimants can
amend their pleading "only upon a showing of the 'good cause' that is

required to modify a scheduling order under Rule 16(b)(4)." *See Sacerdote*, 9 F.4th at 115; *accord Rent-A-Center*, 215 F.R.D. at 101. The inquiry, in turn, focuses primarily "on the diligence" of Counterclaimants. *See Rent-A-Center*, 215 F.R.D. at 104; *see also Kassner*, 496 F.3d at 243. While Counterclaimants insist that they "have at all times diligently prosecuted this case" and their delay "arises as a result of matters beyond [their] control," (Dkt. 176 at 3), the record simply does not support this assertion. Quite the opposite, the record establishes that Counterclaimants have had all the information they allegedly needed to request a pre-motion conference prior to the deadline set forth in the scheduling order, but Counterclaimants slept on their rights. As such, Counterclaimants cannot establish good cause under Rule 16 and their motion should be denied.

Counterclaimants first contend that their Stored Communications Act claim "could not have been adequately pled [] until shortly before they submitted their May 6, 2025, request," allegedly because "the factual basis on which [Counterclaimants] seek[] to bring [their] SCA claim has emerged through the course of this proceeding." (Dkt. 176 at 4). Setting aside the fact that Counterclaimants have still not adequately pleaded a

14

claim under the Stored Communications Act, as discussed *infra* Sec. III, the record utterly contradicts Counterclaimants' position. To illustrate why, one need only consider the allegations in Counterclaimants' proposed amended pleading (Dkt. 175), in relation to information that has been available in this case since long before the deadline to amend passed.

The crux of Counterclaimants' futile claim under the Stored Communications Act is that PV allegedly "access[ed] and obtain[ed]" certain "Telegram, Instagram, email, and text message" communications that O'Keefe "sent or received" while "working [for] PV." (*Id.* at ¶¶ 114, 115, 117). Counterclaimants speculate "[o]n information and belief, [that] PV was able to access" these allegedly private communications "as a result of information left on devices PV took possession of after O'Keefe's departure." (*Id.* at ¶ 119). Even assuming, *arguendo*, that these allegations are true, the critical fact remains that O'Keefe had all the information he needed to plead as much *before* the deadline to do so had passed.

O'Keefe has been on notice since May 2020 – years before this case was even filed – that ECS of PV are the "sole and exclusive property" of

15

PV, that O'Keefe had "no expectation of privacy when it comes to information transmitted over, received by, or stored in or on ECS owned, leased, or operated by, or on behalf" of PV, and that PV "reserve[d] the right to gain access and monitor any information received or transmitted by, or stored in or on, any [PV] ECS," by O'Keefe, "at any time," and "with or without advanced notice."[4] (*See* Hughes Decl. at ¶ 1, Ex. 1). Moreover, PV's May 29, 2024 motion for preliminary injunction expressly stated that "O'Keefe had saved his Telegram communications to [PV's] servers, which were otherwise part of [PV's] records."[5] (Dkt. 51 at 5, n.3). In other

---

[4] While Counterclaimants "object[ed] to the idea" that PV can rely on its ECS policy purportedly because "the Court is only allowed to consider [Counterclaimants'] allegations and whatever [Counterclaimants] attached to the complaint," (Dkt. 168-1 at 3-4 (the statement is incorrectly attributed to counsel for PV in the transcript)), Counterclaimants cite to no authority foreclosing the Court from considering evidence outside the four corners of the complaint in assessing Counterclaimants' diligence.

[5] While Counterclaimants contend that they had "a possible basis for [their] SCA claim on July 29, 2024," – before the deadline to amend and the same day that "PV's Information Technology Director, Joshua Hughes . . . testified at a preliminary injunction hearing in this matter" –  they nonetheless argue that they "had no opportunity at that time to pursue Hughes' testimony." (Dkt. 176 at 4). This beggars

words, Counterclaimants knew that PV had access to communications, including Telegram messages, since at least May 29, 2024, and that PV was authorized to access such communications.

In short, this information, which forms precisely the basis for Counterclaimants' futile claim under the Stored Communications Act, was available to Counterclaimants *five months before* the deadline to amend pleadings, but Counterclaimants did not seek leave to amend by the deadline, instead waiting until *almost a year after* the information became available and *more than six months after* the deadline had passed.[6] That is the antithesis of diligence.

_____

belief, but in any event, even after Mr. Hughes testified at deposition on June 25, 2025, his testimony did not add anything of substance to the information already made available to Counterclaimants at least by May 29, 2024.

[6] It also bears mentioning that, in arguing – incorrectly – that PV will not suffer prejudice if allowed to amend its pleading to include a claim under the Stored Communications Act, Counterclaimants contend that the original count for publication of private facts "tracks almost exactly the essential allegations that must be made under the SCA." (Dkt. 176 at 15-16). Setting aside the fact that publication of private facts is not a cognizable claim under New York law (Dkt. 144 at 3), if Counterclaimants were correct, then they should have been able to include a claim

17

Seeking to hide their indolence, Counterclaimants next contend that "in a November 7, 2024, deposition" of Joseph Barton, "after the deadline for amendment in the scheduling order," Mr. Barton "affirmed the likelihood of an SCA violation, testifying that he had personally obtained Mr. O'Keefe's Telegram messages, text messages, emails, and pictures without Mr. O'Keefe's authorization."    (Dkt. 176 at 5).  Setting aside the misleading presentation of Mr. Barton's testimony, the fact remains, again, that Counterclaimants were made aware that "O'Keefe had saved his Telegram communications to [PV's] servers, which were otherwise part of [PV's] records" at least by May 29, 2024.  (Dkt. 51 at 5, n.3).  Mr. Barton's testimony added nothing of meaningful substance to the information already made available to Counterclaimants at least by May 29, 2024, including that any communications by or to Mr. O'Keefe and stored on PV ECS were subject to inspection by PV.

Even if Mr. Barton's testimony added something of meaningful substance to Counterclaimants' proposed amendment – again, it did not

---

under the Stored Communications Act when they filed their original pleading, and certainly before the deadline to amend had passed.  This further speaks to their lack of diligence.

18

– Counterclaimants still cannot show that they acted diligently after Mr. Barton's deposition. Counterclaimants first raised the prospect of an amendment *almost six months after* Mr. Barton's deposition. (*See* Dkt. 150). The fact that Mr. Barton's transcript may have been designated confidential did not preclude Counterclaimants from relying on the information that allegedly "affirmed" the information they already had (Dkt. 176 at 5) concerning their futile claims under the Stored Communications Act.[7]

Finally, while Counterclaimants contend that "a flash drive" containing O'Keefe's Telegram messages was "never received," Counterclaimants nonetheless admit that they knew about this allegedly

---

[7] Counterclaimants' reference to text messages between Matthew Tyrmand and Daniel Strack (Dkt. 176 at 5-7) fail for much the same reasons that Counterclaimants' reference to the testimony of Mr. Barton fails. Moreover, the fact that discovery was held in abeyance for "a three-month period when PV was without counsel," (*id.* at 5), does not help Counterclaimants. Quite the opposite, that three-month period gave Counterclaimants the opportunity to assess their claims (unhindered by the burdens of discovery) in light of the information that they already had for approximately five months before the deadline to request a pre-motion conference to amend had passed.

missing flash drive by December 5, 2024. (*Id.* at 7). It is unclear what relevant information the allegedly missing flash drive containing the Telegram messages adds to Counterclaimants' proposed amendment, beyond confirming what was already made clear by May 29, 2024, *i.e.*, that "O'Keefe had saved his Telegram communications to [PV's] servers, which were otherwise part of [PV's] records." (Dkt. 51 at 5, n.3). Perhaps for that reason, even though PV's new counsel entered an appearance on February 21, 2025 (Dkt. 133), Counterclaimants did not even bring the existence of the allegedly missing flash drive to PV's new counsel's attention until June 18, 2025 – *almost four months later and on the date Counterclaimants filed their motion to amend.* (*See* Harris Decl.[8] at ¶ 1, Ex. 1). Put simply, try, as they have, to cast themselves innocent victims of their own delay, Counterclaimants have failed to establish that they have acted diligently in seeking to amend their pleading.

In addition, although diligence is the primary consideration in determining whether good cause exists to allow amendment of a pleading, it is "not the only consideration." *Tatintsian v. Vorotyntsev*, No.

---

[8] "Harris Decl." refers to the Declaration of Michael J. Harris, filed concurrently herewith.

16-CV-7203, 2024 U.S. Dist. LEXIS 185079, at *4-5 (S.D.N.Y. Oct. 9, 2024). Indeed, this Court can and should consider "whether allowing amendment of the pleading at this late stage of the litigation" will prejudice PV. *See id.* This factor is easily demonstrated by the fact that Counterclaimants have already sought to further extend the already-extended deadline for the close of fact discovery to accommodate countless depositions (Dkt. 158), none of which would have been necessary if Counterclaimants' motion is – as it should be – denied. Not only does the extension of discovery require PV "to expend significant additional resources to conduct discovery and prepare for trial," it also has little effect other than "to significantly delay the resolution of the dispute." *See id.* at *5. This demonstrates plain prejudice to PV.

In sum, for at least the reasons set forth above, Counterclaimants cannot establish good cause for the requested amendment, and their motion must be denied.

## III.    EVEN UNDER THE MORE LENIENT STANDARD OF RULE 15, COUNTERCLAIMANTS' MOTION MUST BE DENIED

Finally, although the Court should not reach the Rule 15 inquiry, because Counterclaimants' motion to amend is plainly governed by Rule

16, even if the Court reaches the Rule 15 inquiry, Counterclaimants' motion must still be denied. Under Rule 15(a)(2), the Court should deny a motion to amend "upon a showing of delay, bad faith, [or] futility." *See Sacerdote*, 9 F.4th at 115. Each of these factors justifies denial of Counterclaimants' motion even under the more liberal standard of Rule 15. *First*, Counterclaimants have unduly delayed for the same reasons that they were not diligent under Rule 16, as set forth *supra* Sec. II. This factor thus weighs against granting leave to amend under Rule 15.

*Second*, Counterclaimants' motion to amend was filed in bad faith. Despite having knowledge of the information on which Counterclaimants rely to support their proposed amendment since at least as early as May 29, 2024, Counterclaimants waited until nearly a year later to seek amendment, thereafter seeking to extend the discovery schedule to accommodate their own delay. All the while, Counterclaimants have been engaged in a series of extrajudicial behavior, including publishing (i) selectively excerpted video deposition testimony of trial witnesses, (ii) a video of O'Keefe (and his agents) appearing, uninvited, at the home of a witness, and (iii) misleading or false stories concerning the facts of the case and the status of settlement discussions. (Dkt. 161 at 1-2; *see also*

Harris Decl. at ¶ 2, Ex. 2). As a result, witnesses have received violent and intimidating threats, that no person, let alone witness, should have to deal with. (*See* Dkt. 161 at 1-2, n.3-4; *see also* Harris Decl. at ¶ 2, Ex. 2). Counterclaimants' attempt to further continue this case, particularly in view of PV's ECS policy, seems designed to do little more than take advantage of the process so that Counterclaimants can obtain further footage for use in their ill-advised publications.

Contrary to Counterclaimants' assertion otherwise (Dkt. 176 at 15-16), as set forth *supra* Sec. II, Counterclaimants' belated request to amend their pleading also does, in fact, prejudice PV, by forcing PV to expend significant additional resources to conduct discovery and prepare for trial – even though it may not ultimately be necessary – and significantly delaying the resolution of the case. That much is made clear by the fact that Counterclaimants "would not oppose" (Dkt. 176 at 17) a request by PV to extend discovery even further to defend against what is tantamount to a frivolous claim.

*Third*, and relatedly, the bad faith nature of Counterclaimants' proposed amendment is further illustrated by the futility of the claim under the Stored Communications Act. This Court has already made

clear that O'Keefe "should be able to allege whether or not he possessed his personal device" and that "part of what" O'Keefe "ha[s] to allege in the amended complaint is why there was no authorization." (Dkt. 168 at 4-5). Notwithstanding those clear instructions, Counterclaimants have still failed to allege a specific personal device that PV accessed or why there was no authorization. For good reason, PV never accessed anything other than its own devices, which PV's ECS policy explicitly authorized it to do. (*See* Hughes Decl. at ¶ 1, Ex. 1). While Counterclaimants contend that "PV invites error" by referencing the ECS Policy, in truth, PV only demands that Counterclaimants satisfy their burden to plead a claim that has facial plausibility, *i.e.*, more than the mere "the-defendant-unlawfully-harmed-me accusation." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Counterclaimants failed to do so, their proposed amendment is futile.

For at least these reasons, even under Rule 15, Counterclaimants' motion should be denied.

## CONCLUSION

For at least the reasons set forth herein, the Court should deny Counterclaimants' motion, and dismiss this case for lack of subject matter jurisdiction.

Respectfully Submitted,

Michael J. Harris

**LAW OFFICE OF**
**MICHAEL J. HARRIS**
43 West 43rd  Street, Suite 148
New York, NY 10036-7424
Telephone: (203) 231-7490
Email: michael.j.harris56@gmail.com

***Counsel for***
***Counterclaim-Defendants***

*Project Veritas and*
*Project Veritas Action Fund*

25

## CERTIFICATE OF WORD COUNT

The undersigned, Michael J. Harris, hereby certifies that this brief complies with the Individual Rules of Practice of Judge Seibel, as well as Local Rule 7.1(c), in that this brief contains a total of 5,196 words, including footnotes.

_____

Michael J. Harris