# EXHIBIT 2

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  PROJECT VERITAS, et al.,

 4                          Plaintiff(s),

 5                                  23 CV 4533 (AEK)
        -vs-
 6                                  DISCOVERY CONFERENCE

 7

    JAMES O'KEEFE, et al.,
 8
                            Defendant(s).
 9  ------------------------------------x

10
                                United States Courthouse
11                              White Plains, New York

12                              Monday, June 9, 2025

13
    Before:  THE HONORABLE ANDREW E. KRAUSE,
14                              United States Magistrate Judge

15

16  A P P E A R A N C E S :

17
    LAW OFFICE OF MICHAEL J. HARRIS
18       Attorneys for Plaintiff
    BY:  MICHAEL J. HARRIS
19

20  CHILDERS LAW, LLC
         Attorneys for Defendants
21  BY:  NICHOLAS P. WHITNEY

22
    ALSO PRESENT:
23
    JAMES O'KEEFE
24

25
```

1            THE DEPUTY CLERK:  All rise.

2            THE COURT:  Good afternoon, everybody.  Please be

3   seated.

4            THE DEPUTY CLERK:  Good afternoon, everyone.  This is

5   the matter of Project Veritas v. O'Keefe, Docket No. 23 cv 4533,

6   the Honorable Andrew Krause presiding.

7            Counsel, please note your appearance for the record

8   starting with Plaintiff's Counsel.

9            MR. HARRIS:  Good afternoon, your Honor.  Michael

10  Harris on behalf of Project Veritas.

11           THE COURT:  Good afternoon, Mr. Harris.

12           MR. WHITNEY:  Good afternoon, your Honor.  Nick

13  Whitney on behalf of James O'Keefe and O'Keefe Media Group, and

14  Mr. O'Keefe is here as well.

15           MR. O'KEEFE:  James O'Keefe.

16           THE COURT:  Good afternoon, Mr. Whitney.  Good

17  afternoon, Mr. O'Keefe.

18           All right, we're here for a status conference.  I

19  thought it would make sense to have this conference in person.

20  There have been a lot of communications, a lot of letters, and a

21  number of accusations, and so I wanted to make sure we have a

22  full and robust discussion of the various matters that have been

23  identified.

24           I want to just start out by noting, there was some

25  with reference in one of your letters, Mr. Harris, to the

1   possibility of having certain portions of this proceeding

2   conducted under seal or subject to a confidentiality order.

3            As a general matter, this is a public proceeding, it's

4   an open court, and generally, things that are discussed in the

5   courtroom are not subject to sealing.  There could be some very,

6   very limited exemptions to that, but I just want to note that at

7   the outset, so if you wind up raising anything that you may

8   think that you could apply retroactively to have sealed, those

9   applications are generally looked at disfavorably, so I'm not

10  prejudging anything, there may be some unique characteristic or

11  circumstance here that would lend itself to an appropriate

12  application along those lines, but it's generally unlikely that

13  I would seal anything that has taken place here in open court.

14           Similarly, if there are materials that you intend to

15  share with me, for purposes of my making a determination as to

16  any of the applications that are pending, those become judicial

17  documents, and judicial documents are subject to a presumption

18  of public access.

19           Now, that doesn't mean that that presumption cannot be

20  overcome, if there are particular facts and circumstances that

21  would warrant maintaining some submission under seal or subject

22  to some sort of limited protective order, but, again, there is a

23  well-developed body of Second Circuit case law, which you may be

24  familiar with, that makes clear that judicial documents, things

25  that the Court is presented with for purposes of making

1  decisions, subject to a presumption of public access, so that

2  sometimes transforms material that would be otherwise subject to

3  protection, such as pursuant to an appropriately entered

4  confidentiality or protective order, into something that no

5  longer has that protection because it's been presented as a

6  judicial document.

7           So I just say that all at the outset before we start

8  talking about any of the issues that anybody wants to raise so

9  we can just all be mindful of that and have a set of

10 expectations as to what's likely to happen if anything comes up

11 that you may want to avoid raising in the public domain.

12          Do you understand that?

13          MR. HARRIS:  Yes, your Honor.  Thank you.

14          THE COURT:  Okay, all right.

15          Mr. Whitney, any questions about that?

16          MR. WHITNEY:  No, your Honor.  Thank you.

17          THE COURT:  All right.

18          So I've reviewed all of the materials that have been

19 filed on the docket in connection with today's proceeding.

20 That's essentially the letters that begin at ECF 158, continue

21 on at 161, 162, 164, 167, and then the most recent filing, which

22 was a memorandum of law, filed over the weekend by Mr. Whitney.

23 That's at ECF no. 169.

24          I'll note that the memorandum of law was helpful for

25 background purposes, Mr. Whitney, but, of course, you didn't

1  know exactly what was going to be raised here today so it's sort

2  of an anticipatory filing.  Fine.  I would have certainly given

3  you an opportunity to brief any disputed issues afterwards, and,

4  Mr. Harris, there may be some interest on your part in briefing

5  some issues after our conference today, we'll see, but

6  nevertheless, I did read that and I've absorbed that for

7  purposes of our discussion here today.

8         This all started out when Mr. Whitney submitted an

9  application for an extension of the deadline to complete fact

10  depositions.  Ordinarily a fairly routine application, but this

11  one had a number of different components to it, a couple of

12  which were granted at the outset, that was with respect to the

13  deposition of Mr. Garvey, which is now scheduled to take place

14  on June 17th, and the deposition of Mr. Tiermond, which will now

15  take place on June 30th and July 1st.

16         The remainder of the applications in that order were

17  not on consent and so I had issued an order asking for the

18  counterclaim defendants, that is, the Project Veritas parties,

19  to submit their position, and they did so through a letter

20  submitted by Mr. Harris on May 28th.  That letter raised a

21  number of issues, including an application for a stay of

22  discovery and a number of concerns that Project Veritas parties

23  have about the way that some of the discovery materials have

24  been used by the counter-claimants in the case up until this

25  point, and then all of the back and forth followed from there.

1            So, Mr. Harris, why don't I turn to you in the first

2   instance.  This is sort a little bit of a free-form proceeding

3   because the original application is an application for an

4   extension of the discovery deadline, the response to that was,

5   essentially, not only do we not want you to extend the discovery

6   deadline, we want you to stay all discovery for these various

7   reasons, so I'll hear from you on that, and, of course, Mr.

8   Whitney, I'll hear from you in full momentarily.

9            MR. HARRIS:  Sure.  Thank you, your Honor.

10           So our position is, as you noted, that we would like

11  to request a stay of discovery in this case.  We think there's

12  ample case law in this Circuit, from within this District and

13  within others within the Circuit, that supports a stay under

14  these circumstances.  The factors for the Court to consider

15  being the breadth of discover that remains outstanding, the

16  strength of the dispositive motions, and prejudice.  All of

17  these factors, it's our position, favor a stay.

18           There's not really any debate that there are

19  dispositive motions pending.  We filed a motion, a letter

20  motion, before Judge Seibel with regard to our motion to dismiss

21  the counterclaims of Mr. O'Keefe and O'Keefe Media Group, after

22  which they filed a motion to amend.  Courts from within this

23  Circuit have found that motions to amend can be dispositive if

24  it's, if it's to be denied.

25           THE COURT:  Okay, I mean, I understand the case law on

1    that issue and I understand the point about staying discovery

2    when dispositive motions are pending.

3           It's certainly not the default practice.  I mean,

4    there are any number of cases where discovery is stayed pending

5    the resolution of dispositive motions.  We're in a bit of a

6    different spot in this particular case, though, because

7    discovery is well underway, in fact, discovery is almost

8    complete, and it seemed to have been Judge Seibel's inclination,

9    based on the transcript from your last hearing, the pre-motion

10   conference before her, that you should continue with discovery

11   while these motions are being briefed, in part on the

12   understanding that if the case is dismissed, it will be because

13   of a lack of federal jurisdiction, right?  There will be a lack

14   of a basis to maintain this case in federal court.  The

15   counterclaims are state law claims, the motion to amend is to

16   amend a federal cause of action, which would provide federal

17   questioned jurisdiction.  Your perspective, Project Veritas's

18   perspective, is that the federal cause of action should not

19   stand, shouldn't be allowed into the case, and Judge Seibel

20   shouldn't exercise supplemental jurisdiction over the original

21   counterclaims because there's no longer the federal claim that

22   brought you, Project Veritas, to court here in the first place.

23          That all may be correct, I don't know, that issue is

24   not before me, but I think Judge Seibel's analysis of it, brief

25   though it was, was that the case isn't going away.  Even if it

1  leaves federal court, it's just going to state court.  This is

2  not a situation where there won't be a need for this discovery,

3  it just wouldn't be in this venue, and in that case, it seems

4  that the argument in support of a stay is pretty significantly

5  undermined.

6          MR. HARRIS:  Well -- so I would respond to that, your

7  Honor.

8          First of all, we did not present the request for a

9  stay to Judge Seibel.  We did in the context of trying to set

10  the schedule for the briefing on the motion to amend.  I did

11  raise that we would like to see that briefing move quickly, so

12  that costs can be avoided in the event that ultimately does go

13  away, but beyond the jurisdictional question, we do also have

14  several 12(b)(6)-based issues that relate to the complaint, that

15  even if the account were to be dismissed, and I -- you know, the

16  case cannot actually be remanded to State Court.  It was not

17  never original filed in state court, so somebody would have to

18  --

19          THE COURT:  If I said remanded, I didn't mean that.  I

20  just said that it could resurface again in state court.

21          MR. HARRIS:  No, and I apologize, you did not, but I

22  believe during the hearing, 'remand' was mentioned.

23          THE COURT:  Okay.

24          MR. HARRIS:  So it would have to be re-filed in state

25  court, but even if it did, there are still significant 12(b)(6)

1 issues that analogously would apply in state.

2 　　　　THE COURT:  Or whatever the CPLR provision is.

3 　　　　MR. HARRIS:  Right.  I think it's 3211, but...

4 　　　　THE COURT:  Yeah.

5 　　　　MR. HARRIS:  Who knows.

6 　　　　THE COURT:  I think that's it.

7 　　　　MR. HARRIS:  But -- so that would be our position in

8 that regard.

9 　　　　So if we move forward to the prejudice prong of the

10 test, you know, our position -- I mean, this is kind of

11 interesting because they're asking for an extension, in part, to

12 further extend discover -- to get more discovery, which may

13 ultimately prove unnecessary.  If the motion to amend is

14 granted, they can get it later.  They're not going to be

15 prejudiced by that.  Whereas, Project Veritas will be prejudiced

16 if it has to move forward with all of this discovery and incur

17 all of this expense for a case that ultimately may go nowhere.

18 　　　　THE COURT:  Okay, I understand that.  And did you want

19 to talk about breadth at all?

20 　　　　MR. HARRIS:  Well -- and the breadth is expansive.  I

21 mean, I think the request for the extension itself illustrates

22 how expansive it is because the Court has already been very

23 generous in how much time it's given Counterclaim Plaintiffs to

24 obtain this discovery and they haven't be able to do it, because

25 it's expansive, there's, I think, at least seven depositions

1  that remain outstanding and they're seeking to add more, so I

2  think it is expansive.

3          And beyond that, you know, and this will segue into

4  the remaining part, which I get we're in open court and I

5  understand your Honor's position with respect to closing these

6  proceedings, but part of the reason for that request is that the

7  way that this discovery material is being used doesn't seem

8  designed to further this allegation, it seems designed to

9  humiliate and intimidate witnesses, including by posting

10  incorrect information about these witnesses, which has now

11  caused people to, first of all, receive death threats, threats

12  of rape, that's one, and part of the reason for the request to

13  seal the courtroom is because I understand that that's currently

14  the subject of an ongoing federal investigation.

15          Beyond that, I have here, and I'm happy to share it

16  with your Honor and my opposing counsel, a police report that

17  has been filed by one of the witnesses that has already

18  testified in this case and who may be a witness at trial,

19  attesting to the fact that Mr. O'Keefe showed up at his office

20  and his home uninvited.  I mean, it's kind of in -- it's more --

21  it crosses the line beyond inappropriate.

22          THE COURT:  Okay.  Well, there's a lot to unpack

23  there, and I'm happy to turn to those issues just so you can

24  present them to me in a little bit more of an organized way, Mr.

25  Harris, I think it makes sense to do that, because the...it

1    would be helpful to have a complete picture, so why don't you

2    walk through your concerns with me one by one.

3                    MR. HARRIS:  Sure.

4                    Well, I have here an affidavit from Joshua Hughes who

5    is set to testify at the end of June.  I don't know if you want

6    me to approach and present it?

7                    THE COURT:  Yes, please.

8                    MR. HARRIS:  Yeah.

9                    THE COURT:  One is fine.  And if you have an extra one

10   for my law clerk, that would be great.  And you have a copy?

11   Mr. Whitney has received a copy as well?

12                   MR. WHITNEY:  Yes, your Honor.

13                   THE COURT:  Okay.  All right, let me just take a

14   second to review.

15                   I've been handed a document that is captioned

16   "Declaration of Joshua Hughes."  It is a four-page document it's

17   dated June 9th, 2025, which, of course, is today.  I'm just

18   going to take a second to read it.

19                   (Brief pause)

20                   THE COURT:  Okay, this person, Mr. Maxwell who's

21   referenced in here was actually a party in this case at one

22   time.  Is that correct, Mr. Harris?

23                   MR. HARRIS:  That's --

24                   THE COURT:  We're talking about the same individual?

25                   MR. HARRIS:  That's correct, your Honor.

1                 THE COURT:  Okay.

2                 Okay, I mean, in sum and substance this declaration

3    recites that Mr. Hughes was threatened by Mr. Maxwell over a

4    series of text messages, purportedly after Mr. Maxwell reviewed

5    a portion of a deposition that was given in this case as part of

6    some media presentation from Mr. O'Keefe, and Mr. Maxwell then

7    purported took these actions Mr. Hughes, again, as alleged, as

8    set forth in this declaration.

9                 Okay.

10                MR. HARRIS:  So that's, that's one example, your

11   Honor.

12                I do have another affidavit that I would like to share

13   with the Court.  However, I didn't receive it until I was in the

14   car, on the way to court, so I didn't have the ability to print

15   it out.

16                THE COURT:  Okay.

17                MR. HARRIS:  That's also from Mr. Skakle, who also

18   testified in this case.  I'm sorry, Joshua Hughes has not

19   testified yet, but he is set to testify at deposition.  Mr.

20   Skakle has already testified.

21                THE COURT:  Okay.

22                MR. HARRIS:  I'm happy to follow up with the Court

23   with the declaration after this hearing.

24                THE COURT:  Sure.

25                MR. HARRIS:  But in the interim, I do have a police

1 report that was filed by Mr. Skakle that will be authenticated

2 in that affidavit.

3            THE COURT:  Okay, I'll take a look at that.  Thank

4 you.

5            And just for the record, I've received a document, the

6 photocopying is not exactly ideal because the top is cut off a

7 little bit, but it appears to be an incident report from the

8 Stamford Police Department, report date April 21st, 2025.

9            One thing that is subject to redaction in public court

10 filings and withholding is personal identifying information

11 about parties and non-parties, so there is an address listed on

12 this document.  That is something that certainly would not need

13 to be part of the public record.  Multiple addresses, in fact,

14 including one for Mr. Scagle and one for Mr. O'Keefe.  To the

15 extent those are business addresses, that may be different, but

16 in any event, I'm just going to read -- not into the record, but

17 I'm just going to read to myself the contents of this police

18 report, which I will note is a three-page document, again, dated

19 April 21st, 2025.

20            (Brief pause)

21            THE COURT:  All right, I will just note, the last

22 sentence of this narrative said that -- according to the officer

23 who took the report, it says that Mr. Skakle stated that he just

24 wanted the incident documented in case he goes to apply for a

25 protective order against Mr. O'Keefe.  Again, that's April 21st,

Disc. Conf.                    Veritas v. O'Keefe

```
 1  2025.  It was approximately two months ago.
 2          Do you know from this declaration or otherwise, Mr.
 3  Harris, if Mr. Skakle has, in fact, followed through to seek any
 4  sort of order of protection against Mr. O'Keefe or anyone else
 5  associated with the counter-claimants?
 6          MR. HARRIS:  I believe that a civil case has been
 7  filed, but I'm not sure of what the status of that is.
 8          THE COURT:  Okay, but a case seeking an order of
 9  protection often takes place, at least in my understanding, in
10  criminal court, so when you say a civil case has been filed, do
11  you know what that -- do you know anything more about it than
12  that?
13          MR. HARRIS:  I don't know anything more.  I know that
14  there's a case number.  Unfortunately, because the Court did not
15  authorize my technology order, I don't have my phone.  If I
16  pulled up my phone, I would be able to tell your Honor more.
17          THE COURT:  Okay, yes, apparently there was some
18  miscommunication with that on our end.  I apologize for that.
19  You did send an e-mail, but it was -- we just had some crossed
20  wires about that on Friday.
21          MR. HARRIS:  No problem.  And just to be clear, I did
22  look into the civil case number, but it is not publicly
23  available.
24          THE COURT:  Okay, that's fine.  And, again, I'm not
25  sure you'd be able to find out any more about it on an
```

1  electronic system.  Sometimes state court records are not

2  available electronically.

3              MR. HARRIS:  Right.

4              THE COURT:  Certainly you know that.  Okay.

5              I understand that there was some questioning of Mr.

6  Skakle in or around his home, I think some people made

7  references to this in the letters, and perhaps some footage of

8  that questioning ended up in some sort of video that's on Mr.

9  O'Keefe's website.

10             That's the same set of circumstances from April of --

11  April 21st?

12             MR. HARRIS:  That is my understanding, your Honor.

13             THE COURT:  Okay.

14             All right, further points you'd like to raise about

15  this.

16             MR. HARRIS:  No, I think -- for the most part, you

17  know, I do -- again, I don't have my computer, I would have

18  presented videos, but I do have thumb drives if your Honor wants

19  them.  I know --

20             THE COURT:  Is your computer here or just downstairs?

21             MR. HARRIS:  I didn't bring it.

22             THE COURT:  Okay.

23             MR. HARRIS:  I wasn't sure that the Court -- I wasn't

24  sure.

25             THE COURT:  Yeah.

1          MR. HARRIS:  But I do have thumb drives or I'm happy

2    to follow up with some of the video footage.

3          But generally speaking, you know, the other part of

4    this is that all of these things are obviously being broadcast

5    to the public including individuals who as yet to be deposed,

6    and it's not just a matter of the individuals who have already

7    testified or who are about to testify and who will also be trial

8    witnesses, but it's also about what all these other witnesses

9    are going to be seeing.

10         There may be -- if they're seeing this, they may fear

11   that the same exact thing that has happened to these individuals

12   who have testified is going to happen to them, and for many

13   witnesses, that poses embarrassment, it poses fear.  I mean,

14   it's completely inappropriate.

15         THE COURT:  I mean, most instances, I would say, and

16   this is not based on any sort of scientific study or analysis,

17   most instances of witness the image or tampering are designed to

18   prevent the witness from testifying, right?  To scare the

19   witness away from testifying or somehow interfere with the

20   witness's willingness to come forward and testify.

21         What's a bit unusual about this allegation is that

22   your view is that Mr. O'Keefe and others, perhaps, acting at his

23   direction are interfering with witnesses that he is actually

24   seeking to have testify, right?  Which would be sort of

25   counterproductive for him if he thinks this testimony is

 1  relevant or pertinent to his case, right?  I mean, the concern

 2  is that these witnesses who are yet to testify would somehow be

 3  less willing to come forward or less cooperative at a

 4  deposition.

 5          I'm not saying that there aren't other examples in the

 6  history of litigation where that same dynamic has taken place,

 7  but it is not the common presentation of a witness tampering or

 8  a witness intimidation allegation.  Do you see what I mean?

 9          MR. HARRIS:  Sure, and may I say a few things in

10  response?

11          THE COURT:  Please, yeah.

12          MR. HARRIS:  What I would say, first of all, is, you

13  know, what I presented as intimidation or harassment or

14  tampering, I'm not necessarily speaking in the criminal sense.

15  I'm not a prosecutor and it is not my job to --

16          THE COURT:  I understand, and I don't mean the

17  question in a criminal sense either, but even in a civil

18  context, again, if the idea is you're taking action to try to

19  limit the witness's willingness to come forward, even in a civil

20  sense, again, that would seem counter to your interests if you

21  are the person who's seeking the testimony of that witness.

22          MR. HARRIS:  Unless, of course, your intention is not

23  to stop the individual from testifying, but to change their

24  testimony.

25          THE COURT:  Sure.

Disc. Conf.                Veritas v. O'Keefe                    18

1          MR. HARRIS:  To persuade them to testify in a way that

2   is more beneficial to your position than another's.  And just

3   because -- you know, depositions are a discovery device.  Just

4   because Mr. O'Keefe has noticed the depositions of these

5   individuals does not mean that we will not be calling them at

6   trial.

7          THE COURT:  Of course, yeah, that's true.

8          Okay, you had mentioned that there is one case where a

9   witness has been subjected to threats that are now the subject

10  of further federal criminal investigation?

11         MR. HARRIS:  That is my understanding, your Honor.

12         THE COURT:  Okay, and is that different from the

13  potential federal criminal investigation that theoretically

14  could be opened in connection with the information in the

15  declaration from Mr. Hughes?

16         MR. HARRIS:  That is different, yes.

17         THE COURT:  Okay, and who -- are you at liberty to say

18  who that witness is?

19         MR. HARRIS:  I would prefer not to at this time.  I

20  haven't been given permission to do so.

21         THE COURT:  Okay.  But that's the witness who you

22  refer to in your letter, there's a footnote in your letter at

23  ECF no. 161, where you say, "a former Project Veritas employee

24  recently received recorded threats of rape and death shortly

25  after Mr. O'Keefe appeared in a podcast referencing a former

1   Project Veritas employee."

2           MR. HARRIS:  That's correct, your Honor.

3           THE COURT:  And just to be clear, from that sentence,

4   there's a little ambiguity.  When you say that Mr. O'Keefe

5   appeared in a podcast referencing a former Project Veritas

6   employee, was that reference to the former Project Veritas

7   employee who received these threats?

8           MR. HARRIS:  Yes.

9           THE COURT:  Okay.

10          MR. HARRIS:  And just so your Honor is aware, I'm sure

11  you may have guessed this, but it was intentionally drafted to

12  be a little bit ambiguous to conceal the gender.

13          THE COURT:  That's fine.  I just -- the thing that

14  made it ambiguous was the use of 'a' instead of 'the' in the

15  second reference to the Project Veritas employee, but I, I

16  am...certainly aware of the need sometimes for ambiguous

17  drafting to avoid identifying information about a potential

18  witness in a variety of contexts, so...

19          And so the relief that you're seeking, I -- let me

20  just try to understand, because I will say at the outset, I am

21  sceptical about the idea of staying discovery.  I haven't made a

22  final determination on that, but I'm not currently inclined in

23  that direction, so if discovery were to continue, what relief

24  would you be seeking in connection with these incidents, these

25  allegations of harassment, these ongoing episodes that have been

1  -- perhaps have now risen to the level of criminal

2  investigation?  What is your request there, Mr. Harris?

3          MR. HARRIS:  So recognizing that your Honor has fairly

4  broad authority to craft a remedy here, we would certainly defer

5  to what your attorney would think would be appropriate, but at a

6  minimum, we would ask that the depositions proceed remotely so

7  that individuals do not have to appear in person.

8          THE COURT:  And -- okay, you mentioned that in your

9  letter, and what would be the reason for that?

10          MR. HARRIS:  Well, Mr. O'Keefe --

11          THE COURT:  What would that help to accomplish.  In

12  your view.

13          MR. HARRIS:  Mr. O'Keefe typically attends the

14  depositions, so I think his very presence there is -- you know,

15  for these individuals who have -- who are seeing all of this

16  play out, I think it has an intimidating effect, and beyond

17  that, you know, part of what we've been seeing here is that --

18  and I think that the videos kind of bring this out, is that

19  these videos are not -- much as they may say that they're

20  intended for use at trial, they're being used in a way outside

21  of the courtroom to embarrass and to humiliate people, so --

22          THE COURT:  Well, okay, but let...if the deposition

23  took place remotely, that wouldn't address that point, the

24  deposition could still be videotaped, and, in fact, there's an

25  argument that it should be videotaped if you're talking about a

1  witness who may not be within the subpoena range for trial.

2          MR. HARRIS:  Sure.  So in that case, then I think that

3  we would fall back on what I had originally said, which is that

4  the very need to appear in person in a deposition room where Mr.

5  O'Keefe is also present would cause issues with, with what is

6  going on.

7          THE COURT:  Okay.  So, I mean, one --

8          MR. HARRIS:  It would have the effect of intimidating.

9          THE COURT:  I'm just trying to actually understand

10 exactly what you're asking for, so one would be to require the

11 depositions to take place remotely.

12         MR. HARRIS:  Yes.

13         THE COURT:  And are you asking that the Court prohibit

14 Mr. O'Keefe from attending the depositions by video?

15         MR. HARRIS:  So, your Honor, as you -- you know, we

16 actually had this issue pop up on Friday in the deposition of

17 Mr. Wettmore.  As I read your Honor's protective order,

18 deposition testimony is supposed to be attorneys' eyes only for

19 30 days after the deposition, so in my opinion, Mr. O'Keefe

20 should never be in any of these depositions, because that

21 defeats the purpose of your Honor's order requiring that the

22 testimony be held AEO for 30 days.

23         Now, they -- I understand that -- as your Honor may

24 recall, I joined this case fairly late, there was, you know,

25 predecessor counsel before me.  It may have been the case that

1   they allowed Mr. O'Keefe to sit in those depositions.  However,

2   I'm a different attorney, of course, and each deposition is

3   different, and I made very clear on the record at that

4   deposition that I understand your Honor's order to prohibit him

5   from attending these depositions.  Nonetheless, they disagreed

6   and he attend anyways.

7               So...

8               THE COURT:  Okay, and that's not an issue that I gave

9   any particular thought to in entering the protective order,

10  which was a protective order that was submitted on consent by

11  the parties, so the order is the order and I'm pulling it up

12  now, but I don't know that I've ever been specifically presented

13  with that particular question.

14              As you probably won't remember, because you weren't

15  here at the time the protective order was put in place, but as

16  Mr. Whitney may remember I have a standard form protective order

17  that includes my regular routine language that I impose in case

18  where the parties don't have any particular additional or

19  specially requests.  That doesn't even include AEO, attorneys

20  eyes only, language, so this language attorneys eyes only for a

21  period of 30 days is definitely not my original language, so as

22  far as what I intended or didn't intend, you know, the parties'

23  intentions are actually as instructive as mine because, again,

24  that's not language that I drafted, it's language that the

25  parties drafted.

 1              That said, the language is on top of my signature and
 2    it is an order of the Court, so I will give that some additional
 3    thought and consideration.  It's just not something that I
 4    considered or thought about thoroughly at the time because it
 5    was an agreed-upon order that, you know, when I read it, I
 6    didn't have any concern or objection with the language as
 7    presented, so I'm pulling that up as we speak.

 8              So your position Mr. Harris is that Mr. O'Keefe
 9    shouldn't attend the depositions anyway, not necessarily because
10    a separate order is required, but because the existing order
11    provides that he shouldn't.

12              MR. HARRIS:  Yes, your Honor.

13              THE COURT:  Okay.  What else?

14              MR. HARRIS:  Beyond that, your Honor, I think the
15    request -- the ask would be -- and I know -- you know, I'm going
16    to address this kind of lightly here because this document came
17    in over the weekend.

18              In the filing that Mr. Whitney made over the weekend,
19    you know, they sort of allude to the fact that we're asking for
20    a gag order, which is not true.  We're not asking for a gag
21    order.  Project Veritas, like myself, respects the First
22    Amendment.  And while that may be warranted in certain -- some
23    circumstances, we're not asking for it here, but we would ask
24    that the Court prohibit Mr. O'Keefe from appearing at the homes
25    of witnesses or their offices.

Disc. Conf.                Veritas v. O'Keefe                    24

1          And by Mr. O'Keefe, I, of course, mean Mr. O'Keefe and

2   any of his agents or agents of OMG.

3          THE COURT:  Okay.  What else?

4          MR. HARRIS:  That's about it, your Honor.  I think

5   that would cover it.

6          THE COURT:  So you're not making any application that

7   the deposition materials not be shared publicly, as long as

8   there's no violation of the protective order.

9          MR. HARRIS:  Your Honor, if we could make that

10  request, if your Honor were inclined to grant it, we would

11  certainly welcome it.

12         THE COURT:  Well, I'm not inclined to grant it.

13         MR. HARRIS:  Right, and that's, perhaps, why we didn't

14  ask for it.

15         THE COURT:  Well, I appreciate that, but I'm asking

16  you to ask whatever you want to ask for.

17         Look, I appreciate that because, you know, I would say

18  in all the cases that I litigated as an attorney and all the

19  cases that I've presided over as a judge, I can probably count

20  on one hand out of those hundreds, if not, at this point,

21  thousands, of cases, where the parties were interested in

22  sharing the deposition transcripts with anybody, and that's

23  because only a small fraction of those cases would there have

24  been any interest by any member of the public in the contents of

25  those depositions.

 1          There's also, then, a real what I will refer to as a

 2   goose/gander problem with that issue because, very often, one

 3   party doesn't want to start sharing information publicly because

 4   they don't necessarily want their information to be shared

 5   publicly in response.  And it's more of a courtesy, I think,

 6   among counsel in most cases.

 7          Obviously, sometimes there are protective orders that

 8   cover this specifically, but generally, it's a matter of

 9   standard practice and courtesy that discovery materials are

10   maintained within the four corners of the litigation.  Again,

11   that's, I would say, the most typical set of circumstances in

12   the vast majority, overwhelming majority, of cases, but I'm not

13   aware of any law or rule that requires that to be the case,

14   which is what prompted my supplemental order which you and Mr.

15   Whitney both responded to about whether there were any

16   violations of the protective order, because that is different,

17   right?

18          If there had been a specific piece of testimony that

19   had been designated as confidential and subject to the

20   protective order and if it had then be released, you know, then

21   we're talking about a specific order that may have been violated

22   as opposed to just a norm or custom, so I appreciate that you're

23   not making that request, perhaps because your research concluded

24   the same as my instinct and then my subsequent research by my

25   staff tended to confirm.

1          All right, so your principal request, of course, is

2    for a stay, which would sort of obviate the need for all the

3    subsequent requests, which I certainly understand, Mr. Harris,

4    but if -- to the extent I would not be inclined to grant a stay,

5    your subsequent requests are that remaining depositions be

6    conducted remotely; that Mr. O'Keefe not be permitted to attend,

7    either because the protective order doesn't allow him to attend

8    or he just shouldn't be able to; and finally, you request that

9    Mr. O'Keefe and his agents, if you will, be prohibited from

10   appearing at the homes or business locations of the witnesses.

11          Do you have that right?

12          MR. HARRIS:  That's correct.

13          THE COURT:  Okay.  Anything else at this point, Mr.

14   Harris, before I turn to Mr. Whitney?

15          MR. HARRIS:  No, and perhaps this is better reserved

16   for later, but just in the event that your Honor is not inclined

17   to grant the stay and allows the extension of discovery, I just

18   want to reiterate that we are going to take Mr. O'Keefe's

19   deposition, so that would need to be factored into an extended

20   schedule.

21          THE COURT:  I did note that in your letter and,

22   certainly, I can't imagine there would be a good-faith objection

23   to that, Mr. Whitney, since you're asking to have additional

24   witnesses added to the ledger as well, but if you do have any

25   objection, you can let me know.

1              All right --

2              MR. HARRIS:  Thank you, your Honor.

3              THE COURT:  Thank you -- I'll come back to you with

4    other questions as we progress.  Thank you, Mr. Harris.

5              MR. HARRIS:  Great.  Thank you.

6              THE COURT:  All right, Mr. Whitney, there's a lot to

7    responded to there, so I'll let you take it in any order that

8    you want and then I will supplement with questions of my own if

9    there are things that I feel I need more information about.

10             MR. WHITNEY:  All right, I was hoping you'd give me

11   some direction, but --

12             THE COURT:  Okay, that's fine.  Let's -- why don't you

13   start with the stay.

14             You've already heard that I'm disinclined on the

15   request for a stay, but I'll let you make any points that you

16   want to make specifically about why you think discovery should

17   not be stayed here, other than things I've already alluded to.

18             MR. WHITNEY:  I think the Court is rightly skeptical.

19   We have pursued this discovery diligently since the fall of last

20   year.  There was a approximately four-month period where Project

21   Veritas was without counsel and we could not proceed.  We are

22   trying to take depositions of, I don't know, seven to nine

23   additional witnesses, and that has been announced since prior

24   counsel was in the case, and the July 1st deadline for a number

25   of reasons, in our view, is unworkable.

1           I mentioned in my letter that Barry Hinkley had

2    retained counsel and there was a petition to quash the subpoena.

3    I'm trying to work through that with his counsel, but as I'm

4    doing that, Matthew Tiermond, who you reset the depositions for

5    June 30th and June 1st, has retained counsel and now I'm trying

6    to work through the same issues with that lawyer to perhaps

7    adjust Matthew Tiermond's deposition, but I've told him, at this

8    point, it's a July 1st deadline, so I'm not at liberty to move

9    this and work with you.

10          So we think the stay -- there's not a good basis for

11   the stay, and we're glad to hear the Court is sceptical.

12          THE COURT:  Okay, fine.  Let's talk about some of

13   these allegations about witness intimidation.

14          And I'll just say at the outset, I imagine that one

15   thing you will say to me here, Mr. Whitney, is that no one is

16   attempting to intimidate anybody, nobody's attempting to

17   harassing anybody, that's not the purpose of any of these

18   attempted interviews, that's not the purpose of Mr. O'Keefe

19   posting various things on his web sites, it's not the purpose of

20   the video, the movie about...I forget exactly what it's called,

21   Mr. O'Keefe, but the, the Project Veritas --

22          MR. O'KEEFE:  *The Truth About Project Veritas.*

23          THE COURT:  *The Truth About Project Veritas.*  I --

24   there was a citation in Mr. Harris's letter to this article,

25   "O'Keefe in talks to regain control of Project Veritas, launches

1   docu-series *The Truth Inside of Veritas*."  I did read that

2   article in preparation for today's proceeding, there was a link

3   to the film, I don't know how long it was, but I did not watch

4   the film, just so everybody has an idea of what information I

5   have and what information I don't have.

6           The article was quite long and I imagine included a

7   number of quotes and excerpts -- I mean, it included a number of

8   quotes and excerpts from the deposition testimony in this case.

9   I imagine there is the corresponding video clip of those

10  excerpts in the film.

11          Is that -- do I have that right, Mr. Whitney?

12          And there may be others too.  It may be that the -- I

13  don't think that article was meant to be a verbatim script of

14  the film, but it did have a lot of examples which were

15  illustrative for my purposes, I think.

16          MR. WHITNEY:  It is true there are clips from the

17  George Skakle interview of, I guess, April in the film.

18          THE COURT:  Right, but there are also clips from the

19  depositions in the film?

20          MR. WHITNEY:  Yes, your Honor, there are.

21          THE COURT:  And, and -- if you need to ask Mr. O'Keefe

22  this, you can, but are the clips in the film the ones that are

23  quoted in the corresponding article?

24          MR. WHITNEY:  Many of them, but not complete overlap.

25          THE COURT:  Okay, fine.

1            So, again, I understand you may say to me, in part,

2    that was nobody's intention, but, look, you now know, and maybe

3    you've just learned about this, that Mr. Hughes has received

4    some threatening communications from Mr. Maxwell, which, if

5    those are authentic copies of the text messages, and I say this

6    not in a manner to be evaluating anybody's guilt of any

7    potential offense, but it's understandable how a person could

8    view those communications as threatening.  And, again, Mr.

9    Maxwell isn't here, he's no longer a party in this case, but

10   that seems to have been something that happened as a consequence

11   of some of this material being posted, right?  So that's

12   something that the Court has to take seriously.

13            Mr. Harris, to his credit, is not here requesting that

14   any of that material be taken down, I don't think that that's an

15   order that I could realistically issue, nor is he even

16   requesting that Mr. O'Keefe be prohibited from disseminating the

17   information, which, again, I think is a judicious...decision in

18   terms of the scope of the requested relief, but it's concerning,

19   right, that some of Mr. O'Keefe's direct conduct, at least

20   vis-à-vis Mr. Skakle, prompted Mr. Skakle to go to the police,

21   though, as I noted, Mr. Skakle didn't take any further step to

22   -- it seems at least, didn't take any further step to seek a

23   protective order, which he could have, you know, an order of

24   protection.  This business about Mr. Hughes and his interactions

25   with Mr. Maxwell is concerning just on a human level.

1           This additional episode, it's hard to figure out

2  exactly how to factor that into the analysis because Mr. Harris,

3  understandably, doesn't feel at liberty to disclose information

4  about this additional Project Veritas employee who has allegedly

5  been subjected to threats, but, again, this is not usual

6  behavior and it is not a common scenario, that people have to

7  endure this kind of vitriol, whether intended or not, so, again,

8  there's reason for concern.

9           Why don't you take a minute to try to address that

10 however you see fit.

11          MR. WHITNEY:  Well, with respect to the two documents

12 that were presented today, RC Maxwell is not an employee of

13 James O'Keefe or OMG, he's not an agent of them, so -- he's a

14 former party, but he's essentially a member of the public, and

15 that he issued threats against Joshua Hughes, I suppose, is

16 unfortunate and -- but it has nothing to do with my party's

17 conduct.

18          THE COURT:  I mean, it is, it is unfortunate.  You

19 don't have to suppose.  I mean, it's not, it's not good.

20          I mean, whatever Mr. Hughes may or may not have done,

21 you know, having somebody send you text messages that threaten

22 to make an example of a family member is not something that

23 anybody should have to deal with.  Whether they're a public

24 figure, whether they're involved in a lawsuit, whether they work

25 at a place that is a party to a lawsuit, it's just not something

1   that anybody should have to endure in a civilized society.  I

2   think we should be able to agree on that.

3           MR. WHITNEY:  I agree on that.  I withdraw the hedging

4   language on that.

5           THE COURT:  Thank you.

6           MR. WHITNEY:  And with respect to George Skakle, this

7   was a consensual interview that took place in his driveway.  It

8   begins with Mr. O'Keefe walking up to him and saying, hey,

9   George --

10          THE COURT:  To be honest with you, I'm less concerned

11  about that one.

12          MR. WHITNEY:  All right.

13          THE COURT:  And Mr. Skakle -- and I don't mean to make

14  light of it.  The fact that he chose to document this in a

15  police report means that there was something about it that,

16  obviously, didn't sit right with him, but it does seem as though

17  at some point he decided to walk away from it, and whether Mr.

18  O'Keefe and his colleagues may have briefly trespassed on Mr.

19  Skakle's property, which is sort of the...suggestion in the

20  police report doesn't seem that Mr. Skakle pressed charges

21  regarding that and doesn't seem in the nearly two months since

22  then that there's been any further problem with Mr. Skakle.

23          So, again, I don't mean to make light of that, but

24  it's somewhat less acutely concerning than the incident with Mr.

25  Maxwell, who, as you point out, is not and OMG employee or under

1  the control or direction of Mr. O'Keefe, or this other incident

2  which seems to fall into a similar category where you have

3  perhaps a disturbed member of the public who is responding to

4  Mr. O'Keefe's publication of these materials in a way that Mr.

5  O'Keefe is not encouraging or certainly not directing, it just

6  seems to be an outgrowth of the publicity, which, again, it

7  gives the Court concern, but the question is, what do we do

8  about that.

9          So anything further you want to add on that, Mr.

10 Whitney?

11         MR. WHITNEY:  Not on Mr. Skakle or Mr. Hughes, but I'd

12 like to comment more broadly about the vitriol and emotion in

13 this case.

14         THE COURT:  Please.

15         MR. WHITNEY:  First, it's important that Project

16 Veritas represented that they had videos of Mr. O'Keefe chasing

17 trial witnesses through the street.  That never occurred and

18 those do not exist.

19         THE COURT:  Okay, let's just pause there.  I mean,

20 that is -- and I'm not sure that's an exact quote, but there was

21 something to that effect, Mr. Harris.

22         MR. HARRIS:  Yes, so -- thank you, your Honor.  If I

23 had my computer, I would put it up on the screen.

24         I suppose, perhaps, the better language to have used

25 would have been charging through the street at Mr. Skakle's

1   home.  You can actually hear Mr. O'Keefe yell "George" in the

2   video, George being George Skakle, and charging to his home, so

3   Mr. O'Keefe and one of his agents is depicted charging through

4   the streets, and I suppose a better way of describing it is that

5   they are running towards his home.

6           So while Mr. Whitney describes it as walking up to his

7   dry, what I would say is, in fact and in reality, he was

8   charging to him while he was getting his mail from his mailbox.

9           THE COURT:  Okay, so that reference in your letter to

10  ECF no. 161 is to the incident involving Mr. Skakle.

11          MR. HARRIS:  Yes.

12          THE COURT:  All right, you can be seated.

13          MR. HARRIS:  Thank you, your Honor.

14          THE COURT:  All right, I understand that use of phrase

15  now.  You can move on to the next point, Mr. Whitney.

16          MR. WHITNEY:  Yes, your Honor.  Well, I just want to

17  reiterate that the May 22nd conference before Judge Seibel, Mr.

18  Harris said that there were videos plural showing James O'Keefe

19  chasing potential trial witnesses plural, so we've heard about

20  him potentially charging the home of George Skakle, but there's

21  not James O'Keefe chasing witnesses plural.  That --

22          THE COURT:  Okay, let me just make sure that that's

23  correct, and, again, the transcription, as outstanding as our

24  court reporters are, there could have been an S added because

25  it's a telephonic transcription.  That happens occasionally.

Disc. Conf.                    Veritas v. O'Keefe

1           I just want to make sure what the allegation is.

2           MR. HARRIS:  Sure, your Honor.  I think that could

3    also just have been human error on my part when I --

4           THE COURT:  Human error is also something that

5    happens.

6           MR. HARRIS:  But beyond that, I do want to point out

7    although I don't have it here today, there is another witness

8    who factors into this, that's Dan Strack, at whose house I

9    understand Mr. O'Keefe also appeared, first sending two agents

10   to the door, then after Mr. Strack's wife allegedly turned those

11   individuals away, Mr. O'Keefe appearing himself banging on the

12   door, and there are issues there too now.

13          I haven't submitted an affidavit, but, again, if the

14   Court is desirous that I follow up with additional

15   documentation, I would expect to provide that to the Court as

16   well.

17          THE COURT:  Okay.  Mr. Strack, it was the -- am I

18   correct that he was the CFO?  I don't want to --

19          MR. HARRIS:  CTO.

20          THE COURT:  CTO.  Thank you for that clarification.

21          MR. WHITNEY:  COO.

22          MR. HARRIS:  COO, apologies.

23          THE COURT:  Okay.  It was the chief officer of some

24   sort.  The chief operating officer?  Is that right, Mr. O'Keefe?

25          MR. O'KEEFE:  Yes, that's correct.

1                THE COURT:  Okay.

2                And he's testified already?

3                MR. HARRIS:  He has.

4                THE COURT:  So those interactions, or alleged

5     interactions, took place after his testimony, sort of similar to

6     the situation with Mr. Skakle?

7                MR. HARRIS:  Yes.

8                THE COURT:  You got all of that, Tabitha?  Of course,

9     yes.  Okay.

10                Mr. Whitney -- and, again, I don't mean to keep

11    interrupting you, Mr. Whitney.  I just want to have a clear

12    record.

13                MR. WHITNEY:  I'm happy for the interruption.

14                THE COURT:  Okay.

15                MR. WHITNEY:  All right, so we agree that folks should

16    not be subject to this vitriol.

17                Mr. O'Keefe has been subject to vitriol far in excess

18    of what's been relayed here.  Matthew Tiermond, who we seek to

19    depose, and we have two witnesses now in their depositions,

20    under sworn testimony, confirming that Matt Tiermond openly

21    stated in Project Veritas headquarters he wanted to decapitate

22    James O'Keefe and carve his heart out and eat it with a spoon.

23    He is quite visual.

24                THE COURT:  Okay.  I mean --

25                MR. WHITNEY:  George Skakle --

1            THE COURT:  And, again, I'm not saying this to

2    minimize the severity and disturbing nature of that remark,

3    which is atrocious, I don't know why anybody would say that

4    about anybody else, but that really has nothing to do with the

5    litigation, right?  That was as part of the dispute that's given

6    rise to the litigation, it's not because of something that

7    happened in the conduct of this case?

8            MR. WHITNEY:  It's hard to say what Mr. Tiermond's

9    motivations are --

10           THE COURT:  I mean, just temporally.

11           MR. WHITNEY:  I think -- and temporally, that's

12    accurate, your Honor --

13           THE COURT:  Okay.

14           MR. WHITNEY:  -- as the lawsuit was being filed around

15    that time, so...

16           THE COURT:  Okay.  Although they were the ones filing

17    it at that time, I suppose.

18           MR. WHITNEY:  Right.

19           THE COURT:  Right, okay.

20           Well, I'm sorry that you've endured that, Mr. O'Keefe.

21    Honestly, that's, that's not appropriate either, and that's not

22    a one-way street apparently.

23           MR. WHITNEY:  Right.  George Skakle testified during

24    his deposition that he wanted to harm James O'Keefe.

25           THE COURT:  Presently?

Disc. Conf.              Veritas v. O'Keefe

1          MR. WHITNEY:  Yes.

2          THE COURT:  Or at one point he felt that way?

3          MR. WHITNEY:  I don't think we followed up to figure

4    out if that desire had --

5          THE COURT:  Okay.  Although apparently that didn't

6    stop Mr. O'Keefe from approaching Mr. Skakle with colleagues at

7    Mr. Skakle's house, so, okay.

8          MR. WHITNEY:  And I'm prepared to have Mr. O'Keefe

9    testify if necessary, but Mr. Skakle after his deposition

10   approached Mr. O'Keefe at a holiday party and took credit for

11   firing him from Project Veritas, so in the same vein, Mr. Skakle

12   was not intimidated by Mr. O'Keefe.

13         THE COURT:  Fine.

14         MR. WHITNEY:  I will note at this juncture, there's no

15   testimony from anybody that when Mr. O'Keefe appears for a

16   deposition they've been intimidated or he's attempted to

17   intimidate them at their deposition, and it goes the point of

18   trying to exclude him as a party from the depositions in this

19   case.

20         Now, I do have documents or evidence of -- the

21   complaint here is really about OMG exercising its First

22   Amendment right in reporting on this dispute, so I have several

23   exhibits that point out that Project Veritas is guilty of what

24   it charges Mr. O'Keefe with.

25         THE COURT:  I'm only chuckling because in my staff's

1    research into some of these issues, one of the cases that had

2    some relevant information was, in fact, a case where Project

3    Veritas was a defendant, in Michigan, regarding some similar

4    allegations of misconduct having to do with depositions, but are

5    you going to give me examples of things that happened when

6    Project Veritas was under Mr. O'Keefe's leadership?  Because

7    that won't really be compelling.

8              MR. WHITNEY:  No, your Honor, these are -- all follow

9    his departure.

10             THE COURT:  Okay.

11             MR. WHITNEY:  So, for example, there is a September

12   6th, 2023 article -- would you like me to present a copy to your

13   Honor?

14             THE COURT:  If you're going to refer to them, sure,

15   please.

16             MR. WHITNEY:  All right.

17             THE COURT:  And make sure Mr. Harris has one as well.

18   Thank you.

19             And just for the record, Mr. Whitney has handed the

20   Court a printout from an Article in *The Washington Post*.  It's

21   what it appears to be at least.  It's a seven-page document.

22   The headline is "Project Veritas audit accuses 'untouchable'

23   founder of improper spending."

24             Okay, Mr. Whitney you want to point me to the relevant

25   portion here?

 1          MR. WHITNEY:  Yes, your Honor.  I think the most

 2  relevant portion is at the bottom of the second page where it

 3  mentions Hannah Giles, a one-time O'Keefe ally, beginning at the

 4  second to last paragraph?

 5          THE COURT:  Yes, I see.

 6          MR. WHITNEY:  And so Hannah Giles was the successor

 7  CEO of Project Veritas, and first, what Project Veritas did was

 8  disseminate an audit conducted by Dorsey & Whitney that was

 9  supposed to be confidential, and then Hannah Giles here is

10  commenting on the litigation, attacking James O'Keefe in the

11  press, and otherwise, I guess, embarrassing him.

12          That's the first example, your Honor.

13          THE COURT:  Okay.  I guess this, I mean -- and you

14  have other examples of Project Veritas employees saying things

15  about Mr. O'Keefe in the media.

16          MR. WHITNEY:  Yes, and one of the arguments made in

17  the letters was that OMG's reporting is designed to prejudice

18  the jury and that's its only purpose.  I would argue if that's

19  the case, all of these Project Veritas releases, *The Washington*

20  *Post* articles, the next I have is a release of the audit to *The*

21  *New York Times*.

22          THE COURT:  Yeah.  I mean, listen, the idea of, of --

23  first of all, all this stuff happened some time ago, but this

24  e-mail or this letter, I'm sorry, that you just -- excuse me,

25  this article from *The Washington Post* that you just handed up is

1  from September 6th, 2023.  It's hard to restrain conduct that

2  happened that long ago.  I -- Mr. Harris, perhaps, again, in an

3  exercise of discretion didn't raise any arguments about

4  prejudicing the jury pool, which are really premature at this

5  point for all kinds of reasons, not the least of which, maybe

6  this case doesn't stay in federal court at all if Mr. Harris has

7  his way, but there's really no request here other than the stay,

8  there's no request to stop O'Keefe Media Group from reporting on

9  anything.  I mean, I think that was part of the overall

10 presentation about how this information is being received by the

11 public.

12         Frankly, in all likelihood, if there are people who

13 are avid readers of O'Keefe Media Group web sites and articles

14 about this case, those are people who are not going to be

15 suitable jurors in this matter, because they'll have too much

16 information that they've already obtained and processed about

17 it, I think -- well, I'm sure both Project Veritas and O'Keefe

18 Media Group have a wide reach in terms of viewership and

19 audiences, including within the Southern District of New York,

20 and will have an ability to select jurors who are not familiar

21 with this particular dispute.  I'm pretty confident of that.

22         So I understand your point, I understand you may have

23 more examples to make that point, Mr. Whitney, but I think we

24 can move beyond that.

25         MR. WHITNEY:  All right, and then, for the record,

1  I'll enter, separate and apart from sort of the exercise of

2  press reporting, an e-mail Mr. O'Keefe received from Project

3  Veritas, then Project Veritas attorney, Paul Cali, threatening

4  Mr. O'Keefe with physical violence.

5          THE COURT:  And your representation is this is an

6  e-mail from Mr. Cali -- was Mr. Cali an attorney for Project

7  Veritas in this case?

8          MR. WHITNEY:  No.

9          THE COURT:  I don't recall meeting him.  No?

10         MR. WHITNEY:  He was once upon a time counsel for

11 Project Veritas.

12         THE COURT:  Okay.  There's a date on here that says

13 May 3rd.  Do you know what year?

14         MR. WHITNEY:  2023, your Honor.

15         THE COURT:  Okay, I'm not going to read this into the

16 record.  It's full of, shall we say, course language and

17 certainly not, not a communication that is particularly

18 befitting of a member of a bar of this or any court, but it is

19 noted as a...hostile, to say the least, and aggressive message

20 from this individual who you say was Project Veritas's former

21 counsel, directed at Mr. O'Keefe.  Again, I'm not making light

22 of it, I just -- you know, at some point, I'm not sure what to

23 do with that, Mr. Whitney.

24         But, yes, I mean, it's, it's...that person did not

25 cover himself in glory when he wrote that message, I mean, my

1   goodness.

2        MR. WHITNEY:  Yes.

3        We have further examples, but I think the Court gets

4   the point.  I'm happy to present them --

5        THE COURT:  Yeah, no, I get the point.  There's a lot

6   of ill will on both sides.  That, I knew before showing up here

7   today.  The question is really a narrow one for purposes of

8   discovery, which is to say, should there be any limitations or

9   restrictions imposed in this case that will better ensure the

10  safety of witnesses, better ensure that they are free from

11  harassment and intimidation to the extent that any order of this

12  Court could accomplish that, which, again, my powers of

13  restraint are limited, both by the constitution and by reality,

14  that I can't stop this member of the public who has some very

15  strong feelings about this dispute from picking up the phone or

16  picking up, you know, his or her phone to send a text message or

17  whatever it might be.  I say that not to in any way make light

18  of the experiences of these witnesses or potential witnesses,

19  but just to note that it's...challenge at west best to try to

20  entirely control that behavior.

21        Let's focus, I guess, then, on the three requests that

22  Mr. Harris has made.  Again, assuming that I am going to allow

23  discovery to proceed, there are three requests.  One is that the

24  depositions take place by remote means, the second is that Mr.

25  O'Keefe not attend, and I'm going to take a closer look at the

Disc. Conf.                    Veritas v. O'Keefe

1  confidentiality order in a second on that point, and the third

2  is to prohibit Mr. O'Keefe and his agents from appearing at the

3  homes and businesses of any deposition witness in this case.

4            What your position?  Or what is Mr. O'Keefe's

5  position?

6            You haven't had a chance to talk to Mr. O'Keefe about

7  any of these, so actually, I'm going to give you a couple

8  minutes to talk to each other to see if anything of those things

9  would be things that Mr. O'Keefe would be willing to agree to,

10  without my having to order any of them, and I'm not saying I

11  would or I wouldn't, but why don't you just take a -- let's take

12  a five-minute recess, I'd like you to have a chance to talk

13  about that with each other and give that some consideration.

14            In the meantime, I'll step back into the robing room

15  and give a closer read to the confidentiality order to address

16  the issue that Mr. Harris raised, and then we'll come back.

17            Okay?

18            MR. WHITNEY:  One moment, if I may interject before

19  you do that.

20            THE COURT:  Yeah, sure.

21            MR. WHITNEY:  The confidentiality order at this point

22  about attorneys' eyes only, your Honor mentioned that the

23  attorney's intent was just as relevant as the Court's intent.

24            THE COURT:  Right, and you were the only one that was

25  passport of that negotiation, Mr. Whitney, so...

1          MR. WHITNEY:  Right.  And Mr. Wallman was my

2   counterpart there, Mr. Wallman did not read the order that way,

3   and we know that because James O'Keefe attended deposition where

4   Mr. Wallman was counsel and he never tried to exclude Mr.

5   O'Keefe from those depositions based on that confidentiality

6   order that, by the way, we opposed, as you know, so...

7          THE COURT:  I do know that, yes, but -- right, and Mr.

8   Wallman was not afraid to raise issues when he had issues to

9   raise.  I mean, that's been -- that was my experience in this

10  case.  I'm not saying that critically, it's just a fact, we had

11  a number of disputes that were initiated by Mr. Wallman about a

12  variety of things, so I do think that that is a useful point,

13  Mr. Whitney, that Mr. Wallman did not interpret the protective

14  order in that way.  Nevertheless, I'm going to go look at it a

15  little more closely on that point and we'll be back in a few

16  minutes.

17          All right, thanks, everybody.

18           (Recess taken)

19          THE COURT:  Please be seated.  Thank you.

20          All right, so the question on the table for you, Mr.

21  Whitney was, what would Mr. O'Keefe's position be with respect

22  to those three requests from Mr. Harris.

23          MR. WHITNEY:  Mr. O'Keefe is prepared to make a

24  concession.

25          THE COURT:  Okay.

1          MR. WHITNEY:  That -- first of all, Mr. O'Keefe and

2   OMG have an ethical obligation to seek comment on these stories

3   that they're releasing and so that was the goal of visiting Mr.

4   Skakle's home and trying to reach Mr. Strack who both appear in

5   the documentary, and their deposition expert -- excerpts appear

6   as well, but nonetheless, Mr. O'Keefe agrees not to appear at

7   deponent's homes, personally, seeking comment, although he still

8   would like to have, and reserves the right to have, OMG, as an

9   organization, reach out to these witnesses and call them and

10  seek comment on the stories that will be released.

11         THE COURT:  Okay.  Seeking comment through what I

12  would think of -- and I -- again, when I say more traditionally,

13  I don't necessarily mean better.

14         This is not a critique of your style of journalism,

15  Mr. O'Keefe.  I'm just -- it's just an observation, because a

16  lot of journal is conducted over the phone or by

17  videoconference, not in person in a, in a direct face-to-face

18  style.  Some journalism is conducted that way, but, again, there

19  are ways of seeking comment that don't involve going to

20  somebody's house, you or anybody else for that matter, so the

21  idea of seeking comment, I certainly am not going to sit here

22  and say you can't do that.

23         I think the willingness to refrain from appearing

24  personally, Mr. O'Keefe appearing personally, and also have OMG

25  personnel, employees, or agents, appear personally, I assume

Disc. Conf.                    Veritas v. O'Keefe

1  that's part of this agreement, right?

2            MR. WHITNEY:  Yes, your Honor.

3            THE COURT:  Okay, I think -- I appreciate that

4  agreement.  I think that goes a long way towards at least

5  removing the concern that Mr. Skakle -- about a repeat of the

6  experience Mr. Skakle had or Mr. Strack.

7            Mr. Harris, I'm not going to stop OMG from reporting

8  on this case or on the depositions, but I think that does go a

9  long way to addressing the, the immediacy of the concern about

10 intimidation or physical invasion of privacy or something to

11 that effect.

12           MR. HARRIS:  I agree, your Honor, and we would not ask

13 that your Honor interfere with his ability to report.

14           THE COURT:  Right.

15           MR. HARRIS:  We would ask, though, that the agreement

16 be memorialized.

17           THE COURT:  Okay.  I'm going to ask you to write that

18 up with each other as opposed to my ordering it, because you can

19 get the language right and also it is -- you know, you describe

20 it as concession by Mr. O'Keefe, and I think it is that and I

21 recognize it as that, so I'd rather have that be an agreement

22 among the parties rather than a directive from the Court, even

23 though it's happening sort of under the umbrella of this

24 proceeding.

25           If you can't figure that out, I think it really just

1  needs to be an e-mail from Mr. Whitney to Mr. Harris explaining

2  what we've talked about here today.  You can also reference what

3  was said in open court here, because you're going to order the

4  transcript, I'm sure, as you should, and I think that should,

5  that should address the issue, but I think having a written

6  representation of that, on top of the oral representation which

7  has been memorialized on the transcript, will be sufficient, and

8  I appreciate that point.

9          MR. HARRIS:  Thank you, your Honor.

10         THE COURT:  Okay for you, Mr. Harris.

11         MR. HARRIS:  Yes.

12         THE COURT:  Okay, so thank you for that, Mr. Whitney.

13         What about the other two points with respect to remote

14  depositions and -- you can be seated, Mr. Harris -- and Mr.

15  O'Keefe's attendance.

16         MR. WHITNEY:  The remote depositions, I think there's

17  a, there's a nexus problem there.  I think you challenged Mr.

18  Harris on this because it's not clear what purpose that serves.

19         Certainly, in-person depositions are more effective in

20  my experience and so we want the right to -- even though I don't

21  necessarily want to fly to Wichita, Kansas, next week, although

22  I'm prepared to do so because --

23         THE COURT:  Wichita's lovely this year.

24         MR. WHITNEY:  Right.  Or in Miami in late June perhaps

25  or --

Disc. Conf.                    Veritas v. O'Keefe

1          THE COURT:  That seems, that seems hot to me

2    personally, but okay.

3          MR. WHITNEY:  Yeah, it's hot in June, that's true.

4          THE COURT:  I don't mean to -- listen, that's my

5    style.  You don't know me that well.  I try to, you know, inject

6    a little bit of levity from time to time because these are

7    serious proceedings and we should all smile from time to time.

8    That doesn't in the way suggest that I'm not taking it

9    seriously.  People who sit in court with me all the time will

10   just recognize that that's what I do, so I apologize if anybody

11   takes that the wrong way.  It's certainly not intended that way.

12         Here's, here's what I'm prepared to do on the remote

13   depositions.  I'm not going to issue a blanket order requiring

14   all depositions to take place remotely.

15         Mr. Harris, if you have particular witnesses who have

16   particularized concerns about sitting in a room with Mr.

17   O'Keefe, for whatever reason, I will entertain an application

18   for that deposition to take place remotely.  It has to be

19   submitted at least a week prior to the deposition.  We can't be

20   doing this on an emergency basis, like we did with all of those

21   things last week.

22         And I'll hear from you in response, Mr. Whitney, and

23   sometimes on your response will be, no, Judge, I really need to

24   do this one in person because of X, Y, and X reasons; sometimes

25   it might be, you know what, I can skip the flight to Wichita,

1  this one's not going to be as detailed, it's not going to be as

2  document intensive; or maybe it will never be that, but you'll

3  have an opportunity to respond, briefly, of course.

4         Whether the depositions take place remotely or in

5  person, I'm certainly not going to impose any restrictions on

6  videotaping the depositions.  That's an important tool for a

7  trial preparation, so the depositions absolutely should be

8  videotaped, especially for witnesses that are outside the

9  subpoena range of the Court.

10         I think -- I have in mind here this one witness who

11  has remained nameless here and who maybe has a heightened level

12  of concern, and I don't know that the witness's concern has

13  anything to do with Mr. O'Keefe, because, as we've talked about,

14  whatever threats may have been directed against this witness

15  weren't from Mr. O'Keefe specifically, weren't directed by Mr.

16  O'Keefe, at least there's no evidence to suggest that they were

17  directed by Mr. O'Keefe, but, you know, if a witness has

18  received -- prior to testifying even, has received threats of

19  death or sexual violence, I mean, that seems like something that

20  may be a cause for concern, more of a cause for concern than

21  anything else I've heard so far here today.

22         So, again, there may be a more robust application that

23  can be submitted.  There if it's an application that's filed on

24  ECF, it can be filed under seal on ECF.  Maybe these are some

25  things that you'll be able to work out with each other because

 1    of particular concerns.  If not, you know, they pay me a salary

 2    to resolve the disputes, so I will resolve them, that's fine,

 3    but, again, I'm not going to issue a blanket order that all

 4    depositions take place remotely.

 5            I've put the cart before the horse on this a little

 6    bit.  I'm going to go back and just formally memorialize what

 7    I've already hinted at, which is I'm going to deny the

 8    application for a stay of discovery.  I find that there are no

 9    factors here that really support the stay request.  The breadth

10    of discovery is not extensive this is a set of depositions that

11    the counter-claimants have been intending to take for some time,

12    there's been notice of these depositions through court

13    proceedings for quite some time and there's no application that

14    any of the discovery should not be taking place because it goes

15    beyond the scope of what is relevant and proportional to the

16    needs of the case under Rule 26.  If there is such an

17    application for a particular witness, I'll entertain that at an

18    appropriate time, but the breadth of the discovery is not so

19    great as to warrant a stay.

20            The dispositive motion factor I've already addressed

21    to some extent.  We're talking about dispositive motions that

22    are being filed effectively towards the end of discovery, which

23    is understandable, given how the case has proceeded, but it's a

24    little bit different than a stay of discovery at the outset when

25    a motion to dismiss might be pending, where the expenditure of

Disc. Conf.            Veritas v. O'Keefe                    52

1  resources may be unwarranted in light of the potential for the
2  dismissal of the entire case.
3        Here, I think that the expenditure of resources is not
4  insignificant I recognize that it's a burden to some extent on
5  both sides, but I think that there is a high likelihood that at
6  least some claims will be revivable in state court even if they
7  are dismissed in federal court, and for that reason, I don't
8  think that the fact of a dispositive motion that is forthcoming
9  warrants a stay.
10       And as far as prejudice, again, I don't find that the
11  prejudice to Project Veritas here in continuing with discovery
12  is sufficient to warrant a stay.  Of course, again, there's some
13  prejudice.  There will have to be time and money, resources,
14  devoted to discovery as opposed to not, so I'm not saying that
15  there's a finding of zero prejudice here, but I don't find that
16  the prejudice is nearly substantial enough to warrant a stay, so
17  I am going to deny the application for a stay.
18       That, then, gets us to these other questions.
19       I am going to deny the request that the depositions
20  automatically take place remotely, but I will entertain those
21  obligations on a case-by-case basis, as needed.  Mr. O'Keefe has
22  agreed to refrain from personally appearing at the homes or
23  businesses of the deposition witnesses and has also agreed to
24  refrain from having OMG employees appear at the homes and
25  businesses of the witnesses in seeking comment on any of the

Disc. Conf.                    Veritas v. O'Keefe                    53

1  deposition testimony.  If OMG's going to seek comment on any of

2  the deposition testimony, they will use other means of

3  communication, phone, mail, e-mail...whatever else, whatever

4  else doesn't involve showing up unannounced at some person's

5  location.

6          And just to be clear, that agreement doesn't mean that

7  Mr. O'Keefe could not interview with someone in person if they

8  agree to be interviewed in person.  I could imagine a scenario

9  where Mr. O'Keefe or his colleagues say, Mr. So-And-So, we'd

10 like to interview you, would be willing to answer questions by

11 video or in person and the person said, sure, I'd be happy to

12 see you in person, it could happen, stranger things have

13 happened, and so Mr. O'Keefe's agreement to refrain from showing

14 up unannounced at homes or businesses doesn't mean he couldn't

15 talk to these witnesses if they willingly agreed to speak with

16 him.

17         As far as the question of whether Mr. O'Keefe can

18 attend the depositions, I did go back and look at paragraph 3 of

19 the protective order, and I don't read that paragraph to mean

20 that the deposition transcript is automatically treated as

21 highly confidential attorneys' eyes only in every instance.  I

22 read it to mean that if a portion or the entirety of the

23 deposition is designated as confidential or highly confidential,

24 attorney's eyes only, then the 30-day period applies, so I don't

25 think that that's applicable at the outset.

1          And, of course, there would have to be a good-faith

2   basis within the meaning of paragraphs 1 and 2 to -- I'm sorry,

3   there would have to be a good-faith basis to declare some

4   portion, or the entirety, of a deposition to be confidential or

5   highly confidential within the meaning of paragraphs 1 and 2,

6   paragraph 1 in particular, which defines what those terms mean,

7   the disclosing party or, here, the party asserting the

8   protection for a deposition, has to in good faith believe that

9   the information is so highly sensitive -- this is for highly

10  confidential, "confidential information that is so highly

11  sensitive that its disclosure could result in identifiable

12  disadvantage to the designating party, including a party's

13  non-public tax, banking, or health records."

14          So, again, that's a high threshold and it's...those

15  protections are in place, that is, the order of the Court, but

16  there's no language here that automatically requires that the

17  entirety of a deposition transcript be treated as attorney's

18  eyes only, so at least within the meaning of the protective

19  order, Mr. O'Keefe is not prohibited from attending the

20  depositions.

21          Now, I'm not sure if it's really necessary for him to

22  attend all the depositions, but what's, what's Mr. O'Keefe's

23  position on that, Mr. Whitney?

24          MR. WHITNEY:  Yes, your Honor, we would want to

25  reserve the right that he attend in person, and the reason for

 1  that is not just to stare at the person across the table and

 2  attempt to intimidate them, but it's because Mr. O'Keefe lived

 3  this and so he's feeding me documents and questions and

 4  responding in real time and I think we would work much more

 5  productively if we're in the same room than if I have to call

 6  him on breaks, so...

 7          THE COURT:  Yeah, so I'm not going to order that Mr.

 8  O'Keefe be barred from attending the depositions, but, again, in

 9  the same way that I laid it out with respect to the remote

10  deposition issue, if there's a particular articulable basis for

11  why a witness believes that Mr. O'Keefe's presence will have

12  some sort of harassing or intimidating effect on the witness,

13  this, this ruling does not preclude an application to have Mr.

14  O'Keefe specifically from attending in person that particular

15  deposition.

16          Again, that's a tough threshold, I think, to satisfy,

17  and you'd have to really make a proper showing, Mr. Harris.  It

18  can't just be, the witness doesn't feel like seeing Mr. O'Keefe.

19  There would have to be more of a showing in order for that to be

20  compelling.

21          And, listen, Mr. Whitney, I mean, my hope would be

22  that if Mr. Harris really does have some sort of compelling

23  showing, I have no reason to believe there will be, but maybe

24  there's a witness, Mr. O'Keefe, who you've had some run-in with

25  recently, I don't know, but if there is a compelling showing,

1   Mr. Whitney, I would hope that you would take that under careful

2   consideration, discuss it with Mr. O'Keefe, and consider whether

3   that would be one for Mr. O'Keefe to sit out.  Again, I'm not

4   saying you have to agree to it, but I just do want you to talk

5   to each other, have a good-faith discussion about it, and if

6   there's a dispute, you can tee it up for me.

7           And you've seen I try to respond to things as promptly

8   as possible.  I can't always respond to them the same day, which

9   is why I am asking you to submit any disputes about these kinds

10  of things, who can attend, where the deposition's going to be,

11  whether it's going to be remotely, and get those in a week in

12  advance.  For your own planning purposes, so we don't find

13  ourselves in the situation that we had the other day with Mr.

14  Wettmore, somebody needed to get into a car unless we made a

15  decision immediately.  I mean, it's fine, we can do that from

16  time to time, but if we can minimize the amount of fire drills

17  that we have, that would be better for all of our stress levels,

18  I would imagine.  Okay?

19          I think that covers everything except for the overall

20  request for the extension of discovery, which I am going to

21  grant.  I'm going to grant the extension until August 15th,

22  which was the request.

23          I did say when I issued this order previously that

24  extensions were likely to be denied if they weren't made on

25  consent, I am a person of my word, but in this case, I think

1   there are good reasons for the extension.  Particularly given

2   that the briefing on the motion is going to take some time and

3   there's no imminent end of discovery so that Judge Seibel can

4   get the case back for summary judgment practice or whatever the

5   next steps might be for her, I don't think there's any prejudice

6   to a short extension of the discovery deadlines.  There are

7   obviously some open issues with respect to some of these

8   witnesses who may or may not be cooperative and may or may not

9   be exercising rights to seek to move to quash.

10          To be clear, the dates that are subject to the order

11  that I issued at ECF no. 153 are still the dates, right, so that

12  order is still a valid order.  The only thing that's changing

13  here is that we're extending the deadline for the completion of

14  depositions to August 15th, so the same rules are going to

15  apply.

16          You have to tell me when the depositions are, if

17  you're going to move the depositions, you do have to write to me

18  about them, and I don't anticipate extending this deadline any

19  further except to the extent there is a proceeding in another

20  court that is interfering with the completion of the deadline,

21  so if somebody has actually filed a motion to quash in a

22  district where compliance with the subpoena is required, a

23  colleague of mine in Florida or Wichita or wherever is going to

24  have to rule on that motion.  I don't know what he or she will

25  do or how quickly he or she will act on that motion, so that

Disc. Conf.                    Veritas v. O'Keefe

1   would be an exception to my, to my point that I really don't

2   anticipate extending this deadline any further, because that's

3   not something I have as much control over.  You all, I have some

4   control over.  Other judges in other districts I don't have as

5   much control over, and I wouldn't want them to be trying to

6   exert that pressure on me either, so that's just a matter of

7   reciprocal courtesy to my colleagues.

8            We had a deadline in place for you to provide me with

9   a current schedule of depositions.  That deadline was tomorrow.

10  I'm going to extend that deadline to a week from tomorrow, June

11  17th, so hopefully we could have some further clarity.  So the

12  June 10th deadline to provide a status report on the deposition

13  schedule is extended to June 17th, no letter needed for

14  tomorrow, but send me a letter on the 17th and give me an update

15  on where things stand with all of the witnesses.  That means all

16  of the witnesses that were identified in the order at 153.  A

17  couple of those witnesses have, I think, now been deposed.  A

18  couple have dates, but a couple don't have any dates at all.

19           I see now -- I thought that name sounded familiar.  I

20  see now that Paul Cali, Esquire, is actually listed as a witness

21  in this ECF no. 153.  That seems like it's going to be an issue,

22  because of all the usual reasons why deposing an attorney is an

23  issue, so something tells me we'll be back here to talk about

24  that.

25           Where is Mr. Cali located, do we know?

1              MR. WHITNEY:  Miami, Florida.  To our knowledge.

2              THE COURT:  Okay, well, I have a lot of friends in the

3    Southern District of Florida so I guess maybe I'll be hearing

4    from one of them at some point.  Okay.  I knew that name sounded

5    familiar, but I didn't think he was one of the attorneys on this

6    case.  Okay, now I see why it sounded familiar.

7              There was a request as part of the letter at ECF no.

8    158 to add Hannah Giles as a deposition witness.  I will allow

9    that again, though with the same August 15th deadline, and, of

10   course, the request to add Mr. O'Keefe as a witness that Mr.

11   Harris has articulated here in court today and also in writing,

12   that is also granted, again, subject to the same August 15th

13   deadline.

14             So you all have a lot of work to do, you'll be

15   spending a lot of time together over the next two months, but by

16   June 17th, just give me the rundown of where things stand with

17   each witness.  Again, if you have a date and it's agreed upon,

18   that's all you need to tell me, but if things are still

19   percolating in terms of motions to quash or anything of that

20   nature, you'll let me know.

21             And, really, at this point, by the 17th, I don't want

22   to hear that anybody hasn't been served or at least you haven't

23   attempted service.  There's somebody, I think it's a Mr. O'Hara,

24   where you said you may file a motion for alternative service.

25   We've been down that road before obviously, but, you know, you

1 hadn't attempted even to serve Mr. Serafin.  By the 17th, I

2 don't want to hear that there's any witness who you haven't at

3 least attempted to serve, and hopefully you've served everybody,

4 or you'll let me know when you propose to file a motion for

5 alternative service.

6           Obviously, for Mr. -- have you served Mr. Serafin yet,

7 Mr. Whitney?

8           MR. WHITNEY:  No, your Honor, we rounded up dates

9 under that order, so...

10           THE COURT:  Fair enough, okay.  So you might not be in

11 a position -- you'll be in a position to serve him before next

12 Tuesday, but you may not be in a position to make a motion for

13 alternative service because you'll have just started the process

14 of trying.  Hopefully he will be easier to locate than some of

15 these other folks.

16           All right, I think that covers all of the outstanding

17 issues, but you can tell me if I've missed anything.

18           Mr. Harris, is there anything further from the

19 Plaintiff's perspective?

20           MR. HARRIS:  I think that's everything, your Honor.

21           THE COURT:  Okay, I don't think that there's any need

22 for you to submit anything further at this point.  If you would

23 like to, for any reason, you can coordinate via the Chamber's

24 e-mail address to submit something via the Court's FTP site,

25 but, but I don't really think it's necessary.

Disc. Conf.                    Veritas v. O'Keefe

 1            MR. HARRIS:  Okay, and I agree, your Honor.

 2            THE COURT:  Okay.  And I do apologize about the

 3   confusion with the electronic device order.  If that happens

 4   again and you don't really know what's going on, you should feel

 5   free to send another e-mail.  We won't treat it as harassing or

 6   anything like that.

 7            MR. HARRIS:  Okay.

 8            THE COURT:  I'm serious, because that, that was just a

 9   mistake on our part.  Ms. Brown, who is usually a hundred

10   percent on top of these things, was working from home on Friday

11   and it just -- it was just a little bit of confusion.  I was in

12   a five-hour settlement conference, so...it just got a little

13   lost and I do apologize for that.

14            MR. HARRIS:  That's okay, your Honor.  No problem.

15            THE COURT:  But, again, if that happens, just call

16   Chambers or send another e-mail, maybe explain a little bit more

17   what has happened or what the confusion is, and, you know, I'm

18   not sorry we weren't able to get that straightened out.

19            MR. HARRIS:  Thank you, your Honor.

20            THE COURT:  Okay.

21            Mr. Whitney, anything further from your client's

22   perspective?

23            MR. WHITNEY:  No, your Honor, we've covered it.

24            THE COURT:  Okay.  Thank you, counsel.

25            And, listen, you know, one of the reasons it's nice to

1    be here in person is -- first of all, it's to see all of you,

2    but, really, it takes the temperature down a little bit as far

3    as I'm concerned.  To be in court and be in a formal setting,

4    it's little bit different than -- and not that anyone's been

5    inappropriate in this case in the way you've handled it, but,

6    again, I think when people walk into court, there's a little bit

7    of a formality and solemnity to the proceedings that, you know,

8    sometimes just helps, especially when things are getting heated,

9    and so we may come back here again if the temperature gets

10   dialed up again.

11          I'm not doing it to inconvenience anybody or make

12   things difficult, I actually just think it's very helpful, so I

13   appreciate you being here and we'll stand adjourned.  Take care,

14   everybody.

15          We're not going to -- I'll just say, last thing,

16   sorry, we're not going to schedule another proceeding just yet.

17   We're going to get the update on June 17th and then we'll set

18   another status report or status conference date from there.  All

19   right?  And make sure you get the appropriate form so you can

20   order the transcript of today's proceeding, all right?

21          Take care.

22          MR. HARRIS:  All right, thank you.

23          Certified to be a true and accurate transcript.

24



25   _____

TABITHA R. DENTE, RPR, RMR, CRR
- OFFICIAL COURT REPORTER -

Disc. Conf.                    Veritas v. O'Keefe

1                    TABITHA DENTE, RPR, RMR, CRR

2                    OFFICIAL COURT REPORTER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25