UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x
PROJECT VERITAS, et al.,

Plaintiff(s),

23 CV 4533 (AEK)

-vs-

DISCOVERY CONFERENCE

JAMES O'KEEFE, et al.,

Defendant(s).
--------------------------------------x

United States Courthouse
White Plains, New York

Monday, June 9, 2025

Before: THE HONORABLE ANDREW E. KRAUSE,
United States Magistrate Judge

A P P E A R A N C E S:

LAW OFFICE OF MICHAEL J. HARRIS
Attorneys for Plaintiff
BY: MICHAEL J. HARRIS

CHILDERS LAW, LLC
Attorneys for Defendants
BY: NICHOLAS P. WHITNEY

ALSO PRESENT:

JAMES O'KEEFE

THE DEPUTY CLERK: All rise.

THE COURT: Good afternoon, everybody. Please be seated.

THE DEPUTY CLERK: Good afternoon, everyone. This is the matter of Project Veritas v. O'Keefe, Docket No. 23 cv 4533, the Honorable Andrew Krause presiding.

Counsel, please note your appearance for the record starting with Plaintiff's Counsel.

MR. HARRIS: Good afternoon, your Honor. Michael Harris on behalf of Project Veritas.

THE COURT: Good afternoon, Mr. Harris.

MR. WHITNEY: Good afternoon, your Honor. Nick Whitney on behalf of James O'Keefe and O'Keefe Media Group, and Mr. O'Keefe is here as well.

MR. O'KEEFE: James O'Keefe.

THE COURT: Good afternoon, Mr. Whitney. Good afternoon, Mr. O'Keefe.

All right, we're here for a status conference. I thought it would make sense to have this conference in person. There have been a lot of communications, a lot of letters, and a number of accusations, and so I wanted to make sure we have a full and robust discussion of the various matters that have been identified.

I want to just start out by noting, there was some with reference in one of your letters, Mr. Harris, to the

possibility of having certain portions of this proceeding conducted under seal or subject to a confidentiality order.

As a general matter, this is a public proceeding, it's an open court, and generally, things that are discussed in the courtroom are not subject to sealing. There could be some very, very limited exemptions to that, but I just want to note that at the outset, so if you wind up raising anything that you may think that you could apply retroactively to have sealed, those applications are generally looked at disfavorably, so I'm not prejudging anything, there may be some unique characteristic or circumstance here that would lend itself to an appropriate application along those lines, but it's generally unlikely that I would seal anything that has taken place here in open court.

Similarly, if there are materials that you intend to share with me, for purposes of my making a determination as to any of the applications that are pending, those become judicial documents, and judicial documents are subject to a presumption of public access.

Now, that doesn't mean that that presumption cannot be overcome, if there are particular facts and circumstances that would warrant maintaining some submission under seal or subject to some sort of limited protective order, but, again, there is a well-developed body of Second Circuit case law, which you may be familiar with, that makes clear that judicial documents, things that the Court is presented with for purposes of making

decisions, subject to a presumption of public access, so that sometimes transforms material that would be otherwise subject to protection, such as pursuant to an appropriately entered confidentiality or protective order, into something that no longer has that protection because it's been presented as a judicial document.

So I just say that all at the outset before we start talking about any of the issues that anybody wants to raise so we can just all be mindful of that and have a set of expectations as to what's likely to happen if anything comes up that you may want to avoid raising in the public domain.

Do you understand that?

MR. HARRIS: Yes, your Honor. Thank you.

THE COURT: Okay, all right.

Mr. Whitney, any questions about that?

MR. WHITNEY: No, your Honor. Thank you.

THE COURT: All right.

So I've reviewed all of the materials that have been filed on the docket in connection with today's proceeding. That's essentially the letters that begin at ECF 158, continue on at 161, 162, 164, 167, and then the most recent filing, which was a memorandum of law, filed over the weekend by Mr. Whitney. That's at ECF no. 169.

I'll note that the memorandum of law was helpful for background purposes, Mr. Whitney, but, of course, you didn't

know exactly what was going to be raised here today so it's sort of an anticipatory filing. Fine. I would have certainly given you an opportunity to brief any disputed issues afterwards, and, Mr. Harris, there may be some interest on your part in briefing some issues after our conference today, we'll see, but nevertheless, I did read that and I've absorbed that for purposes of our discussion here today.

This all started out when Mr. Whitney submitted an application for an extension of the deadline to complete fact depositions. Ordinarily a fairly routine application, but this one had a number of different components to it, a couple of which were granted at the outset, that was with respect to the deposition of Mr. Garvey, which is now scheduled to take place on June 17th, and the deposition of Mr. Tiermond, which will now take place on June 30th and July 1st.

The remainder of the applications in that order were not on consent and so I had issued an order asking for the counterclaim defendants, that is, the Project Veritas parties, to submit their position, and they did so through a letter submitted by Mr. Harris on May 28th. That letter raised a number of issues, including an application for a stay of discovery and a number of concerns that Project Veritas parties have about the way that some of the discovery materials have been used by the counter-claimants in the case up until this point, and then all of the back and forth followed from there.

So, Mr. Harris, why don't I turn to you in the first instance. This is sort a little bit of a free-form proceeding because the original application is an application for an extension of the discovery deadline, the response to that was, essentially, not only do we not want you to extend the discovery deadline, we want you to stay all discovery for these various reasons, so I'll hear from you on that, and, of course, Mr. Whitney, I'll hear from you in full momentarily.

MR. HARRIS: Sure. Thank you, your Honor.

So our position is, as you noted, that we would like to request a stay of discovery in this case. We think there's ample case law in this Circuit, from within this District and within others within the Circuit, that supports a stay under these circumstances. The factors for the Court to consider being the breadth of discover that remains outstanding, the strength of the dispositive motions, and prejudice. All of these factors, it's our position, favor a stay.

There's not really any debate that there are dispositive motions pending. We filed a motion, a letter motion, before Judge Seibel with regard to our motion to dismiss the counterclaims of Mr. O'Keefe and O'Keefe Media Group, after which they filed a motion to amend. Courts from within this Circuit have found that motions to amend can be dispositive if it's, if it's to be denied.

THE COURT: Okay, I mean, I understand the case law on

that issue and I understand the point about staying discovery when dispositive motions are pending.

It's certainly not the default practice. I mean, there are any number of cases where discovery is stayed pending the resolution of dispositive motions. We're in a bit of a different spot in this particular case, though, because discovery is well underway, in fact, discovery is almost complete, and it seemed to have been Judge Seibel's inclination, based on the transcript from your last hearing, the pre-motion conference before her, that you should continue with discovery while these motions are being briefed, in part on the understanding that if the case is dismissed, it will be because of a lack of federal jurisdiction, right? There will be a lack of a basis to maintain this case in federal court. The counterclaims are state law claims, the motion to amend is to amend a federal cause of action, which would provide federal questioned jurisdiction. Your perspective, Project Veritas's perspective, is that the federal cause of action should not stand, shouldn't be allowed into the case, and Judge Seibel shouldn't exercise supplemental jurisdiction over the original counterclaims because there's no longer the federal claim that brought you, Project Veritas, to court here in the first place.

That all may be correct, I don't know, that issue is not before me, but I think Judge Seibel's analysis of it, brief though it was, was that the case isn't going away. Even if it

leaves federal court, it's just going to state court. This is not a situation where there won't be a need for this discovery, it just wouldn't be in this venue, and in that case, it seems that the argument in support of a stay is pretty significantly undermined.

MR. HARRIS: Well -- so I would respond to that, your Honor.

First of all, we did not present the request for a stay to Judge Seibel. We did in the context of trying to set the schedule for the briefing on the motion to amend. I did raise that we would like to see that briefing move quickly, so that costs can be avoided in the event that ultimately does go away, but beyond the jurisdictional question, we do also have several 12(b)(6)-based issues that relate to the complaint, that even if the account were to be dismissed, and I -- you know, the case cannot actually be remanded to State Court. It was not never original filed in state court, so somebody would have to --

THE COURT: If I said remanded, I didn't mean that. I just said that it could resurface again in state court.

MR. HARRIS: No, and I apologize, you did not, but I believe during the hearing, 'remand' was mentioned.

THE COURT: Okay.

MR. HARRIS: So it would have to be re-filed in state court, but even if it did, there are still significant 12(b)(6)

issues that analogously would apply in state.

THE COURT: Or whatever the CPLR provision is.

MR. HARRIS: Right. I think it's 3211, but...

THE COURT: Yeah.

MR. HARRIS: Who knows.

THE COURT: I think that's it.

MR. HARRIS: But -- so that would be our position in that regard.

So if we move forward to the prejudice prong of the test, you know, our position -- I mean, this is kind of interesting because they're asking for an extension, in part, to further extend discover -- to get more discovery, which may ultimately prove unnecessary. If the motion to amend is granted, they can get it later. They're not going to be prejudiced by that. Whereas, Project Veritas will be prejudiced if it has to move forward with all of this discovery and incur all of this expense for a case that ultimately may go nowhere.

THE COURT: Okay, I understand that. And did you want to talk about breadth at all?

MR. HARRIS: Well -- and the breadth is expansive. I mean, I think the request for the extension itself illustrates how expansive it is because the Court has already been very generous in how much time it's given Counterclaim Plaintiffs to obtain this discovery and they haven't be able to do it, because it's expansive, there's, I think, at least seven depositions

that remain outstanding and they're seeking to add more, so I think it is expansive.

And beyond that, you know, and this will segue into the remaining part, which I get we're in open court and I understand your Honor's position with respect to closing these proceedings, but part of the reason for that request is that the way that this discovery material is being used doesn't seem designed to further this allegation, it seems designed to humiliate and intimidate witnesses, including by posting incorrect information about these witnesses, which has now caused people to, first of all, receive death threats, threats of rape, that's one, and part of the reason for the request to seal the courtroom is because I understand that that's currently the subject of an ongoing federal investigation.

Beyond that, I have here, and I'm happy to share it with your Honor and my opposing counsel, a police report that has been filed by one of the witnesses that has already testified in this case and who may be a witness at trial, attesting to the fact that Mr. O'Keefe showed up at his office and his home uninvited. I mean, it's kind of in -- it's more -- it crosses the line beyond inappropriate.

THE COURT: Okay. Well, there's a lot to unpack there, and I'm happy to turn to those issues just so you can present them to me in a little bit more of an organized way, Mr. Harris, I think it makes sense to do that, because the...it

would be helpful to have a complete picture, so why don't you walk through your concerns with me one by one.

MR. HARRIS: Sure.

Well, I have here an affidavit from Joshua Hughes who is set to testify at the end of June. I don't know if you want me to approach and present it?

THE COURT: Yes, please.

MR. HARRIS: Yeah.

THE COURT: One is fine. And if you have an extra one for my law clerk, that would be great. And you have a copy? Mr. Whitney has received a copy as well?

MR. WHITNEY: Yes, your Honor.

THE COURT: Okay. All right, let me just take a second to review.

I've been handed a document that is captioned "Declaration of Joshua Hughes." It is a four-page document it's dated June 9th, 2025, which, of course, is today. I'm just going to take a second to read it.

(Brief pause)

THE COURT: Okay, this person, Mr. Maxwell who's referenced in here was actually a party in this case at one time. Is that correct, Mr. Harris?

MR. HARRIS: That's --

THE COURT: We're talking about the same individual?

MR. HARRIS: That's correct, your Honor.

THE COURT: Okay.

Okay, I mean, in sum and substance this declaration recites that Mr. Hughes was threatened by Mr. Maxwell over a series of text messages, purportedly after Mr. Maxwell reviewed a portion of a deposition that was given in this case as part of some media presentation from Mr. O'Keefe, and Mr. Maxwell then purported took these actions Mr. Hughes, again, as alleged, as set forth in this declaration.

Okay.

MR. HARRIS: So that's, that's one example, your Honor.

I do have another affidavit that I would like to share with the Court. However, I didn't receive it until I was in the car, on the way to court, so I didn't have the ability to print it out.

THE COURT: Okay.

MR. HARRIS: That's also from Mr. Skakle, who also testified in this case. I'm sorry, Joshua Hughes has not testified yet, but he is set to testify at deposition. Mr. Skakle has already testified.

THE COURT: Okay.

MR. HARRIS: I'm happy to follow up with the Court with the declaration after this hearing.

THE COURT: Sure.

MR. HARRIS: But in the interim, I do have a police

report that was filed by Mr. Skakle that will be authenticated in that affidavit.

THE COURT: Okay, I'll take a look at that. Thank you.

And just for the record, I've received a document, the photocopying is not exactly ideal because the top is cut off a little bit, but it appears to be an incident report from the Stamford Police Department, report date April 21st, 2025.

One thing that is subject to redaction in public court filings and withholding is personal identifying information about parties and non-parties, so there is an address listed on this document. That is something that certainly would not need to be part of the public record. Multiple addresses, in fact, including one for Mr. Scagle and one for Mr. O'Keefe. To the extent those are business addresses, that may be different, but in any event, I'm just going to read -- not into the record, but I'm just going to read to myself the contents of this police report, which I will note is a three-page document, again, dated April 21st, 2025.

(Brief pause)

THE COURT: All right, I will just note, the last sentence of this narrative said that -- according to the officer who took the report, it says that Mr. Skakle stated that he just wanted the incident documented in case he goes to apply for a protective order against Mr. O'Keefe. Again, that's April 21st,

2025. It was approximately two months ago.

Do you know from this declaration or otherwise, Mr. Harris, if Mr. Skakle has, in fact, followed through to seek any sort of order of protection against Mr. O'Keefe or anyone else associated with the counter-claimants?

MR. HARRIS: I believe that a civil case has been filed, but I'm not sure of what the status of that is.

THE COURT: Okay, but a case seeking an order of protection often takes place, at least in my understanding, in criminal court, so when you say a civil case has been filed, do you know what that -- do you know anything more about it than that?

MR. HARRIS: I don't know anything more. I know that there's a case number. Unfortunately, because the Court did not authorize my technology order, I don't have my phone. If I pulled up my phone, I would be able to tell your Honor more.

THE COURT: Okay, yes, apparently there was some miscommunication with that on our end. I apologize for that. You did send an e-mail, but it was -- we just had some crossed wires about that on Friday.

MR. HARRIS: No problem. And just to be clear, I did look into the civil case number, but it is not publicly available.

THE COURT: Okay, that's fine. And, again, I'm not sure you'd be able to find out any more about it on an

electronic system. Sometimes state court records are not available electronically.

MR. HARRIS: Right.

THE COURT: Certainly you know that. Okay.

I understand that there was some questioning of Mr. Skakle in or around his home, I think some people made references to this in the letters, and perhaps some footage of that questioning ended up in some sort of video that's on Mr. O'Keefe's website.

That's the same set of circumstances from April of -- April 21st?

MR. HARRIS: That is my understanding, your Honor.

THE COURT: Okay.

All right, further points you'd like to raise about this.

MR. HARRIS: No, I think -- for the most part, you know, I do -- again, I don't have my computer, I would have presented videos, but I do have thumb drives if your Honor wants them. I know --

THE COURT: Is your computer here or just downstairs?

MR. HARRIS: I didn't bring it.

THE COURT: Okay.

MR. HARRIS: I wasn't sure that the Court -- I wasn't sure.

THE COURT: Yeah.

MR. HARRIS: But I do have thumb drives or I'm happy to follow up with some of the video footage.

But generally speaking, you know, the other part of this is that all of these things are obviously being broadcast to the public including individuals who as yet to be deposed, and it's not just a matter of the individuals who have already testified or who are about to testify and who will also be trial witnesses, but it's also about what all these other witnesses are going to be seeing.

There may be -- if they're seeing this, they may fear that the same exact thing that has happened to these individuals who have testified is going to happen to them, and for many witnesses, that poses embarrassment, it poses fear. I mean, it's completely inappropriate.

THE COURT: I mean, most instances, I would say, and this is not based on any sort of scientific study or analysis, most instances of witness the image or tampering are designed to prevent the witness from testifying, right? To scare the witness away from testifying or somehow interfere with the witness's willingness to come forward and testify.

What's a bit unusual about this allegation is that your view is that Mr. O'Keefe and others, perhaps, acting at his direction are interfering with witnesses that he is actually seeking to have testify, right? Which would be sort of counterproductive for him if he thinks this testimony is

relevant or pertinent to his case, right? I mean, the concern is that these witnesses who are yet to testify would somehow be less willing to come forward or less cooperative at a deposition.

I'm not saying that there aren't other examples in the history of litigation where that same dynamic has taken place, but it is not the common presentation of a witness tampering or a witness intimidation allegation. Do you see what I mean?

MR. HARRIS: Sure, and may I say a few things in response?

THE COURT: Please, yeah.

MR. HARRIS: What I would say, first of all, is, you know, what I presented as intimidation or harassment or tampering, I'm not necessarily speaking in the criminal sense. I'm not a prosecutor and it is not my job to --

THE COURT: I understand, and I don't mean the question in a criminal sense either, but even in a civil context, again, if the idea is you're taking action to try to limit the witness's willingness to come forward, even in a civil sense, again, that would seem counter to your interests if you are the person who's seeking the testimony of that witness.

MR. HARRIS: Unless, of course, your intention is not to stop the individual from testifying, but to change their testimony.

THE COURT: Sure.

MR. HARRIS: To persuade them to testify in a way that is more beneficial to your position than another's. And just because -- you know, depositions are a discovery device. Just because Mr. O'Keefe has noticed the depositions of these individuals does not mean that we will not be calling them at trial.

THE COURT: Of course, yeah, that's true.

Okay, you had mentioned that there is one case where a witness has been subjected to threats that are now the subject of further federal criminal investigation?

MR. HARRIS: That is my understanding, your Honor.

THE COURT: Okay, and is that different from the potential federal criminal investigation that theoretically could be opened in connection with the information in the declaration from Mr. Hughes?

MR. HARRIS: That is different, yes.

THE COURT: Okay, and who -- are you at liberty to say who that witness is?

MR. HARRIS: I would prefer not to at this time. I haven't been given permission to do so.

THE COURT: Okay. But that's the witness who you refer to in your letter, there's a footnote in your letter at ECF no. 161, where you say, "a former Project Veritas employee recently received recorded threats of rape and death shortly after Mr. O'Keefe appeared in a podcast referencing a former

Project Veritas employee."

MR. HARRIS: That's correct, your Honor.

THE COURT: And just to be clear, from that sentence, there's a little ambiguity. When you say that Mr. O'Keefe appeared in a podcast referencing a former Project Veritas employee, was that reference to the former Project Veritas employee who received these threats?

MR. HARRIS: Yes.

THE COURT: Okay.

MR. HARRIS: And just so your Honor is aware, I'm sure you may have guessed this, but it was intentionally drafted to be a little bit ambiguous to conceal the gender.

THE COURT: That's fine. I just -- the thing that made it ambiguous was the use of 'a' instead of 'the' in the second reference to the Project Veritas employee, but I, I am...certainly aware of the need sometimes for ambiguous drafting to avoid identifying information about a potential witness in a variety of contexts, so...

And so the relief that you're seeking, I -- let me just try to understand, because I will say at the outset, I am sceptical about the idea of staying discovery. I haven't made a final determination on that, but I'm not currently inclined in that direction, so if discovery were to continue, what relief would you be seeking in connection with these incidents, these allegations of harassment, these ongoing episodes that have been

-- perhaps have now risen to the level of criminal investigation? What is your request there, Mr. Harris?

MR. HARRIS: So recognizing that your Honor has fairly broad authority to craft a remedy here, we would certainly defer to what your attorney would think would be appropriate, but at a minimum, we would ask that the depositions proceed remotely so that individuals do not have to appear in person.

THE COURT: And -- okay, you mentioned that in your letter, and what would be the reason for that?

MR. HARRIS: Well, Mr. O'Keefe --

THE COURT: What would that help to accomplish. In your view.

MR. HARRIS: Mr. O'Keefe typically attends the depositions, so I think his very presence there is -- you know, for these individuals who have -- who are seeing all of this play out, I think it has an intimidating effect, and beyond that, you know, part of what we've been seeing here is that -- and I think that the videos kind of bring this out, is that these videos are not -- much as they may say that they're intended for use at trial, they're being used in a way outside of the courtroom to embarrass and to humiliate people, so --

THE COURT: Well, okay, but let...if the deposition took place remotely, that wouldn't address that point, the deposition could still be videotaped, and, in fact, there's an argument that it should be videotaped if you're talking about a

witness who may not be within the subpoena range for trial.

MR. HARRIS: Sure. So in that case, then I think that we would fall back on what I had originally said, which is that the very need to appear in person in a deposition room where Mr. O'Keefe is also present would cause issues with, with what is going on.

THE COURT: Okay. So, I mean, one --

MR. HARRIS: It would have the effect of intimidating.

THE COURT: I'm just trying to actually understand exactly what you're asking for, so one would be to require the depositions to take place remotely.

MR. HARRIS: Yes.

THE COURT: And are you asking that the Court prohibit Mr. O'Keefe from attending the depositions by video?

MR. HARRIS: So, your Honor, as you -- you know, we actually had this issue pop up on Friday in the deposition of Mr. Wettmore. As I read your Honor's protective order, deposition testimony is supposed to be attorneys' eyes only for 30 days after the deposition, so in my opinion, Mr. O'Keefe should never be in any of these depositions, because that defeats the purpose of your Honor's order requiring that the testimony be held AEO for 30 days.

Now, they -- I understand that -- as your Honor may recall, I joined this case fairly late, there was, you know, predecessor counsel before me. It may have been the case that

they allowed Mr. O'Keefe to sit in those depositions. However, I'm a different attorney, of course, and each deposition is different, and I made very clear on the record at that deposition that I understand your Honor's order to prohibit him from attending these depositions. Nonetheless, they disagreed and he attend anyways.

So...

THE COURT: Okay, and that's not an issue that I gave any particular thought to in entering the protective order, which was a protective order that was submitted on consent by the parties, so the order is the order and I'm pulling it up now, but I don't know that I've ever been specifically presented with that particular question.

As you probably won't remember, because you weren't here at the time the protective order was put in place, but as Mr. Whitney may remember I have a standard form protective order that includes my regular routine language that I impose in case where the parties don't have any particular additional or specially requests. That doesn't even include AEO, attorneys eyes only, language, so this language attorneys eyes only for a period of 30 days is definitely not my original language, so as far as what I intended or didn't intend, you know, the parties' intentions are actually as instructive as mine because, again, that's not language that I drafted, it's language that the parties drafted.

That said, the language is on top of my signature and it is an order of the Court, so I will give that some additional thought and consideration. It's just not something that I considered or thought about thoroughly at the time because it was an agreed-upon order that, you know, when I read it, I didn't have any concern or objection with the language as presented, so I'm pulling that up as we speak.

So your position Mr. Harris is that Mr. O'Keefe shouldn't attend the depositions anyway, not necessarily because a separate order is required, but because the existing order provides that he shouldn't.

MR. HARRIS: Yes, your Honor.

THE COURT: Okay. What else?

MR. HARRIS: Beyond that, your Honor, I think the request -- the ask would be -- and I know -- you know, I'm going to address this kind of lightly here because this document came in over the weekend.

In the filing that Mr. Whitney made over the weekend, you know, they sort of allude to the fact that we're asking for a gag order, which is not true. We're not asking for a gag order. Project Veritas, like myself, respects the First Amendment. And while that may be warranted in certain -- some circumstances, we're not asking for it here, but we would ask that the Court prohibit Mr. O'Keefe from appearing at the homes of witnesses or their offices.

And by Mr. O'Keefe, I, of course, mean Mr. O'Keefe and any of his agents or agents of OMG.

THE COURT: Okay. What else?

MR. HARRIS: That's about it, your Honor. I think that would cover it.

THE COURT: So you're not making any application that the deposition materials not be shared publicly, as long as there's no violation of the protective order.

MR. HARRIS: Your Honor, if we could make that request, if your Honor were inclined to grant it, we would certainly welcome it.

THE COURT: Well, I'm not inclined to grant it.

MR. HARRIS: Right, and that's, perhaps, why we didn't ask for it.

THE COURT: Well, I appreciate that, but I'm asking you to ask whatever you want to ask for.

Look, I appreciate that because, you know, I would say in all the cases that I litigated as an attorney and all the cases that I've presided over as a judge, I can probably count on one hand out of those hundreds, if not, at this point, thousands, of cases, where the parties were interested in sharing the deposition transcripts with anybody, and that's because only a small fraction of those cases would there have been any interest by any member of the public in the contents of those depositions.

There's also, then, a real what I will refer to as a goose/gander problem with that issue because, very often, one party doesn't want to start sharing information publicly because they don't necessarily want their information to be shared publicly in response. And it's more of a courtesy, I think, among counsel in most cases.

Obviously, sometimes there are protective orders that cover this specifically, but generally, it's a matter of standard practice and courtesy that discovery materials are maintained within the four corners of the litigation. Again, that's, I would say, the most typical set of circumstances in the vast majority, overwhelming majority, of cases, but I'm not aware of any law or rule that requires that to be the case, which is what prompted my supplemental order which you and Mr. Whitney both responded to about whether there were any violations of the protective order, because that is different, right?

If there had been a specific piece of testimony that had been designated as confidential and subject to the protective order and if it had then be released, you know, then we're talking about a specific order that may have been violated as opposed to just a norm or custom, so I appreciate that you're not making that request, perhaps because your research concluded the same as my instinct and then my subsequent research by my staff tended to confirm.

All right, so your principal request, of course, is for a stay, which would sort of obviate the need for all the subsequent requests, which I certainly understand, Mr. Harris, but if -- to the extent I would not be inclined to grant a stay, your subsequent requests are that remaining depositions be conducted remotely; that Mr. O'Keefe not be permitted to attend, either because the protective order doesn't allow him to attend or he just shouldn't be able to; and finally, you request that Mr. O'Keefe and his agents, if you will, be prohibited from appearing at the homes or business locations of the witnesses.

Do you have that right?

MR. HARRIS: That's correct.

THE COURT: Okay. Anything else at this point, Mr. Harris, before I turn to Mr. Whitney?

MR. HARRIS: No, and perhaps this is better reserved for later, but just in the event that your Honor is not inclined to grant the stay and allows the extension of discovery, I just want to reiterate that we are going to take Mr. O'Keefe's deposition, so that would need to be factored into an extended schedule.

THE COURT: I did note that in your letter and, certainly, I can't imagine there would be a good-faith objection to that, Mr. Whitney, since you're asking to have additional witnesses added to the ledger as well, but if you do have any objection, you can let me know.

All right --

MR. HARRIS: Thank you, your Honor.

THE COURT: Thank you -- I'll come back to you with other questions as we progress. Thank you, Mr. Harris.

MR. HARRIS: Great. Thank you.

THE COURT: All right, Mr. Whitney, there's a lot to responded to there, so I'll let you take it in any order that you want and then I will supplement with questions of my own if there are things that I feel I need more information about.

MR. WHITNEY: All right, I was hoping you'd give me some direction, but --

THE COURT: Okay, that's fine. Let's -- why don't you start with the stay.

You've already heard that I'm disinclined on the request for a stay, but I'll let you make any points that you want to make specifically about why you think discovery should not be stayed here, other than things I've already alluded to.

MR. WHITNEY: I think the Court is rightly skeptical. We have pursued this discovery diligently since the fall of last year. There was a approximately four-month period where Project Veritas was without counsel and we could not proceed. We are trying to take depositions of, I don't know, seven to nine additional witnesses, and that has been announced since prior counsel was in the case, and the July 1st deadline for a number of reasons, in our view, is unworkable.

I mentioned in my letter that Barry Hinkley had retained counsel and there was a petition to quash the subpoena. I'm trying to work through that with his counsel, but as I'm doing that, Matthew Tiermond, who you reset the depositions for June 30th and June 1st, has retained counsel and now I'm trying to work through the same issues with that lawyer to perhaps adjust Matthew Tiermond's deposition, but I've told him, at this point, it's a July 1st deadline, so I'm not at liberty to move this and work with you.

So we think the stay -- there's not a good basis for the stay, and we're glad to hear the Court is sceptical.

THE COURT: Okay, fine. Let's talk about some of these allegations about witness intimidation.

And I'll just say at the outset, I imagine that one thing you will say to me here, Mr. Whitney, is that no one is attempting to intimidate anybody, nobody's attempting to harassing anybody, that's not the purpose of any of these attempted interviews, that's not the purpose of Mr. O'Keefe posting various things on his web sites, it's not the purpose of the video, the movie about...I forget exactly what it's called, Mr. O'Keefe, but the, the Project Veritas --

MR. O'KEEFE: *The Truth About Project Veritas.*

THE COURT: *The Truth About Project Veritas.* I -- there was a citation in Mr. Harris's letter to this article, "O'Keefe in talks to regain control of Project Veritas, launches

docu-series *The Truth Inside of Veritas*." I did read that article in preparation for today's proceeding, there was a link to the film, I don't know how long it was, but I did not watch the film, just so everybody has an idea of what information I have and what information I don't have.

The article was quite long and I imagine included a number of quotes and excerpts -- I mean, it included a number of quotes and excerpts from the deposition testimony in this case. I imagine there is the corresponding video clip of those excerpts in the film.

Is that -- do I have that right, Mr. Whitney?

And there may be others too. It may be that the -- I don't think that article was meant to be a verbatim script of the film, but it did have a lot of examples which were illustrative for my purposes, I think.

MR. WHITNEY: It is true there are clips from the George Skakle interview of, I guess, April in the film.

THE COURT: Right, but there are also clips from the depositions in the film?

MR. WHITNEY: Yes, your Honor, there are.

THE COURT: And, and -- if you need to ask Mr. O'Keefe this, you can, but are the clips in the film the ones that are quoted in the corresponding article?

MR. WHITNEY: Many of them, but not complete overlap.

THE COURT: Okay, fine.

So, again, I understand you may say to me, in part, that was nobody's intention, but, look, you now know, and maybe you've just learned about this, that Mr. Hughes has received some threatening communications from Mr. Maxwell, which, if those are authentic copies of the text messages, and I say this not in a manner to be evaluating anybody's guilt of any potential offense, but it's understandable how a person could view those communications as threatening. And, again, Mr. Maxwell isn't here, he's no longer a party in this case, but that seems to have been something that happened as a consequence of some of this material being posted, right? So that's something that the Court has to take seriously.

Mr. Harris, to his credit, is not here requesting that any of that material be taken down, I don't think that that's an order that I could realistically issue, nor is he even requesting that Mr. O'Keefe be prohibited from disseminating the information, which, again, I think is a judicious...decision in terms of the scope of the requested relief, but it's concerning, right, that some of Mr. O'Keefe's direct conduct, at least vis-à-vis Mr. Skakle, prompted Mr. Skakle to go to the police, though, as I noted, Mr. Skakle didn't take any further step to -- it seems at least, didn't take any further step to seek a protective order, which he could have, you know, an order of protection. This business about Mr. Hughes and his interactions with Mr. Maxwell is concerning just on a human level.

This additional episode, it's hard to figure out exactly how to factor that into the analysis because Mr. Harris, understandably, doesn't feel at liberty to disclose information about this additional Project Veritas employee who has allegedly been subjected to threats, but, again, this is not usual behavior and it is not a common scenario, that people have to endure this kind of vitriol, whether intended or not, so, again, there's reason for concern.

Why don't you take a minute to try to address that however you see fit.

MR. WHITNEY: Well, with respect to the two documents that were presented today, RC Maxwell is not an employee of James O'Keefe or OMG, he's not an agent of them, so -- he's a former party, but he's essentially a member of the public, and that he issued threats against Joshua Hughes, I suppose, is unfortunate and -- but it has nothing to do with my party's conduct.

THE COURT: I mean, it is, it is unfortunate. You don't have to suppose. I mean, it's not, it's not good.

I mean, whatever Mr. Hughes may or may not have done, you know, having somebody send you text messages that threaten to make an example of a family member is not something that anybody should have to deal with. Whether they're a public figure, whether they're involved in a lawsuit, whether they work at a place that is a party to a lawsuit, it's just not something

that anybody should have to endure in a civilized society. I think we should be able to agree on that.

MR. WHITNEY: I agree on that. I withdraw the hedging language on that.

THE COURT: Thank you.

MR. WHITNEY: And with respect to George Skakle, this was a consensual interview that took place in his driveway. It begins with Mr. O'Keefe walking up to him and saying, hey, George --

THE COURT: To be honest with you, I'm less concerned about that one.

MR. WHITNEY: All right.

THE COURT: And Mr. Skakle -- and I don't mean to make light of it. The fact that he chose to document this in a police report means that there was something about it that, obviously, didn't sit right with him, but it does seem as though at some point he decided to walk away from it, and whether Mr. O'Keefe and his colleagues may have briefly trespassed on Mr. Skakle's property, which is sort of the...suggestion in the police report doesn't seem that Mr. Skakle pressed charges regarding that and doesn't seem in the nearly two months since then that there's been any further problem with Mr. Skakle.

So, again, I don't mean to make light of that, but it's somewhat less acutely concerning than the incident with Mr. Maxwell, who, as you point out, is not and OMG employee or under

the control or direction of Mr. O'Keefe, or this other incident which seems to fall into a similar category where you have perhaps a disturbed member of the public who is responding to Mr. O'Keefe's publication of these materials in a way that Mr. O'Keefe is not encouraging or certainly not directing, it just seems to be an outgrowth of the publicity, which, again, it gives the Court concern, but the question is, what do we do about that.

So anything further you want to add on that, Mr. Whitney?

MR. WHITNEY: Not on Mr. Skakle or Mr. Hughes, but I'd like to comment more broadly about the vitriol and emotion in this case.

THE COURT: Please.

MR. WHITNEY: First, it's important that Project Veritas represented that they had videos of Mr. O'Keefe chasing trial witnesses through the street. That never occurred and those do not exist.

THE COURT: Okay, let's just pause there. I mean, that is -- and I'm not sure that's an exact quote, but there was something to that effect, Mr. Harris.

MR. HARRIS: Yes, so -- thank you, your Honor. If I had my computer, I would put it up on the screen.

I suppose, perhaps, the better language to have used would have been charging through the street at Mr. Skakle's

home. You can actually hear Mr. O'Keefe yell "George" in the video, George being George Skakle, and charging to his home, so Mr. O'Keefe and one of his agents is depicted charging through the streets, and I suppose a better way of describing it is that they are running towards his home.

So while Mr. Whitney describes it as walking up to his dry, what I would say is, in fact and in reality, he was charging to him while he was getting his mail from his mailbox.

THE COURT: Okay, so that reference in your letter to ECF no. 161 is to the incident involving Mr. Skakle.

MR. HARRIS: Yes.

THE COURT: All right, you can be seated.

MR. HARRIS: Thank you, your Honor.

THE COURT: All right, I understand that use of phrase now. You can move on to the next point, Mr. Whitney.

MR. WHITNEY: Yes, your Honor. Well, I just want to reiterate that the May 22nd conference before Judge Seibel, Mr. Harris said that there were videos plural showing James O'Keefe chasing potential trial witnesses plural, so we've heard about him potentially charging the home of George Skakle, but there's not James O'Keefe chasing witnesses plural. That --

THE COURT: Okay, let me just make sure that that's correct, and, again, the transcription, as outstanding as our court reporters are, there could have been an S added because it's a telephonic transcription. That happens occasionally.

I just want to make sure what the allegation is.

MR. HARRIS: Sure, your Honor. I think that could also just have been human error on my part when I --

THE COURT: Human error is also something that happens.

MR. HARRIS: But beyond that, I do want to point out although I don't have it here today, there is another witness who factors into this, that's Dan Strack, at whose house I understand Mr. O'Keefe also appeared, first sending two agents to the door, then after Mr. Strack's wife allegedly turned those individuals away, Mr. O'Keefe appearing himself banging on the door, and there are issues there too now.

I haven't submitted an affidavit, but, again, if the Court is desirous that I follow up with additional documentation, I would expect to provide that to the Court as well.

THE COURT: Okay. Mr. Strack, it was the -- am I correct that he was the CFO? I don't want to --

MR. HARRIS: CTO.

THE COURT: CTO. Thank you for that clarification.

MR. WHITNEY: COO.

MR. HARRIS: COO, apologies.

THE COURT: Okay. It was the chief officer of some sort. The chief operating officer? Is that right, Mr. O'Keefe?

MR. O'KEEFE: Yes, that's correct.

THE COURT: Okay.

And he's testified already?

MR. HARRIS: He has.

THE COURT: So those interactions, or alleged interactions, took place after his testimony, sort of similar to the situation with Mr. Skakle?

MR. HARRIS: Yes.

THE COURT: You got all of that, Tabitha? Of course, yes. Okay.

Mr. Whitney -- and, again, I don't mean to keep interrupting you, Mr. Whitney. I just want to have a clear record.

MR. WHITNEY: I'm happy for the interruption.

THE COURT: Okay.

MR. WHITNEY: All right, so we agree that folks should not be subject to this vitriol.

Mr. O'Keefe has been subject to vitriol far in excess of what's been relayed here. Matthew Tiermond, who we seek to depose, and we have two witnesses now in their depositions, under sworn testimony, confirming that Matt Tiermond openly stated in Project Veritas headquarters he wanted to decapitate James O'Keefe and carve his heart out and eat it with a spoon. He is quite visual.

THE COURT: Okay. I mean --

MR. WHITNEY: George Skakle --

THE COURT: And, again, I'm not saying this to minimize the severity and disturbing nature of that remark, which is atrocious, I don't know why anybody would say that about anybody else, but that really has nothing to do with the litigation, right? That was as part of the dispute that's given rise to the litigation, it's not because of something that happened in the conduct of this case?

MR. WHITNEY: It's hard to say what Mr. Tiermond's motivations are --

THE COURT: I mean, just temporally.

MR. WHITNEY: I think -- and temporally, that's accurate, your Honor --

THE COURT: Okay.

MR. WHITNEY: -- as the lawsuit was being filed around that time, so...

THE COURT: Okay. Although they were the ones filing it at that time, I suppose.

MR. WHITNEY: Right.

THE COURT: Right, okay.

Well, I'm sorry that you've endured that, Mr. O'Keefe. Honestly, that's, that's not appropriate either, and that's not a one-way street apparently.

MR. WHITNEY: Right. George Skakle testified during his deposition that he wanted to harm James O'Keefe.

THE COURT: Presently?

MR. WHITNEY: Yes.

THE COURT: Or at one point he felt that way?

MR. WHITNEY: I don't think we followed up to figure out if that desire had --

THE COURT: Okay. Although apparently that didn't stop Mr. O'Keefe from approaching Mr. Skakle with colleagues at Mr. Skakle's house, so, okay.

MR. WHITNEY: And I'm prepared to have Mr. O'Keefe testify if necessary, but Mr. Skakle after his deposition approached Mr. O'Keefe at a holiday party and took credit for firing him from Project Veritas, so in the same vein, Mr. Skakle was not intimidated by Mr. O'Keefe.

THE COURT: Fine.

MR. WHITNEY: I will note at this juncture, there's no testimony from anybody that when Mr. O'Keefe appears for a deposition they've been intimidated or he's attempted to intimidate them at their deposition, and it goes the point of trying to exclude him as a party from the depositions in this case.

Now, I do have documents or evidence of -- the complaint here is really about OMG exercising its First Amendment right in reporting on this dispute, so I have several exhibits that point out that Project Veritas is guilty of what it charges Mr. O'Keefe with.

THE COURT: I'm only chuckling because in my staff's

research into some of these issues, one of the cases that had some relevant information was, in fact, a case where Project Veritas was a defendant, in Michigan, regarding some similar allegations of misconduct having to do with depositions, but are you going to give me examples of things that happened when Project Veritas was under Mr. O'Keefe's leadership? Because that won't really be compelling.

MR. WHITNEY: No, your Honor, these are -- all follow his departure.

THE COURT: Okay.

MR. WHITNEY: So, for example, there is a September 6th, 2023 article -- would you like me to present a copy to your Honor?

THE COURT: If you're going to refer to them, sure, please.

MR. WHITNEY: All right.

THE COURT: And make sure Mr. Harris has one as well. Thank you.

And just for the record, Mr. Whitney has handed the Court a printout from an Article in *The Washington Post*. It's what it appears to be at least. It's a seven-page document. The headline is "Project Veritas audit accuses 'untouchable' founder of improper spending."

Okay, Mr. Whitney you want to point me to the relevant portion here?

MR. WHITNEY: Yes, your Honor. I think the most relevant portion is at the bottom of the second page where it mentions Hannah Giles, a one-time O'Keefe ally, beginning at the second to last paragraph?

THE COURT: Yes, I see.

MR. WHITNEY: And so Hannah Giles was the successor CEO of Project Veritas, and first, what Project Veritas did was disseminate an audit conducted by Dorsey & Whitney that was supposed to be confidential, and then Hannah Giles here is commenting on the litigation, attacking James O'Keefe in the press, and otherwise, I guess, embarrassing him.

That's the first example, your Honor.

THE COURT: Okay. I guess this, I mean -- and you have other examples of Project Veritas employees saying things about Mr. O'Keefe in the media.

MR. WHITNEY: Yes, and one of the arguments made in the letters was that OMG's reporting is designed to prejudice the jury and that's its only purpose. I would argue if that's the case, all of these Project Veritas releases, *The Washington Post* articles, the next I have is a release of the audit to *The New York Times*.

THE COURT: Yeah. I mean, listen, the idea of, of -- first of all, all this stuff happened some time ago, but this e-mail or this letter, I'm sorry, that you just -- excuse me, this article from *The Washington Post* that you just handed up is

from September 6th, 2023. It's hard to restrain conduct that happened that long ago. I -- Mr. Harris, perhaps, again, in an exercise of discretion didn't raise any arguments about prejudicing the jury pool, which are really premature at this point for all kinds of reasons, not the least of which, maybe this case doesn't stay in federal court at all if Mr. Harris has his way, but there's really no request here other than the stay, there's no request to stop O'Keefe Media Group from reporting on anything. I mean, I think that was part of the overall presentation about how this information is being received by the public.

Frankly, in all likelihood, if there are people who are avid readers of O'Keefe Media Group web sites and articles about this case, those are people who are not going to be suitable jurors in this matter, because they'll have too much information that they've already obtained and processed about it, I think -- well, I'm sure both Project Veritas and O'Keefe Media Group have a wide reach in terms of viewership and audiences, including within the Southern District of New York, and will have an ability to select jurors who are not familiar with this particular dispute. I'm pretty confident of that.

So I understand your point, I understand you may have more examples to make that point, Mr. Whitney, but I think we can move beyond that.

MR. WHITNEY: All right, and then, for the record,

I'll enter, separate and apart from sort of the exercise of press reporting, an e-mail Mr. O'Keefe received from Project Veritas, then Project Veritas attorney, Paul Cali, threatening Mr. O'Keefe with physical violence.

THE COURT: And your representation is this is an e-mail from Mr. Cali -- was Mr. Cali an attorney for Project Veritas in this case?

MR. WHITNEY: No.

THE COURT: I don't recall meeting him. No?

MR. WHITNEY: He was once upon a time counsel for Project Veritas.

THE COURT: Okay. There's a date on here that says May 3rd. Do you know what year?

MR. WHITNEY: 2023, your Honor.

THE COURT: Okay, I'm not going to read this into the record. It's full of, shall we say, course language and certainly not, not a communication that is particularly befitting of a member of a bar of this or any court, but it is noted as a...hostile, to say the least, and aggressive message from this individual who you say was Project Veritas's former counsel, directed at Mr. O'Keefe. Again, I'm not making light of it, I just -- you know, at some point, I'm not sure what to do with that, Mr. Whitney.

But, yes, I mean, it's, it's...that person did not cover himself in glory when he wrote that message, I mean, my

goodness.

MR. WHITNEY: Yes.

We have further examples, but I think the Court gets the point. I'm happy to present them --

THE COURT: Yeah, no, I get the point. There's a lot of ill will on both sides. That, I knew before showing up here today. The question is really a narrow one for purposes of discovery, which is to say, should there be any limitations or restrictions imposed in this case that will better ensure the safety of witnesses, better ensure that they are free from harassment and intimidation to the extent that any order of this Court could accomplish that, which, again, my powers of restraint are limited, both by the constitution and by reality, that I can't stop this member of the public who has some very strong feelings about this dispute from picking up the phone or picking up, you know, his or her phone to send a text message or whatever it might be. I say that not to in any way make light of the experiences of these witnesses or potential witnesses, but just to note that it's...challenge at west best to try to entirely control that behavior.

Let's focus, I guess, then, on the three requests that Mr. Harris has made. Again, assuming that I am going to allow discovery to proceed, there are three requests. One is that the depositions take place by remote means, the second is that Mr. O'Keefe not attend, and I'm going to take a closer look at the

confidentiality order in a second on that point, and the third is to prohibit Mr. O'Keefe and his agents from appearing at the homes and businesses of any deposition witness in this case.

What your position? Or what is Mr. O'Keefe's position?

You haven't had a chance to talk to Mr. O'Keefe about any of these, so actually, I'm going to give you a couple minutes to talk to each other to see if anything of those things would be things that Mr. O'Keefe would be willing to agree to, without my having to order any of them, and I'm not saying I would or I wouldn't, but why don't you just take a -- let's take a five-minute recess, I'd like you to have a chance to talk about that with each other and give that some consideration.

In the meantime, I'll step back into the robing room and give a closer read to the confidentiality order to address the issue that Mr. Harris raised, and then we'll come back.

Okay?

MR. WHITNEY: One moment, if I may interject before you do that.

THE COURT: Yeah, sure.

MR. WHITNEY: The confidentiality order at this point about attorneys' eyes only, your Honor mentioned that the attorney's intent was just as relevant as the Court's intent.

THE COURT: Right, and you were the only one that was passport of that negotiation, Mr. Whitney, so...

MR. WHITNEY: Right. And Mr. Wallman was my counterpart there, Mr. Wallman did not read the order that way, and we know that because James O'Keefe attended deposition where Mr. Wallman was counsel and he never tried to exclude Mr. O'Keefe from those depositions based on that confidentiality order that, by the way, we opposed, as you know, so...

THE COURT: I do know that, yes, but -- right, and Mr. Wallman was not afraid to raise issues when he had issues to raise. I mean, that's been -- that was my experience in this case. I'm not saying that critically, it's just a fact, we had a number of disputes that were initiated by Mr. Wallman about a variety of things, so I do think that that is a useful point, Mr. Whitney, that Mr. Wallman did not interpret the protective order in that way. Nevertheless, I'm going to go look at it a little more closely on that point and we'll be back in a few minutes.

All right, thanks, everybody.

(Recess taken)

THE COURT: Please be seated. Thank you.

All right, so the question on the table for you, Mr. Whitney was, what would Mr. O'Keefe's position be with respect to those three requests from Mr. Harris.

MR. WHITNEY: Mr. O'Keefe is prepared to make a concession.

THE COURT: Okay.

MR. WHITNEY: That -- first of all, Mr. O'Keefe and OMG have an ethical obligation to seek comment on these stories that they're releasing and so that was the goal of visiting Mr. Skakle's home and trying to reach Mr. Strack who both appear in the documentary, and their deposition expert -- excerpts appear as well, but nonetheless, Mr. O'Keefe agrees not to appear at deponent's homes, personally, seeking comment, although he still would like to have, and reserves the right to have, OMG, as an organization, reach out to these witnesses and call them and seek comment on the stories that will be released.

THE COURT: Okay. Seeking comment through what I would think of -- and I -- again, when I say more traditionally, I don't necessarily mean better.

This is not a critique of your style of journalism, Mr. O'Keefe. I'm just -- it's just an observation, because a lot of journal is conducted over the phone or by videoconference, not in person in a, in a direct face-to-face style. Some journalism is conducted that way, but, again, there are ways of seeking comment that don't involve going to somebody's house, you or anybody else for that matter, so the idea of seeking comment, I certainly am not going to sit here and say you can't do that.

I think the willingness to refrain from appearing personally, Mr. O'Keefe appearing personally, and also have OMG personnel, employees, or agents, appear personally, I assume

that's part of this agreement, right?

MR. WHITNEY: Yes, your Honor.

THE COURT: Okay, I think -- I appreciate that agreement. I think that goes a long way towards at least removing the concern that Mr. Skakle -- about a repeat of the experience Mr. Skakle had or Mr. Strack.

Mr. Harris, I'm not going to stop OMG from reporting on this case or on the depositions, but I think that does go a long way to addressing the, the immediacy of the concern about intimidation or physical invasion of privacy or something to that effect.

MR. HARRIS: I agree, your Honor, and we would not ask that your Honor interfere with his ability to report.

THE COURT: Right.

MR. HARRIS: We would ask, though, that the agreement be memorialized.

THE COURT: Okay. I'm going to ask you to write that up with each other as opposed to my ordering it, because you can get the language right and also it is -- you know, you describe it as concession by Mr. O'Keefe, and I think it is that and I recognize it as that, so I'd rather have that be an agreement among the parties rather than a directive from the Court, even though it's happening sort of under the umbrella of this proceeding.

If you can't figure that out, I think it really just

needs to be an e-mail from Mr. Whitney to Mr. Harris explaining what we've talked about here today. You can also reference what was said in open court here, because you're going to order the transcript, I'm sure, as you should, and I think that should, that should address the issue, but I think having a written representation of that, on top of the oral representation which has been memorialized on the transcript, will be sufficient, and I appreciate that point.

MR. HARRIS: Thank you, your Honor.

THE COURT: Okay for you, Mr. Harris.

MR. HARRIS: Yes.

THE COURT: Okay, so thank you for that, Mr. Whitney.

What about the other two points with respect to remote depositions and -- you can be seated, Mr. Harris -- and Mr. O'Keefe's attendance.

MR. WHITNEY: The remote depositions, I think there's a, there's a nexus problem there. I think you challenged Mr. Harris on this because it's not clear what purpose that serves.

Certainly, in-person depositions are more effective in my experience and so we want the right to -- even though I don't necessarily want to fly to Wichita, Kansas, next week, although I'm prepared to do so because --

THE COURT: Wichita's lovely this year.

MR. WHITNEY: Right. Or in Miami in late June perhaps or --

THE COURT: That seems, that seems hot to me personally, but okay.

MR. WHITNEY: Yeah, it's hot in June, that's true.

THE COURT: I don't mean to -- listen, that's my style. You don't know me that well. I try to, you know, inject a little bit of levity from time to time because these are serious proceedings and we should all smile from time to time. That doesn't in the way suggest that I'm not taking it seriously. People who sit in court with me all the time will just recognize that that's what I do, so I apologize if anybody takes that the wrong way. It's certainly not intended that way.

Here's, here's what I'm prepared to do on the remote depositions. I'm not going to issue a blanket order requiring all depositions to take place remotely.

Mr. Harris, if you have particular witnesses who have particularized concerns about sitting in a room with Mr. O'Keefe, for whatever reason, I will entertain an application for that deposition to take place remotely. It has to be submitted at least a week prior to the deposition. We can't be doing this on an emergency basis, like we did with all of those things last week.

And I'll hear from you in response, Mr. Whitney, and sometimes on your response will be, no, Judge, I really need to do this one in person because of X, Y, and X reasons; sometimes it might be, you know what, I can skip the flight to Wichita,

this one's not going to be as detailed, it's not going to be as document intensive; or maybe it will never be that, but you'll have an opportunity to respond, briefly, of course.

Whether the depositions take place remotely or in person, I'm certainly not going to impose any restrictions on videotaping the depositions. That's an important tool for a trial preparation, so the depositions absolutely should be videotaped, especially for witnesses that are outside the subpoena range of the Court.

I think -- I have in mind here this one witness who has remained nameless here and who maybe has a heightened level of concern, and I don't know that the witness's concern has anything to do with Mr. O'Keefe, because, as we've talked about, whatever threats may have been directed against this witness weren't from Mr. O'Keefe specifically, weren't directed by Mr. O'Keefe, at least there's no evidence to suggest that they were directed by Mr. O'Keefe, but, you know, if a witness has received -- prior to testifying even, has received threats of death or sexual violence, I mean, that seems like something that may be a cause for concern, more of a cause for concern than anything else I've heard so far here today.

So, again, there may be a more robust application that can be submitted. There if it's an application that's filed on ECF, it can be filed under seal on ECF. Maybe these are some things that you'll be able to work out with each other because

of particular concerns. If not, you know, they pay me a salary to resolve the disputes, so I will resolve them, that's fine, but, again, I'm not going to issue a blanket order that all depositions take place remotely.

I've put the cart before the horse on this a little bit. I'm going to go back and just formally memorialize what I've already hinted at, which is I'm going to deny the application for a stay of discovery. I find that there are no factors here that really support the stay request. The breadth of discovery is not extensive this is a set of depositions that the counter-claimants have been intending to take for some time, there's been notice of these depositions through court proceedings for quite some time and there's no application that any of the discovery should not be taking place because it goes beyond the scope of what is relevant and proportional to the needs of the case under Rule 26. If there is such an application for a particular witness, I'll entertain that at an appropriate time, but the breadth of the discovery is not so great as to warrant a stay.

The dispositive motion factor I've already addressed to some extent. We're talking about dispositive motions that are being filed effectively towards the end of discovery, which is understandable, given how the case has proceeded, but it's a little bit different than a stay of discovery at the outset when a motion to dismiss might be pending, where the expenditure of

resources may be unwarranted in light of the potential for the dismissal of the entire case.

Here, I think that the expenditure of resources is not insignificant I recognize that it's a burden to some extent on both sides, but I think that there is a high likelihood that at least some claims will be revivable in state court even if they are dismissed in federal court, and for that reason, I don't think that the fact of a dispositive motion that is forthcoming warrants a stay.

And as far as prejudice, again, I don't find that the prejudice to Project Veritas here in continuing with discovery is sufficient to warrant a stay. Of course, again, there's some prejudice. There will have to be time and money, resources, devoted to discovery as opposed to not, so I'm not saying that there's a finding of zero prejudice here, but I don't find that the prejudice is nearly substantial enough to warrant a stay, so I am going to deny the application for a stay.

That, then, gets us to these other questions.

I am going to deny the request that the depositions automatically take place remotely, but I will entertain those obligations on a case-by-case basis, as needed. Mr. O'Keefe has agreed to refrain from personally appearing at the homes or businesses of the deposition witnesses and has also agreed to refrain from having OMG employees appear at the homes and businesses of the witnesses in seeking comment on any of the

deposition testimony. If OMG's going to seek comment on any of the deposition testimony, they will use other means of communication, phone, mail, e-mail...whatever else, whatever else doesn't involve showing up unannounced at some person's location.

And just to be clear, that agreement doesn't mean that Mr. O'Keefe could not interview with someone in person if they agree to be interviewed in person. I could imagine a scenario where Mr. O'Keefe or his colleagues say, Mr. So-And-So, we'd like to interview you, would be willing to answer questions by video or in person and the person said, sure, I'd be happy to see you in person, it could happen, stranger things have happened, and so Mr. O'Keefe's agreement to refrain from showing up unannounced at homes or businesses doesn't mean he couldn't talk to these witnesses if they willingly agreed to speak with him.

As far as the question of whether Mr. O'Keefe can attend the depositions, I did go back and look at paragraph 3 of the protective order, and I don't read that paragraph to mean that the deposition transcript is automatically treated as highly confidential attorneys' eyes only in every instance. I read it to mean that if a portion or the entirety of the deposition is designated as confidential or highly confidential, attorney's eyes only, then the 30-day period applies, so I don't think that that's applicable at the outset.

And, of course, there would have to be a good-faith basis within the meaning of paragraphs 1 and 2 to -- I'm sorry, there would have to be a good-faith basis to declare some portion, or the entirety, of a deposition to be confidential or highly confidential within the meaning of paragraphs 1 and 2, paragraph 1 in particular, which defines what those terms mean, the disclosing party or, here, the party asserting the protection for a deposition, has to in good faith believe that the information is so highly sensitive -- this is for highly confidential, "confidential information that is so highly sensitive that its disclosure could result in identifiable disadvantage to the designating party, including a party's non-public tax, banking, or health records."

So, again, that's a high threshold and it's...those protections are in place, that is, the order of the Court, but there's no language here that automatically requires that the entirety of a deposition transcript be treated as attorney's eyes only, so at least within the meaning of the protective order, Mr. O'Keefe is not prohibited from attending the depositions.

Now, I'm not sure if it's really necessary for him to attend all the depositions, but what's, what's Mr. O'Keefe's position on that, Mr. Whitney?

MR. WHITNEY: Yes, your Honor, we would want to reserve the right that he attend in person, and the reason for

that is not just to stare at the person across the table and attempt to intimidate them, but it's because Mr. O'Keefe lived this and so he's feeding me documents and questions and responding in real time and I think we would work much more productively if we're in the same room than if I have to call him on breaks, so...

THE COURT: Yeah, so I'm not going to order that Mr. O'Keefe be barred from attending the depositions, but, again, in the same way that I laid it out with respect to the remote deposition issue, if there's a particular articulable basis for why a witness believes that Mr. O'Keefe's presence will have some sort of harassing or intimidating effect on the witness, this, this ruling does not preclude an application to have Mr. O'Keefe specifically from attending in person that particular deposition.

Again, that's a tough threshold, I think, to satisfy, and you'd have to really make a proper showing, Mr. Harris. It can't just be, the witness doesn't feel like seeing Mr. O'Keefe. There would have to be more of a showing in order for that to be compelling.

And, listen, Mr. Whitney, I mean, my hope would be that if Mr. Harris really does have some sort of compelling showing, I have no reason to believe there will be, but maybe there's a witness, Mr. O'Keefe, who you've had some run-in with recently, I don't know, but if there is a compelling showing,

Mr. Whitney, I would hope that you would take that under careful consideration, discuss it with Mr. O'Keefe, and consider whether that would be one for Mr. O'Keefe to sit out. Again, I'm not saying you have to agree to it, but I just do want you to talk to each other, have a good-faith discussion about it, and if there's a dispute, you can tee it up for me.

And you've seen I try to respond to things as promptly as possible. I can't always respond to them the same day, which is why I am asking you to submit any disputes about these kinds of things, who can attend, where the deposition's going to be, whether it's going to be remotely, and get those in a week in advance. For your own planning purposes, so we don't find ourselves in the situation that we had the other day with Mr. Wettmore, somebody needed to get into a car unless we made a decision immediately. I mean, it's fine, we can do that from time to time, but if we can minimize the amount of fire drills that we have, that would be better for all of our stress levels, I would imagine. Okay?

I think that covers everything except for the overall request for the extension of discovery, which I am going to grant. I'm going to grant the extension until August 15th, which was the request.

I did say when I issued this order previously that extensions were likely to be denied if they weren't made on consent, I am a person of my word, but in this case, I think

there are good reasons for the extension. Particularly given that the briefing on the motion is going to take some time and there's no imminent end of discovery so that Judge Seibel can get the case back for summary judgment practice or whatever the next steps might be for her, I don't think there's any prejudice to a short extension of the discovery deadlines. There are obviously some open issues with respect to some of these witnesses who may or may not be cooperative and may or may not be exercising rights to seek to move to quash.

To be clear, the dates that are subject to the order that I issued at ECF no. 153 are still the dates, right, so that order is still a valid order. The only thing that's changing here is that we're extending the deadline for the completion of depositions to August 15th, so the same rules are going to apply.

You have to tell me when the depositions are, if you're going to move the depositions, you do have to write to me about them, and I don't anticipate extending this deadline any further except to the extent there is a proceeding in another court that is interfering with the completion of the deadline, so if somebody has actually filed a motion to quash in a district where compliance with the subpoena is required, a colleague of mine in Florida or Wichita or wherever is going to have to rule on that motion. I don't know what he or she will do or how quickly he or she will act on that motion, so that

would be an exception to my, to my point that I really don't anticipate extending this deadline any further, because that's not something I have as much control over. You all, I have some control over. Other judges in other districts I don't have as much control over, and I wouldn't want them to be trying to exert that pressure on me either, so that's just a matter of reciprocal courtesy to my colleagues.

We had a deadline in place for you to provide me with a current schedule of depositions. That deadline was tomorrow. I'm going to extend that deadline to a week from tomorrow, June 17th, so hopefully we could have some further clarity. So the June 10th deadline to provide a status report on the deposition schedule is extended to June 17th, no letter needed for tomorrow, but send me a letter on the 17th and give me an update on where things stand with all of the witnesses. That means all of the witnesses that were identified in the order at 153. A couple of those witnesses have, I think, now been deposed. A couple have dates, but a couple don't have any dates at all.

I see now -- I thought that name sounded familiar. I see now that Paul Cali, Esquire, is actually listed as a witness in this ECF no. 153. That seems like it's going to be an issue, because of all the usual reasons why deposing an attorney is an issue, so something tells me we'll be back here to talk about that.

Where is Mr. Cali located, do we know?

MR. WHITNEY: Miami, Florida. To our knowledge.

THE COURT: Okay, well, I have a lot of friends in the Southern District of Florida so I guess maybe I'll be hearing from one of them at some point. Okay. I knew that name sounded familiar, but I didn't think he was one of the attorneys on this case. Okay, now I see why it sounded familiar.

There was a request as part of the letter at ECF no. 158 to add Hannah Giles as a deposition witness. I will allow that again, though with the same August 15th deadline, and, of course, the request to add Mr. O'Keefe as a witness that Mr. Harris has articulated here in court today and also in writing, that is also granted, again, subject to the same August 15th deadline.

So you all have a lot of work to do, you'll be spending a lot of time together over the next two months, but by June 17th, just give me the rundown of where things stand with each witness. Again, if you have a date and it's agreed upon, that's all you need to tell me, but if things are still percolating in terms of motions to quash or anything of that nature, you'll let me know.

And, really, at this point, by the 17th, I don't want to hear that anybody hasn't been served or at least you haven't attempted service. There's somebody, I think it's a Mr. O'Hara, where you said you may file a motion for alternative service. We've been down that road before obviously, but, you know, you

hadn't attempted even to serve Mr. Serafin. By the 17th, I don't want to hear that there's any witness who you haven't at least attempted to serve, and hopefully you've served everybody, or you'll let me know when you propose to file a motion for alternative service.

Obviously, for Mr. -- have you served Mr. Serafin yet, Mr. Whitney?

MR. WHITNEY: No, your Honor, we rounded up dates under that order, so...

THE COURT: Fair enough, okay. So you might not be in a position -- you'll be in a position to serve him before next Tuesday, but you may not be in a position to make a motion for alternative service because you'll have just started the process of trying. Hopefully he will be easier to locate than some of these other folks.

All right, I think that covers all of the outstanding issues, but you can tell me if I've missed anything.

Mr. Harris, is there anything further from the Plaintiff's perspective?

MR. HARRIS: I think that's everything, your Honor.

THE COURT: Okay, I don't think that there's any need for you to submit anything further at this point. If you would like to, for any reason, you can coordinate via the Chamber's e-mail address to submit something via the Court's FTP site, but, but I don't really think it's necessary.

MR. HARRIS: Okay, and I agree, your Honor.

THE COURT: Okay. And I do apologize about the confusion with the electronic device order. If that happens again and you don't really know what's going on, you should feel free to send another e-mail. We won't treat it as harassing or anything like that.

MR. HARRIS: Okay.

THE COURT: I'm serious, because that, that was just a mistake on our part. Ms. Brown, who is usually a hundred percent on top of these things, was working from home on Friday and it just -- it was just a little bit of confusion. I was in a five-hour settlement conference, so...it just got a little lost and I do apologize for that.

MR. HARRIS: That's okay, your Honor. No problem.

THE COURT: But, again, if that happens, just call Chambers or send another e-mail, maybe explain a little bit more what has happened or what the confusion is, and, you know, I'm not sorry we weren't able to get that straightened out.

MR. HARRIS: Thank you, your Honor.

THE COURT: Okay.

Mr. Whitney, anything further from your client's perspective?

MR. WHITNEY: No, your Honor, we've covered it.

THE COURT: Okay. Thank you, counsel.

And, listen, you know, one of the reasons it's nice to

be here in person is -- first of all, it's to see all of you, but, really, it takes the temperature down a little bit as far as I'm concerned. To be in court and be in a formal setting, it's little bit different than -- and not that anyone's been inappropriate in this case in the way you've handled it, but, again, I think when people walk into court, there's a little bit of a formality and solemnity to the proceedings that, you know, sometimes just helps, especially when things are getting heated, and so we may come back here again if the temperature gets dialed up again.

I'm not doing it to inconvenience anybody or make things difficult, I actually just think it's very helpful, so I appreciate you being here and we'll stand adjourned. Take care, everybody.

We're not going to -- I'll just say, last thing, sorry, we're not going to schedule another proceeding just yet. We're going to get the update on June 17th and then we'll set another status report or status conference date from there. All right? And make sure you get the appropriate form so you can order the transcript of today's proceeding, all right?

Take care.

MR. HARRIS: All right, thank you.

Certified to be a true and accurate transcript.



TABITHA DENTE, RPR, RMR, CRR

OFFICIAL COURT REPORTER